# COVER PAGE

## Petitioner's Exhibits

- Exhibits #1- #13

① 53] [Exhibit#1]

Current Location: Green Bay Correctional Institution NO_C - _C73LO

| ICCR204<br>Wisconsin Department of Corrections<br>Bureau of Classification and Movement | INMATE CLASSIFICATION REPORT<br>Re-Classification | PAGE 6 |
|---|---|---|
| **Name**<br>PRUDE, TERRANCE D | **DOC #**<br>335878 | **Hearing Date**<br>12/22/2022 |

**Pre Hearing Interview**

| Type of Review | Inmate Contact (Pre-Hearing) |
|---|---|
| Scheduled | Seen |

**Inmate Comments (Pre-Hearing)**

Mr. Prude was interviewed on 11/14 at cell front due to institution lockdown. He wishes to attend and requests medium with transfer to SCI/RCI/OSCI. He believes that since the AC mandatory restrictor no longer applies to him, he is eligible for medium. He requested that I pull him out to interview him to discuss why I was not recommending medium for him when he is eligible.

Date: 12/05/2022 --- Time: 11:13:59 AM --- User: J. Wertel, SW/GBCI

**Staff Appraisal and Recommendations (Pre-Hearing)**

Overview: Mr. Prude's request is not supported at this scheduled classification review. Mr. Prude's single cell restriction was removed on 9/30/22. He continues to improve his conduct noting no major conduct reports during this recall period. Since returning to general population in March 2021, Mr. Prude has had no major conduct issues. However, he was on Administrative Confinement status on/off from 5/3/17 to 3/23/21. When he was not on AC status, he was in DS status. He is approaching the two year mark in GP status. As noted in his previous Reclassification report, a sustained period of positive adjustment would be necessary to demonstrate suitability for medium custody. Given his history of assaultive/threatening/gang-related misconduct, this SW does not believe less than 2 years of satisfactory adjustment is a sustained period of time. At a minimum, SW believes Mr. Prude should maintain appropriate adjustment in GP for, at least, as long as he was in AC status, which would appear to be a more defined sustained period of time. Mr. Prude does not agree with this social worker's rationale for continued maximum custody, so he was encouraged to advocate for himself when he attends his hearing. Mr. Prude is encouraged to continue his appropriate adjustment and work with education to enroll in school.

With regards to his motivation/attitude statements, SW reviewed all volumes of his social services file and his legal file. There is only the original sentencing transcript. SW could not find an amended/modified transcript or order amending that information from the original criminal complaint. Instructed Mr. Prude to write the courts asking for those documents to be forwarded to DOC for inclusion in his files.

Current work/school assignment: IUN

Programming: prior completions of CGIP and Anger Mgmt, withdrew from Academics in 1/2022, and awaits other assigned needs. It is also noted he completed the 1st DBT Skills Training group at GBCI noting excellent participation. No review of substance use history.

Case Plan: his COMPAS recommendation is medium. No formal case planning completed; however, he has expressed interest in obtaining his HSED and encouraged to work with education to enroll.

Mandatory restrictor(s): exclusion to minimum custody due to sentence structure as he is more than 5 years to adjusted release date.

Recommendation: based on less than 2 years of appropriate adjustment following on/off AC status for about 4 years, recent removal of single cell restriction, and need for a longer consecutive period of recalls with appropriate adjustment; SW recommends continued maximum custody with retention at GBCI.

Date: 12/05/2022 --- Time: 11:39:09 AM --- User: J. Wertel, SW/GBCI

| Staff | Title | Date |
|---|---|---|
| J. WERTEL | SOCIAL WORKER-CORREC | 12/05/2022 |

54

# Exhibit #2

- 43-Pages Attached

1 55

# DAI Instrument for Custody Classification (IFCC)

## Mandatory Restrictors

STATE OF WISCONSIN DEPARTMENT OF CORRECTIONS

[Exhibit #2]

GBCI LAW LIBRARY

Original Effective Date: July 25, 2022

**Division of Adult Institutions**

DAI Administrator: Sarah Cooper

DAI Assistant Administrator: Stephanie Hove

DAI Assistant Administrator: Paul Kemper

BOCM Director: Angela Hansen

State of Wisconsin Department of Corrections

56

[redacted] (2) [Exhibit #2]

**Purpose:** Mandatory restrictors prevent an individual from placement in a specified custody level due to Division of Adult Institution (DAI) policy and/or correctional practices implemented to manage an individual while confined. Individuals who were classified prior to implementing mandatory restrictors will remain at their current custody.

The mandatory restrictors shall be applied during initial and reclassification processes in DAI.

| Minimum Community Custody Mandatory Restrictor: |
| --- |

Individuals with the following mandatory restrictor are excluded from being classified minimum community custody:

GPS and/or Special Bulletin Notice (SBN)
Individuals who require a lifetime GPS and/or Special Bulletin Notice (SBN).

| Minimum and Minimum Community Custody Mandatory Restrictors: |
| --- |

Individuals who have one or more of the following mandatory restrictors are excluded from being classified minimum and minimum community custody:

1. Immigration & Customs Enforcement (ICE) Detainer
   Individuals who have an active or pending Immigration & Customs Enforcement (ICE) detainer or have been referred to ICE for review. If ICE has provided written confirmation the individual is not facing deportation, the restrictor does not apply.

2. Unmet Assigned Sex Offender Treatment (SOT) Needs
   Individuals who have an assigned SOT2, SOT4 or Child Pornography Only (CPO) treatment need that is not completed. Individuals with a SOT1 are not subject to this mandatory restrictor.

3. Pending Felony Charges and/or Detainers
   Individuals with any pending felony charges and/or felony detainers from any state, Federal government, or another country. This includes felony charges under review/investigation by the district attorney or other law enforcement agency with no final decision regarding whether charges will be filed.

   This does not include detainers due to cost commitments.

4. Life Sentence
   Old Law (Offenses committed on/before 6-1-84) and New Law Life Sentence (Offenses committed on/after 6-1-84 and before 12-31-99):
   Individuals who have not reached their initial PED and do not have a parole endorsement to reduce custody and/or an indication of release consideration.

GBCI LAW LIBRARY

57 ③ [Exhibit #2]

Truth in Sentencing (TIS) Life Sentence (Offense dates on/after 12/31/99 for felonies):
Individuals who have not reached their Extended Supervision Eligibility Date (ESED) and have not received an indication from the sentencing court of upcoming release.

5. Pending End of Confinement Review Board (ECRB) and/or Special Purpose Evaluation (SPE)
   Individuals who have not cleared the ECRB or SPE.

6. Sentence Structure
   *Male System:*
   Individuals with more than five years to their adjusted release date.
   *Female System:*
   Individuals with more than eight years to their adjusted release date.

   Application of this mandatory restrictor shall not be applied for those individuals with the following circumstances:
   1. Parole eligible individuals who have reached their initial Parole Eligibility Date (PED) and have a parole endorsement to reduce custody and/or an indication of release consideration.

   2. Individuals serving a Risk Reduction Sentence who are approaching their Release Eligibility Date, have completed the majority of their Risk Reduction Sentence Plan (RRSP) and need to attain minimum or minimum community to complete their RRSP.

Medium, Minimum and Minimum Community Custody Mandatory Restrictors:

Individuals who have one or more of the following mandatory restrictors are excluded from being classified medium, minimum and minimum community custody:

1. Life Sentence or 30 years or More of Confinement to Serve at Admission
   Individuals serving a life sentence or total confinement time of 30 years or more upon DAI admission shall be classified maximum custody for a minimum of three years. Utilize the totality of the confinement time the individual was sentenced to serve. Calculate the time left to serve from the date of the initial classification hearing.

   Application of this mandatory restrictor shall not be applied for those individuals who:
   - Released on a life sentence and are returned on revocation.
   - Served 30 years or more during their last period of confinement and are returned on revocation.
   - Released on a vacated sentence and returned as a result of re-sentencing.

2. Administrative Confinement (AC)
   Individuals managed in AC or have not completed 12 months in general population from date of release from AC.



GBCI LAW LIBRARY

59 [redacted] (4) [Exhibit#2]

## Escape or Attempted Escape Mandatory Restrictors:

Individuals who have a documented history of attempted or completed escape from confinement or custody are impacted by this mandatory restrictor.

Definitions:

An unfenced facility is a correctional center with no physical barrier preventing individuals from leaving the facility.

A fenced facility is a maximum, medium, or minimum site where there is a physical barrier preventing individuals from leaving the facility. Escapes under the following circumstances shall be considered escapes from a fenced facility:

- Court, hospital or transportation trip
- Law enforcement during arrest or court hearings
- Jail/Detention/Huber facility (e.g., MSDF DCC holds)
- Mental health facility

Escape is any documented behavior which includes:

- Leaving the custody of DOC or law enforcement personnel
- Attempted escape from the custody of the DOC or law enforcement personnel
- Aiding in an escape
- Conspiring/making plans to escape
- Unauthorized possession of items/materials likely to be used in an escape

Escape does not include:

- Absconding from community supervision
- Failing to report to an assigned Division of Community Corrections agent
- Failing to appear for court/bail jumping
- Cutting off a GPS or electronic monitoring bracelet
- Escaping from house arrest while in the community
- Leaving a community-based Alternative to Revocation (ATR) Facility
- Fleeing/eluding in a vehicle

Confirmation of escape behaviors may be found in the following documents:

- Conduct Report
- Incident Report
- County Jail Report
- Criminal Complaint
- Judgment of Conviction
- Revocation Summary
- Pre-Sentence Investigation

Application of Escape Mandatory Restrictor:

The level of mandatory restrictor applied is based on the security level of the facility from which the individual escaped. Escapes from an out-of-state facility shall utilize the security

59 (5) [Exhibit #2]

level of the facility as designated by that state. If the security level is not available, assume it is from a fenced facility.

When calculating time frame for escape:

- Utilize the most recent disposition date of the conduct report or county jail report for the escape-related behavior.
- Utilize the date of the most recent conviction if the escape conduct report is unavailable.
- Utilize the date of the escape-related behavior when no disposition date or conviction date is known.
- If the individual has been in escape status for a period of time, utilize the date of their return to DAI or the date of the conduct report disposition whichever is most current.

| Escape Minimum and Minimum Community Custody Mandatory Restrictors: |
|---|

Individuals are excluded from being classified minimum and minimum community custody for the following time period and circumstances:

1. One year from the date of an escape or attempted escape from an unfenced facility and/or while on a project crew or work release.

2. Five years from the date of an escape or attempted escape from an unfenced facility and/or while on a project crew or work release if the escape behavior involves one or more of the following elevating factors:
   - Use of violence, threat of violence, taking of hostages and/or weapons during the escape.
   - Solicitation of staff or coercion of staff to facilitate the escape.
   - Plans which may include outside assistance or paraphernalia such as manufactured tools, rope, handcuffs, letters/calls to family, maps of escape routes, facility blueprints, mannequins, etc.
   - Commission of further criminal activity/new charges while in escape status.

3. Five years from the date of an escape or attempted escape from inside a minimum-security fenced facility.

| Escape Medium, Minimum and Minimum Community Custody Mandatory Restrictions |
|---|

Individuals are excluded from being classified medium, minimum and minimum community custody for 10 years from the time of an escape or attempted escape from a maximum or medium security facility.

GBCI LAW LIBRARY

60

6 6 [Exhibit #2]

REFERENCE:

Document mandatory restrictors in the following areas of the inmate classification report:

- Initial Classification - Staffing Comments
- Pre-Hearing - Staff Appraisal
- Reclassification - Committee Comments

Sample Mandatory Restrictor Statements for Pre-Hearing and Committee Comments:

- A mandatory restrictor applies due to an unmet SOT2 need; therefore, continued placement in medium custody is appropriate.
- A mandatory restrictor applies due to an escape from WCCS on 10/19/2021. The restrictor will no longer apply 10/19/2022.
- A mandatory restrictor applies due to Special Bulletin Notice requirements; therefore, a custody assignment lower than minimum is not appropriate.
- It is acknowledged a mandatory restrictor is applicable due to more than 5 years remaining to serve; however, current custody will be maintained unless additional factors dictate custody elevation.
- The person has two mandatory restrictors due to the time remaining to serve (over 5 years) and an unmet SOT2 need.

GBCI LAW LIBRARY

61] [redacted] (7) [Exhibit#2]

## Quick Review Mandatory Restrictors (refer to manual for detail in application)

1. **Requires GPS and/or Special Bulletin Notice (SBN)**
   (excludes minimum community custody)

2. **Immigration & Customs Enforcement (ICE) Detainer active/pending**
   (excludes minimum and minimum community custody)

3. **Pending Felony Charges and/or Detainers**
   (excludes minimum and minimum community custody)

4. **Unmet Assigned Sex Offender Treatment (SOT) Needs**
   (excludes minimum and minimum community custody)

5. **Pending End of Confinement Review Board (ECRB) and/or Special Purpose Evaluation (SPE)**
   (excludes minimum and minimum community custody)

6. **Sentence Structure**
   (excludes minimum and minimum community custody)
   **Male:** More than <u>five</u> years to adjusted release date
   **Female:** More than <u>eight</u> years to adjusted release date

7. **Life Sentence**
   (excludes minimum and minimum community custody)
   **Old Law/New Law Life Sentence** – Not reached their initial PED <u>and</u> do not have a parole endorsement to reduce custody and/or an indication of release consideration.

   **TIS Life Sentence** – Not reached their Extended Supervision Eligibility Date (ESED) <u>and</u> have not received an indication from the sentencing court of upcoming release.

8. **Life Sentence or 30+ years of confinement at the time of DAI Admission requires maximum custody a minimum or three years**
   (excludes medium custody).

9. **Administrative Confinement (AC)** – In AC or general population less than 12 months
   (excludes medium custody)

10. **Escape or Attempted Escape**
    - From a minimum unfenced facility and/or project crew or work release
      (excludes minimum and minimum community custody for one year)
    - From a minimum unfenced with elevating factors
      (excludes minimum and minimum community custody for five years)
    - From inside a fenced minimum facility
      (excludes minimum and minimum community custody for five years)
    - From a medium or maximum facility
      (excludes medium custody for 10 years)

GBCI LAW LIBRARY

93 (39)

[Exhibit#2]

THIS PAGE INTENTIONALLY LEFT BLANK

92| (38) [Exhibit#2]

Calculation based upon a PSU evaluation. This shall be documented on the DOC-3474 Psychological Minimum-Security Placement Recommendation.

f. **Within 24 months of adjusted release and need to prepare for reentry**
This may be applied when a lower custody level than WICS IFCC Plus Mandatory Restrictor Calculation is recommended to facilitate release opportunities.

g. **Single Occupancy Cell Recommendation**
This may be applied when a higher custody level than WICS IFCC Plus Mandatory Restrictor Calculation is recommended because the individual has been assigned a single cell per DAI Policy 306.00.51. This is applicable to the IFCC for male reclassification only.

h. **Reentry Initiative**
This may be applied when a lower custody level than the WICS IFCC Plus Mandatory Restrictor Calculation is recommended to facilitate placement for a specific need (i.e. primary program enrollment, vocational program enrollment and/or work commitment agreement).

i. **Parole Consideration**
This may be applied when a parole action and/or endorsement indicates a lower custody than the WICS IFCC Plus Mandatory Restrictor Calculation.

j. **Other**
This may be applied when an aggravating or mitigating condition supports a different custody than the WICS IFCC Plus Mandatory Restrictor Calculation and cannot be accounted for in the other discretionary overrides.

91 (37) [Exhibit #2]

## SECTION 5: DISCRETIONARY OVERRIDES

**Purpose:** A discretionary override is a recommendation for custody other than the WICS IFCC Plus Mandatory Restrictor Calculation. A discretionary override may assign a higher or lower custody level than the WICS IFCC Plus Mandatory Restrictor Calculation.

Any objective classification instrument cannot account for all factors and circumstances an individual may present. Discretionary overrides allow for adjustment of custody when the totality of the circumstances is not adequately captured on the IFCC. Discretionary overrides cannot void a mandatory restrictor. Discretionary overrides shall be an exception and limited in use. The reason for applying the discretionary override(s) shall be documented in the Discretionary Overrides Comments section.

All recommendations for a discretionary override shall be reviewed by the BOCM Director/designee.

Discretionary overrides may apply when one or more of the following factors exist. Select all that apply:

a. **Elevated security interests which threatens safety, security and orderly operations**
This may be applied when a higher custody level than the WICS IFCC Plus Mandatory Restrictor Calculation is recommended due an individual's institution adjustment or other factors impacting safety and security.

b. **Nature of Offense / High Profile**
This may be applied when a higher custody level than the WICS IFCC Plus Mandatory Restrictor Calculation is recommended due to length of sentence and the severity of the current offense or notoriety impacting public perception.

c. **Prior Offense History**
This may be applied when a higher custody level than the WICS IFCC Plus Mandatory Restrictor Calculation is recommended and the pattern of offense history creates an elevated risk of significant misconduct while incarcerated.

d. **Interstate Corrections Compact (ICC) status contradicts custody recommended**
This may be applied when the sending state advises against minimum or minimum community custody or the reason for placement in Wisconsin under ICC does not support the WICS IFCC Plus Mandatory Restrictor Calculation.

e. **Mental health needs as determined by Psychological Services Unit (PSU) staff**
This may be applied when mental health needs prevent placement in minimum or minimum community as recommended by the WICS IFCC Plus Mandatory Restrictor



Case 2:24-cv-01039-LA Filed 03/31/25 Page 13 of 176 Document 21-1

*EXAMPLE:*

- *Current Custody: Minimum*
- *WICS IFCC Calculation: Minimum*
- *Mandatory Restrictor: Excludes Minimum and Minimum Community*
- *Overall Recommendation: Minimum*
- *Result: The Legacy – Mandatory Restrictor option must be selected because your recommendation of minimum is consistent with the WICS IFCC Calculation, but the mandatory restrictor would otherwise exclude placement at minimum custody.*

d. **Legacy - IFCC Discrepancy and Mandatory Restrictor** – Select this option IF you are recommending the CURRENT custody level be continued and the IFCC Overall Recommendation is lower than the WICS IFCC Calculation AND lower than what the most restrictive mandatory restrictor allows.

*EXAMPLE:*

- *Current Custody: Minimum*
- *WICS IFCC Calculation: Medium*
- *Mandatory Restrictor: Excludes Minimum and Minimum Community*
- *IFCC Overall Recommendation: Minimum*
- *Result: The Legacy – IFCC Discrepancy and Mandatory Restrictor option must be selected because your recommendation of minimum custody is lower than the WICS IFCC Calculation of medium custody AND the mandatory restrictor would otherwise exclude placement at minimum custody.*

49 (35) [Exhibit #2]

## SECTION 4: LEGACY PROCESS – RECLASSIFICATION ONLY

**Purpose:** Utilizing a legacy process allows individuals who are being successfully managed at a lower custody to remain in that custody despite the IFCC recommendation and/or a mandatory restrictor. The legacy process is only used to maintain an individual at their current custody.

The legacy process applies to individuals classified prior to implementation of the mandatory restrictors (July 25, 2022) and/or implementation of the IFCC December 11, 2023. Individuals may remain at their current custody if there are no other risk factors (e.g., behavior resulting in a conduct report or new felony charges) which prevent continued placement.

In WICS select the most applicable option(s):

a. **None Apply** – The IFCC defaults to None Apply. Keep this option selected when the legacy process is not applicable.

b. **Legacy - IFCC Discrepancy** - Select this option IF you are recommending the CURRENT custody level be continued and the IFCC Overall Recommendation is lower than the WICS IFCC Calculation, but not lower than what the most restrictive mandatory restrictor allows.

---

*EXAMPLE:*

- *Current Custody: Minimum*
- *WICS IFCC Calculation: Medium*
- *Mandatory Restrictor: None or excludes Minimum Community*
- *Overall Recommendation: Minimum*
- *Result: The Legacy – IFCC Discrepancy option must be selected because your recommendation of minimum is lower than the WICS IFCC Calculation of medium and there are no mandatory restrictors that would otherwise exclude placement at minimum custody.*

---

c. **Legacy - Mandatory Restrictor** - Select this option IF you are recommending the CURRENT custody level be continued and the IFCC Overall Recommendation is lower than what the most restrictive mandatory restrictor allows, but not lower than the WICS IFCC Calculation.

48 (34) [Exhibit#2]

c. Five years from the conviction/disposition date of an escape or attempted escape from inside a minimum security fenced facility.

| Escape Medium, Minimum and Minimum Community Custody Mandatory Restrictor |
| --- |

Individuals are excluded from being classified medium, minimum and minimum community custody for 10 years from the conviction/disposition date of an escape or attempted escape from a maximum or medium security facility.

87 (33) [Exhibit #2]

c. Escape from an out-of-state facility shall utilize the security level of the facility as designated by that state.
d. Secure mental health facilities (e.g., Mendota, Winnebago) are medium security facilities.

**Community Escape Behavior:**
Escape or attempted escape associated with arrest while in the community, not under DAI supervision, are excluded from this mandatory restrictor. This may include convictions for Escape - Custody or Escape – Criminal Arrest.

Escape or attempted escape convictions for behavior after arrest which occurred in a secure environment or during intake/processing shall be considered an escape from an unfenced facility and the applicable mandatory restrictor is applied.

Escape or attempted escape convictions for behavior from a county jail is considered escape from a maximum security facility and the applicable mandatory restrictor is applied.

**Calculating Time Frame of Escape:**
The time frame for an escape mandatory restrictor may apply across multiple incarcerations. When calculating time, utilize the most recent date of conviction or date of the conduct report disposition for the escape behavior. If both a conviction date and disposition date exist for the same escape behavior, use the conduct report disposition date.

| Escape Minimum and Minimum Community Custody Mandatory Restrictors |
|---|

Individuals are excluded from being classified <u>minimum and minimum community custody</u> for the following time period and circumstances:

a. One year from the conviction/disposition date of an escape or attempted escape from an unfenced facility and/or while on a project crew, work release or a Huber walkaway.
b. Five years from the conviction/disposition date of an escape or attempted escape from an unfenced facility and/or while on a project crew, work release or Huber if the escape behavior involves one or more of the following elevating factors:
    1. Use/threat of violence.
    2. Taking of hostages.
    3. Use of weapons.
    4. Solicitation and/or coercion of staff to facilitate the escape.
    5. Plans to use outside assistance or paraphernalia such as manufactured tools, rope, handcuffs, letters/calls to family, maps of escape routes, facility blueprints, mannequins, etc.
    6. Commission of criminal activity/new charges while in escape status.

86] (32) [Exhibit#2]

Individuals serving a life sentence or total confinement time of 30 years or more upon DAI admission shall be classified maximum custody for a minimum of three years.

Utilize the totality of the confinement time the individual was sentenced to serve. Calculate the time left to serve from the date of the initial classification hearing.

Individuals with pending charges which have the potential for confinement time of more than 30 years are not subject to the mandatory restrictor. Upon conviction, custody and placement will be reviewed.

Application of this mandatory restrictor shall not be applied for those individuals who:

1. Released on a life sentence and are returned on revocation.
2. Served 30 years or more during their last period of confinement and are returned on revocation.
3. Released on a vacated sentence and returned as a result of re-sentencing.
4. Interstate Corrections Compact or Inter-Governmental Agencies who have served over three years in their home jurisdiction.

b. **Administrative Confinement (AC)**
Individuals managed in AC, while in DAI custody or have not completed 12 months in general population or a status other than AC. Utilize the date of release from AC to determine 12 months.

| Escape or Attempted Escape Mandatory Restrictors |
|---|

Individuals with a conviction or conduct report for escape or attempted escape are impacted by this mandatory restrictor. If there is no conviction or conduct report for escape then the mandatory restrictor does not apply. However, escape behaviors shall still be considered as a part of the classification risk analysis.

Convictions or conduct reports which include a modifier/enhancer such as aiding and abetting, conspiracy, attempt are scored based upon the severity of the underlying offense. For example, Escape - Aiding and Abetting is scored as Escape.

**General Guidelines:**

a. The mandatory restrictor applied is determined by the security level of the facility from which the individual escaped and whether the facility is fenced or unfenced.
    1. An unfenced facility has no physical barrier preventing individuals from leaving the facility.
    2. A fenced facility has a physical barrier preventing individuals from leaving the facility.
b. If an individual in DAI custody is Out Wardens Order (OWO) or Out Court Order (OCO) status and engages in escape behaviors, utilize the security level of the DAI facility where the individual was confined.

85 (31) [Exhibit #2]

other law enforcement agency with no final decision regarding whether charges will be filed.

The presence of a warrant does not mean this mandatory restrictor is applied. If a warrant exists the nature of the warrant shall be reviewed and considered in determining custody.

d. **Life Sentence**
<u>Old Law (Offenses committed before 6-1-84) and New Law Life Sentence (Offenses committed on/after 6-1-84 and before 12-31-99):</u>
Individuals who have not reached their initial Parole Eligibility Date (PED) and do not have a parole endorsement to reduce custody and/or an indication of release consideration.

<u>Truth in Sentencing (TIS) Life Sentence (Offense dates on/after 12-31-99 for felonies)</u>:
Individuals who have not reached their Extended Supervision Eligibility Date (ESED) and have not received an indication from the sentencing court of upcoming release.

If an individual has a mandatory restrictor for a life sentence, the mandatory restrictor for sentence structure is not selected

e. **Pending End of Confinement Review Board (ECRB) and/or Special Purpose Evaluation (SPE)**
Individuals who have not cleared the ECRB or SPE.

f. **Sentence Structure**
Individuals with more than five years to their adjusted release date.

Application of this mandatory restrictor shall not be applied for those individuals with the following circumstances:

1. Parole eligible individuals who have reached their initial or subsequent Parole Eligibility Date (PED) and have a parole endorsement to reduce custody and/or an indication of release consideration. Utilize the Presumptive Mandatory Release (PMR) date to calculate sentence structure when applicable.
2. Individuals serving a Risk Reduction Sentence (RRS) who are approaching their Release Eligibility Date (RED), have completed the majority of their Risk Reduction Sentence Plan (RRSP) and need to attain minimum or minimum community to complete their RRSP.

| Medium, Minimum and Minimum Community Custody Mandatory Restrictors |
| --- |

Individuals who have one or more of the following mandatory restrictors are excluded from being classified <u>medium, minimum and minimum community custody</u>:

a. **Life Sentence or 30 Years or More of Confinement to Serve at Time of Admission**

84 (30) [Exhibit#2]

## SECTION 3: MANDATORY RESTRICTORS

**Purpose:** Mandatory restrictors prevent an individual from placement in a specified custody level in accordance with DAI policy and/or correctional practices implemented to manage an individual while confined.

**Guidelines:**

The mandatory restrictors shall be applied during initial and reclassification processes in DAI. If more than one mandatory restrictor applies, custody may not be lower than the most restrictive/higher custody per the mandatory restrictors.

The time frame for mandatory restrictors may apply across multiple incarcerations.

| Minimum Community Custody Mandatory Restrictor |
|---|

Individuals with the following mandatory restrictor may not be classified minimum community custody:

**GPS and/or Special Bulletin Notice (SBN)**

Applied only upon verification/confirmation of required lifetime GPS and/or Special Bulletin Notice (SBN).

| Minimum and Minimum Community Custody Mandatory Restrictors |
|---|

Individuals who have one or more of the following restrictors may not be classified minimum and minimum community custody:

a. **Immigration and Customs Enforcement (ICE) Detainer**
   Individuals who have an active or pending Immigration and Customs Enforcement (ICE) detainer or have been referred to ICE for review. If ICE has provided written confirmation the individual is not facing deportation, the restrictor does not apply.

b. **Unmet Sex Offender Treatment (SOT) Needs**
   Individuals who have an assigned SOT2, SOT4 or Child Pornography Only (CPO) treatment need that is not completed. Individuals with an assigned SOT1 need are not subject to this mandatory restrictor.

   A pending sex offender treatment evaluation (SOTE) does not require application of this mandatory restrictor. If the SOTE is the only exclusion for reduced custody a request shall be made to have the SOTE completed.

c. **Pending Adult Felony Charges and/or Detainers**
   Individuals with pending adult felony charges and/or felony detainers from any state, Federal government or another country are subject to this mandatory restrictor. This includes adult felony charges under review/investigation by the district attorney or



Case 2:24-cv-01039-LA Filed 03/31/25 Page 20 of 176 Document 21-1

83 (29) [Exhibit #2]

The WICS IFCC Calculation is the recommended custody level based on the Custody Score.

| Custody | Score Range - Reclassification |
|---|---|
| Maximum | 20 to High |
| Medium | 11 to 19 |
| Minimum | 5 to 10 |
| Minimum-Community | Low to 4 |

83 (28) [Exhibit#2]

At RC this factor is scored as follows:

| Security Threat Group Involvement | Score |
|---|---|
| Not Confirmed/Suspected | 0 |
| Suspected/Confirmed | 1 |

## 2.7 Reclassification Work / Program Assignment / Placement

**Purpose:** To identify an individual's engagement in positive activities while confined. Consistent engagement in primary programming/education/work activities is an indicator of positive institution adjustment.

**Explanation of Score:**

This factor scores the number of weeks an individual was paid for employment (institution job, Bureau of Correctional Enterprises (BCE), work release), primary programming, and/or education or was in voluntary unassigned status based on WICS Assignment/Removal and State Payroll Ledger. This factor does not have a negative impact for non-participation.

The factor considers 52 weeks, or the number of weeks since admission if less than 52 weeks, prior to the week the IFCC is calculated. If at any point during the week the work/program assignment/placement status changes, the person will receive credit for this status.

The following statuses are considered:

- Institution employment, education and primary programming – credited for each week in the pay period they were paid for at least one hour
- BCE and work release – credited for each week employed
- Voluntary unassigned status – each week in status is counted

At RC this factor is scored as follows:

| Work/Program Assignment/Placement | Score |
|---|---|
| 75 percent or more | -3 |
| 25 up to 75 percent | -1 |
| Less than 25 percent | 0 |
| Voluntary unassigned 10 percent or more | 0 |

## IFCC Custody Score and WICS IFCC Calculation

The custody score is auto-calculated based on factors assigned a point value using data entered in WICS for the Reclassification factors.

81 (27) [Exhibit #2]

violations), federal and out-of-state juvenile and adult conduct reports. The frequency of institution misconduct is a strong predictor of future adjustment issues.

**Explanation of Score:**
This factor scores the number of conduct reports with a Class A, B or C rule violations for which the incarcerated individual was found guilty during the last 12 months. Each conduct report counts as one report, even if the individual was found guilty of multiple violations (e.g., one conduct report with one Class A and two Class B violations counts as one conduct report). Twelve months is calculated from the disposition date of the conduct report to the date the IFCC is calculated in WICS.

At RC this factor is scored as follows:

| Number Conduct Reports with Class A, B or C Rule Violation | Score |
|---|---|
| None within one year | 0 |
| 1 to 2 within one year | 1 |
| 3 to 6 within one year | 3 |
| 7 or more within one year | 5 |

## 2.5 Reclassification – Current Age

**Purpose:** Age has been found to correlate with institution misconduct. Research shows as individuals age, the likelihood of misconduct decreases.

**Explanation of Score:** An individual's current age as of the date the IFCC is calculated will be used to provide a score.

At RC this factor is scored as follows:

| Current Age | Score |
|---|---|
| 60 or older | 1 |
| 47 to 59 | 2 |
| 34 to 46 | 3 |
| 23 to 33 | 4 |
| 22 or younger | 5 |

## 2.6 Reclassification – Security Threat Group (STG) Involvement

**Purpose:** To indicate an individual's confirmed or suspected affiliation with a STG. Individuals affiliated with a STG are more likely to be involved in all types of misconduct.

**Explanation of Score:**
This factor considers if the individual is identified in WICS as a suspected or confirmed STG member. Individuals who are not verified as either suspected or confirmed shall be scored as not confirmed/suspected.

80 26 [Exhibit#2]

**Action Required for Non-Wisconsin DAI Conduct Reports:**

Conduct reports which occurred in the last three years from the following shall be manually entered in this section:

a. County Jails (only Class A and B violations)
b. Federal Bureau of Prisons
c. Juvenile confinement
d. Other state

Utilize jail information received on the DOC-0618 County Jail Report. If the DOC-0618 does not provide a hearing date/date of disposition, use the date of the incident. The score will be based upon verified information received.

Enter the following data into the IFCC Jail/Out of State/Juvenile Conduct Reports for IFCC:

a. Facility Type: County Jail, Federal, Juvenile or Other State.
b. State: Select the state the conduct occurred at if an out-of-state facility
c. County Jail: Select the county jail where the conduct occurred, if applicable
d. Violation: Enter the name of violation(s) for which the individual was found guilty. Up to four violations may be entered. If more than four, select the four most significant. Do not enter Class C or D violations from county jail.
e. Class: Select the class (A, B, C, D) most closely associated with the category in Appendix for each guilty violation.
f. Disposition Date: Use the date of incident if hearing date is not available.

At RC this factor is scored as follows:

| Most Serious Rule Violation | Score |
|---|---|
| None within three years | 0 |
| Class D within three years | 1 |
| Class C within three years | 2 |
| Class B within the last three years | 3 |
| Class B within two years | 3 |
| Class B within one year | 3 |
| Class A within three years | 5 |
| Class A within two years | 5 |
| Class A within one year | 8 |

2.4 Reclassification – Number of Conduct Reports with a Class A, B or C Rule Violation

**Purpose**: To determine the frequency an individual has violated an institution's code of conduct. This factor considers misconduct during the current or prior incarceration(s), including county jail (Class A and B violations), DCC holds in a DAI facility (Class A and B



Case 2:24-cv-01039-LA Filed 03/31/25 Page 24 of 176 Document 21-1

The following criteria are utilized when calculating this factor:

a. Offenses with a modifier/enhancer such as conspiracy, attempt or party to a crime are scored according to the severity of the underlying offense (e.g., Armed Robbery, Party to a Crime is scored as Armed Robbery).
b. Each count is a conviction; therefore, multiple counts of the same offense within one case shall be counted individually (e.g., One case with convictions for five counts of Armed Robbery and three counts Felon Possess Firearm equals eight convictions).
c. Multiple convictions of the same offenses across different jurisdictions shall be counted individually (e.g., two counts of Burglary in Dodge County and three counts of Burglary in Fond du Lac County equals five convictions).
d. Juvenile adjudications classified by statute as a felony or misdemeanor if convicted as an adult, shall be scored in this section.

At RC this factor is scored as follows:

| Current and Prior Elevated Offenses | Score |
|---|---|
| No elevated offenses | 0 |
| 1 to 4 elevated offenses | 1 |
| 5 or more elevated offenses | 2 |

## 2.3 Reclassification – Most Serious Rule Violation

**Purpose:** To identify the most serious behavior which resulted in a conduct report. This factor considers misconduct during the current or prior incarceration(s), including county jail Class A and B violations), Division of Community Corrections (DCC) holds in a DAI facility (Class A and B violations), federal and out-of-state juvenile and adult conduct reports. Research has shown past misconduct is the strongest predictor of future misconduct.

**Explanation of Score:**

This factor scores the most serious rule violation for which the individual was found guilty in the last <u>three</u> years. Three years is calculated from the disposition date of the conduct report to the date the IFCC is calculated in WICS.

Wisconsin DOC 303 Rule Violations have been placed into four categories as indicated in the Appendix:

- Class A
- Class B
- Class C
- Class D

78| (24) [Exhibit#2]

f. Statute
g. Statute Name
h. Conviction Date: If there is no conviction date, use the sentencing date. If no conviction or sentencing date available for juvenile case, use offense date.
i. Elevated: Yes or No
j. Category: High, Moderate or Low

At RC this factor is scored as follows:

| **Most Serious Current and Prior Offenses** | **Score** |
|---|---|
| Current Low/No Prior Offenses | -1 |
| Current Low/Prior Low | 0 |
| Current Low/Prior Moderate | 0 |
| Current Low/Prior High | 0 |
| Current Moderate/No Prior Offenses | 0 |
| Current Moderate/Prior Low | 0 |
| Current Moderate/Prior Moderate | 2 |
| Current Moderate/Prior High | 2 |
| Current High/No Prior | 2 |
| Current High/Prior Low | 4 |
| Current High/Prior Moderate | 4 |
| Current High/Prior High | 4 |

## 2.2 Reclassification – Current and Prior Elevated Offenses

**Purpose:** To identify the frequency of elevated offenses associated with misconduct for which the individual is currently confined and has been convicted of within the last 10 years. For the purpose of classification, elevated offenses are narrowly defined as offenses which are violent, intimidating or threatening in nature and are found to be correlated with serious violent or predatory misconduct while confined. Therefore, not all violent, intimidating or threatening offenses are considered elevated.

**Explanation of Score:**

This factor scores the number of current and prior elevated felony and misdemeanor convictions in the last 10 years. Ten years is calculated from the conviction date to the date the IFCC is calculated in WICS.

*Example:*
*IFCC is calculated on June 1, 2022.*
*All convictions from June 1, 2012 thru June 1, 2022.*

77 (23) [Exhibit#2]

WICS will use the date the IFCC is calculated and the date of conviction to calculate ten years. If the conviction date is unavailable, WICS will use the sentence date.

---

*Example:*
*Classification hearing is conducted June 1, 2022.*
*Prior convictions from June 1, 2012-June 1, 2022 will be considered.*

---

**Action Required for Prior Offenses not Auto-populated:**

All Wisconsin, federal and out-of-state prior juvenile and adult offenses resulting in adjudication or conviction within the last 10 years which do not appear in the WICS Prior Offenses in the Last 10 Years Grid and for which the individual is not currently confined, shall be manually entered in Additional Offense History in the Last 10 Years.

- Enter active concurrent and/or consecutive probation if conviction is within the last 10 years.
- Do not enter active ES or Parole convictions.
- Enter all criminal and criminal traffic offenses in the last 10 years.
- Do not enter dismissed/read-in charges.
- Do not enter non-criminal offenses.

If the prior offense displays "NO ROWS FOUND" in the WICS Prior Offenses in the Last 10 Years Grid, confirm for accuracy.

**Interstate Corrections Compact (ICC) and Intergovernmental Agreement (IGA):**

If the prior offense displays "UNKNOWN STATUTE - IC CASE" in the WICS Prior Offenses in the Last 10 Years Grid, the offense will require manual entry in Additional Offense History in the Last 10 Years to calculate the IFCC. In these cases, the offense will appear twice on the IFCC.

**Category and Elevated Offenses:**

All offenses entered into WICS have been placed into a category and assigned High, Moderate or Low and identified as elevated or not.

When an offense is manually entered, staff shall identify the offense category as High, Moderate or Low and indicate if it is an elevated offense.

Enter the following data in the Additional Offense History in the Last 10 Years:

a. Type: Adult or Juvenile
b. State: If Federal offense, use United States
c. Case # (Enter Unknown if it is not available)
d. County
e. Number of Counts

76 (22) [Exhibit#2]

- Enter all criminal and criminal traffic offenses.
- Do not enter dismissed/read-in charges.
- Do not enter non-criminal offenses.

**Interstate Corrections Compact (ICC) or Intergovernmental Agreement (IGA):**
Individuals confined under the Interstate Corrections Compact (ICC) or Intergovernmental Agreement (IGA) may have "NO ROWS FOUND" in the WICS Current Offense Grid. The offenses will require manual entry in Additional Current Offenses to calculate the IFCC.

If the current offense displays "UNKNOWN STATUTE - IC CASE" the offense will require manual entry in Additional Current Offenses to calculate the IFCC. In these cases, the offense will appear twice on the IFCC.

**Category and Elevated Offenses:**
All offenses entered into WICS have been placed into a category and assigned High, Moderate or Low and have been identified as elevated or not.

When an offense is manually entered, staff shall identify the offense category as High, Moderate or Low and indicate if it is an elevated offense.

Enter the following data in Additional Current Offenses:

a. Type: Adult or Juvenile
b. State: If Federal offense, use United States
c. Case # (Enter Unknown if it is not available)
d. County
e. Number of Counts
f. Statute
g. Statute Name
h. Conviction Date: If there is no conviction date, use the sentencing date. If no conviction or sentencing date available for juvenile case, use offense date.
i. Elevated: Yes or No
j. Category: High, Moderate or Low

**Most Serious Prior Offense(s):**
Prior convictions within the last 10 years which resulted in DOC confinement or supervision are auto-populated in the WICS Prior Offenses in the Last 10 Years Grid of the IFCC. WICS will select and score the most serious prior offense. Convictions with active concurrent and/or consecutive probation are scored in this section if the conviction occurred within the last 10 years.

75 (21) [Exhibit#2]

# SECTION 2 - RECLASSIFICATION

| 2.1 Reclassification – Most Serious Current or Prior Offenses |
|---|

**Purpose:** To identify the most serious offense(s) for which the individual is currently confined and has been convicted of within the last 10 years. The level of severity assigned to each current and prior offense is based on a combination of the offense and the likelihood someone convicted of that offense will engage in misconduct while incarcerated.

**Explanation of Score:**
Wisconsin current and prior felony and misdemeanor offenses are categorized as:

a. High
b. Moderate
c. Low

The categorization of high, moderate or low are based on research and data whenever possible. As new statutes are created or changed, BOCM shall be notified to determine the appropriate category.

**Offense Modifier/Enhancer:**
Offenses which include a modifier/enhancer such as conspiracy, attempt or party to a crime, are scored based upon the severity of the underlying offense (e.g., Armed Robbery, Party to a Crime is scored as Armed Robbery).

**Outside Jurisdictions:**
Offenses from jurisdictions other than Wisconsin shall be assigned to a category utilizing the offense which most resembles the Wisconsin statute.

**Resolution of Pending Case(s):**
A conviction received during confinement will be scored if it is the most serious offense for which the individual is currently incarcerated.

**Most Serious Current Offense:**
Wisconsin offenses which result in DAI confinement and active Extended Supervision (ES) or Parole are auto-populated in the WICS Current Offense Grid in the IFCC. WICS will select and score the most serious current offense for which the individual is convicted and currently confined.

Convictions with active concurrent or consecutive probation are not scored in this section and may be scored in Prior Offenses.

**Action Required for Current Offenses not Auto-populated:**
Juvenile and adult federal or out-of-state convictions which resulted in confinement time or Parole for a federal or out-of-state conviction and are being served concurrently in Wisconsin, shall be entered into Additional Current Offenses in the IFCC.

.74 (20) [Exhibit #2]

| | |
|---|---|
| Medium | 10 to 21 |
| Minimum | 6 to 9 |
| Minimum-Community | Low to 5 |

73 (19) [Exhibit#2]

including county jail (Class A and B violations), DCC holds in a DAI facility (Class A and B violations), federal and out-of-state juvenile and adult conduct reports. The frequency of institution misconduct is a strong predictor of future adjustment issues.

**Explanation of Score:**
This factor scores the number of Class A, B or C rule violations the individual was found guilty of during the last <u>three</u> years. Each violation with a guilty disposition is counted (e.g., one conduct report with one Class A and two Class B violations counts as three rule violations). Three years is calculated from the disposition date of the conduct report to the date the IFCC is calculated in WICS.

At IC this factor is scored as follows:

| **Number of Class A, B or C Rule Violations** | **Score** |
|---|---|
| None within three years | 0 |
| 1 to 2 within three years | 1 |
| 3 to 7 within three years | 3 |
| 8 or more within three years | 5 |

## 1.5 Initial – Current Age

**Purpose:** Age has been found to correlate with institution misconduct. Research indicates as individuals age, the likelihood of misconduct decreases.

**Explanation of Score:** An individual's current age as of the date the IFCC is calculated will be used to provide a score.

At IC this factor is scored as follows:

| **Current Age** | **Score** |
|---|---|
| 60 or older | 1 |
| 47 to 59 | 2 |
| 34 to 46 | 3 |
| 23 to 33 | 4 |
| 22 or younger | 5 |

## IFCC Custody Score and WICS IFCC Calculation

The custody score is auto-calculated based on factors assigned a point value using data entered in WICS for the Initial Classification factors.

The WICS IFCC Calculation is the recommended custody level based on the Custody Score.

| **Custody** | **Score Range - Initial Classification** |
|---|---|
| Maximum | 22 to High |

72 (18) [Exhibit #2]

**Action Required for Non-Wisconsin DAI Conduct Reports:**

Conduct reports which occurred in the last three years from the following shall be manually entered in this section:

a. County Jails (only Class A and B violations)
b. Federal Bureau of Prisons
c. Juvenile confinement
d. Other states

Utilize jail information received on the DOC-0618 County Jail Report. If the DOC-0618 does not provide a hearing date/date of disposition, use the date of the incident. The score will be based upon verified information received.

Enter the following data into the IFCC Jail/Out of State/Juvenile Conduct Reports for IFCC:

a. Facility Type: County Jail, Federal, Juvenile or Other State
b. State: Select the state the conduct occurred in if an out-of-state facility
c. County Jail: Select the county jail where the conduct occurred, if applicable
d. Violation: Enter the name of violation(s) for which the individual was found guilty. Up to four violations may be entered. If more than four, select the four most significant. Do not enter Class C and D violations from county jail.
e. Class: Select the class (A, B, C, D) most closely associated with the category in Appendix for each guilty violation.
f. Disposition Date: Use the date of incident if hearing date is not available.

At IC this factor is scored as follows:

| **Most Serious Rule Violation/STG** | **Score** |
|---|---|
| None in the last three years | 0 |
| Class D within three years | 0 |
| Confirmed/Suspected STG | 2 |
| Class C within three years | 2 |
| Class B within three years | 3 |
| Class B within two years | 3 |
| Class A within three years | 6 |
| Class A within two years | 6 |
| Class B within one year | 8 |
| Class A within one year | 10 |

1. 4 Initial – Number of Class A, B, or C Rule Violations

**Purpose**: To determine the frequency an individual has violated an institution's code of conduct. This factor considers misconduct during the current or prior incarceration(s),



Case 2:24-cv-01039-LA Filed 03/31/25 Page 32 of 176 Document 21-1

71 (17) [Exhibit#2]

b. Each count is a conviction; therefore, multiple counts of the same offense within one case shall be counted individually (e.g., one case with convictions for five counts of Armed Robbery and three counts Felon Possess Firearm equals eight convictions).
c. Multiple convictions of the same offenses across different jurisdictions shall be counted individually (e.g., two counts of Burglary in Dodge County and three counts of Burglary in Fond du Lac County equals five convictions).
d. Juvenile adjudications classified by statute as a felony or misdemeanor if convicted as an adult, shall be scored in this section.

At IC this factor is scored as follows:

| Current and Prior Elevated Offenses | Score |
|---|---|
| No elevated offenses | 0 |
| 1 elevated offense | 1 |
| 2 to 4 elevated offenses | 3 |
| 5 or more elevated offenses | 5 |

## 1.3 Initial – Most Serious Rule Violation/Security Threat Group (STG)

**Purpose:** To identify the most serious behavior which resulted in a conduct report. This factor considers misconduct during the current or prior incarceration(s), including county jail (Class A and B violations), Division of Community Corrections (DCC) holds in a DAI facility (Class A and B violations), federal and out-of-state juvenile and adult conduct reports. Research has shown past misconduct is the strongest predictor of future misconduct.

STG status (suspected or confirmed) is considered as individuals affiliated with an STG are more likely to be involved in all types of misconduct.

**Explanation of Score:**
This factor scores the most serious rule violation for which the individual was found guilty in the last three years. Three years is calculated from the disposition date of the conduct report to the date the IFCC is calculated in WICS.

Wisconsin DOC 303 Rule Violations have been placed into four categories as indicated in the Appendix:

- Class A
- Class B
- Class C
- Class D

This factor also considers if the individual is identified in WICS as a suspected or confirmed STG member.

70 (16) [Exhibit#2]

i. Elevated: Yes or No
j. Category: High, Moderate or Low

At IC this factor is scored as follows:

| Most Serious Current and Prior Offenses | Score |
|---|---|
| Current Low/No Prior Offenses | 0 |
| Current Low/Prior Low | 0 |
| Current Low/Prior Moderate | 1 |
| Current Low/Prior High | 1 |
| Current Moderate/No Prior Offenses | 2 |
| Current Moderate/Prior Low | 2 |
| Current Moderate/Prior Moderate | 3 |
| Current Moderate/Prior High | 4 |
| Current High/No Prior | 5 |
| Current High/Prior Low | 5 |
| Current High/Prior Moderate | 5 |
| Current High/Prior High | 6 |

## 1.2 Initial – Current and Prior Elevated Offenses

**Purpose:** To identify the frequency of elevated offenses associated with misconduct for which the individual is currently confined and has been convicted of within the last 10 years. For the purpose of classification, elevated offenses are narrowly defined as offenses which are violent, intimidating or threatening in nature and found to be correlated with serious violent or predatory misconduct while confined. Therefore, not all violent, intimidating or threatening offenses are considered elevated.

**Explanation of Score:**
This factor scores the number of current and prior elevated felony and misdemeanor convictions in the last 10 years. Ten years is calculated from the conviction date to the date the IFCC is calculated in WICS.

*Example:*
***IFCC is calculated on June 1, 2022.***
***All offenses from June 1, 2012 thru June 1, 2022.***

The following criteria are utilized when calculating this factor:

a. Offenses with a modifier/enhancer such as conspiracy, attempt or party to a crime are scored according to the severity of the underlying offense (e.g., Armed Robbery, Party to a Crime is scored as Armed Robbery).

69 (15) [Exhibit#2]

*Example:*
*IFCC is calculated on June 1, 2022*
*Prior convictions from June 1, 2012 thru June 1, 2022 will be considered.*

**Action Required for Prior Offenses not Auto-populated:**

All Wisconsin, federal and out-of-state prior juvenile and adult offenses resulting in adjudication or conviction within the last 10 years, which do not appear in the WICS Prior Offenses in the Last 10 Years Grid and for which the individual is not currently confined, shall be manually entered into the Additional Offense History in the Last 10 Years.

- Enter active concurrent and consecutive probation if conviction is in the last 10 years.
- Do not enter active ES or Parole convictions.
- Enter all criminal and criminal traffic offenses in the last 10 years.
- Do not enter dismissed/read-in charges.
- Do not enter non-criminal offenses.

If the prior offense displays "NO ROWS FOUND" in the WICS Prior Offenses in the Last 10 Years Grid, confirm for accuracy.

**Interstate Corrections Compact (ICC) or Intergovernmental Agreement (IGA):**

If the prior offense displays "UNKNOWN STATUTE - IC CASE" in the WICS Prior Offenses in the Last 10 Years Grid, the offense will require manual entry in Additional Offense History in the Last 10 Years to calculate the IFCC. In these cases, the offense will appear twice on the IFCC.

**Category and Elevated Offenses:**

All offenses entered into WICS have been placed into a category and assigned High, Moderate or Low and have been identified as elevated or not.

When an offense is manually entered, staff shall identify the offense category as High, Moderate or Low and indicate if it is an elevated offense.

Enter the following data in the Additional Offense History in the Last 10 Years:

a. Type: Adult or Juvenile
b. State: If Federal offense, use United States
c. Case # (Enter Unknown if it is not available)
d. County
e. Number of Counts
f. Statute
g. Statute Name
h. Conviction Date: If there is no conviction date, use the sentencing date. If no conviction or sentencing date available for juvenile case, use offense date.

68 (14) [Exhibit #2]

- Enter all criminal and criminal traffic offenses.
- Do not enter dismissed/read-in charges.
- Do not enter non-criminal offenses.

**Interstate Corrections Compact (ICC) or Intergovernmental Agreement (IGA):**
Individuals confined under the Interstate Corrections Compact (ICC) or Intergovernmental Agreement (IGA) may have "NO ROWS FOUND" in the WICS Current Offense Grid. The offenses will require manual entry in Additional Current Offenses to calculate the IFCC.

If the current offense displays "UNKNOWN STATUTE - IC CASE" the offense will require manual entry in Additional Current Offenses to calculate the IFCC. In these cases, the offense will appear twice on the IFCC.

**Category and Elevated Offenses:**
All offenses entered into WICS have been placed into a category and assigned High, Moderate or Low and have been identified as elevated or not.

When an offense is manually entered, staff shall identify the offense category as High, Moderate or Low and indicate if it is an elevated offense.

Enter the following data in the Additional Current Offenses:

a. Type: Adult or Juvenile
b. State: If Federal offense, use United States
c. Case # (Enter Unknown if it is not available)
d. County
e. Number of Counts
f. Statute
g. Statute Name
h. Conviction Date: If there is no conviction date, use the sentencing date. If no conviction or sentencing date for juvenile case, use offense date.
i. Elevated: Yes or No
j. Category: High, Moderate or Low

**Most Serious Prior Offense(s):**
Prior convictions within the last 10 years which resulted in DOC confinement or supervision are auto-populated in the WICS Prior Offenses in the Last 10 Years Grid. WICS will select and score the most serious prior offense. Convictions with active concurrent or consecutive probation are scored in this section if the conviction occurred within the last 10 years.

WICS will use the date the IFCC is calculated and the date of conviction to calculate ten years. If the conviction date is unavailable, WICS will use the sentence date.

67

(13)

[Exhibit #2]

## SECTION 1 - INITIAL CLASSIFICATION FACTORS

| 1.1 Initial – Most Serious Current and Prior Offenses |
| --- |

**Purpose:** To identify the most serious offense(s), for which the individual is currently confined and has been convicted of within the last 10 years. The level of severity assigned to each current and prior offense is based on a combination of the offense and the likelihood someone convicted of that offense will engage in misconduct while incarcerated.

**Explanation of Score:**

Wisconsin current and prior felony and misdemeanor offenses are categorized as:

a. High
b. Moderate
c. Low

The categorization of high, moderate or low is based on research and data whenever possible. As new statutes are created or changed, BOCM shall be notified to determine the appropriate category.

**Offense Modifier/Enhancers:**

Offenses which include a modifier/enhancer such as conspiracy, attempt or party to a crime are scored based upon the severity of the underlying offense (e.g., Armed Robbery, Party to a Crime is scored as Armed Robbery).

**Outside Jurisdictions:**

Offenses from jurisdictions other than Wisconsin shall be assigned to a category utilizing the offense which most resembles the Wisconsin statute.

**Resolution of Pending Case(s):**

A conviction received during confinement will be scored if it is the most serious offense for which the individual is currently incarcerated.

**Most Serious Current Offense:**

Wisconsin offenses which result in DAI confinement and active Extended Supervision (ES) or Parole are auto-populated in the WICS Current Offense Grid in the IFCC. WICS will select and score the most serious current offense for which the individual is convicted and currently confined.

Convictions with active concurrent or consecutive probation are not scored in this section and may be scored in WICS Prior Offenses in the Last 10 Years Grid.

**Action Required for Current Offenses not Auto-populated:**

Juvenile and adult federal or out-of-state convictions which resulted in confinement time or Parole for a federal or out-of-state conviction and are being served concurrently in Wisconsin, shall be entered into the Additional Current Offenses in the IFCC.



Case 2:24-cv-01039-LA Filed 03/31/25 Page 37 of 176 Document 21-1

66 (12) [Exhibit#2]

| | |
|---|---|
| Current Age | Current Age |
| | Security Threat Group Involvement |
| | Work/Program Assignment/Placement |

**The IFCC will result in score/calculations/recommendations as follows:**

a. Custody Score is auto-calculated based on factors assigned a point-value using data entered in WICS.
b. WICS IFCC Calculation is the recommended custody level based on the Custody Score.
c. WICS IFCC Plus Mandatory Restrictor Calculation is the recommended custody level after the WICS IFCC Calculation and mandatory restrictors have been applied.
d. IFCC Overall Recommendation is the classification recommendation.

**Custody Assignment:**

Based on the results of the IFCC and other factors as defined per DOC 302 in assigning custody classification, individuals are assigned one of the four following custody levels:

Maximum Custody: Requires very close monitoring of conduct, behavior and activities.

Medium Custody: Requires moderate monitoring of conduct, behavior and activities.

Minimum Custody: Requires general monitoring of conduct, behavior and activities inside the institution and permits assignment outside the confines of the institution.

Minimum Community Custody: Requires limited monitoring of conduct, behavior and activities. This classification is used for the following activities:

a. Work or study release under DOC 324 Work and Study Release
b. Off grounds work projects under the supervision of non-correctional staff under DOC 325 Temporary Release Under Supervision
c. Driving institution vehicles under DOC 325 Temporary Release Under Supervision
d. Leave for qualified individuals under DOC 326 Leave for Qualified Inmates

65 ⑪ [Exhibit #2]

c) Individuals have the opportunity to be present or waive their appearance at the hearing. However, if the individual is being considered for a custody reduction their attendance may be requested.

**Early Recalls:**
Early recall hearings may be conducted when a significant change affecting custody, program assignment or facility placement occurs. Early recalls may be requested per DOC 302.17 (13) and submitted on the DOC-2212 Early Re-Classification (RC) Hearing Request.

**Transgender:**
For individuals identified as transgender or intersex per DAI Policy 500.70.27 Transgender Management and Care, utilize the IFCC for the system where the individual is confined.

**Instrument for Custody Classification (IFCC):**

BOCM uses the IFCC to guide the assignment of custody. The IFCC shall be completed by an Offender Classification Specialist (OCS) prior to every initial and reclassification hearing utilizing one of the following instruments:

a. IFCC-IC
b. IFCC-RC

The instrument shall be applied as close to the IC or RC hearing as possible.

**Selection of the IFCC:**
If a scheduled recall or a significant change requiring an early recall occurs within an individual's first six months of confinement, the IFCC-IC is utilized and the WICS action type selected is Reclassification. The six months is calculated from the date of admission to the date of the reclassification hearing.

Reclassification actions beyond six months of DAI admission shall utilize the IFCC-RC.

The following are the factors utilized for male custody classification:

| Initial Classification Factors | Reclassification Factors |
|---|---|
| Most Serious Current and Prior Offenses | Most Serious Current and Prior Offenses |
| Current and Prior Elevated Offenses | Current and Prior Elevated Offenses |
| Most Serious Rule Violation/Security Threat Group (STG) | Most Serious Rule Violation |
| Number of Class A, B or C Rule Violations | Number of Conduct Reports with a Class A, B or C Rule Violation |

64 (10) [Exhibit #2]

# CLASSIFICATION OVERVIEW

**Authority:**

This manual is issued in compliance with Wisconsin Administrative Code Chapter Department of Corrections (DOC) 302 Inmate Classification, Sentence and Release Provisions.

**Introduction:**

ility

The Wisconsin Division of Adult Institutions (DAI) Instruments for Custody Classification (IFCC) are objective and validated instruments used to assign custody to individuals under the supervision of DAI. The Bureau of Offender Classification and Movement (BOCM) relies on specifically trained staff, the use of reliable and valid factors and defined criteria to objectively classify male and female individuals in DAI. The IFCC are gender responsive, point-based and rely on factors which predict misconduct while confined based on analysis of the DAI population.

The IFCC are designed to reduce the likelihood of subjective interpretation and/or value bias influencing classification operations. The manual provides instructions and guidelines on how to apply the IFCC in a consistent manner to objectively determine a custody classification score. It is important to recognize the IFCC are only one part of custody classification. The system also utilizes mandatory restrictors, defined as conditions which prohibit placement at a specified custody level in accordance with DAI policy and/or correctional practices implemented to manage an individual while confined. Furthermore, the IFCC include a discretionary override process to manage cases which warrant an alternate custody level recommendation.

**When does BOCM classify:**

a) Admission
b) Scheduled recalls following admission, a minimum of once every 12 months
c) When a significant change occurs and an early recall is approved

**Initial Classification:**

a) Every individual sentenced to DAI has an Initial Classification (IC) upon admission.
b) The IC results in the assignment of custody, program need(s), facility placement and a scheduled recall date for a Reclassification (RC) hearing.
c) Individuals with six months or less remaining to serve at the time of their IC are classified without the individual present and programs are not assigned.

**Reclassification:**

a) Reclassification (RC) hearings are conducted a minimum of once per calendar year.
b) An RC hearing results in the assignment of custody, program need(s) and facility placement after admission to DAI.

63

(9)

[Exhibit#2]

# Table of Contents


CLASSIFICATION OVERVIEW .......... 3

SECTION 1 - INITIAL CLASSIFICATION FACTORS .......... 6

1.1 Initial – Most Serious Current and Prior Offenses .......... 6

1.2 Initial – Current and Prior Elevated Offenses .......... 9

1.3 Initial - Most Serious Rule Violation/Security Threat Group (STG) .......... 10

1. 4 Initial – Number of Class A, B, or C Rule Violations .......... 11

1.5 Initial – Current Age .......... 12

IFCC Custody Score and WICS IFCC Calculation .......... 12

SECTION 2 - RECLASSIFICATION .......... 14

2.1 Reclassification – Most Serious Current or Prior Offenses .......... 14

2.2 Reclassification – Current and Prior Elevated Offenses .......... 17

2.3 Reclassification – Most Serious Rule Violation .......... 18

2.4 Reclassification – Number of Conduct Reports with a Class A, B or C Rule Violation .......... 19

2.5 Reclassification – Current Age .......... 20

2.6 Reclassification – Security Threat Group (STG) Involvement .......... 20

2.7 Reclassification Work / Program Assignment / Placement .......... 21

IFCC Custody Score and WICS IFCC Calculation .......... 21

SECTION 3: MANDATORY RESTRICTORS .......... 23

Minimum Community Custody Mandatory Restrictor .......... 23

Minimum and Minimum Community Custody Mandatory Restrictors .......... 23

Medium, Minimum and Minimum Community Custody Mandatory Restrictors .......... 24

Escape or Attempted Escape Mandatory Restrictors .......... 25

Escape Minimum and Minimum Community Custody Mandatory Restrictors .......... 26

Escape Medium, Minimum and Minimum Community Custody Mandatory Restrictor .......... 27

SECTION 4: LEGACY PROCESS – RECLASSIFICATION ONLY .......... 28

SECTION 5: DISCRETIONARY OVERRIDES .......... 30

APPENDIX: WI DOC 303 RULE VIOLATIONS .......... 33

62 (8)

[Exhibit # 2]

# Bureau of Offender Classification and Movement (BOCM)

# Instrument for Custody Classification (IFCC)

# Male System Manual

Original Effective Date: December 11, 2023

**Division of Adult Institutions**

Administrator: Sarah Cooper

Assistant Administrator: Stephanie Hove

Assistant Administrator: Paul Kemper

BOCM Director: Angela Hansen

State of Wisconsin

**Department of Corrections**

94 | (40) [Exhibit#a]

## APPENDIX: WI DOC 303 RULE VIOLATIONS

**Class A**

| | |
|---|---|
| DOC 303.11 | Assault |
| DOC 303.12 | Aggravated assault |
| DOC 303.13 | Assault on employee |
| DOC 303.16 | Sexual assault |
| DOC 303.17 | Sexual assault-aggravated |
| DOC 303.18 | Threats |
| DOC 303.19 | Stalking |
| DOC 303.21 | Inciting a disturbance |
| DOC 303.22 | Participating in a disturbance |
| DOC 303.23 | Taking a hostage |
| DOC 303.24 | Group resistance and petitions |
| DOC 303.25 | Cruelty to animals |
| DOC 303.45 | Possession, manufacture or use of weapons |

**Class B**

| | |
|---|---|
| DOC 303.14 | Sexual conduct |
| DOC 303.15 | Sexual contact or intercourse |
| DOC 303.20 | Endangering safety |
| DOC 303.26 | Escape |
| DOC 303.27 | Disguising identity |
| DOC 303.30 | Soliciting an employee |
| DOC 303.32 | Lying about an employee |
| DOC 303.33 | Disruptive conduct |
| DOC 303.35 | False names and titles |
| DOC 303.36 | Enterprises and fraud |
| DOC 303.43 | Possession of intoxicants |
| DOC 303.44 | Possession of intoxicant paraphernalia |
| DOC 303.48 | Possession of electronic communication or data storage devices |
| DOC 303.58 | Misuse of medication |
| DOC 303.60 | Use of intoxicants |

**Class C**

| | |
|---|---|
| DOC 303.28 | Disobeying orders |
| DOC 303.29 | Disrespect |
| DOC 303.31 | Lying |
| DOC 303.34 | Unauthorized forms of communication |
| DOC 303.37 | Theft |
| DOC 303.41 | Counterfeiting and forgery |
| DOC 303.46 | Possession of tobacco |
| DOC 303.52 | Leaving assigned area |
| DOC 303.53 | Being in an unassigned area |
| DOC 303.54 | Entry into another inmate's assigned living area |
| DOC 303.59 | Disfigurement |

**Class D**

| | |
|---|---|
| DOC 303.38 | Damage or alteration of property |
| DOC 303.39 | Misuse of state or federal property |
| DOC 303.40 | Unauthorized transfer of property |
| DOC 303.42 | Possession or use of money or negotiable instruments |
| DOC 303.47 | Possession of contraband—miscellaneous |
| DOC 303.49 | Unauthorized use of the mail |
| DOC 303.50 | Punctuality and attendance |
| DOC 303.51 | Loitering |
| DOC 303.55 | Improper storage |
| DOC 303.56 | Dirty assigned living area |
| DOC 303.57 | Poor personal hygiene |
| DOC 303.61 | Gambling |
| DOC 303.62 | Refusal to work or attend school |
| DOC 303.63 | Inadequate work or school performance |
| DOC 303.64 | Violating conditions of leave |

951

(41)

# Wisconsin Department of Corrections

Governor Tony Evers | Secretary Kevin A. Carr

[Exhibit#2]

**DATE:** June 15, 2020

**TO:** DAI Persons in Our Care (PIOC) [POST FOR PIOC]

**FROM:** Makda Fessahaye, Administrator
Division of Adult Institutions

**SUBJECT:** Parole Eligible Individuals in the Division of Adult Institutions

The Bureau of Offender Classification and Movement (BOCM), the Office of Program Services (OPS) and the Wisconsin Parole Commission have discussed ways to work together to assist in preparation for success while confined and when released into the community. DAI is invested in case planning that supports parole eligible individuals with preparation towards release consideration. Consideration of parole commission comments and endorsements will continue to be considered when determining case plans, custody assignment, program enrollment and facility site placements. Program providers may consider program enrollment based upon a parole eligibility date, overall case dynamics and available resources. Parole eligible individuals, regardless of the time until the parole eligibility date, may be considered for program enrollment or reassessment.

To assist in case planning, broad guidelines of parole deferral periods follows:

- **Release Planning:** Individuals with deferral periods of less than 12 months are generally engaged in release planning and are addressing factors that will support and sustain a successful release in the near future. This *may* mean enrollment into primary programs and custody reduction. Parole eligible individuals in this deferral range are the highest priority amongst parole eligible individuals for additional resources to help transition them back to the community.

- **Risk Reduction:** Individuals with deferral periods of 12-18 months are generally engaged in completing steps that facilitate risk reduction. This *may* mean enrollment into primary programs and custody reduction.

- **Protection of the Public:** Individuals with deferral periods greater than 18 months may be considered for release in the future. The primary focus is on protection of the public, as determined by, but not limited to, the severity/profile of the offense, institution conduct and compliance with expectations.

While BOCM, Parole and OPS have different and independent responsibilities and authority, which may result in differences in decisions, these entities will continue to work closely together to achieve a common goal.

96
42

# WISCONSIN DEPARTMENT OF CORRECTIONS

Governor Tony Evers / Secretary Kevin A. Carr

## Division of Adult Institutions

**DATE:** June 15, 2020

[Exhibit#2]

**TO:** Wardens & Deputy Wardens
Corrections Program Supervisors
Social Workers/Treatment Specialists
Bureau of Offender Classification and Movement
Office of Program Services
Parole Commission DAI Wardens

**FROM:** Makda Fessahaye, Administrator
Division of Adult Institutions

**RE:** Parole Considerations

---

The Division of Adult Institutions (DAI) protects the public through secure and humane treatment of individuals who have been committed to confinement. DAI affords the persons in our care (PIOC) the opportunity to gain skills and insight into their criminal behavior which are needed to support a crime-free life upon release to the community. While implementing this mission, DAI prioritizes public safety and remains sensitive to the experience of victims.

Currently, there are approximately 2000 individuals incarcerated in the DAI who are parole eligible. The Bureau of Offender Classification and Movement (BOCM), the Office of Program Services (OPS) and the Wisconsin Parole Commission have discussed operating guidelines to be used when assisting parole eligible individuals preparing for success while confined and in the community.

DAI is invested in case planning that assists parole eligible individuals with preparation towards release consideration. Parole commission comments and endorsements shall be considered when determining case plans, custody assignment, program enrollment and site placements. The language in the parole action and the endorsements will indicate the planned course by the parole commission for an individual case.

Parole eligible individuals, regardless of the time until the parole eligibility date, may be considered for program enrollment or reassessment. Consistent program enrollment practices, may serve to improve facility climate. Therefore, programs may be offered to parole eligible individuals without an endorsement from the parole commission. DAI Policy 300.00.25 Primary Program Status will be updated to reflect procedures when considering program enrollment for this population.

To assist in case planning broad guidelines of deferral periods follows:

[Exhibit#2]

(43)

97

- **Release Planning:** Individuals with deferral periods of less than 12 months are generally engaged in release planning and are addressing factors that will support and sustain a successful release in the near future.
- **Risk Reduction:** Individuals with deferral periods of 12-18 months are generally engaged in completing steps that facilitate risk reduction.
- **Protection of the Public:** Individuals with deferral periods greater than 18 months may be considered for release in the future. The primary focus is on protection of the public, as determined by, but not limited to, the severity/profile of the offense, institution conduct and compliance with expectations.

While BOCM, Parole and OPS have different and independent responsibilities and authority which may result in differences in decisions, these entities work closely together to achieve a common goal. It is anticipated this positive working relationship will continue. Communication and collaboration between case managers, BOCM, Parole Commission and OPS is encouraged.

98

# Exhibit #3

- 3-Pages Attached

PCAT240
DEPARTMENT OF CORRECTIONS
Parole Commission
DOC-1208 (Rev.08/2012) WICS

[Exhibit#3]

991 (1)

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

# PAROLE COMMISSION ACTION

| OFFENDER NAME | DOC # | FACILITY NAME | AGENT # | TIS | 980 |
|---|---|---|---|---|---|
| PRUDE, TERRANCE D. | 335878 | Green Bay Correctional Institution [GBCI] | 33603 | No | No |
| RECOMMENDED ACTION TAKEN | NEW PED | MR/ES | RECOMMENDED ELIGIBILITY DATE | DATE ACTION TAKEN | HEARING TYPE |
| Defer (for 12 Months) | 04/05/2023 | 07/10/2054 | | 02/15/2022 | Parole Review |

**If you are recommended for a parole grant/release, the time frame within which you shall be released, as established by the Chairperson of the Parole Commission, shall be reflected in the grant/order.**

**GENERAL REASONS FOR ACTION TAKEN**

1. You have developed an adequate plan, but will need Agent's verification.
2. Your institutional conduct has been satisfactory.
3. Your program participation has NOT been satisfactory.
4. Release at this time would involve an unreasonable risk to the public.
5. You have NOT served sufficient time for punishment.

COMMISSION COMMENTS

You were seen for parole consideration on case 99CF05988 for 4 Cts. of Armed Robbery with Threat of Force (PTAC). You received 20 years on each count, consecutive, for a total of an 80 year sentence structure (noting this was corrected from the previous parole review that stated an overall sentence of 60 years). This case carries PMR status and this was explained to you. You were also convicted on Count 5 of this case - Armed Robbery with Threat of Force (PTAC) and received an imposed and stayed sentence of 20 years with a probation term of 20 years. Your PED is 04/05/2022 and your MR is 07/10/2054. This is your 2nd meeting with the Parole Commission and your last defer was 18 months.

According to the record, in November 1999 you and co-actors robbed individuals of their property. In one incident you pointed a semi-automatic handgun at a man and then you and co-actors grabbed the man out of his car and drove away in the car. In another incident a woman was approached as she was walking to her car. A male ran up and pointed a semi-automatic gun at her and she was told to let her purse fall. She dropped her purse and another individual picked up her purse and then ran to her parked car and stole her car and you acted as the look-out. Then in another incident, a male and female were walking home from work when two males came upon them with handguns and ordered the male and female to get on the ground. Money was taken from them, as well as the purse being taken from the female. You were the driver of a car while the co-actors robbed these individuals. There was also another incident of a man and a woman being approached as they were entering their car. A gun was put in the man's face and you and co-actors demanded money and the keys to his vehicle. The man and woman were told to then get out of the car and you and your co-actors drove away in the car. You discussed your involvement in the above offenses noting that you were 17 years old at the time. You described not having proper guidance and acting out of greed for wanting things that you could not afford. You indicated that you were criminal minded back then but stated you have since matured and feel you have a changed mentality. You discussed your regrets to the harm you caused the victims. You had previously shared that your aunt was robbed and you have gained further insight on how that has affected your aunt thus giving you further understanding on the impact your negative actions had on the victims of your case.

At the age of 39, you are serving your 1st adult incarceration and you have served approximately 22 years and 2 months. You do have a prior record as a juvenile for 2 cases of Operating Vehicle w/o Owner's Consent, Disorderly Conduct, Petty Theft, and Fleeing, Duty Upon Striking an Occupied/Attended Vehicle & 2nd Degree Reckless Endangering Safety. You did spend time at Ethan Allen School as a juvenile. You discussed your placement at EAS and did not feel it was a rehabilitative environment. You stated that you discharged from your EAS placement on August 5, 1999 and became involved in your current offenses in November 1999. During this incarceration, you have demonstrated problematic behaviors which have resulted you remaining in Maximum custody. You have 18 minor conduct reports and 33 major conduct reports on your record. You received your last major conduct report on 07/30/2020 for Unauthorized Use of the Mail and Group Resistance & Petitions, which involved you participating in STG activity. It was discussed that there is documented history of you being involved in STG activity and you stated that you have removed yourself from STG association. You discussed your conduct history

and provided your perspective as well as indicating that you are making ef... s in a positive direction. You received your last minor conduct report on 08/05/2021 for Disobeying Orders, which involved you using another incarcerated individual's pin # to place a phone call. Although this is an increase of 1 minor conduct report since
(2) last meeting with the Parole Commission in August 2020, your have demonstrated significant improvement; therefore, your conduct is deemed satisfactory for this review. It was discussed that you were in Administrative Confinement for approximately 4 ½ years, but have been back in General Population for almost a year
100 (03/23/2022). You were encouraged to continue in this positive direction.

With regard to programming, you completed CGIP (09/2010) and Anger Management (04/2015). You have been terminated from Academics due to placements in disciplinary status. In your past parole review you indicated you are interested in completing education to obtain GED/HSED, but you recently withdrew from primary academics (01/2022). You discussed that you have a desire to be involved in Academics, but it appears there has been some confusion with you getting re-enrolled. The Parole Commission will endorse enrollment in Academics. You are on the wait list for SUD 3, the Employment Program and Vocational (optional) programming. You discussed what you have learned so far in programming is to have better self- control in your responses to negative situations and have developed a more positive attitude. You discussed utilizing self-talk to not impulsively react to a situation and take more time to think about your actions. You stated that you are motivated for continued programming.

There was not an updated release plan uploaded in the computer system, but you stated you did complete one. You stated your release plan is to reside with a friend in Sheboygan, WI, with an alternate plan with your aunt in Milwaukee, WI. This may be workable, but will require the approval of your agent.

Based on the nature and severity of your case, more time is warranted. Demonstrating positive adjustment, successfully completing all of your identified program needs, successfully transitioning through lower levels of security and having an eventual approved release plan will assist in reducing your risk to a more reasonable level. It is the recommendation of the Commission to defer your case for 12 months with an endorsement to enroll in Academics.

Note: This review was conducted via video.

***Note: This deferral requires the final approval of the Parole Chairperson.**

Date: 02/17/2022 --- Time: 04:06:07 PM --- User: J. Kramer

The Chair's decision in this case is based upon a review of Department of Corrections (DOC) records, including your (Mr. pPrude) adjustment while incarcerated AND Parole Commissioner's findings and recommendation, which was based upon an extensive review of your conviction history and behavior while in DOC custody.

The Chair supports and adopts the Commissioner's assessment and corresponding recommendation for your case. The Commission supports a reduction in custody if your conduct remains satisfactory, by your next classification review. It is the judgment of the Chair that parole be denied and a deferral of 12 months is appropriate and necessary given the totality of this record; and thus hereby ordered.

Date: 03/15/2022 --- Time: 02:07:02 PM --- User: J. Tate, Chairperson

[Exhibit #3]


Case 2:24-cv-01039-LA Filed 03/31/25 Page 49 of 176 Document 21-1

PCAT240
DEPARTMENT OF CORRECTIONS
Parole Commission
DOC-1208 (Rev.08/2012) WICS

101 ③ [Exhibit #3]

WISCONSIN
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

# PAROLE COMMISSION ACTION

| OFFENDER NAME | DOC # | FACILITY NAME | AGENT # | TIS | 980 |
|---|---|---|---|---|---|
| PRUDE, TERRANCE D. | 335878 | Green Bay Correctional Institution [GBCI] | 33603 | No | No |
| **RECOMMENDED ACTION TAKEN** | **NEW PED** | **MR/ES** | **RECOMMENDED ELIGIBILITY DATE** | **DATE ACTION TAKEN** | **HEARING TYPE** |
| Defer (for 12 Months) | 04/05/2023 | 07/10/2054 | | 02/15/2022 | Parole Review |

RECOMMENDED CONDITIONS OF SUPERVISION

REQUESTS FOR INFORMATION

| TYPE | COMMENTS | DUE DATE | STAFF |
|---|---|---|---|
| Other | The Parole Commission endorses enrollment in Academics. Thank you. | 12/31/9999 | WERTEL, JAMIE L |
| Other | The Parole Commission endorses enrollment in Academics. Thank you. | 12/31/9999 | SCHORNACK, MIRANDA L |

MEMBER SIGNATURE

DATE SIGNED

J. Tate 0113038

03/15/2022

PAROLE COMMISSION CHAIRPERSON

DATE APPROVED

*The recommended Action is approved for the stated reasons.*

☐ File Review

THERE IS NO ADMINISTRATIVE APPEAL OF THIS DECISION

**DISTRIBUTION:** Original - Social Service File; Copy - Parole Commission; Copy - RC; Copy - DCC Case File; Copy - INMATE
Copy - Field Supervisor when PPI is Requested

# Exhibit #4

- 3-Pages Attached

PC.:T240
DEPARTMENT OF CORRECTIONS
Parole Commission
DOC-1208 (Rev.08/2012) WICS
103 [redacted] (1)

WISCONSIN
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

[Exhibit #4]

# PAROLE COMMISSION ACTION

| OFFENDER NAME<br>PRUDE, TERRANCE D. | DOC #<br>335878 | FACILITY NAME<br>Green Bay Correctional Institution [GBCI] | AGENT #<br>33603 | TIS<br>No | 980<br>No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION TAKEN<br><br>Defer (for 18 Months) | NEW PED<br><br>04/05/2022 | MR/ES<br><br>07/10/2054<br>[Adjusted Release Date] | RECOMMENDED ELIGIBILITY DATE | DATE ACTION TAKEN<br><br>08/19/2020 | HEARING TYPE<br><br>Parole Review |

**If you are recommended for a parole grant/release, the time frame within which you shall be released, as established by the Chairperson of the Parole Commission, shall be reflected in the grant/order.**

**GENERAL REASONS FOR ACTION TAKEN**

1. You have developed an adequate plan, but will need Agent's verification.
2. Your institutional conduct has NOT been satisfactory.
3. Your program participation has NOT been satisfactory.
4. Release at this time would involve an unreasonable risk to the public.
5. You have NOT served sufficient time for punishment.

COMMISSION COMMENTS

You were seen today for parole consideration on case 99CF05988 for 4 Cts. of Armed Robbery with Threat of Force (PTAC). You received 20 years on each count, consecutive, for a total of a 60 year sentence. This case carries PMR status and this has been explained to you. You were also convicted on Count 5 of this case - Armed Robbery with Threat of Force (PTAC) and received an imposed and stayed sentence of 20 years with a term of 20 years probation. This was your initial review as you had previously waived consideration in September 2019, but re-applied for parole consideration in June 2020.

According to the record, in November 1999 you and co-actors robbed individuals of their property. In one incident you pointed a semi-automatic handgun at a man and then you and co-actors grabbed the man out of his car and drove away in the car. In another incident a woman was approached as she was walking to her car. A male ran up and pointed a semi-automatic gun at her and she was told to let her purse fall. She dropped her purse and another individual picked up her purse and then they ran to her parked car and stole her car. Then in another incident, a male and female were walking home from work when two males came upon them with handguns and ordered the male and female to get on the ground. Money was taken from them, as well as the purse being taken from the female. There was also another incident of a man and a woman being approached as they were entering their car. A gun was put in the man's face and you and co-actors demanded money and the keys to his vehicle. The man and woman were told to then get out of the car and you and your co-actors drove away in the car. You discussed your involvement in the above offense noting that you were 17 years old at the time. You described not having proper guidance and acting out of greed for wanting things that you could not afford. You indicated that you were criminal minded back then but stated you have since matured and feel you have a changed mentality. You discussed your regrets to the harm you caused the victims. You stated that your aunt was recently robbed and you have gained further insight on how that has affected your aunt thus giving you further understanding on the impact your negative actions had on the victims of your case.

At the age of 38, you are serving your 1st adult incarceration and you have served approximately 20 years and 8 months. You do have a prior record as a juvenile for 2 cases of Operating Vehicle w/o Owner's Consent, Disorderly Conduct, Petty Theft, and Fleeing, Duty Upon Striking an Occupied/Attended Vehicle & 2nd Degree Reckless Endangering Safety. You did spend time at Ethan Allen School as a juvenile. You discussed your placement at EAS and did not feel it was a rehabilitative environment. You stated that you discharged from your EAS placement on August 5, 1999 and became involved in your current offenses in November 1999. During this incarceration, you have demonstrated problematic behaviors which has resulted you remaining in Maximum custody. You have 17 minor conduct reports and 33 major conduct reports on your record. It is noted that at the time of this review you were seen in Restrictive Housing via video due to being in Disciplinary Separation status as a result of your most recent major conduct report received on 07/30/2020 for Unauthorized Use of the Mail and Group Resistance & Petitions, which involved you participating in STG activity. It was discussed that there is documented history of you being involved in STG activity. You discussed your conduct history and provided your perspective. You denied being involved in further criminal behavior and stated that you no longer belong to a gang.

② 104

With regard to programming, you completed CGIP (09/2010) and Anger Management (04/2015). You have been terminated from Academics due to placements in disciplinary status. You indicated you are interested in completing education to obtain GED/HSED. You discussed that you had previously been working on your educational goals when the educational system updated to having only computer testing. You were toward the end of working on achieving your educational goals, but did not quite finish before the update and were told you would have to start the testing process over. You indicated that you were frustrated with learning of this at that time, but indicated that you are interested in pursuing completion of your GED/HSED. You are on the wait list for SUD 3 and Vocational (optional) programming. You discussed what you have learned so far in programming is that you have better self- control in your responses to negative situations and have developed a more positive attitude. You discussed utilizing self-talk to not impulsively react to a situation and take more time to think about your actions. You stated that you are motivated for continued programming.

Your release plan is to reside with your aunt in Milwaukee, WI, with an alternate plan with a friend in Milwaukee, WI. This may be workable, but will require the approval of your agent.

Based on the nature and severity of your case, more time is warranted. Demonstrating positive adjustment, successfully completing all of your identified program needs, successfully transitioning through lower levels of security and having an eventual approved release plan will assist in reducing your risk to a more reasonable level. It is the decision of the Commission to defer your case for 18 months.

***Note: The length of this deferral requires the final approval of the Parole Chairperson.**

Date: 08/19/2020 — Time: 03:35:25 PM — User: J. Kramer

[Exhibit#4]

PCAT240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS

105 ③

[Exhibit#4]

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

# PAROLE COMMISSION ACTION

| OFFENDER NAME<br>PRUDE, TERRANCE D. | DOC #<br>335878 | FACILITY NAME<br>Green Bay Correctional Institution [GBCI] | AGENT #<br>33603 | TIS<br>No | 980<br>No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION TAKEN<br><br>Defer (for 18 Months) | NEW PED<br><br>04/05/2022 | MR/ES<br><br>07/10/2054 | RECOMMENDED ELIGIBILITY DATE | DATE ACTION TAKEN<br><br>08/19/2020 | HEARING TYPE<br><br>Parole Review |

RECOMMENDED CONDITIONS OF SUPERVISION

REQUESTS FOR INFORMATION

| | |
|---|---|
| J. Kramer 4392 | 08/19/2020 |
| MEMBER SIGNATURE | DATE SIGNED |
| | |
| PAROLE COMMISSION CHAIRPERSON<br>*The recommended Action is approved for the stated reasons.* | DATE APPROVED |

☐ File Review

THERE IS NO ADMINISTRATIVE APPEAL OF THIS DECISION

**DISTRIBUTION:** Original - Social Service File; Copy - Parole Commission; Copy - RC; Copy - DCC Case File; Copy - INMATE
Copy - Field Supervisor when PPI is Requested



Case 2:24-cv-01039-LA Filed 03/31/25 Page 54 of 176 Document 21-1

106

# Exhibit #5

- 3-Pages Attached

PCAT240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS

107 ① [Exhibit#5]

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

# PAROLE COMMISSION ACTION

| OFFENDER NAME | DOC # | FACILITY NAME | AGENT # | TIS | 980 |
|---|---|---|---|---|---|
| PRUDE, TERRANCE D. | 335878 | Green Bay Correctional Institution [GBCI] | 33603 | No | No |
| RECOMMENDED ACTION TAKEN | NEW PED | MR/ES | RECOMMENDED ELIGIBILITY DATE | DATE ACTION TAKEN | HEARING TYPE |
| Defer (for 12 Months) | 04/05/2024 | 07/10/2054 | | 02/16/2023 | Parole Review |

**If you are recommended for a parole grant/release, the time frame within which you shall be released, as established by the Chairperson of the Parole Commission, shall be reflected in the grant/order.**

**GENERAL REASONS FOR ACTION TAKEN**

1. You have NOT developed an adequate plan. It will need further development.
2. Your institution conduct has been marred by multiple minor reports of misconduct.
3. Your program participation has NOT been satisfactory.
4. Release at this time would involve an unreasonable risk to the public.
5. You have NOT served sufficient time for punishment.

COMMISSION COMMENTS

You were seen for parole consideration on case 99CF05988 for 4 Cts. of Armed Robbery with Threat of Force (PTAC). You received 20 years on each count, consecutive, for a total of an 80 year sentence structure. This case carries PMR status and this was explained to you. You were also convicted on Count 5 of this case - Armed Robbery with Threat of Force (PTAC) and received an imposed and stayed sentence of 20 years with a probation term of 20 years. Your PED is 04/05/2022 and your MR is 07/10/2054. This is your 3rd review with the Parole Commission and your last defer was 12 months.

According to the record, in November 1999 you and co-actors robbed individuals of their property. In one incident you pointed a semi-automatic handgun at a man and then you and co-actors grabbed the man out of his car and drove away in the car. In another incident a woman was approached as she was walking to her car. A male ran up and pointed a semi-automatic gun at her and she was told to let her purse fall. She dropped her purse and another individual picked up her purse and then ran to her parked car and stole her car and you acted as the look-out. Then in another incident, a male and female were walking home from work when two males came upon them with handguns and ordered the male and female to get on the ground. Money was taken from them, as well as the purse being taken from the female. You were the driver of a car while the co-actors robbed these individuals. There was also another incident of a man and a woman being approached as they were entering their car. A gun was put in the man's face and you and co-actors demanded money and the keys to his vehicle. The man and woman were told to then get out of the car and you and your co-actors drove away in the car. You discussed your involvement in the above offenses noting that you were 17 years old at the time. You described not having proper guidance and acting out of greed for wanting things that you could not afford. You indicated that you were criminal minded back then but stated you have since matured and feel you have a changed mentality. You have discussed your regrets to the harm you caused the victims. You had previously shared that your aunt was robbed and you have gained further insight on how that has affected your aunt thus giving you further understanding on the impact your negative actions had on the victims of your case.

At the age of 40, you are serving your 1st adult incarceration and you have served approximately 23 years and 3 months. You do have a prior record as a juvenile for 2 cases of Operating Vehicle w/o Owner's Consent, Disorderly Conduct, Petty Theft, and Fleeing, Duty Upon Striking an Occupied/Attended Vehicle & 2nd Degree Reckless Endangering Safety. You did spend time at Ethan Allen School as a juvenile. You discussed your placement at EAS and did not feel it was a rehabilitative environment. You stated that you discharged from your EAS placement on August 5, 1999 and became involved in your current offenses in November 1999.

During this incarceration, you have demonstrated problematic behaviors which have resulted you remaining in Maximum custody. You have 21 minor conduct reports and 33 major conduct reports on your record. This is an increase of 3 minor conduct reports since your last review in February 2022. You received your last major conduct report on 07/30/2020 for Unauthorized Use of the Mail and Group Resistance & Petitions, which describes you participating in STG activity. It was discussed that there is documented history of you being involved in STG activity and you stated that you have removed yourself from STG association. You have discussed your conduct

history and provided your perspective, as well as indicating that you are making efforts in a positive direction. You received your last minor conduct report in November 2022 for Possession of Contraband. It was discussed that you were in Administrative Confinement for approximately 4 ½ years, but have been back in General Population for almost two years and you were encouraged to continue in this positive direction. You discussed that a previous Parole Chairperson supported a reduction in custody if your conduct remained satisfactory by your next reclassification review (03/15/2022). You then met with the reclassification committee on 12/22/2022. The reclassification committee acknowledged the Parole Commission's support for reduced custody, but determined continued monitoring at the current level is necessary to ensure the safety of the public and the institution, noting your overall adjustment history.

With regard to programming, you are on the wait list for SUD3, the Employment Program, and Vocational (optional). You completed CGIP (09/2010) and Anger Management (04/2015). Through programming, you have discussed learning better self- control in your responses to negative situations and developing a more positive attitude. You discussed utilizing self-talk to not impulsively react to a situation and to take more time to think about your actions. You are listed as withdrawing from Academics (01/2022) and you indicated that you have been trying to get back in school. You discussed that you have a desire to be involved in Academics, but there appears to be confusion with you getting re-enrolled. The Parole Commission will continue to endorse enrollment in Academics.

There was not an updated release plan in your file or uploaded in the computer for this review. Your social worker also documented a COMPAS note on 02/07/2023 that a completed release plan had not been received from you. During this review, you indicated you completed it. You were then asked about your release plan and you stated that you had several people willing to hire you, but did not indicate any residence options.

Based on the nature and severity of your case, more time is warranted. Demonstrating positive adjustment, successfully completing all of your identified program needs, successfully transitioning through lower levels of security and having an eventual approved release plan will assist in reducing your risk to a more reasonable level. It is the decision of the Commission to defer your case for 12 months with continued endorsement for re-enrollment in Academics.

Date: 02/16/2023 --- Time: 04:55:10 PM --- User: J. Kramer

[Exhibit#5]



Case 2:24-cv-01039-LA Filed 03/31/25 Page 57 of 176 Document 21-1

PCAT240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS

109 [Exhibit#5] ③

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

# PAROLE COMMISSION ACTION

| OFFENDER NAME<br>PRUDE, TERRANCE D. | DOC #<br>335878 | FACILITY NAME<br>Green Bay Correctional Institution [GBCI] | AGENT #<br>33603 | TIS<br>No | 980<br>No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION TAKEN<br>Defer (for 12 Months) | NEW PED<br>04/05/2024 | MR/ES<br>07/10/2054 | RECOMMENDED ELIGIBILITY DATE | DATE ACTION TAKEN<br>02/16/2023 | HEARING TYPE<br>Parole Review |

RECOMMENDED CONDITIONS OF SUPERVISION

REQUESTS FOR INFORMATION

| TYPE | COMMENTS | DUE DATE | STAFF |
|---|---|---|---|
| Other | The Parole Commission continues to endorse enrollment in Academics. Thank you. | 12/31/9999 | CLEARY, CONSTANCE A |

J. Kramer 4392 — 02/16/2023

MEMBER SIGNATURE — DATE SIGNED

PAROLE COMMISSION CHAIRPERSON — DATE APPROVED

*The recommended Action is approved for the stated reasons.*

☐ File Review

THERE IS NO ADMINISTRATIVE APPEAL OF THIS DECISION

**DISTRIBUTION:** Original - Social Service File; Copy - Parole Commission; Copy - RC; Copy - DCC Case File; Copy - INMATE
Copy - Field Supervisor when PPI is Requested


Case 2:24-cv-01039-LA Filed 03/31/25 Page 58 of 176 Document 21-1

# Exhibit #6

- 1-Page Attached

III ① [Exhibit#6]

Current Location: Green Bay Correctional Institution NO_C - _C73LO

| ICCR204<br>Wisconsin Department of Corrections<br>Bureau of Classification and Movement | INMATE CLASSIFICATION REPORT<br>Re-Classification | PAGE 8 |
|---|---|---|
| Name<br>PRUDE, TERRANCE D | DOC #<br>335878 | Hearing Date<br>12/22/2022 |

**Committee Comments**

*This scheduled review was conducted pursuant to WI Administrative Code 302, and addresses custody, site placement and program assignments.*

Mr. Prude arrived at GBCI on 12/06/18 from WSPF. He is serving his 1st incarceration.
He saw the Parole Commission on 02/15/22 and received a D-12, along with an endorsement for Academic enrollment and support for custody reduction if conduct remains satisfactory. His next Parole hearing is scheduled for February 2023.

A COMPAS Legacy Assessment was completed on 1/29/15.

**COMPAS Risk Rating**
Violent Recidivism: Low
General Recidivism: Medium
COMPAS Supervision Recommendation: Medium

**ERP** = Statutorily Eligible but not suitable due to: Potential for ERP

**CIP** = Not Eligible due to: Age Restriction

Per ss. DOC 302.07 & 302.09, the committee concurs with the social worker and unanimously recommends retention in maximum custody at GBCI. A 12-month recall is set.
Continued monitoring in maximum custody at GBCI is recommended. Mr. Prude's adjustment has been manageable noting 3 minor conduct reports within the period of review; 2 of which were for using others' PIN numbers to place phone calls. Committee acknowledges the Parole Commission's support for reduced custody. However, the committee believes continued monitoring in maximum custody is necessary to ensure the safety of the public and the institution, noting Mr. Prude's overall adjustment history that includes multiple conduct reports for assaultive incidents and STG activities. Prison misconduct led to several placements on Administrative Confinement (AC), with the most-recent AC placement ending 03/2021. He was then placed in the Step Unit on a transition plan from 03/2021 until 08/2021 when he was moved to the cell halls. Committee believes the risk of future maladjustment has not yet been mitigated to a level commensurate with placement in a less-restrictive environment. Committee notes that since reception in 02/2001, Mr. Prude has spent over half of this incarceration on AC, adjustment segregation, program segregation, and disciplinary separation statuses. The longest period of time spent in GP was from 02/2005 to 12/2007. A more sustained period of positive adjustment and compliance with rules will be necessary to demonstrate suitability for medium custody. Single cell restriction was removed 10/01/22. He has not doubled in over ten years. Prior completions of Anger Mgmt. in 2015 and CGIP 1 & 2 in 2010 are noted. Current status is voluntary unassigned status due to refusal/withdrawal from Academic the week of 01/21/22. Mr. Prude is encouraged to return to school/Academic. Risk associated with nature of current offenses, STG-related misconduct, potential time left to serve, and overall adjustment history precludes custody reduction. Medium custody is therefore not supported at this time. Assessed risk and needs may be addressed in current custody and placement. Expectations are to maintain appropriate adjustment and enroll in programming if/when offered.

In regards to the current motivation/attitude statement in which Mr. Prude wrote the social worker and stated, "*The PRC documentation continues to repeat that I gave incriminating statements against co-defendants which is false. The court already rectified this error via transcript and order. It's not a big problem but if the facts are going to be listed I*

# Exhibit #7

- 1-Page Attached

113 (1) [Exhibit#7]



| Name | DOC # | Hearing Date: | PAGE 9 OF 11 |
|---|---|---|---|
| PRUDE, TERRANCE D | 335878 | 11/27/2024 | |

**Staff Appraisal and Recommendations (Pre-Hearing)**

This is PIOC Mr. Prude's regularly scheduled Re-Classification (RC) review. He was interviewed for his RC Pre-Hearing by Social Worker Mr. Johnson on 09/26/2024 at 2:27 PM.
Mr. Prude transferred to Wisconsin Secure Program Facility (WSPF) from Green Bay Correctional Institution (GBCI) on 12/20/2023.
Mr. Prude's Parole Eligibility Date is 04/05/2025. The Parole Commission deferred him for 12 Months on 02/22/2024 because his "institution conduct has not been satisfactory", "program participation has not been satisfactory", and he has "not served sufficient time for punishment", etc.
To Mr. Prude's credit, he only received one Minor Conduct Report during this review period since 11/10/2023. However, he is in Administrative Confinement since 11/10/2023 after receiving a 08/07/2023 Group Resistance and Petitions Conduct Report.
Mr. Prude's COMPAS Unified Case Plan was discussed and updated. His current goals are to complete the Cognitive-Behavioral Program, get married, get to Medium Custody status, stay out of restrictive housing, stay out of trouble, stay away from anti-social peers, get a mentor, obtain his HSED/get back into school.
Voluntary Program:
1. On 04/02/2024, Mr. Prude enrolled into the Epictetus group.
2. From 07/05/2024 to 08/02/2024, Mr. Prude worked on the Preparing to Change Workbook.
Release Planning:
On 12/21/2023, Mr. Prude wrote that "I have managed to locate a job with my wife's help 8 & my uncle has a business / company in Milwaukee & has agreed to hire me."

Date: 09/26/2024 --- Time: 03:47:03 PM --- User: D. Johnson

| Staff | Title | Date |
|---|---|---|
| D. JOHNSON | SOCIAL WORKER-CORREC | 09/26/2024 |

**INSTRUMENT FOR CUSTODY CLASSIFICATION**

| Factor | Category | Score |
|---|---|---|
| Most Serious Current and Prior Offenses | Current High/No Prior Offenses | 2 |
| Current and Prior Elevated Offenses | 4 elevated offenses | 1 |
| Most Serious Rule Violation | Class A within two years | 5 |
| Number of Conduct Reports with a Class A, B, or C Rule Violation | 1 within one year | 1 |
| Current Age | 42 | 3 |
| Security Threat Group Involvement | Confirmed | 1 |
| Work/Program Assignment/Placement | Less than 25 percent | 0 |

**Custody Score**

13

**WICS IFCC Calculation**

Medium Custody

**Mandatory Restrictors**

More than five years to Adjusted Release Date (excludes minimum and minimum community custody)
Administrative Confinement - Individuals currently managed in AC or who were released from AC less than 12 months ago (excludes medium custody)

**Mandatory Restrictors Comments**

5 years to release - 07/10/49
Held in AC status 11/10/23 - 10/28/24 (expires 10/27/2025)

Date: 12/02/2024 --- Time: 10:15:43 AM --- User: M. Tairi/BOCM/WSPF

**WICS IFCC Plus Mandatory Restrictor Calculation**

Maximum Custody

114

# Exhibit #8

• 10-Pages Attached

Eastern District Court

Petitioner: Terrance Prude,
-vs- Case # 24-CV-1039
Respondent: Warden Gary Boughton.

## Affidavit Of Terrance Prude

I, Terrance Prude, swear[1] under oath that the testimony below is true and correct and based on my personal experiences and personal Knowledge and made freely:

(1) In 1997, I was 14 years of age when I was introduced to a group of older men name "Flint", "Kane", "Marco", "Murder-Man", and "Mack"[2]. These five men were at least 25-39 years of age. I was introduced by my uncle, Kevin Prude[3].

(2) These men (along with my uncle Kevin) ran a "crew" of teenagers who aged from 13-17 years old. Each of the five men had 15 to 20 teenagers they controlled

---

1 Under penalty of perjury federal statute 28 U.S.C. 1746.
2 These names, to my understanding, were "street code" names.
3 Kevin Prude is my mother's brother.

that would go out and make money by way of crime. These men would use threats to beat or kill us teenagers if we didn't "break even" every Friday.

(3) "Break Even" was one of the laws we had to obey. Each teenager must turn in $5,000 every Friday in order to "break even". This was a weekly tax that we owed for being apart of the "crew" and when we didn't pay the "break even" tax we would be physically beatened by the adult men (including my uncle Kevin).

(4) The male teenagers: The male teens were ordered to bring money in by: (1) selling drugs; or (2) armed robbery; or (3) stealing cars and selling the parts off the car to local mechanic shops; or (4) doing all of the above. I was delegate the "job" of paragraphs 2 and 3. herein.

(5) The female teenagers: The female teens were ordered to bring money in by: (1) selling drugs; or (2) armed robbery; or (3) stealing cars and selling the parts off the car to local mechanic shops; or (4) prostitution; or (5) working at strip clubs with fake I.D.'s; or (6) doing all of the above.

(6) If any of us didn't "break even", whatever the owed balance was would carry over to the next week. For an example, if I only brought in $2,000 that Friday, I would have to bring in $8,000 that next Friday.

(7) The back-fees-owed were called "L.C. fees" which "L.C." meant "Last Chance". We could be severely beaten or have a finger or toe chopped off. Thus, under the L.C. fees we would work hard every week just to pay off L.C. fees while the regular $5,000 fee remained outstanding. In effect, the inability to be on time in paying the "break even" and "last chance" is what made us forever in debt to the "Crew". In this way, they "owned" us.

(8) Because of this, I caught an auto theft (i.e. stolen car charge) conviction[4] in 1997 and did 2 years in a juvenile prison called Ethan Allen School for Boys. I had just turned 15 years of age on April 29th. I caught these convictions in July of 1997.

---

[4] Apart of the charge was 2nd degree reckless injury where I led the police on a high speed chase and I crashed into a man on a motorcycle.

(9) While in juvenile prison, my uncle visited me and told me I owed the "Crew" "about $25,000" and that I'd have to repay it when I'm released.

(10) In 1999, I was released during the month of February. I was visited (at the group home [redacted] I was released to)[5] by the "Crew" and told that I needed to escape from the group home[5A] and come live at their "spot" to get to work on my "outstanding debt". I agreed to awol but I got revoked from probation and sent back to Ethan Allen kitty prison for stealing a cell phone[5B] from a group home staff member.

(11) From April 13, 1999 to August 5, 1999 I remained at Ethan Allen. I discharged from Ethan Allen on August 5, 1999 and I was actually picked up by my uncle, Murder-Man and Kane. From the day I was released I was threatened to reimburse these fees and told that I would be endangering my family lives if I went back to prison without repaying the debt. I was introduced to other teen males whose "job" was solely armed robbery activity. The "Crew" would

---

5 My uncle informed the "Crew" of my location.

5A See Wis. Stat. 938.02(7).

5B I stole the fancy phone and sold it to pay the "Crew".

gather up 10 to 15 teens and designate to us certain vicinities in Milwaukee to rob. My designate area was from 60th & Keefe down to 40th & Keefe and from 40th & Keefe over to 40th & North Avenue and from 40th & North Avenue up to 60th & North Avenue and from 60th & North Avenue over to 60th & Keefe.[6] Me and 10 to 15 other teens worked these area's during the month of November of 1999.

(12) Every month the "Crew" would pick us up and take us to different designated area's within Milwaukee Wisconsin (in a big 3 row-seated van).

(13) I managed to get a reduced "break even" fee and a reduced "L.C." fee weekly to $2,000 a week and my uncle managed to get the "Crew" to stop the weekly tax from stacking up until I became caught up on the outstanding debt I owed. So weekly my debt would go down, not up. This left me only owing $60,000 approximately.[7] I owed this amount when I was arrested 11-20-1999.

---

[6] All the armed robbery charges/convictions I had/have were within this designated vicinity. But, at times we deviated.

[7] Between August 5th and November 20th of 1999 I paid the "Crew" about $40,000.

(14) Each robbery I was allowed to keep $200.00 for myself with which I used to buy marajuana and food. Each robbery team consisted of at least 2 "reporters" who would report the amount of every robbery and they were paid $1,000[8] a week by the "Crew" as an incentive to accurately report. Sometimes these "reporters" would lie and say some of the younger teens under-reported the proceeds from a robbery because they would only be paid if they reported misconduct of under-reporting. This caused alot of conflicts amongst the robbery teams because false-reporting allowed the "reporters" to under-report what amounts they were bringing in by the same $1,000 that their false-reports sliced off. My friend Anthony Seaberry was killed in 1998 due to a "reporters" false-report.

(15) I've witnessed teenagers be beatened and shot in the hand or foot for failing to pay fees. I was stabbed by another teen in my neck and back for not turning in any fees on the "payday" (i.e. Friday). This took place in 1997 at the direction of the "Crew". I

---

8 This $1,000 "payment" would not be actual money handed out. Instead, the $1,000 would be sliced off from either the "break even" or "L.C." fees.

was hospitalized for 2-days for this and the wounds are still visible today.

(16) When I was arrested and charged for these armed robbery offenses I'm currently still incarcerated for I told my attorney Russell Bohach all the details in this affidavit and asked him if there was any way I could use the fact I was forced to rob as a defense and he told me that it would be a bad idea because revealing the details of it can do more harm than good because (1) it'll show the robberies were part of an organized scheme; and (2) under Wisconsin statutes I was considered an adult and not a teenager at the age of 17. He claimed if I had been under 17 years old I could have benefitted from a position that I was being forced and threatened as a defense against the charges. I also was told this by the new public defender I was appointed name Mark S. Rosen. I later (years later after being sentenced) learned that both attorneys advice was legally defective.

(17) In 2022, the Wisconsin Supreme Court came out with a case called State v. Kizer, 403 Wis. 2d 142, 976 N.W. 2d 356 (2022) that made me aware of the fact that being forced to engage in criminal activity is an absolute defense to my charges no matter what age I was when I was forced to rob. Wis. Stat. 939.46(1),

939.47, 940.302(1)(b)-(d)(2)(a)1.a. 2.a., and 939.45(1) allowed my circumstances to be a absolute defense against the robbery charges.

(18) Also, as a victim of a crime under the above statutes, I was a "child" at the age of 17 pursuant to Wis. Stat. 948.01(1). This statute deems me a "child" if I'm victimized but the statute deems me to not be a "child" at age 17 for the purpose "of prosecuting a person who is alleged to have violated a state or federal criminal law". See Wis. Stat. 948.01(1).

(19) The State of Wisconsin allowed in 1999 (and also allows today) for my circumstances to be a total defense against the charges. See Wis. Stat. 939.46(1m).

(20) Due to the omissions of these defenses, I was sentenced to an 80 year prison term. The omissions of these facts that compelled my criminal conduct allows the record to paint me as a "thug" or "gangster" driven by greed and criminality desires, which is false. I, along with other teenagers, were trafficked under s. 940.302(1)(b)-(d). Without the forces and threats from the "Crew" I would not have committed any of the crimes. I've never claimed to be innocent, I've only claimed to be not guilty due to forced criminality.

(21) I believe my attorney improperly applied Wis. Stat. 948.01(1) in reverse, i.e. he focused on the fact I was being prosecuted for a state law criminal offense and viewed me as an "adult" at the age of 17. Instead, because I was a victim first, my attorneys should have defended me from the legal posture that I was not an adult at age 17 due to being victimized by adults under the statutes listed above at par 17. Case law show that when a victim is 17 years of age they are not adults and are defined as a "child".[9]

(22) It took decades for me to really accept the reality that I was a child victim and now I understand that I was groomed mentally by my uncle who is the person who introduced me to the "Crew". I later learned that my uncle Kevin was the actual leader of the "Crew" (**Note:** "Crew" meant: "**Cash Rules Every World**").

---

[9] See State v. Conley, 2021 WI App 36, at ¶21-23, 960 N.W. 2d 628, 2021 WL 1375909, at 5 (Ct. App. Wis. April 13, 2021) (seventeen year old was forced into violating prostitution laws (Wis. Stat. 944.30(1m)(a)-(e)) but was treated as a "child" victim and not a 17 year old adult defendant).

Terrance Prude #335878
Wis. Secure Program Facility
P.O. Box 1000
Boscobel, WI 53805
Signed: Terrance Prude
Date: 10-24-2024

- Notary Printed Name: Ronald Brooks
- Notary Signature: R Br
- Notary Commission Expires: 01/07/2026
- Date: 10/24/2024
- County: Grant

# Exhibit #9

- 1-Page Attached

(1)

126




(3-Days After Sentencing)

PRUDE, TERRANCE 335878-A

[Exhibit #9]

# Exhibit #10

- 1-Page Attached

| Print Requester | Booking # | Request Date | Requested Ink | Room | Location |
|---|---|---|---|---|---|
| TERRANCE PRUDE | 335878 | 12/16/24 00:13 CST | Color | _FR2 | _FR2_223_L |

10/28/24 19:56 CDT

(1)

128




[Exhibit #10]

1291

# Exhibit #11

• 90-Pages Attached

Fed. R. Evid. 201(b)(2)(c)(2)

[Exhibit #11]

130

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| VICTORIANO HEREDIA, et al, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 3:19-cv-0338-jdp |
| JOHN TATE II, et al., | ) | |
| Defendants. | ) | |

**PROPOSED FINDINGS OF FACT IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

4875-0670-1578.2
QB\72763919.4

131

## TABLE OF CONTENTS


I. THE PARTIES ..... 1

A. Named Plaintiffs and Members of the Class ..... 1

B. Defendants ..... 3

II. JURISDICTION AND VENUE ..... 5

III. UNDISPUTED FACTS ..... 6

A. Plaintiffs Were Sentenced Under Wisconsin's Indeterminate Sentencing Scheme, with a Minimum and Maximum Term of Imprisonment Set by the Court From a Legal Range ..... 6

B. Defendants Routinely and Arbitrarily Increase Plaintiffs' Punishment Beyond the Minimum Set by the Legislature and Sentencing Judge, Contrary to the Spirit of Indeterminate Sentencing ..... 7

1. Defendants' De Facto Practice Is to Deny Parole for Class Members Until After Their Initial Parole Eligibility Date ("Initial PED") ..... 7

2. Defendants Interpret Administrative Code § PAC 1 to Require Them to Decide Whether Plaintiffs Have Served "Sufficient Time So That Release Would Not Depreciate the Seriousness of the Offense" ..... 8

3. The Parole Commission Has No Guidelines for How Much Punishment is "Sufficient" ..... 11

4. Defendants Routinely Increase Punishment for Class Members Based on the Subjective and Arbitrary Finding That They Have Not Served "Sufficient" Time for Punishment ..... 15

C. The Parole Commission Increases Plaintiffs' Minimum Term of Punishment Based on Facts Not Found at Trial or Required for Plea ..... 24

1. Defendants Aggravate the Mandatory Minimum Sentence Based on Facts that Were Not Elements of the Crime of Conviction ..... 24

2. Defendants Punish Class Members for Crimes for Which They Were Not Convicted .... 32

3. Defendants Increase Punishment Based on Administrative Fact Finding Regarding Class Members' Juvenile History: Facts Not Found By A Jury or Beyond a Reasonable Doubt 34

D. Defendants Deny Class Members a Meaningful Opportunity for Release Based on Demonstrated Maturity and Rehabilitation and Do Not Consider the Hallmark Features of Youth to Diminish Culpability ..... 35

1. Defendants Do Not Evaluate Class Members Using the Standard of Maturity and Rehabilitation ..... 35

2. Defendants Do Not Consider that Child Offenders Are Less Culpable for Their Crimes than Adult Offenders and Do Not Know How to Apply the Features of Youth ..... 43




4875-0670-1578.2
QB\72763919.4

132

3. Defendants Require Certain Programming For Release, But Deny Class Members Access to Rehabilitative Programming Until Well After They Have Already Served Their Minimum Term of Imprisonment ........ 43

4. Defendants Require Extended Time in Reduced Security Classifications For Release, But Deny Plaintiffs Transfer to These Classifications Until Well After Their Parole Eligibility Date ........ 48

5. Defendants Impose Ad Hoc Release Requirements On Juvenile Lifers Unrelated to Rehabilitation and Reform ........ 62

E. Class Members Are Denied Due Process of Law in Parole Decisions ........ 72

1. Defendants Fail to Give Plaintiffs Sufficient Advance Notice of Their Parole Hearing .. 72

2. Defendants Fail to Give Class Members Notice of the Factors and Information to Be Considered at their Parole Hearing ........ 73

3. Defendants Deny Class Members a Fair Opportunity to Present Evidence Relevant to Maturity and Rehabilitation at Their Parole Hearing ........ 74

4. Defendants Deny Plaintiffs the Opportunity to See and Rebut Information Used Against Them at Parole Hearings ........ 75

5. Plaintiffs Are Denied the Opportunity to Be Heard by the Actual Decisionmaker ........ 82

6. Defendants Fail to Adequately Explain Their Reasons for Denying Parole to Class Members ........ 83

7. Plaintiffs Cannot Vindicate Their Liberty Interest Without Access to Counsel and Expert Assistance ........ 85

133

Pursuant to Federal Rule of Civil Procedure 56, and this Court's procedures on summary judgment, Plaintiffs Victoriano Heredia, et al., as representatives of a class of similarly situated individuals ("Plaintiffs" or "Class Members"), by their attorneys, respectfully submit these Proposed Findings of Fact in support of their Motion for Summary Judgment.

## I. THE PARTIES

### A. Named Plaintiffs and Members of the Class

1. Named Plaintiffs Victoriano Heredia, Jumar Jones, Barney Guarnero, Dujuan Nash, Joseph Orosco, Brian Pheil, Deng Yang, and Dontae Doyle, and the Class Members they represent, are individuals who are or were incarcerated within the Wisconsin prison system for crimes they committed as juveniles. Dkt. 61, Amended Complaint ("Complaint") at ¶ 8; Dkt. 65, Defendants' Answer to Amended Complaint, ("Answer") at ¶ 8.

2. Each Named Plaintiff received a life sentence or a de facto life sentence to a term of years that exceeds 470 months (*i.e.*, greater than their life expectancy) with the opportunity to seek parole after serving a statutorily calculated minimum prison term. Dkt. 61, Complaint at ¶¶ 12–19; Dkt. 65, Answer at ¶¶ 12–19.

3. The Named Plaintiffs represent "[a]ll persons serving life sentences, or a term of at least 470 months, for crimes committed when they were children under the age of 18 in the custody of Wisconsin Department of Corrections ['DOC'] and who are now, or will be, eligible for release under parole supervision," and are divided into two subclasses, persons who were convicted of homicide offenses and individuals who were convicted of non-homicide offenses. Dkt. 53, Opinion and Order granting Plaintiffs' Motion for Class Certification at 11–12; Dkt. 113, Opinion and Order at 7–8.



4875-0670-1578.2
QB\72763919.4

134

4. Victoriano Heredia, Jumar Jones, Joseph Orosco, Dujuan Nash, Brian Pheil, Barney Guarnero, and Deng Yang represent the subclass of prisoners convicted of homicide offenses. Dkt. 113, Opinion and Order at 7.

5. Dontae Doyle represents the subclass of prisoners convicted of non-homicide offenses. Dkt. 113, Opinion and Order at 7–8.[1]

6. Class Members fall into two categories: those who are or were incarcerated for crimes committed before December 31, 1999 classified as Class A felonies: (1) first-degree intentional homicide and (2) operating a vehicle without consent and use of dangerous weapon causing death[2] or those who are or were serving de facto life sentences for crimes committed before December 31, 1999 that included non-homicide "serious felonies." WIS. STAT. § 302.11(1g)(a).[3] [4] Declaration of Ellen E. Cranberg, Esq. in support of Plaintiffs' Proposed

[1] Mr. Doyle was released to parole after the Court certified the non-homicide subclass. Notwithstanding, Mr. Doyle remains eligible to represent this subclass. *See Sosna v. Iowa,* 419 U.S. 393, 401 (1975) (mooting of a named plaintiff's claim does not eliminate federal jurisdiction over a class action where the class has been certified and the controversy remains alive as to class members); *Payton v. County of Kane,* 308 F.3d 673, 680-81 (7th Cir. 2002) ("The Supreme Court underscored in *Sosna* the independent legal status of class actions from the original plaintiff and held that, where a class has been properly certified, even the mootness of the named plaintiff's individual claim does not render the class action moot . . . ."); *Primax Recoveries, Inc. v. Sevilla,* 324 F.3d 544, 546 (7th Cir. 2003) ("[T]he mooting of the named plaintiff's claim in a class action . . . does not moot the action so long as the case has been certified as a class action[.]") (citing *Sosna v. Iowa* and *County of Riverside v. McLaughlin,* 500 U.S. 44, 51 (1991)). For avoidance of doubt, however, Plaintiffs intend to seek leave to add Terrance Prude as an additional representative of the non-homicide subclass. Mr. Prude is a member of and is also willing and able to represent this subclass.

[2] Before 1988, the only Class-A Felonies other than homicide were (1) taking hostages, (2) kidnapping causing permanent physical injury, (3) causing death by tampering with household products, and (4) treason; in 1993 (5) causing death by carjacking was added. WIS. STAT. § 943.23(1r) (effective December 25, 1993).

[3] All references to Wisconsin Statutes are to the (2019–2020) code unless noted otherwise, with the exception that Class Members were convicted under the laws in effect at the time of their crime.

[4] These class members have a maximum discharge date of 470 months or longer, which, according to the U.S. Sentencing Commission, is a life sentence if they are not granted parole. *See* U.S. SENTENCING COMMISSION, LIFE SENTENCES IN THE FEDERAL SYSTEM 10 (February 2015), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf (last accessed Mar. 7, 2022).

135

Findings of Fact ("Cranberg Decl.") at ¶ 3, Ex. 1; *id.* at ¶ 3, Ex. 2; *id.* at ¶ 67, Ex. 66; *id.* at ¶ 68, Ex. 67.

**B. Defendants**

7. Defendant John Tate II ("Defendant Tate") is the Chairperson of the Wisconsin Parole Commission ("Parole Commission"). Dkt. 61, Complaint at ¶ 21; Dkt. 65, Answer at ¶ 21.

8. As Parole Chair, Defendant Tate is responsible for the Parole Commission's administrative functions and for supervising other Parole Commissioners. WIS. STAT. § 304.01(1); Dkt. 68, Deposition of Parole Chairperson John Tate II in his capacity as a F. R. CIV. P. 30(b)(6) witness on December 9, 2020 ("Tate Dep.") at 19:16–20 ("I am the final decider of parole outcomes, responsible for administering all activities of the Parole Commission, responsible for providing supervision to the [C]ommissioners and the office staff.").

9. Wisconsin Administration Regulations require that Defendant Tate approve all release recommendations made by Parole Commissioners. WIS. ADMIN. CODE § PAC 1.07(3) – (4); Dkt. 68, Tate Dep. Dec. 9, 2020 at 19:16.

10. If parole is denied, the Commission sets the time at which the applicant may be considered again for parole release; this is called the "deferral period" or, colloquially, the "defer." WIS. ADMIN. CODE § PAC 1.06(9); *Id.* § 1.07(1) ([C]ommissioner "may deny release and defer consideration for a specified period of time.").

11. Wisconsin Administration Regulations require that Defendant Tate approve all deferral periods more than 12 months. WIS. ADMIN. CODE §§ PAC 1.06(9); PAC 1.07(1); Dkt. 68, Tate Dep. Dec. 9, 2020 at 133:2–5.

12. Deferral periods less than 12 months do not require the approval of the Chairperson. WIS. ADMIN. CODE § PAC 1.06(9).

136

13. As Parole Chair, Defendant Tate has authority to raise or lower the deferral period recommended by the Parole Commissioner who conducted the Parole Interview. *Id.* § PAC 1.07(4).

14. Shannon Pierce ("Pierce") is a Wisconsin Parole Commissioner. Dkt. 118, Deposition of Parole Commissioner Shannon Pierce ("Pierce Dep") at 5:3.

15. Defendant Jennifer Kramer ("Kramer") is a Wisconsin Parole Commissioner. Dkt. 61, Complaint at ¶ 22; Dkt. 65, Answer at ¶ 22.

16. Defendant Douglas Drankiewicz ("Drankiewicz") is a Former Wisconsin Parole Commissioner. Dkt. 61, Complaint at ¶ 23; Dkt. 65, Answer at ¶ 23.

17. Parole Commissioners conduct "release consideration interviews," make recommendations to the Chairperson to grant or deny parole and make a recommendation regarding the length of the deferral period before a Class Member will again be considered for parole release. WIS. ADMIN. CODE §§ PAC 1.06(1); PAC 1.07(1).

18. Defendant Kevin Carr ("Carr") is the Secretary of the Wisconsin Department of Corrections. Dkt. 61, Complaint at ¶ 24; Dkt. 65, Answer at ¶ 24.

19. As DOC Secretary, Carr is responsible for the DOC's obligation to "[a]dminister parole, extend supervision, and probation matters, except that the decision to grant or deny parole to inmates shall be made by the [P]arole [C]ommission . . . ." WIS. STAT. § 301.03(3); Dkt. 61, Complaint at ¶ 24; Dkt. 65, Answer at ¶ 24.

20. Defendant Carr is responsible for the DOC's obligation to "provide . . . to the parole commission: (a) Records relating to inmates which . . . are necessary to the conduct of the commission's responsibilities. (b) Scheduling assistance for parole interviews . . . (c) Clerical

137

support related to parole interviews. (d) Appropriate physical space . . . to conduct the parole interviews." WIS. STAT. § 304.01(2).

21. In addition, Defendant Carr is responsible for and supervises the Bureau of Classification and Movement ("BOCM"), a unit within the DOC's Division of Adult Institution ("DAI") which determines Class Members' custody classification, housing status, and program access. Dkt. 61, Complaint at ¶ 24; Dkt. 65, Answer at ¶ 24; WIS. ADMIN. CODE §§ DOC 302.03(7); DOC 302.03(12).

22. Defendant Angela Hansen ("Hansen") is the Director of BOCM. Dkt. 61, Complaint at ¶ 25; Dkt. 65, Answer at ¶ 25.

23. BOCM, with input from institution-level reclassification or Review Committees ("RC"), controls Class Members' custody classifications, institutional placement, and programming eligibility. WIS. ADMIN. CODE § DOC 302.17.

24. Defendants are sued in their official capacity. Dkt. 61, Complaint at ¶¶ 21–25; Dkt. 65, Answer at ¶¶ 21–25.

## II. JURISDICTION AND VENUE

25. The Court has personal jurisdiction over these Defendants. Dkt. 61, Complaint at ¶ 11; Dkt. 65, Answer at ¶ 11.

26. Federal question jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This controversy arises under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Dkt. 61, Complaint at ¶ 10; Dkt. 65, Answer, at ¶ 10.

27. Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2). Dkt. 61, Complaint at ¶ 11; Dkt. 65, Answer at ¶ 11.

138

## III. UNDISPUTED FACTS

### A. Plaintiffs Were Sentenced Under Wisconsin's Indeterminate Sentencing Scheme, with a Minimum and Maximum Term of Imprisonment Set by the Court From a Legal Range

28. Class Members were sentenced under Wisconsin's indeterminate sentencing scheme, in effect prior to December 31, 1999 (hereafter "Indeterminate Sentencing").

29. Under Indeterminate Sentencing, the Wisconsin Legislature established the lawful range of punishment, both the statutory mandatory minimum term[5] and the statutory maximum.[6] WIS. STAT. § 939.50(3). Felony crimes were classified into letter-based categories, A through I. *Id.* §§ 304.06(1)(b); 939.50(1)–(2); 973.013(1)(a).

30. Under Indeterminate Sentencing, the mandatory minimum term of imprisonment for a Class A felony—*i.e.*, the minimum time by law before initial parole eligibility—was 20 years.[7] WIS. STAT. §§ 939.50(3)(a); 304.06(1)(b). For a Class A felony, the mandatory statutory maximum term of imprisonment was life. *Id.* at § 939.50(3)(a).

31. Under Indeterminate Sentencing, the maximum term of imprisonment for felonies in Classes B–I was set by WIS. STAT. § 939.50(3)(b)–(i).[8] The range for the minimum term of imprisonment was set by law at 25 percent of the maximum term of imprisonment. *Id.* at § 304.06(1)(b) (1995–96).

---

[5] *Minimum term of imprisonment*, as used here, is the number of years of incarceration that must be served before the person may be lawfully released to parole supervision (i.e., Initial Parole Eligibility Date or "Initial PED").

[6] *Maximum term of imprisonment*, as used here, is the highest number of years of incarceration authorized if parole is denied.

[7] If persons earned full time deductions for good time, they were entitled to be considered for parole after 13 years and four months. WIS. STAT. § 57.06(1) (1985–86).

[8] The maximum term of imprisonment for non-Class A felonies ranged from 20 years (Class B felonies) to less than two years (Class E felonies). *Id* at §§ 939.50(3)(b)-(e) (1985–86).

139

32. The Wisconsin Legislature's Indeterminate Sentencing scheme also authorized the sentencing judge to select a minimum term of imprisonment within the range authorized by statute. *See* WIS. STAT. §§ 973.0135(2)(b); 973.014(1)(b) (1995–96).

33. When persons sentenced under Wisconsin's Indeterminate Sentencing scheme reach their first parole eligibility date ("Initial PED"), they have served the minimum term of imprisonment imposed by the sentencing judge from the range for the minimum term set by the legislature. WIS. ADMIN. CODE § PAC 1.06(16)(a).

34. Wisconsin law currently authorizes the Parole Commission to release Class Members once they have reached their Initial PED or minimum term of imprisonment; that is, their minimum sentence as set by the sentencing court based on the statutory range. WIS. STAT. § 304.06(1)(b); WIS. ADMIN. CODE § PAC 1.05.

### B. Defendants Routinely and Arbitrarily Increase Plaintiffs' Punishment Beyond the Minimum Set by the Legislature and Sentencing Judge, Contrary to the Spirit of Indeterminate Sentencing

#### 1. Defendants' De Facto Practice Is to Deny Parole for Class Members Until After Their Initial Parole Eligibility Date ("Initial PED")

35. The Parole Commission applies a "presumption" that Plaintiffs will not be released at their initial parole interview, i.e., upon completion of the minimum term of imprisonment. Dkt. 68, Tate Dep. Dec. 9, 2020 at 73:21–23 (". . . there is a presumption that you're not going to release on your PE [parole eligibility] date.").

36. No current or former Class Member of the Homicide Offender Class *has ever been released at their initial parole interview*, i.e., when their minimum term of imprisonment was completed. Cranberg Decl. at ¶ 3, Ex. 2; *id.* at ¶ 67, Ex. 66.

37. No Class Member, or former Class Member, of the Non-Homicide Offender Class has ever been released at their initial parole interview, i.e., when their minimum term of



QB\72763919.4

140

imprisonment was completed. *Id.* at ¶ 3, Ex. 2; *id.* at ¶ 67, Ex. 66; *id.* at 4, Ex. 3; Dkt. 85, Deposition of former Parole Chairperson Daniel Gabler ("Gabler Dep.") at 53:13–17 ("Q: [D]id you ever release somebody on their parole eligibility date?" A: "No." Q: "Why is that? A: "Because it wasn't appropriate.").

### 2. Defendants Interpret Administrative Code § PAC 1 to Require Them to Decide Whether Plaintiffs Have Served "Sufficient Time So That Release Would Not Depreciate the Seriousness of the Offense"

38. State statute provides no standards against which Parole Commissioners must evaluate candidates when making release determinations upon completion of the minimum term of imprisonment. See generally WIS. STAT. CH 304.

39. However, in 2010, the Parole Commission promulgated administrative rules to narrow and define their administrative powers. Wis. ADMIN. CODE PAC § 1.06, eff. Dec. 12, 2010.

40. Under the Parole Commission's rules, "[a] recommendation for a parole grant or release to extended supervision order may be made after consideration of . . . criteria . . . ." ("Release Criteria"). WIS. ADMIN. CODE § PAC 1.06; Dkt. 86, Deposition of former Parole Commissioner Steven Landreman ("Landreman Dep.") at 60:3–9 (affirming that Parole Commissioners are given "various criteria" to consider when making parole decisions).

41. The Release Criteria in the Parole Commission's administrative code include whether: "(a) The inmate has become parole . . . eligible under § 304.06, Stats., and § PAC 1.05; (b) The inmate has served sufficient time so that release would not depreciate the seriousness of the offense; (c) The inmate has demonstrated satisfactory adjustment to the institution; (d) The inmate has not refused or neglected to perform required or assigned duties; (e) The inmate has participated in and has demonstrated sufficient efforts in required or recommended programs . . . . ; (f) The inmate has developed an adequate release plan; (g) The inmate is subject to a sentence

141

of confinement in another state or is in the United States illegally and may be deported; and (h) The inmate has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice." WIS. ADMIN. CODE § PAC 1.06(16).

42. Parole Commissioners interpret § PAC 1.06(16)(b) as a requirement that Parole Commissioners, rather than the sentencing judge, must decide how much imprisonment must be served such that it constitutes sufficient punishment for a given crime. Dkt. 86, Landreman Dep. at 155:3–5 (Parole Commissioners must make "an independent assessment from what the judge made at the time of sentencing."); *id.* at 122:11–122:23 (asserting that Parole Commissioners' job is to "understand what the court's reasoning was, what [the court's] position was when [the court] made [the PED] determination so that I can use that as sort of my starting point for determining how to proceed."); Dkt. 85, Gabler Dep. at 73:14–17; (Q: "[D]id the chair, meaning yourself, need to have found that the person had served sufficient time for punishment in order to be granted release?" A: "Correct. That's how I did my job."); Dkt. 117, Deposition of Parole Chairperson John Tate II in his personal capacity on February 25, 2022 ("Tate Dep.") at 152:11–17 (Q: "Can you find that sufficient time has been served [so as not] to depreciate the seriousness of the offense simply because you believe that the minimum term of incarceration that was imposed by the judge is just not enough punishment, not enough time incarcerated?" A: "That is the discretion of the Commission, yes."); *id.* at 36:15 ("[T]he [§ PAC 1.06] factors. . . are the only reasons we're able to go by for either approving or disapproving an action."); Tate Dep. Dec. 9, 2020 at 82:2–8 (Q: "[D]o you think it's [P]arole's job to decide how much punishment is enough for a crime?" A: "Parole is assigned the task of determining how much time a person should serve as to not depreciate the seriousness of their offense by code, by statute. So it's not a

1421

matter of opinion; it's a matter of law."); *Id.* at 103:19–104:1 (A: "So you can't really presume that the parole eligibility date, even if everything else was met . . . those factors [relating to seriousness of offense] would still matter."); Dkt. 118, Pierce Dep at 107:3–8 (Q: "Does it matter to you whether a judge has set a specific PED?" A: "No.").

43. Former Chairperson Gabler testified that one reason for increasing the time that must be served for punishment for Class Members was to align Class Members' minimum periods of imprisonment with Truth-in-Sentencing ("T-I-S") punishments, even though T-I-S did not go into effect in Wisconsin until December 31, 1999. Dkt. 85, Gabler Dep. at 52:3–23.

44. In implementing WIS. ADMIN. CODE § PAC 1, the Parole Commission completes a Parole Commission Action form ("Action Sheet"), which is an interface on the Wisconsin Integrated Corrections System ("WICS") for every Commission decision. Dkt. 68, Tate Dep. Dec. 9, 2020 at 195:8–12 ("It's the system used to do all of our parole actions. Wisconsin Integrated Corrections System [WICS] . . . . That's where every pretty much every document, that's when it's generated for persons in custody.").

45. The Action Sheet contains a drop-down menu with five pre-listed items that must be answered for each parole interview. Dkt. 68, Tate Dep. Dec. 9, 2020 at 58:14–21; Dkt. 86, Landreman Dep. at 108:23–25; Dkt. 85, Gabler Dep. at 71:16–21.

46. The drop-down menu on the Action Sheet requires choosing a setting for each of the following: "you [have/have NOT] served sufficient time for punishment;" "your institutional conduct [has/has NOT] been satisfactory;" "your program participation [has/has NOT] been satisfactory;" "you have developed an adequate plan, but will need Agent's verification" [or] "you have NOT developed an adequate plan. It will need further development;" and "release at

143

this time would involve an unreasonable risk to the public." Dkt. 68, Tate Dep. Dec. 9, 2020 at 58–61; Dkt. 117, Tate Dep. Feb. 25, 2022 at 39:3–7; Cranberg Decl. at ¶ 7, Ex. 6.

47. Defendant Parole Commissioners will not recommend release unless all five criteria on the Action Sheet's drop-down menu are met, including the "sufficient time for punishment" factor. Dkt. 86, Landreman Dep. at 110:5–8 (Q: "And all of those have to be jointly met, correct, for parole release?" A: "All criteria must be met to justify parole release, correct."); Dkt. 85, Gabler Dep. at 72:2–3; *id.* at 111:3–7 (Q: "When you were the acting chair, did you ever see any of your [C]ommissioners that you were supervising recommend release for anyone where some subset or singular of these were not met?" A: "No."); Dkt. 84, Deposition of former Parole Commissioner Douglas Drankiewicz ("Drankiewicz Dep.") at 93:24–94:2, 103:23–104:4 (Parole Commissioners' release decisions are "tied directly" to these five criteria); Dkt. 117, Tate Dep. Feb. 25, 2022 at 103:18–21 (Q: "Do you have the legal authority to grant parole to someone who hasn't met all five of these criteria?" A: "No.").

48. Regarding sufficient time for punishment, the "Notice of Parole Commission Consideration" form provided to Class Members provides that the Parole Commission "will consider" "(a) the length of sentence; (b) mitigating and aggravating factors of the crime; (c) the Class Member's motivation for the crime; (d) role in the crime; (e) type of crime; (f) the Class Member's feelings about the crime and victim(s); and (g) the attitude of the judge and District Attorney . . .." Cranberg Decl. at ¶ 6, Ex. 5.

### 3. The Parole Commission Has No Guidelines for How Much Punishment Is "Sufficient"

49. Defendants admit that the standard for "sufficiency of punishment" is subjective, similar to "what kind of wine do you like to drink." Dkt. 85, Gabler Dep. at 183:20; *see also* Dkt. 68, Tate Dep. Dec. 9, 2020 at 103:6–18 ("some of these factors are more subjective than

144

objective . . . sufficient time is really less—less objective because it really takes into account the person's subjective view of their offense, their objective role in the offense, the subjective impact of their offense, the objective length of time that they've served versus length of time that they were ordered to potentially serve."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 133:1–6 (Q: "So what the [C]ommissioner has to find in order for No. 5 to be satisfied is that in their own subjective opinion this amount of time is or is not sufficient as to not depreciate the seriousness of the offense?" A: "Yes."); Dkt. 116, Deposition of Parole Commissioner Jennifer Kramer ("Kramer Dep.") at 119:4–14 (Q: "[H]ow do you go about assessing how much punishment is enough for any given crime? . . . ." [A:] "It goes . . . to -- talking with the individual, and looking at the circumstances of the case and the offense and going on that . . ."); Dkt. 118, Pierce Dep. at 118:11–13 (Commissioner Pierce would "argue that a sufficient amount of time is more subjective than the other criteria").

50. In making parole decisions, Defendants have never found that the minimum term of imprisonment for the crime—the punishment imposed by the sentencing judge from within the range authorized by the legislature—was "sufficient" for Class Members. *See e.g.*, Cranberg Decl. at ¶ 8, Ex. 7; *id.* at ¶ 9, Ex. 8; *id.* at ¶ 10, Ex. 9 (former Commissioner Francis noting [redacted] *id.* at ¶ 11; Ex. 10 [redacted]); *id.* at ¶ 12, Ex. 11 [redacted]



QB\72763919.4

145

[redacted] *id.* at ¶ 13, Ex. 12 ([redacted]; *id.* at ¶ 14, Ex. 13 [redacted]; *id.* at ¶ 15, Ex. 14 [redacted]; *id.* at ¶ 16, Ex. 15. [redacted]; *id.* at ¶ 17, Ex. 16. [redacted]; *see also* Dkt. 86, Landreman Dep. at 126:24–127:2 (Q: "Do you ever remember seeing a homicide case where you determined that 13 years and four months was sufficient time for punishment?" A: "No.").

51. The Parole Commission does not define what quantum of punishment on top of the minimum term of incarceration mandated by the legislature and imposed by sentencing judge constitutes "sufficient punishment" for this administrative agency. Dkt. 85, Gabler Dep. at 183:10–24 (sufficiency of punishment is "like pornography . . . you know it when you see it."); Dkt. 68, Tate Dep. Dec. 9, 2020 at 26:7–19 ("There is no kind of prescription anywhere that this

146

is what's supposed to happen when. It's really up to the judgment of those who are in those positions."). *See also* Cranberg Decl. at ¶ 18, Ex. 17 at 5:10–11 [redacted]; Dkt. 118, Pierce Dep. at 100:11–12 ("We have disagreed on how sufficient time is determined."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 144:11–13 ("If you're looking for like these factors combined with this conviction equals this time that's not going to exist, let's make that clear."); *id.* at 205:13–17 (Q: "So is it the case that each [C]ommissioner is free to decide by what means they expect the person to satisfy the five criteria?" A: "To a degree. And it's really based on each individual case too.").

52. Commissioners are able to find that the time served is "insufficient," yet are unable to articulate what *would be* "sufficient" punishment. Dkt. 84, Drankiewicz Dep. at 189:90–91 [redacted]; Dkt. 85, Gabler Dep. at 183:16–186:21 [redacted]; Dkt 117, Tate Dep. Feb. 25, 2022 at 158:20–24 (Q: "Do you know when you evaluate someone

147

how much time they must serve in order to not depreciate the seriousness of the offense?" A: "No. That would be like making a decision before you see a person.").

53. Defendants consider whatever information they wish, from whatever source, without any knowledge of the veracity of that information, when they assess the "seriousness" of a Class Members' crime. Dkt. 86, Landreman Dep. at 132:8 –14 (asserting that as a Commissioner, he considered "any other factor" that he deemed relevant to assessing seriousness and had "complete discretion" to decide what weight to give it); Dkt. 84, Drankiewicz Dep. at 115: 3–5 ("Severity might have to do with the level of violence in a particular crime or the level of culpability."); *id.* at 170:1–7 (former Commissioner Drankiewicz testifying that he considered the "element" of "premeditation" as relevant to the seriousness of an applicant's crime even though that was not an element of the crime for which the applicant had been convicted); Cranberg Decl. at ¶ 6, Ex. 5 (noting that the Parole Commission is "not limited to" the considerations of a–g); Dkt. 116, Kramer Dep. at 40:9-14 ("When I do parole reviews, I do review with them the offense for which we're discussing parole criteria, overall behaviors. And during my conversations with individuals, one of the questions I typically ask is 'what were the motivating dynamics involved in their behaviors . . . .'").

54. Defendants maintain that the finding of whether punishment has been sufficient for a given offense is a matter of unfettered discretion. Dkt. 68, Tate Dep. Dec. 9, 2020 at 29:16–17 ("Parole decisions are absolutely discretionary. That's the nature of parole."

**4. Defendants Routinely Increase Punishment for Class Members Based on the Subjective and Arbitrary Finding That They Have Not Served "Sufficient" Time for Punishment**

55. The Parole Commission sets no uniform standards for Parole Commissioners to apply when determining what constitutes punishment that is "sufficient" and does "not depreciate the seriousness of the offense." Dkt. 86, Landreman Dep. at 131:12–25 ("There [are]

148

no uniform standards given to [P]arole [C]ommissioners to instruct them on what seriousness is and how to assess it."); Dkt. 118, Pierce Dep. at 108 (new Parole Commissioners receive no training on how to assess sufficient time).

56. As Defendants admit, determining what punishment is "sufficient" varies from Commissioner to Commissioner. Dkt. 85, Gabler Dep. at 73:10–17 (Former Chairperson Gabler testified that, as Chair, it was his job to determine the appropriate duration of punishment and to override the determination of other Commissioners as to whether the amount of punishment that was "sufficient"); Dkt. 68, Tate Dep. Dec. 9, 2020 at 105:24–107:1 (Chairman Tate explaining that before his tenure, "a [C]ommissioner could assess sufficient time had been served and then if a different [C]ommissioner reviews the case, they might determine sufficient time had not been served because of the subjective nature of that factor"); Dkt. 118, Pierce Dep. at 118:11–13 (explaining that Commissioners "have never had like a formal discussion of like X amount of time is sufficient or is not sufficient. It seems to be based on each individual [C]ommissioner."); *id.* at 187:8–11 ("I just think the [parole] criteria lend themselves to being rather subjective and I guess that consistency would inherently be improved if those [parole] criteria were reevaluated.").

*Plaintiff* [redacted]

a. Plaintiff [redacted] has been parole-eligible since 2004. Cranberg Decl. at ¶ 67, Ex. 66.

b. [redacted] found that [redacted] had [redacted]. *Id.* at ¶ 19, Ex. 18.



QB\72763919.4

149

c. [redacted] Parole Commissioner [redacted] decided that [redacted] *had not* [redacted] despite Commissioner [redacted] previous finding. *Compare id.* at ¶ 20, Ex. 19.

*Plaintiff* [redacted]

d. In [redacted], former Commissioner [redacted] found that [redacted], but [redacted] found that [redacted] *had* [redacted] Declaration of Patrick Proctor-Brown, Esq. in support of Plaintiffs' Proposed Findings of Fact ("Proctor-Brown Decl."), filed herewith, at ¶ 50, Ex. 148 at 2.

e. Six months later, Commissioner [redacted] again found that [redacted] "had NOT [redacted]." And – notwithstanding the fact that [redacted] ordered [redacted] before the next consideration. Proctor-Brown Decl. at ¶ 51, Ex. 149 at 2.

57. Former Commissioner [redacted] has determined whether punishment was "sufficient" by comparing the number of free years the Class Member would get to live relative to the years the victim lived. Cranberg Decl. at ¶ 21, Ex. 20 at 39:16–21 [redacted],

150

[redacted]

58. A Parole Commissioner may assess sufficiency of punishment based on speculation of how the victim, the District Attorney ("DA"), and judges, other than the sentencing judge (who set the minimum), would feel about release. Dkt. 68, Tate Dep. Dec. 9, 2020 at 61:16–19 (If "the victim still holds the same level of intensity as far as how they feel they've been impacted as day one, then that does indicate how serious the offense was. . . ."); Dkt. 84, Drankiewicz Dep. at 177:11–16; 114:9–11 (testifying that he assesses the seriousness of the offense by, in part, "consider[ing] how other people maybe respond to it, DAs, judges, supporters, victims.").

59. A Parole Commissioner might find that the amount of punishment will *never* be sufficient. Cranberg Decl. at ¶ 22, Ex. 21 at 62:6–15 (former Commissioner [redacted] telling [redacted] that [redacted].

60. Defendants deny release to Class Members on the grounds that they have "NOT served sufficient time for punishment" even when they acknowledge strong evidence of rehabilitation.

a. [redacted]

[9] Class Member [redacted] was convicted of [redacted]. Cranberg Decl. at ¶ 36, Ex. 35.

[redacted]

[redacted]

151

[redacted]; *id.* at ¶ 37, Ex. 36 ([redacted]); *id.* at ¶ 58, Ex. 57 ([redacted]); *id.* at ¶ 51, Ex. 50 [redacted] [redacted]). Class Member [redacted] Proctor-Brown Decl. at ¶ 7, Ex. 105, before [redacted]. Cranberg Decl. at ¶ 3, Ex. 2.

b. On [redacted], former Commissioner [redacted] commended Class Member [redacted] for [redacted] Cranberg Decl. at ¶ 5; Ex. 4, at 3:42–3:53; *id.* at 6:30–7:12 (Audio of [redacted] Parole Hearing).

c. On [redacted] former Commissioner [redacted] denied parole release to Class Member [redacted] because, he decided, [redacted] for

152

[redacted]," and that Mr. [redacted] had, "[redacted] for the crime. Cranberg Decl. at ¶ 24 Ex. 23 at 31:21–32:1; *id.* at 34:20–21 ([redacted] stating "[redacted]).

d. On [redacted] denied Plaintiff [redacted] release to parole supervision, stating: [redacted]." Cranberg Decl. at ¶ 25, Ex. 24 (emphasis added).

e. Plaintiff [redacted] has received [redacted]. Yet, Commissioner [redacted] believed more time must be served "[redacted] that he caused. Cranberg Decl. at ¶ 26, Ex. 25; *Id.* at ¶ 27 Ex. 26 ([redacted].

f. Plaintiff [redacted] has served almost four *decades* in prison, despite [redacted] Mr. [redacted] served nearly 20 years beyond his initial PED date because

of what Commissioners consider to be [redacted]" Cranberg
153 Decl. at ¶ 67, Ex. 66 (showing [redacted]); *id.* at ¶ 28, Ex. 27 (denying Class Member [redacted] parole nearly two decades after his initial parole eligibility date, stating [redacted].")

g. After praising Class Member [redacted]' honesty, responsibility, programming achievements, community involvement, and overall progress, Commissioner [redacted] denied [redacted] release to parole supervision because "[redacted] Cranberg Decl. at ¶ 29, Ex. 28 at 36:14–20.

h. Class Member [redacted] was sentenced to serve a minimum term of 22 years. Cranberg Decl. at ¶ 67, Ex. 66. In 2010, five years beyond this court-set minimum, former Commissioner [redacted] told him, "[redacted] despite the fact that Class Member [redacted] Cranberg Decl. at ¶ 30, Ex. 29. In 2020, 15 years after Class Member [redacted] had served his minimum sentence, Commissioner [redacted] found he *still* [redacted]. Cranberg Decl. at ¶ 31, Ex. 30.

i. Class Member [redacted] has been denied release for over [redacted] beyond his minimum term despite [redacted]. Mr. [redacted] is now a "spiritual man" who tries to "grow and do something constructive." *Id.* at ¶ 22, Ex. 21 at 47:16-17; *id.* at 57:25; *id.* at ¶ 3, Ex. 1 (showing Class Member Campbell's Initial PED date as July 25, 2010). Nonetheless, Commissioners believe [redacted]." Cranberg Decl. at ¶ 32, Ex. 31.

154

j. Plaintiff [redacted] has been denied release for years because Former Chairman [redacted] believed that [redacted]. Cranberg Decl. at ¶ 33, Ex. 32 at 2. In [redacted], the same month [redacted] earned [redacted], Commissioner [redacted] again determined that [redacted]." *Id.* at ¶ 34, Ex. 33; Declaration of Plaintiff [redacted] However, that assessment was overridden by the Chair who instead denied release on the grounds that [redacted] had [redacted] Cranberg Decl. at ¶ 34, Ex. 33.

k. Plaintiff [redacted] sustained no major conduct reports for nearly a decade, had completed all required programing, and was commended for [redacted]. Proctor-Brown Decl. at ¶ 63, Ex. 162. In light of these facts, Commissioner [redacted] denied Mr. [redacted] parole because [redacted]. *Id.*

155 61. Parole Commissioners are not trained on how to interpret the parole criteria in §§ PAC 1.04 or 1.06 such that they are applying a clear and consistent standard for parole release. Dkt. 68, Tate Dep. Dec. 9, 2020 at 22:7–8 (the Chairperson position gets no training); 24:21–25:11 (training revolves around how to use the computer system); 51:16–19; 52:25 ("It's out of the frying pan and into the fire for new [C]ommissioners" because there is "no template"); Dkt. 85, Gabler Dep. at 94:2–7 (Q: "You didn't receive any training on how to assess the [parole] criteria, right?" A: "No."); *id.* at 58:10–19; Dkt. 86, Landreman Dep. at 40:15–23; Dkt. 84, Drankiewicz Dep. at 241:15–17 (Q: "But the Parole Commission itself does not provide that training?" A: "No.").

62. Although the Parole Commission bases its release determination in part upon an administrative inquiry into the "seriousness of the offense," Commissioners are not trained in psychology, neurobiology, or youth trauma, and thus are not trained to evaluate the or reduced culpability and enhanced potential for change applicable to Class Members who were all children at the time they committed their offense. Dkt. 85, Gabler Dep. at 210:5–9; *id.* at 211:11–212:25; Dkt. 116, Kramer Dep at 32:24–33:25 (Commissioner Kramer testifying that she does not know the behavioral consequences for the immaturity of an adolescent brain, she "does not know what parts of the brain are later to develop," and she cannot say for sure that there is a specific behavior in adolescents that can be purely attributed to the characteristics of an adolescent brain); *id.* at 33:24–34:7 (Commissioner Kramer "recognize[s] that [trauma] may impact [brain development]" but she could not answer whether trauma impacts brain development because of her belief that the impact is "on an individual basis"); Dkt. 118, Pierce Dep. at 41:17–42:10 (Commissioner Pierce testifying that the Parole Commission provides no training regarding childhood trauma or adolescent brain development).

156

### C. The Parole Commission Increases Plaintiffs' Minimum Term of Punishment Based on Facts Not Found at Trial or Required for Plea

#### 1. Defendants Aggravate the Mandatory Minimum Sentence Based on Facts that Were Not Elements of the Crime of Conviction

63. When determining whether Class Members have served sufficient time so as not to depreciate the seriousness of the offense, Defendants consider circumstances of the crime beyond the statutory elements of the crime of conviction. Dkt. 68, Tate Dep. Dec. 9, 2020 at 60:9–61:25; Dkt. 86, Landreman Dep. at 144:4–10 (Q: "You're not just referring to the legal definition of the offense . . . . You're referring to the relationship of the victim and the defendant, the things that happened before and after, a motive that they might have had, all those things?" A: "Yes ma'am, that's correct."); Dkt. 84, Drankiewicz Dep. 175:20–25 (testifying that he does not "feel it necessary to disregard [a] fact just because . . . it was potentially not presented to a jury at time of conviction."); Dkt. 85, Gabler Dep. at 85:11–15; *id.* at 120:2–5 (former Chairperson Gabler testifying that he does not "limit himself" to the elements of the crime of conviction but looks to "all the factors, everything, everything in the guy's record to make a decision."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 147:13–148:4 (Q: "Does the Commission treat all legally identical crimes at the same level of seriousness?" A: "No.").

64. The Parole Commission looks to statements made in pre-sentence reports, social service files, juvenile records, sentencing transcripts, victim statements, and other materials to determine how "serious" the crime is and therefore how much punishment beyond the minimum term Class Members must serve. Dkt. 85, Gabler Dep. at 67:8–20, 129:1–6; Dkt. 84, Drankiewicz Dep. at 128:17–25, 129:1–12, 176:13–21; Dkt. 118, Pierce Dep. at 73:22–74:24 ("[I]t's important that I get the description of the offense accurate through like the criminal complaint or arrest reports or presentence investigation. Also, I find a description in the

157

classification actions and in the prior Parole Commission actions. So I'll look at kind of all of those things for the description of the offense . . . ." Q: "Where would you say that you gather the most details about the underlying crime?" A: "The criminal complaint and the presentence investigation, if they're available."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 147:18–21; *id.* at 148:4 (Q: "So one source of facts that distinguish legally identical crimes would maybe be found in the criminal complaint?" A: "Yes."); Dkt. 116, Kramer Dep. at 68:23–69:11 (testifying that she relies on the criminal complaint to ascertain facts of the crime).

65. Commissioners are free to make factual findings to an evidentiary standard less than beyond a reasonable doubt. Dkt. 84, Drankiewicz Dep. at 175:3–25; Dkt. 117, Tate Dep. Feb. 25, 2022 at 145:12–19 (Q: "Have you ever instructed your [C]ommissioners that they have to find the aggravating circumstances to any degree of certainty?" A. "No."); *id.* at 157:10–158:11 (Chairperson Tate testifying that "[i]t seems odd to [him] to have to instruct somebody and say, like, only follow the record if your (sic) X percentage certain that it is reality, when really that's the thing that informs why this person is incarcerated.").

66. Defendants have denied parole based on the "high profile nature of the case." Cranberg Decl. at ¶ 31, Ex. 30 ([redacted] denying Class Member [redacted] even when he had served 37 years and 10 months — nearly two decades past his minimum sentence date. Commissioner [redacted] strongly praising [redacted] rehabilitation, programming completion, and release plan, but nonetheless denied parole [redacted]"); *id.* at ¶ 67, Ex. 66 (showing Class Member Roeling's initial release date as 2004).

67. Defendants have denied parole because they found the individual had, in the prelude to the crime, elected to involve themselves in a "high risk situation." Cranberg Decl. at ¶

158

35, Ex, 183 at 12:7–19. ([redacted]).

68. Defendants have denied parole based on speculative harms that *could have been caused* by the crime.

a. In [redacted] Class Member [redacted] was convicted of attempted first-degree homicide, and sentenced to a minimum term of approximately 12 years. Cranberg Decl. at ¶ 36, Ex. 35.

b. In [redacted] former Commissioner [redacted]." Cranberg Decl. at ¶ 36, Ex. 35.

c. In [redacted], at [redacted] next parole hearing, former Commissioner [redacted] again [redacted] and set [redacted], writing: [redacted] *Id.* at ¶ 37, Ex. 36.

69. Defendant Commissioners have increased the minimum term of imprisonment for Class Members based on findings of mental states that were not found by a jury or beyond a reasonable doubt.

a. Class Member [redacted] was convicted of WIS. STAT. § 943.23(1G), the crime of "operating vehicle without owner's consent with a deadly weapon causing death," a

carjacking-specific felony murder statute that briefly was classified as an A felony
159 that does not have as an element a mens rea of intent/purpose to cause death.

b. In [redacted], former Commissioner [redacted] denied parole and recommended that [redacted] not be considered for parole release again [redacted], in part because he personally believed that [redacted] Cranberg Decl. at ¶ 85, Ex. 84. In [redacted] *Id.*

c. [redacted], in [redacted], former Commissioner [redacted] again [redacted] to Class Member [redacted] and recommended a [redacted] because he found that [redacted]," based on the Commission's fact finding that [redacted] *Id.* at ¶ 38, Ex. 37.

d. Defendant [redacted] further testified that he imposed a less lengthy parole deferral on Named Plaintiff [redacted] than on Class Member [redacted] because he believed that [redacted] crime was [redacted] whereas [redacted] deserved [redacted] because [redacted] Dkt. 86, Landreman Dep. at 136:12–139:16 (continuing further, [redacted]) *Id.*

e. Unlike Class Member [redacted], Named Plaintiff [redacted] was convicted of, WIS. STAT § 940.01(1), first-degree intentional homicide, not second-degree intentional



QB\72763919.4

160 homicide with "adequate provocation," WIS. STAT. § 940.01 (2)(a) (known in other jurisdictions as voluntary manslaughter or the common law "heat of passion" killing).

70. Defendant Commissioners have denied parole, thus increasing the minimum term of imprisonment, because of their view that certain motives require more punishment, even where motive is not an element of the crime (motive is distinct from mental states, which are elements of the Class Members' crimes). Dkt. 68, Tate Dep. Dec. 9, 2020 at 60:19–20 (citing "justification or rationale behind committing the offense" as a "factor" in whether a parole applicant had "served sufficient time so as to not depreciate the seriousness of the offense"); Dkt. 84, Drankiewicz Dep. at 112:1–25; Dkt. 86, Landreman Dep. at 147:12–17 (premeditation "would be a factor, certainly" when evaluating sufficiency of punishment); *id.* at 142:5–20 (Q: "The one thing you're looking for when you're looking to assess seriousness is how culpable their mind is, their mental state when they do the act?" A: "Yes."); *id.* at 144:17–19 (Q: "So you might ask the parole applicant what their motive was?" A: "Yes."); Cranberg Decl. at ¶ 39, Ex. 38 at 2:20–22; *id.* at ¶ 41, Ex. 40 at 3:10, 7:18; *id.* at ¶ 42, Ex. 41 at 5:2 (former Commissioner Drankiewicz asking Class Member [redacted] about his motives at the time of his offense); *id.* at ¶ 43, Ex. 42 at 5:21; *id.* at ¶ 44, Ex. 43 at 46:11; *id.* at ¶ 42 (Class Member [redacted] being denied parole in part because [redacted]; Dkt. 117, Tate Dep. Feb. 25, 2022 at 142:8–15 (Q: "Examples of aggravating circumstances that might make [one of] two legally identical crimes . . . more serious would be something like motive, vulnerability of the victim, the extent of harm that was brought about; is that right?" A: "Yes, those can be examples of aggravating circumstances.").

71. Defendant Commissioners have increased the minimum term of imprisonment for Class Members based on characteristics of the victim including the age, profession, family, or social status of the victim, even when those attendant circumstances were not elements of the offense. *See e.g.*, Cranberg Decl. at ¶ 45, Ex. 44; *id.* at ¶ 46, Ex. 45; *id.* at ¶ 47, Ex. 46 (increasing punishment of Class Member [redacted], who had served almost 30 years beyond his minimum sentence, because [redacted]; *id.* at ¶ 48, Ex. 47 (increasing punishment of Named Plaintiff [redacted], in part because the victim, [redacted] [redacted] was [redacted]”); *id.* at ¶ 49, Ex. 48 at 8:1–11:25 (former Commissioner [redacted] denying release to Class Member [redacted] in part because of a letter from the county executive urging her to deny parole because [redacted] had been involved in the [redacted] *id.* at ¶ 50, Ex. 49 at 4:23–25 (denying parole for Class Member [redacted], in part, because [redacted]”).

a. Former Parole Chair [redacted] testified that a Class Member should serve a longer minimum term of imprisonment if s/he killed a 70-year-old or a child than someone who killed a 20-year-old. Dkt. 85, Gabler Dep. at 93:3–6.

b. In 2015 former Commissioner [redacted] denied parole to [redacted], effectively increasing his punishment, in part, because [redacted] [redacted] Cranberg Decl. at ¶ 24, Ex. 23.

c. In 2017, Commissioner [redacted] denied parole to Class Member [redacted] [redacted] because the victim was [redacted] Cranberg Decl. at ¶ 51; Ex. 50.

d. Defendant Commissioners have denied parole, thus extending prison time further, based on the victim's "innocent" nature, something that is also not an

162 element of the crime, nor a fact that was found by the jury at trial. *See* Cranberg Decl. at ¶ 52, Ex. 51; *id.* at ¶ 53, Ex. 52 (increasing punishment of Class Member [redacted], emphasizing the innocence of his victim); *see id.* at ¶ 54, Ex. 53; *id.* at ¶ 55, Ex. 54; *id.* at ¶ 56, Ex. 55; *id.* at ¶ 19, Ex. 18; *id.* at ¶ 57, Ex. 56 (praising Class Member [redacted] for his rehabilitation and institutional conduct over his more than 30 years in prison, but [redacted] because his victim was [redacted]); *id.* at ¶ 58, Ex. 57 (congratulating Class Member [redacted] on successfully completing programing and good conduct, but still [redacted] in part because [redacted] [redacted]); *id.* at ¶ 22, Ex. 21 at 60:1–3 ([redacted] Class Member [redacted] parole due to [redacted] [redacted]"); Dkt. 84, Drankiewicz Dep. at 213:10–11; 214:15–18 (Q: "You said that if the victim is innocent, that is relevant to the seriousness of the offense. Is that also relevant if they're not innocent?" A: "Well, it's something that I would consider." Q: "Fair to say the status of the victim matters to you in your parole determination?" A: "Yes."); Dkt. 116, Kramer Dep. at 141:14– 17 (testifying that whether the victim was a child could factor into the seriousness of a crime); *id.* at 140:15–18; 141:23–142:4 ("Motive matters. Because I want to know if they have an understanding of that motivation and have they evaluated that motivation within themselves . . . . Was it planned, and how many series of decisions occurred to continuing the offense? Was it reactionary or impulsive? Was it

163

> preplanned? The involvement of the planning. You know, some of that could be in factors if you're asking me to provide examples.").

72. Defendant Commissioners have denied parole, thus increasing the minimum term of imprisonment, because of their view that additional punishment is warranted due to the nature of the relationship between the Class Member and the victim, although the nature of that relationship is not an element of the crime or a fact found at trial. *See e.g.*, Cranberg Decl. at ¶ 59, Ex. 58 (denying parole to Plaintiff [redacted] in part because [redacted]); *id.* at ¶ 60, Ex. 59 at 4:6–13 (Commissioner Landreman inquiring of [redacted] Plaintff [redacted] [redacted] whether or not the victim was [redacted] and stating that he needed clarification of the "elements" of "what happened").

73. Defendants have denied parole, thus increasing the minimum term of imprisonment, based on attendant circumstances that were not elements of the offense. Cranberg Decl. at ¶ 61, Ex. 60 at 5:05; *id.* at ¶ 12, Ex. 11 (asking why Class Member [redacted] [redacted] [redacted]); *id.* at ¶ 54, Ex. 53; *id.* at ¶ 55, Ex. 54; *id.* at ¶ 56, Ex. 55; *id.* at ¶ 19, Ex. 18; *id.* at ¶ 57, Ex. 56 (each [redacted] Plaintiff [redacted] based on the location of [redacted], that [redacted] [redacted]). *See also id.* ¶ 5, Dkt. 116, Kramer Dep at 142:8–12 (testifying that she considers the following: [redacted] had a loaded weapon, so that would be a question to be addressed as to, you know, why did that person have that? Was that common for him – for that individual to have [redacted]]?").

74. Defendants have denied parole, thus increasing the minimum term of imprisonment, after deciding that Class Members should be punished more based on their view of what took place before or after the crime of conviction.

a. Former Commissioner LaCost increased Class Member [redacted] punishment because he and his codefendant [redacted] Cranberg Decl. at ¶ 62, Ex. 61 at 18:3–9.

b. Class Member [redacted] was denied release in [redacted], in part because of the "[redacted]" although this is not an element of his crime and Mr. [redacted] has already served an additional two decades beyond his initial parole eligibility date. *Id.* at ¶ 49, Ex. 48 at 11:3–18; *see also id.* at ¶ 63, Ex. 62 at 22:1 (increasing punishment because Class Member [redacted]").

c. Defendant [redacted] noted the fact that [redacted]. *Id.* at ¶ 84, Ex. 83 (2018 PCA stating "[redacted]."); Cranberg Decl. at ¶ 83, Ex. 82 (same in January, 2019); *id.* at ¶ 80, Ex. 79 (same in September, 2019). Former Commissioner Drankiewicz has been echoing this finding since 2017. Cranberg Dec. at ¶ 81, Ex. 80.[10]

d. Chair Tate testified that the fact that Plaintiff [redacted] "[redacted]" and [redacted] were "factors" that affected the "seriousness of the offense." Dkt. 117, Tate Dep. Feb. 25, 2022 at 154:22–155:13.

**2. Defendants Punish Class Members for Crimes for Which They Were Not Convicted**

75. Defendants have denied parole to Class Members after concluding they committed crimes for which they were never convicted or for which they were not found liable.

[10] During former Commissioner [redacted]s deposition, he "couldn't say" whether [redacted] was a fact presented to the jury, but regardless determined that it went to [redacted] "state of mind;" a fact that Mr. [redacted] "review[s]." Dkt. 84, Drankiewicz Dep. at 192:8–22.

165 a. Commissioner [redacted] denied parole to Class Member [redacted] based on Commissioner [redacted]s belief that there was a "[redacted]. [redacted] was never charged with [redacted], nor ever convicted of such an offense. *Id.* at ¶ 22, Ex. 21 at 48:22–25; 49:1–17 (denying parole to Campbell, finding that there was a [redacted]" to his crimes, even thou[redacted]

b. Commissioner [redacted] denied parole to Plaintiff [redacted] based on his personal conclusion that [redacted] was very fortunate to not have been charged with intentional homicide. Cranberg Decl. at ¶ 60, Ex. 59 at 61.

c. In 1991, at the age of [redacted], Class Member [redacted] murdered his abusive father while [redacted]. He was found not legally liable of [redacted]. Cranberg Decl. at ¶ 70, Ex. 69 at 2.

d. In [redacted], Commissioner [redacted] and former Parole Chairman [redacted] denied [redacted] release to parole supervision, extending his incarceration by five years, because "[redacted]." Cranberg Decl. at ¶ 70, Ex. 69 at 2 (emphasis added) (Chairman [redacted] requiring Class Member [redacted] to serve more time for crimes for which *he was found not responsible* by a jury, and adding a crime for Mr.



QB\72763919.4

166 [redacted] was never charged – [redacted] is not an element of First Degree Intentional Homicide – the actual crime of conviction); Dkt. 85, Gabler Dep. at 187:18–24.

### 3. Defendants Increase Punishment Based on Administrative Fact Finding Regarding Class Members' Juvenile History: Facts Not Found By A Jury or Beyond a Reasonable Doubt

76. Defendants have increased the minimum term of imprisonment, beyond the initial parole eligibility date, based on fact finding about juvenile conduct not found by a jury or beyond a reasonable doubt. *See, e.g.*, Cranberg Decl. at ¶ 50, Ex. 49 at 14:16–18; *id.* at 3:15–22 (asserting that Class Member [redacted] "[redacted]" basing that analysis on "prior reports" summarizing "statements" "that [redacted].").

77. Defendant Commissioners have increased the minimum term of imprisonment for Class Members based on past juvenile records of criminal conduct, "both leading up to and following [the] crime." *See, e.g.*, Cranberg Decl. at ¶ 40, Ex. 39, ([redacted] stating that "additional time should be served so as not to depreciate the seriousness of your crimes and criminal history both leading up to and following this crime."); *id.* at ¶ 71, Ex. 70 ([redacted] notes that [redacted] "had a significant criminal record beginning when [he was] a juvenile.").

167

### D. Defendants Deny Class Members a Meaningful Opportunity for Release Based on Demonstrated Maturity and Rehabilitation and Do Not Consider the Hallmark Features of Youth to Diminish Culpability

#### 1. Defendants Do Not Evaluate Class Members Using the Standard of Maturity and Rehabilitation

78. Parole Commissioners do not apply the standard of demonstrated maturity and rehabilitation to evaluate juvenile lifers for parole release. Dkt. 86, Landreman Dep. at 205:8–14 (Q: ". . . did you understand in those 18 years that you worked [at the Parole Commission] that the law required you to apply the standard of rehabilitation and reform . . . ?" A: "I don't know what 'standard for rehabilitation and reform' means."); Dkt. 84, Drankiewicz Dep. at 246:1–14 (Q: "Have you ever heard that phrase ['demonstrated maturity and rehabilitation'] before?" A: "No, not as you read it . . . ." Q: "Chairman Tate hasn't said, 'Juveniles deserve a meaningful opportunity for release based on demonstrated maturity and rehabilitation?'" A: "I don't recall that . . . . " Q: "Have you ever received training on legal developments related to juvenile lifers?" A: "No."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 66:2–14; *id.* at 64 (Chairperson Tate testifying that he "didn't know" if Parole was familiar with hallmark features of youth "relevant to culpability or capacity for reform[,]" and explaining his belief that training on the topic was "not necessary at this point").

79. The parole criteria listed in the DOC Administrative Code make no mention of "demonstrated maturity and rehabilitation" as a standard for release to parole supervision. Nor are they mentioned in the criteria listed in the Notice of Parole Commission Action. Cranberg Decl. at ¶ 6, Ex. 5.

80. Parole Commissioners do not believe that they need to release Class Members, including members of the non-homicide subclass, if they have demonstrated maturity and rehabilitation. Cranberg at ¶ 5, Ex. 4 at 186:18– (Q: "Do you believe you have to release [redacted]

168

if he has demonstrated maturity and rehabilitation?" A: "I would not make a release recommendation until he – until I felt he had completed all the factors satisfactorily [including sufficient time for punishment].").

81. The State of Wisconsin does not train Parole Chairs or Parole Commissioners how to evaluate Class Members for maturation and rehabilitation. Dkt. 87, Plaintiff's Expert Report ("Expert Report") at 19; Dkt. 68, Tate Dep. Dec. 9, 2020 at 22:7–18; Dkt. 85, Gabler Dep. 58:9–19; Dkt. 84, Drankiewicz Dep. at 245:23–246:14.

82. Parole Commissioners devote a significant portion of parole interviews focusing on facts surrounding the offense, rather than on evidence of rehabilitation and maturity. Dkt. 87, Expert Report at 20–22; Parole Commissioners often mention evidence indicative of Class Members' emotional and social maturity (e.g., program participation, growth in education or vocation, acceptance of responsibility for past crimes and infractions, good processing of feelings, and other "pro-social" skills), but rather than evaluating whether such evidence shows maturation or rehabilitation they continue to deny parole for lack of "sufficiency of punishment." Cranberg Decl. at ¶ 89, Ex. 90; *id.* at ¶ 12, Ex. 11.

83. While Class Members are offered a theoretical "opportunity" at parole, nothing in the formal training, regulations, or standards of the Parole Commission provides a *meaningful* opportunity to be released upon a showing of rehabilitation and maturity. Dkt. 87, Expert Report at 9.

84. Defendants believe that granting parole release to Class Members is a purely discretionary act of grace reserved for "exceptional individuals" and "model inmates" instead of the Constitutional right for minors for whom a life sentence has been deemed disproportionate punishment by a sentencing judge (for all homicide offender Class Members) or by the United

169

States Supreme Court (for all non-homicide offender Class Members). Dkt. 84, Drankiewicz Dep. at 108:4–19 (Q: "So, you would only recommend release for a model inmate; is that accurate?" A: "Well, again, it gets down to how you want to define what this model looks like. But I mean yes, I'm looking for those criteria to be that . . . And so I'm not looking for marginal individuals for discretionary release. I'm looking for exceptional individuals."); Cranberg Decl. at ¶ 65, Ex. 64 at 16:2–5 ("If you ever want to get out before your [Maximum Release] date . . . it's got to be . . . perfection."); *id.* at ¶ 88, Ex. 87 at 6:24–7:3 [redacted] telling Class Member [redacted] "And, you know, I, I can't *reward* someone who's continued to make mistakes.") (emphasis added).

### 2. Defendants Do Not Consider that Child Offenders Are Less Culpable for Their Crimes than Adult Offenders and Do Not Know How to Apply the Features of Youth

85. Defendants believe it is their job, not the job of the sentencing judge, to assess proportionality of punishment. Dkt. 117, Tate Dep. Feb. 25, 2022 at 230:7–14 (Q: [Do you agree that] "[s]omeone else already decided how much time is sufficient so as not to depreciate the seriousness of the offense. And that's the legislature and the sentencing judge, the person that was closest to the facts of the crime." A: "I would disagree." Q: "And the democratic elected body sets that punishment?" A: "I would disagree."); *id.* at 133:1–6 (Q: "So, what the [C]ommissioner has to find in order for No. 5 ['You have/ have NOT served sufficient time for punishment'] to be satisfied is that in their own subjective opinion this amount of time is or is not sufficient so as to not depreciate the seriousness of the offense?" A: "Yes.").

86. Parole Commissioners are unaware that the hallmark features of youth place substantive limits on what constitutes proportionate punishment as set forth in *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016). Dkt. 84, Drankiewicz Dep. at 246:18–247:14.

170 87. Wisconsin made no changes in its parole policies and practices for juvenile offenders in response to the Supreme Court decisions in *Miller, Graham,* and *Montgomery.* Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. First Set of Requests for Admissions Nos. 1–3).

88. Defendants apply the same parole policies, procedures, and standards to parole applicants life-sentenced for crimes committed as children that they apply to all parole applicants. Cranberg Decl. at ¶ 87, Ex. 86 (Defs. Resp. to Pls. Interrogatory No. 10) ("The practice for juvenile lifers is no different than the practice for non-juvenile lifers."); Dkt. 68, Tate Dep. Dec. 9, 2020 at 108:2–3; 107:1–3 ("There is no distinction between juvenile lifers [in] parole practice."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 49:22–50:8 (Q: "When you started as a chair, at the start of your tenure, how did the Parole Commission assure that the [C]ommissioner actually conducting the in-person interview of a person who was life sentenced for a crime committed as a child considered the hallmark features of youth in making their parole decision?" A: "There were no distinctions to how the parole [C]ommissioners operate as far as conducting hearings or writing their documents between persons who were convicted prior to 18, persons who were convicted after, or before the age of 18 or after."); Dkt. 116, Kramer Dep. at 152:19 ("It's the same factor for everyone's review.").

89. Commissioners are not required to consider youth at the time of the crime. Dkt. 116, Kramer Dep. at 151:3–14 (Q: "[D]o you have discretion when you do consider age at the time of the offense to give that age any weight you think it deserves?" A: "I would just say that it's an overall factor of what was going on with that individual at the time of the age that they were when they committed the offense." Q: "Okay. And so it doesn't have more or less weight than any other factor necessarily?" A: "No." . . . . Q: "Could it in fact sometimes have no

171

weight?" A: "Potentially."); *id.* at 150:25–151:2 (Q: "Is there any law or regulation that requires you to [consider age at the time of the offense]?" A: "Not that I'm aware of.").

90. Commissioners are not told to take youth into account or are otherwise given training or instruction on understanding the hallmark features of youth. Dkt. 117, Tate Dep. Feb. 25, 2022 at 61:24–62:6 (Chairman Tate testifying that he has not instructed the Parole Commissioners to consider the hallmark features of youth. Q: "So . . . you have not and you do not need to instruct your [P]arole [C]ommissioners that they are required to make their decision in light of the hallmark features of youth diminished culpability and enhanced capacity for reform?" . . . " A: "No."); *id.* at 57:21–18: "I do not require my [C]ommissioners – I do not give my commissioners an explicit list of individual factors that they must consider. . . . [I]t would be asinine for us to say, 'For this case to look at these things, for this type of case look at these things.' That's not realistic. That's not logical."); *id.* 58:23–59:5 (Q: "So for the 140-so persons who fit our class definition, the answer is no, that [C]ommissioners are not required to make their decisions in light of the hallmark features of youth, the diminished culpability, and enhanced capacity for reform?" A: "Commissioners are not instructed to do anything differently [for juvenile offenders] than what they would do for everybody else . . . ."); Dkt. 118, Pierce Dep. at 63:10–16 ("Did you receive training for making parole decisions specifically for juvenile offenders?" A: "No." Q: "Do you in practice make those decisions any differently for juvenile offenders versus adult offenders?" "No.").

91. Defendants do not understand what the hallmarks of youth are, and do not understand how they are relevant to their parole evaluations. Dkt. 116, Kramer Dep. at 39:13–40:1 (Q: "Other than impulse control and lack of experience with complex problem solving and lack of general world experience, are there any ways that you know of in which an adolescent

173

brain differs from that of an adult?" A: "In a technical sense, no." Q: "How about in any sense?" A: "But I feel like you're asking me the technical sense of brain development, which I stated I do not have a technical understanding of brain development specifically. You're asking me for technical information that I don't have specific knowledge to address specific brain development."); Dkt. 118, Pierce Dep. at 42:1al 7 (Commissioner Pierce testifying that she has no knowledge, experience, or training in child development).

92. Defendants, in fact, penalize Class Members for explaining their crime within the context of juvenile brain development. *See, e.g.*, Cranberg Decl. at ¶ 72, Ex. 71 at 2 (former Chair [redacted] asserting "records reflect your [redacted]"); Proctor-Brown Decl. at ¶ 81, Ex. 80 (Chair [redacted] telling Named Plaintiff [redacted] "Your principle claim to the Commission was that . . . some of the crimes you admit to . . . were the result of [redacted]. In explaining to the Commissioner during the hearing that the reason why you were [redacted] you said 'because that was my environment . . . [redacted] and that's why I [redacted].' [redacted]").

93. Parole Commissioners have increased punishment for Class Members where they had a juvenile history even when that misconduct is explained by childhood trauma, youthful inability to engage in constructive self-expression, or because "the frontal cortex isn't fully developed until way late in the late 20s." Cranberg Decl. at ¶ 82, Ex. 81 ("you explained

173

suppressed anger from childhood trauma and an inability to effectively express yourself contributed to your situation . . . considering the severity of the offense and the senseless loss of life, more time is warranted."); *id.* at ¶ 12, Ex. 11.

94. Commissioners do not acknowledge that susceptibility to peer pressure is a hallmark feature of youth and a mitigating circumstance for Class Members' crimes. Cranberg Decl. at ¶ 75, Ex. 74 at 2 ("[redacted]."); *id.* at ¶ 73, Ex. 72 ("[redacted]."); *id.* at ¶ 71, Ex. 70 (Commissioner [redacted] noting that [redacted] self-reported that he was [redacted] at the time of his offense but still deferring the case 10 months); ¶ 86, Ex. 85 (failing to mention Class Member [redacted] susceptibility to peer pressure when 17 years old and committing crime [redacted]).

95. Even where the hallmark features of youth are fully present, Parole Commissioners impose full moral culpability on Class Members if the Parole Commissioner believes that the Class Member "knew right from wrong." *Id.* at ¶ 74, Ex. 73 at 6:22–24 ("[J]ust because someone's frontal cortex is not developed doesn't mean they don't know the difference between right and wrong."); *id.* at ¶ 11, Ex. 10 (denying parole for Class Member [redacted] in part because "despite [redacted]"); Cranberg Decl. at ¶ 76, Ex. 75 (former Commissioner LaCost incarcerating Class Member [redacted] for 7 more months in part because he "[redacted]

1741

[redacted].”); *id.* at ¶ 62, Ex. 61 at 7:23–24 (former Commissioner [redacted] denying parole in part because she thought Class Member [redacted] given that [redacted] *id.* at ¶ 40, Ex. 39 (former Commissioner LaCost denying parole and deferring the next parole hearing by 18 months in part because [redacted].”).

96. Defendants do not interpret juvenile behavior that occurred before the crime of conviction in light of the hallmark features of youth and transient immaturity, and instead base denials on such records in spite of current evidence of rehabilitation and reform. Cranberg Decl. at ¶ 77, Ex. 76 at 7:16–25 (noting Class Member [redacted] in denying him parole); *id.* at ¶ 78, Ex. 77 (denying parole for Class Member [redacted] because of his “juvenile record” for [redacted]”); *id.* at ¶ 46, Ex. 45 (denying parole for Class Member [redacted], in part, due to of his “[redacted]”); *id.* at ¶ 79, Ex. 78 (denying parole for Plaintiff [redacted] because of his [redacted] . . . .”); *id.* at ¶ 80, Ex. 79 (denying parole for Class Member [redacted] in part because of “. . . a lengthy juvenile record . . . .”); *id.* at ¶ 71, Ex 151 (denying parole to Class Member [redacted] citing “a significant criminal record beginning when you were a juvenile.”).

97. Defendants sometimes even treat youth as an aggravating factor. Dkt. 116, Kramer Dep. at 153:4–9 (“Mitigating or aggravating, [a juvenile offender’s] age could be one factor that’s reviewed.” Q: “And it could be a mitigating factor, but it could also be an aggravating factor, is that right?” A: “It could be.”).

[redacted]

[redacted]

175

### 3. Defendants Require Certain Programming For Release, But Deny Class Members Access to Rehabilitative Programming Until Well After They Have Already Served Their Minimum Term of Imprisonment

98. Wisconsin Parole Commissioners receive no training or guidance on why, how, or when to endorse Class Members for programming or a reduced security classification. Dkt. 68, Tate Dep. Dec. 9, 2020 at 146:14–148:13.

99. While a Parole Commissioner can recommend a Class Member for specific programming, the decision about whether or when that programming is made available is made by BOCM. Dkt. 68, 12/9/2020 Tate Dep. Dec. 9, 2020 at 146:14–15 ("BOCM is the sole authority for when and how and what programming people get."); Dkt. 86, Landreman Dep. at 73:5–10; 87:21–25 (BOCM and the programming committee have the power to make their own, final decisions); Dkt. 117, Tate Dep. Feb. 25, 2022 at 94:16 ("Programming is probably the one [requirement] that's [Class Members] have the [least] direct control over because even DOC doesn't necessarily have the entire control over what programming can or can't be offered.").

100. BOCM does not provide Class Members priority for programming until they are deemed to be approaching "imminent release." Dkt. 67, Deposition of BOCM Director Angela Hansen ("Hansen Dep.") at 119:21–120:2.

101. "Imminent release" requires a Class Member to have received a deferral length of less than 12 months. Dkt. 67, Hansen Dep. at 114:15–18.

102. Class Members do not receive a deferral less than 11 months until after well after they have served their minimum sentence. *See* Cranberg Decl. at ¶ 92, Ex. 91; *id.* at ¶ 93, Ex. 92; *id.* at ¶ 32, Ex. 31 (Class Member [redacted] received [redacted]); *id.* at ¶ 94, Ex. 93; ¶ 48, Ex. 47; (Named Plaintiff [redacted] received [redacted]); *id.* at ¶ 42, Ex. 41 at 14:20–21; *id.* at

176

16:3–17:12; *id.* at 21:23–22:7 (former Commissioner [redacted] explaining to non-homicide Class Member [redacted], incarcerated since 1997 for a [redacted], that he could not receive [redacted] programming until he had an 11 month deferral, despite his "excellent conduct." "[I]f we are serious about getting you into that program, there's a number that they want to see. Otherwise I'd probably not offer it. That's an 11 month deferral.").

103. Class Members, all of whom have maximum terms of life (or de facto life), who become parole eligible are not considered close to release by BOCM staff because "we don't know at that time or have any indication of when their release will occur." Dkt 67, Hansen Dep. at 129:19–130:19; *id.* at ¶ 48, Ex. 47.

104. Class Members are frequently denied access to reduced security classifications, rehabilitative programming, including essential required programming, and work experience because priority is given to people who are approaching their mandatory or fixed release date under Truth-in-Sentencing. Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Request for Admission No. 21); Dkt 67, Hansen Dep. at 110:20–24; 121:6–10) (testifying that "BOCM looks at who is releasing to the community and [tries] to address those individuals first . . . ," programming is assigned "primarily by release date," and waitlists for programing invariably put "lifers . . . grouped at the bottom" because BOCM does not consider parole eligibility dates to be release dates); *id.* at 90:1–10 ("If an individual is confined and has 15 years to serve, they may not go directly to a facility with their program available, just based on resources and bed management . . . . Because not every site has every primary need."); *id.* at. 119:21–120:2; 122:2–8 (". . . it's a catch-22 that that juvenile lifers who are trying to get programming that will allow them to demonstrate maturity and rehabilitation are denied the programming need because they aren't prioritized for the programming."); Declaration of Class Member [redacted]

177

[redacted] *Compare* Cranberg Decl. at ¶ 45, Ex. 44 *with id.* at ¶ 35, Ex. 34 at 7:10– 12 (denying Class Member [redacted] parole in 2016, in part because he was still "in need of [redacted] treatment]" which he could not receive until he was classified as [redacted] custody by BOCM, but when Commissioner [redacted] asked [redacted]" two years later, Mr. [redacted] replied "I ain't done none of it. I mean, since the program . . . ."); *see also* Cranberg Decl. at ¶ 95, Ex. 94 (Plaintiff [redacted] was denied placement on a waitlist for [redacted] because group enrollment was based on release date); Dkt. 84, Drankiewicz Dep. at 153:25–155:17; *id.* at 158:23–25 (Class Member [redacted] was [redacted], in part because he could not enroll in [redacted] Program, despite being waitlisted since 1998); Cranberg Decl. at ¶ 96, Ex. 95 [redacted] *id.* at ¶ 65, Ex. 64 (Class Member [redacted] was denied parole despite being on the "waitlist for cognitive behavioral" for years); Dkt. 67, Hansen Dep. 89:19–90:10; Cranberg Decl. at ¶ 97, Ex. 96 (Plaintiff [redacted] was denied access to [redacted], which he had been assigned since entering the prison system, because he was not classified as [redacted] custody); Declaration of Class Member [redacted] at ¶ 16 [redacted] has been denied [redacted] programming even though, in 1999, the court ordered him to receive it, because he is not closer to release. [redacted] inability to complete this program prevents him from getting closer to release).

105. BOCM's internal, invalidated, risk assessment matrix bars Class Members from access to programming available only in minimum security settings because it considers all life-

178

sentenced individuals to be "higher risk" for misconduct per se. Dkt. 67, Hansen Dep. at 144:12–14, 145:1–3.

106. The Parole Commission frequently requires Class Members to complete certain programs prior to release, even if those programs were not assigned during their initial classification. Dkt. 68, Tate Dep. Dec. 9, 2020 at 123:24–124:7 ( ". . . as far as parole is concerned, if we say, you need to complete this program before we release you, then you need to complete this program before we release you . . . no release will happen . . . unless you satisfy the discretionary criteria that we're laying out in terms of expectations."); Dkt. 86, Landreman Dep. at 198:7–17 (testifying that though a Commissioner could not physically mandate someone to be in a program, deeming a program "essential" meant he would not release them without completion); Dkt. 117, Tate Dep. Feb. 25, 2022 at 95:4–9 (Q: "[I]s it true that each [C]ommissioner, it's up to their subjective discretion to decide which programs must be completed prior to release and which programs could be completed in the community?" A: "Yes[.]"); Proctor-Brown Decl. at ¶ 65, Ex. 164 at 4:13; 5:11–12 (former Commissioner [redacted] acknowledging that she lost track of Class Member [redacted]s programming progress, in part because she "keep[s] adding things" as "things always change in the DOC").

107. BOCM does not necessarily provide Class Members the programming opportunities that Defendant Parole Commissioners require, and parole is then denied based on Class Members' failure to complete programs they were never offered or allowed to take. Dkt. 117, Tate Dep. Feb. 25, 2022 at 93:14 ("Is it [sometimes] the case that someone is willing and hoping to take a program and that they're not able to access it for an extended period of time for reasons outside of their control?" A "Yeah. That's probably one of the biggest challenges we actually have."); Cranberg Decl. at ¶ 98, Ex. 97 (instructing Plaintiff [redacted] to complete a

179

second vocational program, given his "limited work skills" due to incarceration as a youth, but when [redacted] requested the program, he was denied by BOCM because he had already completed a vocational program and could not be prioritized for another. Instead of lifting the requirement for parole, former Commissioner [redacted] instructed [redacted] to "keep trying to obtain a spot in the program."); *id.* at ¶ 99, Ex. 98 (noting that Class Member [redacted] had no major conduct reports for 13 years and had "successfully completed" a range of programming but denying parole, in part, based on the finding that he had "unmet program needs of [redacted] and must successfully complete these programs at the institution level, *when they become available to you.*") (emphasis added); Dkt. 68, Tate Dep. Dec. 9, 2020 at 124:10–14 "individuals sometimes will say, well, I don't have to complete that program . . . you don't have to do anything but we also don't have to release you unless discretionally we determine that you've satisfied our criteria.").

108. The Parole Commission, in some cases, has refused to endorse a Class Member for programs that he or she is required to complete prior to release. Dkt 86, Landreman Dep 201:11–203:5 (testifying that he did not recommend programs he said Named Plaintiff [redacted] needed to take to have "satisfactory program completion" and could not get into, even though his recommendation would make it more likely [redacted] would get the program); Cranberg Decl. at ¶ 48, Ex. 47 (Parole Commissioners did not endorse Named Plaintiff [redacted] application for the vocational program they had instructed him to take); *id.* at ¶ 96, Ex. 95 ("[redacted]").



QB\72763919.4

180

109. Class Members have also been denied release for failure to complete programming they cannot get into because BOCM has prioritized "individuals that are high need and moderate need for resources versus those that are low need." Dkt. 67, Hansen Dep. at 93:25–94:4; *id.* at 95:25–96:4; Cranberg Decl. at ¶ 100, Ex. 99 (BOCM repeatedly denying Named Plaintiff [redacted] access to "[redacted]," a program his COMPAS assessment identified as a [redacted], because he was *too low-need*, he was not able to complete the program until 2020, after the Parole Commission Chair "overrode" the denial).

**4. Defendants Require Extended Time in Reduced Security Classifications For Release, But Deny Plaintiffs Transfer to These Classifications Until Well After Their Parole Eligibility Date**

110. The Wisconsin Parole Commission requires Class Members to meet various "unofficial" or "discretionary" requirements for release. Proctor-Brown Decl. at ¶ 2, Ex. 100 at 14:5–19 (Defendant Tate telling Class Member [redacted]: "Okay. So you probably are aware of like some of the, you know, unofficial or discretionary things that the commission puts into place before, you know, granting release. Some of which are being in a reduced level of custody, working towards a [drivers'] license, having substantial savings.").

111. One of the "unofficial" or "discretionary" requirements required of Class Members is transition through all DOC custody levels (maximum custody, medium custody, minimum security custody, and minimum community custody). Dkt. 85, Gabler Dep. at 79:9–12 (testifying that Commissioners "generally want to see someone progress from maximum to medium to minimum to community work release"); Proctor-Brown Decl. at ¶ 3, Ex. 101 (advising Class Member [redacted] that it is "essential" that he transition through reduced custody); Cranberg Decl. at ¶ 67, Ex. 66; *id.* at ¶ 3 Ex. 2 (showing five of 83 Class Members earned parole at a classification above minimum in the past 12 years; seven other Class Members

181

were released from incarceration at a classification above minimum due to death, court order, mandatory release date, or extended supervision, but were not paroled).

**a. Classification Reduction Is Not Commenced Until Well After Class Members Have Completed Their Minimum Terms**

112. As life-sentenced juvenile offenders, Class Members, are classified as [redacted] security custody upon intake. Dkt. 67, Hansen Dep. at 145:1–148:5.

113. Administrative regulations prevent Class Members from being classified as [redacted] custody until they have already passed their parole eligibility date. WIS. ADMIN. CODE § DOC 302.12.)

114. Once commenced, progression through custody classifications is slow. Proctor-Brown Decl. at ¶ 58, Ex. 156 (BOCM Program Assistant Catherine Knuteson writing Plaintiff [redacted], "Most individuals in our care progress slowly through each level one at a time.").

115. Movement through custody classifications depends on factors outside of the control of both Class Members and the Parole Commission, including available resources. *Id.* (Ms. Knuetson continued: "[P]lease know the speed of movement to other locations mainly depends upon available DAI resources at the time of transfer. We take into account transportation scheduling, bed space, individual program needs, proximately to release, in addition to appropriate adjustment along with several other factors outlined in [WIS. ADMIN. CODE § DOC] 302.").

116. Regardless of the level of custody, BOCM's security classification tool uses offense history and sentence structure as criteria for custody classification. WIS. ADMIN. CODE § DOC 302.11; Dkt. 67, Hansen Dep. at 65:6–20 (explaining that risk assessment tool takes into account the following: offense, offense history, sentence structure, institutional adjustment, escape history, emotional mental health, program participation, temporary factors).

1421

117. If a Class Member's "offense history" is "high," BOCM's security classification tool designates the Class Member's overall risk as "high" also, absent an override. Dkt. 67, Hansen Dep. at 142:19–22.

118. BOCM's security classification tool tracks older custody guidelines. Dkt. 67, Hansen Dep. at 144:17–25, which explicitly required that life-sentenced person spend significant time in maximum custody. Proctor-Brown Decl. at ¶ 5, Ex. 103.

119. Once Class Members are eligible for parole, BOCM's policy is to require an endorsement to minimum from the Parole Commission before reclassifying them to minimum custody levels. Proctor-Brown Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions No. 4) ("Defendants admit that it is BOCM's current practice to deny Class Members' request for minimum or minimum community custody absent an endorsement from the Parole Commission or some other indication that the Class Member is progressing towards release."); Dkt. 67, Hansen Dep. at 119:21–120:2; *id.* at 162:1–6 ("Where I think [Parole's endorsement] comes into play, like we have mentioned, is that when [BOCM is] looking at transitioning [a person] through minimum or minimum community custody because that -- then Parole would give us some indication of when that individual could potentially be facing release.").

120. Typically, the Parole Commission does not endorse a Class Member for minimum custody until the Class Member has "D11 or less" (*i.e.,* 11 months or less until parole will be reconsidered), which is when the Class Member would be considered low risk, according to BOCM's risk tool. Dkt 67, Hansen Dep. at 155:14–25.

121. The effect of BOCM's policies and administrative rules is to deny Class Members access to reduced custody classifications until they are well past their initial parole eligibility dates. Dkt. 67, Hansen Dep 163:17–20 (explaining that BOCM will not reduce custody from

183

[redacted] until after parole eligibility date); Dkt 68, Tate Dep. at 91:3–12 (testifying that conviction with a life sentence should correspond to a higher level of initial custody, and "how quickly and how effectively [people] reduce in those levels of custody is outside of the purview of the Parole Commission, though, prior to their eligibility date."); *id.* at 157:17–20; 157:23–158:23; 184:20–25 (Defendant Tate testifying "there's no prescriptive time" that Class Members are instructed they must remain at certain custody levels, and that "each [C]ommissioner may have their own interpretation" of "what is an extended period of time" based on the Class Member's "overall history," length of time at higher custody levels, or time to determine "whether they're going to make another mistake at this next level or make a poor choice[.]" All of this to mean that the process of a Class Member moving through reduced classification levels can be a "slow transition."). *See also* Cranberg Decl. at ¶ 64, Ex. 63 (former Commissioner [redacted] instructing Plaintiff [redacted] he would have a "slow transition" through [redacted] custody and [redacted]); *id.* at ¶ 25, Ex. 24 (asserting that Class Member [redacted], who had been incarcerated for 23 years with good conduct, needed [redacted] before the Parole Commission would even consider a possible endorsement to a secure [redacted] custody facility. [redacted]; Declaration of Plaintiff [redacted] at ¶ 12 (same); Proctor-Brown Decl. at ¶ 4, Ex. 102 at 14:24–15:6, 21:25–22:19 (telling Class Member [redacted] that he should serve more time to prepare for transition back into the community); *id.* at ¶ 6, Ex. 104 at 11:19–25 (after being housed in [redacted] custody for nearly a year, Class Member [redacted] was told by former [C]ommissioner [redacted] that he would need to



QB\72763919.4

184

serve at least another year in [redacted] custody before the Parole Commission would considered moving him to [redacted] custody).

### b. Defendants Impose Additional "Risk Reduction" Burdens on Class Members Because They Were Juveniles When Entered Prison

122. Parole Commissioners have stated that they *especially* require Class Members to proceed through custody reductions because they entered prison as children. *See, e.g.*, Dkt. 86, Landreman Dep. at 163:8 – 164:25.

a. In 2021, Commissioner [redacted] found that Named Plaintiff [redacted] had satisfactory programming, institutional conduct, and release plan. Nonetheless, she denied parole based on insufficient time for punishment and stated: "[redacted]" Cranberg Decl. at ¶ 34, Ex. 33.

b. Chairperson [redacted] overrode [redacted] stating that [redacted] has served "sufficient [time] as to not depreciate the seriousness of [his] offense," based on his sustained positive conduct and overall maturation. However, Chairperson Tate denied [redacted] parole notwithstanding his assessment of maturation stating: [redacted]" *Id.*

c. Chairperson [redacted] made this assessment notwithstanding the fact that [redacted] had not been given the opportunity to "demonstrate proper adjustment in a reduced

185 custody setting" until nine years after completion of his minimum term of incarceration. *Id.*

123. Each reduced custody level is considered a "test" of whether the person is safe to release and is therefore not a risk to society. *See* Dkt. 85, Gabler Dep. at 79:25 (testifying that time spent in lower custody is a test of judgment); Dkt. 68, Tate Dep. Dec. 9, 2020 at 82:9–15 (Parole evaluates institutional adjustment by looking at conduct at reduced custody levels); Proctor-Brown Decl. at ¶ 7, Ex. 105 at 10:23–11:16 (former Commissioner [redacted] informing Class Member [redacted] that lower custody [redacted]"); *id.* at ¶ 8, Ex. 106 at 13–23);[11] *id.* at ¶ 9, Ex. 107 at 5:16–17 (former Commissioner Drankiewicz again describing to Class Member [redacted] that the move to reduced security is a "right" that must be "earned" and later stating [redacted] Cranberg Decl. at ¶ 61, Ex. 60 at (former Commissioner [redacted] telling Plaintiff [redacted] she would be "watching" for how he handled himself when "things get shaky" after his step-down to [redacted] custody); *id.* at ¶ 65, Ex. 64 at 23:3–13 [redacted]

[11] Former Commissioner [redacted]: "I mean, people can hang out in maximum security, and minimum, medium security, and say they've changed - " [redacted] " - but the constraints upon them are pretty significant. So you're, you're changed in this environment . . . but what happens when you get extra freedoms and nobody's watching? Are you still the same person?"

186

[redacted]

124. The Parole Commission expects Class Members to serve even more time than adult offenders in reduced custody because they were incarcerated as adolescents. Dkt. 68, Tate Dep. Dec. 9, 2020 at 180:2–10 (Defendant Tate testified that "minimum community custody is so valuable as it relates to really lengthy sentences, particularly for those who are convicted as juveniles, because they otherwise have no exposure to the community."); *id.* at 184:20–185:2 (Chairperson Tate testifying that someone being in maximum for 21 years before transitioning is an indication of "slow transition" going forward because they need to accomplish more than someone who has been in for a shorter period of time); Proctor-Brown Decl. at ¶ 10, Ex. 108 (Commissioner [redacted] telling Class Member [redacted], who had served 37 years, including 17 years past his parole eligibility date, and had not had a conduct report since 2001, that he would still [redacted] since [he] w[as] so young when [he] came into prison."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 83:21–84:11 ("We'd like there to be an opportunity for a person to be exposed to a setting that they probably have not been in for decades prior to throwing them all the way back into that, ideally . . . I think it is more beneficial to [child offenders] . . . because their entire life has been incarcerated."); *id.* at ¶ 24, Ex. 23 at 14:6–24 (former Commissioner [redacted] telling [redacted] "[redacted]

187

[redacted] Proctor Brown Decl. at ¶ 64, Ex. 163 at 66:13–69:5 (former Commissioner [redacted] telling Plaintiff [redacted] that "[redacted]" because Mr. [redacted]'s "goal" was to "release [redacted] back into the community in the best situation possible.").

**c. Proving Risk Reduction Is Outside of the Control of Class Members and They Are Denied the Opportunity for Arbitrary Reasons**

125. Custody classification, also referred to as security classification, is determined by BOCM not the Parole Commission. WIS. ADMIN. CODE § DOC 302.08; Dkt. 68, Tate Dep. Dec. 9, 2020 at 171:4–8 (testifying that the Parole Commission has no authority to designate security classification).

126. Transition through security levels is also prolonged because "[Class Members are] always battling BOCM or bed space." Dkt. 84, Drankiewicz Dep. at 228:5–6. Even when Class Members receive endorsement to lower custody levels, they may have to wait years to obtain a transfer and start the process of transitioning through reduced custody levels and gradually reduced deferral periods. Dkt. 68, Tate Dep. Dec. 9, 2020 at 121:19–25. *See also* Proctor-Brown Decl. at ¶ 12, Ex. 110 at 5:16–7:6 (Class Member [redacted], who had served 21 years and been parole eligible since 2010, was approved for [redacted] custody in 2019, learned from BOCM and Parole that he would have to wait yet another year before actually receiving a bed in a [redacted] custody facility. Former Commissioner [redacted] told Mr. [redacted], "[t]he bed space in minimums is so packed up right now. You just have to wait for a bed to open before you can go.").

143

127. Parole Commissioners' discretion to decide what constitutes suitable adjustment to each reduced security level is checked only by the Chairperson. The Chairperson's discretion, in turn, is entirely unchecked. Dkt. 117, Tate Dep. Feb. 25, 2022 at 89:11–15 (Q: "So is it fair to say that it's up to each commissioner's individual discretion to decide what counts as satisfactory adjustment to the institution?" A: "Yes. It's their judgment."); *id.* at 90:3–13 (Q: "[S]ome [C]ommissioners might say, 'I want to see ten years without any bad reports' and some [C]ommissioners might say one year?" A: " . . . [A Commissioner expecting ten years] would probably be corrected and given some direction by the chair and say that's not reasonable." Q: "By you as the chair, but a different chair could say actually 50 years is the right number?" A: "Potentially. Those are possibilities based on the structure of the law.").

128. After waiting years to attain minimum security custody, Class Members must wait further to attain minimum community custody, and then wait further to participate in work-release programs. Former Commissioner LaCost equated this wait to "standing in line at Great America." Cranberg Decl. at ¶ 44, Ex. 43 at 8:1–14; Proctor-Brown Decl. at ¶ 7, Ex. 105 at 6:8–6:13 (same).

129. Defendants' requirement that Class Members serve time in minimum community custody prior to release is not reasonably related to the need to reduce risk to public safety prior to release. WIS. ADMIN. CODE § DOC 302.07 (Factors in Assigning a Custody Classification); Dkt. 117, Tate Dep. Feb. 25, 2022 at 81:6–83:20 (Q: "You wouldn't use the communities – the rural communities in Wisconsin where these facilities are located as lab rats if you thought the person had a significant probability of causing harm, would you?" A: "No . . . obviously I wouldn't recommend anybody who's actively dangerous or having fights or something like that to a level of custody, but we also need to measure whether they're going to perform well on

1491

supervision because they're kind of menial . . . there's a bunch of smaller rules that exist that we'd much rather they be able to manage those well and not come back to prison under some technicalities."); *id.* at 191:5–11 (Chairperson Tate describing minimum custody as not essential but "preferred and beneficial.").

130. As part of the transition to lower custody levels Class Members have also been required to "work outside the fence." Cranberg Decl. at ¶ 98, Ex. 97; Proctor-Brown Decl. at ¶ 11, Ex. 109; Dkt. 67, Hansen Dep at 123:5–20.

131. Work outside the fence is only available to people with minimum community custody who are housed at minimum community institutions or centers with work release options. Dkt. 67, Hansen Dep. at 123:5–12.

132. Defendants require minimum community custody and work release for Class Members who were incarcerated as children "because they otherwise have no exposure to the community." Dkt. 68, Tate Dep. Dec. 9, 2020 at 180:2–7; Dkt. 85, Gabler Dep. at 199:5–7 (noting that "an objective for the Parole Commission [is] to get somebody to have some experiences outside the fence before they're finally released from prison.").

133. Work-release assignments, like programming, are dependent on capacity including "what's happening in the community relative to jobs as well . . . sometimes there's ample space and sometimes, you know, if we're in a recession there's not." Dkt. 67, Hansen Dep. at 123:5–20.

134. Class Members with life sentences are not prioritized for work release because they do not have an "outdate." Cranberg Decl. at ¶ 44, Ex. 43 at 8:1–9:14 ([redacted] telling Class Member [redacted] that based on his sentence, "[t]here's no guarantee of a release date . . . . If the Warden put all 60 people serving a life sentence out at work release it would tie up every work

1901

release job she has, and it would give no one the opportunity to get to work release who's actually got a release date.").

135. In 2018, there were 800 individuals awaiting a work release job to be "tested," but there were only 60 work release jobs available, and "only eight to 12 of them" were reserved for people with life sentences. Cranberg Decl. at ¶ 44, Ex. 43 at 8:10–22 (informing Class Member [redacted] he has to wait in a "very long line" because there are 800 guys [the Warden] is trying to prepare for transition to the community" and there are not "800 work-release jobs."). *See also* Proctor-Brown Decl. at ¶ 7, Ex. 105 at 4:3–19; *id.* at 6:8–13 (former Commissioner LaCost informing Class Member [redacted] that [redacted]").

136. Commissioners deny parole release to Class Members who have not been given an opportunity to participate in a work release program through no fault of their own. Cranberg Decl. at ¶ 98, Ex. 97 (former Commissioner [redacted] told Class Member [redacted] that he must [redacted]"); Proctor-Brown Decl. at ¶ 13, Ex. 111 (As early as 2012, Class Member [redacted] was told by the Parole Commission that he needed to [redacted]); Dkt. 86, Landreman Dep. 171:1–173:11.

137. When a reclassification committee cannot make a unanimous recommendation, the decision will be referred to the second step committee. The second step committee consists of the warden of the institution and a BOCM sector chief. Proctor-Brown Decl. at ¶ 14, Ex. 112.

191

138. The Parole Commission can make endorsements for reduced classifications, transfers, specific programs, and early reclassification hearings but BOCM is not required to follow these endorsements and regularly declines to do so.

a. Named Plaintiff [redacted] was denied a classification reduction and transfer to a [redacted] institution despite multiple parole endorsements, making it impossible for him to meet the discretionary release criteria Defendants demand.

b. In [redacted] Mr. [redacted]'s fourth parole interview and nine years beyond his minimum sentence, Defendant [redacted] denied parole stating: "[redacted]" The Chair imposed an additional [redacted] so that [redacted] could "benefit" from this "exposure." Proctor-Brown Decl. at ¶ 15, Ex. 113 at 2.

c. Despite having been housed at a [redacted] institution for over a year, on [redacted] Mr. [redacted] was denied a classification reduction after the second step committee found that "in the interest of safe transition, continued [redacted] custody demonstrating a longer period of positive adjustment before custody reduction is appropriate." *Id.* at ¶ 16, Ex. 114.



QB\72763919.4

192 d. In [redacted] at Mr. [redacted] parole hearing approaching ten years beyond his minimum term, the Chairman [redacted]" The Commission [redacted] The Chair imposed [redacted]" Proctor-Brown Decl. at ¶ 17, Ex. 115 at 2.

e. In spite of the Commission's multiple recommendations, Mr. [redacted] was *twice* denied an early reclassification hearing making it impossible for him to receive a reduction in custody or a transfer by his next parole hearing. Offender Classification Specialist denied [redacted] an early reclassification hearing stating [redacted]" Proctor-Brown Decl. at ¶ 18, Ex. 116 at 7. *See also id.* at ¶ 19, Ex. 117 (Letter from Angela Hansen, BOCM Director).

f. In [redacted] at Mr. [redacted] parole hearing during the ten years beyond his minimum term, the Commission again denied parole based on a "[redacted] Proctor-Brown Decl. at ¶ 51, Ex. 149. Commissioner [redacted] again found that Mr. Guarnero had not

served sufficient time for punishment. *Id.* Nonetheless, the Chair imposed another four months of incarceration and ordered a Pre-Release Investigation. *Id.*

193

g. To date, [redacted] has been held in [redacted] custody for an additional year beyond what the Parole Commission endorsed. Finally, on [redacted], Mr. [redacted] was approved for [redacted] custody but has not been transferred to a [redacted]-security institution. *Id.* at ¶ 52, Ex. 150.

139. Denials of early reclassification requests are not appealable even if they are based on incorrect information. WIS. ADMIN. CODE § DOC 302.19(2).

140. By deferring parole reconsideration for more than 11 months (i.e., exceeding the level at which BOCM will consider a custody reduction), the Parole Commission holds Class Members at higher custody levels thus withholding the opportunity or ability to demonstrate what Defendants call "risk reduction." Proctor-Brown Decl. at ¶ 21, Ex. 119 (granting Plaintiff [redacted] a lengthy deferral). In Mr. [redacted]'s classification hearing before his custody reduction, it was noted "[redacted] *Id.* at ¶ 53, Ex. 151.

194 **5. Defendants Impose Ad Hoc Release Requirements on Juvenile Lifers Unrelated to Rehabilitation and Reform**

**a. Defendants Have Required Class Members to Save Thousands of Dollars Notwithstanding That Their Ability to Save Money is Highly Limited**

141. To grant parole, "the [P]arole [C]ommission [must be] satisfied that the prisoner has adequate plans for suitable employment or to otherwise sustain himself or herself." WIS. STAT. § 304.06(2).

142. Commissioners require much more than adequate plans for employment and sustenance; they want Class Members to have thousands of dollars in savings. Proctor-Brown Decl. at ¶ 22, Ex. 120 at 21:4–5 (Parole Commission telling [redacted] that "it's not unusual, for me to release guys with 15, 20 thousand dollars in their account"); *id.* at ¶ 23, Ex. 121 (asserting [redacted] dollars of institutional savings was inadequate even though Plaintiff was employed and had no debt); *id.* at ¶ 24, Ex. 122 (014130) (Plaintiff [redacted]s savings of [redacted] "won't go far in aiding [his] financial sustainability in the community."); *id.* at ¶ 25, Ex. 123 at 39:8 (Commissioner [redacted] telling Class Member [redacted] that [redacted] is "Not a lot of money, really" and denying parole based on this lack of savings); *id.* at ¶ 26, Ex. 124 (former Commissioner [redacted] denying release to Class Member [redacted] because he has not saved enough money, saying "[y]ou managed to save 9K to date however, given the cost of living that is a minimal amount and further money should be saved to increase the likelihood of success post release."); Dkt. 68, Tate Dep. Dec. 9, 2020 at 182:10–184:2 (Chairperson Tate explaining the "informal" reasons that factor into parole, including that it's to the parole applicant's benefit to have "a lot of money" but "it's not a prerequisite.").

143. One reason that Commissioners require Class Members to spend time in minimum and community minimum facilities is so that they can be assigned prison labor for

195

minimal wages. Dkt. 86, Landreman Dep. at 183:13–20 (stating that the "value" of Class Members spending time in minimum security facilities is "obtaining additional resources" such as "[m]oney, civilian employee, civilian work, supervisors.").

144. Saving money doing prison labor is difficult because Plaintiffs are paid from $0.12 to $0.42 per hour at most for institution jobs, and roughly $0.79 to $1.41 for Bureau of Correctional Enterprises (formerly Badger State Industries) jobs. *See* Wisconsin DAI Policy 309.55.01 I(B)(3); Dkt. 86, Landreman Dep. at 184:1–13 (acknowledging that prison labor is paid "pennies on the dollar," and that it takes a long time to save the amount Commissioners demand because incarcerated persons are "also responsible for purchasing their own hygiene and things," in addition to restitution, court assessments, fines and fees).

145. Labor fees for off-site project crews, an assignment only gained at minimum community custody, range from $1.00 to $2.00 per hour, and incarcerated people still only receive $0.42 per hour. Wisconsin DAI Policy 325.00.09(IV)(C)–(F)). At this low-pay, it takes Class Members years, even decades, working full-time, to accumulate ten thousand dollars in savings.[12] *See, e.g.*, Proctor-Brown Decl. at ¶ 27, Ex. 125 at 2 (Mr. [redacted] had only been able to save about $1,500 dollars after two years on work release).

146. In addition, DOC deducts room, board and transportation charges from the money earned by Class Members. Proctor-Brown Decl. at ¶ 28, Ex. 126 (DOC policy requires that work-release pay "shall be placed in a segregated trust account and shall result in room, board, and transportation charges as determined by the DOC.").

[12] Accumulating just $10,000 at even $1.41 per hour requires over 177, 40-hour weeks, or roughly 3.5 years of fulltime labor. At $0.42 per hour, reaching $10,000 would take over 595, 40-hour weeks or roughly 11.4 years of fulltime labor. At $0.12 per hour, reaching $10,000 would take 2,083, 40-hour weeks or roughly 40 years of fulltime labor. All calculations assume the workers save every penny they make.

196 147. DOC Policy provides that “up to 100%” of funds can be deducted from monies deposited into a Class Member’s account for any of 29 financial obligations, which range from court fees and restitution to room and board, including a catch-all category of “remaining DCC obligations.” *Id.*; WIS. STAT. §§ 973.032(10)–(11); 301.32.

148. Defendants repeatedly deny parole to Class Members for failure to satisfy restitution requirements or other “financial obligations.” Proctor-Brown Decl. at ¶ 29, Ex. 127 (denying Plaintiff [redacted] parole in [redacted] because he had outstanding obligations in the amount of [redacted] instructing him that “the Parole Commission expects satisfaction of your financial obligations as it further speaks to your attitude toward the crime”); *id.* at ¶ 30, Ex. 128 (instructing [redacted] to pay his obligations of [redacted] as a condition for parole release); Cranberg Decl. at ¶ 44, Ex. 43 at 13:9–15:22 (former Commissioner [redacted] informing Plaintiff [redacted] that payment of restitution and supervision fees prior to release is “part of the expectation for the Parole Comission.” and “[redacted]

149. Class Members who are unable to work cannot pay restitution or other financial obligations. Proctor-Brown Decl. at ¶ 57, Ex. 155 (Named Plaintiff [redacted] explaining that inability to work rendered him unable to pay restitution).

150. The financial requirement is unrelated to public safety. Dkt. 116, Kramer Dep. at 133:3–14 (Q: “Is the fact that you think people should have a certain amount of money in their accounts, is that related at all to risk? Is that founded at all on scientific studies of risk to public safety?” A: I would not know if that's a scientific study. What I discussed with you earlier was my experience as a probation and parole agent for 21 years of what I've seen of individuals

197

transitioning from incarceration with limited funds and limited resources, that that could contribute to significant challenges transitioning.").

**b. Defendants Consider Class Members' ability to Get a Driver's License to be Released But Deny Them The Opportunity to Do So Until Well After They Have Already Served Their Minimum Term of Imprisonment**

151. The Parole Commission expects Class Members to obtain a driver's license prior to release. Proctor-Brown Decl. at ¶ 32, Ex. 130 at 12:14–15 (former Commissioner [redacted] telling Class Member [redacted], "I expect inmates to get their driver's license while they're incarcerated."); *id.* at ¶ 31, Ex. 129 at 3–6 (former Commissioner [redacted] explaining to Class Member [redacted] why he should earn his driver's license); *id.* at ¶ 22, Ex. 120 at 21: 11–13 (former Commissioner [redacted] telling Class Member [redacted] "And the other thing I want you to focus on, once you get to community custody, is getting your driver's license."); Dkt. 68, Tate Dep. Dec. 9, 2020 at 182:10–14 (testifying as to why a driver's license is important to parole).

152. Class Members have been directed to obtain drivers' licenses even when their housing assignment make it impossible for them to do so. Cranberg Decl. at ¶ 54, Ex. 53; Proctor-Brown Decl. at ¶ 31, Ex. 129 at 7:14–15 (former Commissioner [redacted] advising Class Member [redacted] that earning a driver's license is "probably the best course of action, but it really comes down to bed space and -- and COVID." [redacted] acknowledged he had no control over [redacted] transition).[13]

[13] The Wisconsin Department of Corrections' Opportunities and Options Resource Guide states that only the Milwaukee Secure Detention Facility and Racine Youthful Offender Correctional Facility offer Driver's License Permit Instruction. "Opportunities and Options Resource Guide" WIS. DEP'T OF CORRECTIONS available at https://doc.wi.gov/Documents/AboutDOC/AdultInstitutions/OpportunitiesOptionsResourceGuideEnglish.pdf (July 2020) (last accessed Mar. 28, 2022).

198

**c. Defendants Deny Class Members the Opportunity to Develop a Release Plan Until Well After They Have Already Served Their Minimum Term of Imprisonment**

153. DOC requires a release plan but gives Class Members no guidance on how to prepare this plan. Declaration of Plaintiff Victoriano Heredia, filed herewith, ¶17.

154. Defendants will deny Class Members release if their release plan is "inadequate". WIS. ADMIN. CODE § PAC 1.06; Dkt. 118, Pierce Dep. at 86:25–87:3 (Q: "Would you ever . . . recommend someone for release without an approved release plan?" A: "No.").

155. Release plans for Class Members are deemed "inadequate" until they have been verified by a parole agent. Dkt. 118, Pierce Dep. at 85:25–86:2; 87:8–9.

156. Parole agents do not devote time or resources to developing or verifying Plaintiffs' release plans until years after the minimum term of imprisonment has already been served. Dkt. 85, Gabler Dep. at 197:13–17 (". . . an agent wouldn't necessarily allocate the time or resources to verify the plan knowing that . . . chances are the guy getting out on his first date is pretty limited."); Dkt. 84, Drankiewicz Dep. at 199:18–23 ("When someone is approaching release and it's considered to be more or less imminent, then I will ask for a release plan for the agent to verify the plan. It doesn't do me any good to send an agent out to do work that isn't going to be acted upon."); Dkt 86, Landreman Dep. at 177:4–7 ("I'm not going to ask that his parole plan be reviewed prematurely . . . ."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 178:18–21 ("[Agents] usually won't [conduct a pre-release plan] until the Parole Commission requests it.").

157. The Parole Commission has no "method or certain criteria" for determining the adequacy of a release plan. Dkt. 85, Gabler Dep. at 98:1–4 (Q: "[I]n determining whether [the release plan] was appropriate or inappropriate, did you have any method or certain criteria that you used to assess that?" A: "No." ); Proctor-Brown Decl. at ¶ 4, Ex. 102 at 27:20–28:6 ("[O]ne of the things we do want to know is like, how much have you dug into whether this is going to be

199

a good environment for you . . . [l]ike, you know, [ask your] uncle, what do you do? Do you and -- you know, your aunt or auntie, or whatever -- I mean, do they go to church? Do they go out to . . . the movies? . . . Do they go to the bar? Do they play softball? . . . .try and get an idea of what their lifestyle is like.").[14]

158. Commissioners do not review the adequacy of the release plan until the parole interview date. Dkt. 85, Gabler Dep. at 99:16–25. Any objections Commissioners may have to the release plans, therefore, cannot be addressed prior to the interview. Declaration of Plaintiff Victoriano Heredia ¶ 17.

159. Parole Commissioners require that Class Members—people who, by definition, have spent their entire adult lives in prison—demonstrate "pro-social connections" with family members and reject release plans without these connections. Dkt. 85, Gabler Dep. at 82:14–83:3; *id.* at 83:20–24 (former Chairman Gabler testifying that he relied on a chart as Chairman that emphasizes "family and/or marital" connection as a "Top Four" criminogenic need essential to reducing recidivism); Cranberg Decl. at ¶ 35, Ex. 34 at 14:3–16:12, (former Commissioner [redacted] encouraging Plaintiff [redacted] to begin a relationship with a sister he did not know so he could list her as housing on his release plan adding: [redacted]"); Proctor-Brown Decl. at ¶ 4, Ex. 102 at 25:23–26:5 (warning Class Member [redacted] to have a "solid support network" so if "all [of] the sudden dude gives you his sister's address, and you start talking to her and all the sudden now one year later you want to marry her and move in with her, DOC doesn't support that kind of thing."); *id.* at ¶ 32, Ex. 130 at 60:3–4 (former

---

[14] Ellipses indicate breaks in the transcript where Class Member [redacted] attempted to answer former Commissioner [redacted] question affirmatively that yes his family does attend church, in the hopes that this answer would permit her to approve his release plan.

2001

Commissioner [redacted] denying parole in part because of [redacted] lack of "healthy relationships being formed.").

160. Parole Commissioners reject release plans if they rely on relationships formed while the Class Member was behind bars. Dkt. 85, Gabler Dep. at 75:24–76:10 ("how significant can this possibly . . . be when you've been separated by barbed wire?"); Proctor-Brown Decl. at ¶ 33, Ex. 131 (denying [redacted] release after [redacted] had served 21 years and four months, in part, because [redacted]).

161. Where Class Members cannot return to families, and DOC deems their relationships to be inadequate, they are required to list a transitional living program ("TLP") as their housing plan. Christina Charmichael & Jere M. Bauer, "Wisconsin Prisoner Reentry Programs," WIS. LEG. FISCAL BUREAU, available at https://wisfamilyimpact.org/wp-content/uploads/2014/10/s_wifis26c03.pdf (last accessed Mar. 25, 2022). TLPs are DOC sponsored, but Commissioners reject release plans because they rely on TLP housing. Cranberg Decl. at ¶ 35, Ex. 34 at 14:8–15:20 (former Commissioner LaCost describing TLPS as "a free for all" where "guys living there . . . are doing drugs, [and] are bringing prostitutes," despite the fact that [redacted] reached out to several TLPs and felt that living there would provide him with a good support system); Cranberg Decl. at ¶ 34; Ex. 132 at 10:38-11:37 (audio track) (finding Class Member [redacted]'s plan to live in a TLP upon release inadequate and denying him release to parole supervision because [redacted]").



QB\72763919.4

2011

**d. Defendants Deny Release for Reasons That Has No Bearing on Risk to Society or Maturation and Rehabilitation**

162. One of the main routes for Class Members to show maturity and rehabilitation is through institutional adjustment and conduct. Dkt. 68, Tate Dep. Dec. 9, 2020 at 82:12–21.

163. Conduct for which Class Members may be disciplined is outlined in the Wisconsin Administrative Code DOC Chapter 303.

164. Rule violations are classified as either major or minor. Dkt. 68, Tate Dep. Dec. 9, 2020 at 83:6.

165. Any violation may be a major violation depending on the "specific violation, situation, and perceived threat to order and security." Proctor-Brown Decl. at ¶ 35, Ex. 133 at 13.

166. For example, Class Members can receive a minor or major conduct report for feeding squirrels, Cranberg Decl. at ¶ 74, Ex. 65 at 31:24–25; improper storage, WIS. ADMIN. CODE § DOC 303.55; inadequate work or school performance, *id.* at § DOC 303.62; unauthorized use of the mail, *id.* at § DOC 303.49; disrespect, *id.* at § DOC 303.29; dirty assigned living area, *id.* at § DOC 303.56; or group resistance and petitions, *id.* at § DOC 303.24; Proctor-Brown Decl at ¶ 37, Ex. 135 at 4:4–9:9.

167. Commissioners acknowledge that not every misconduct report indicates a risk to the public, much less a risk or an unreasonable risk to the public upon release. Dkt. 84, Drankiewicz Dep. at 167:23–168:9; Dkt. 85, Gabler Dep. 109: 13–111:7 (Chair Gabler admitting that he did not know how Named Plaintiff [redacted] minor tickets related to propensity for violent conduct and he did not know what kind of rules of society he thought [redacted] would break). This is in part because Commissioners acknowledge the difficulty of following rules when Class Members, by definition, spend their entire adulthood in the "intense, chaotic environment" that is prison. Dkt. 86, Landreman Dep. at 193:2; *see also* Proctor-Brown Decl. at

202

¶ 36, Ex. 134 at 43:7–9 (former Commissioner [redacted] telling Class Member [redacted] "let's face it, coming into an adult prison when you're 16, that ain't right, that ain't normal, that—I'm not surprised that you've had some bumps.").

168. Likewise, Class Members can receive major misconduct reports for behaviors that would be "perfectly legal" once they are released to parole. Dkt. 84, Drankiewicz Dep. at 167:22; Dkt. 85, Gabler Dep. at 109:2–5 (acknowledging that comparing the restrictiveness of prison rules to society's rules is like comparing "apples to basketballs").

169. Commissioners, however, have considered even minor conduct violations such as replacing a dirty food tray with a clean food tray, loitering, or using unauthorized forms of communication as evidence that a Class Member will not follow the "rules of society," and therefore that Class Members should not be released. Proctor-Brown Decl. at ¶ 38, Ex. 136 at 3; Dkt. 85, Gabler Dep. at 108:17–109:22; *see also* Proctor-Brown Decl. at ¶ 9, Ex. 123 at 4:1–13 (former Commissioner [redacted] expressing frustration at the minor infraction Class Member [redacted] received for throwing a handball over the wall because "little things add up" and "when they do, it kind of demonstrates that there is a certain mindset that the details don't matter" despite Mr. [redacted] having no major infractions for 15 years); *id.* at ¶ 37, Ex. 135 (Former Commisisoner [redacted] telling Class Member [redacted] he's "shooting [him]self in the foot with [his] misconduct," specifically referring to keeping decks of cards given to him by a guard, taking extra hamburger patties, and improper storage of muscle cream).

170. Accordingly, Defendants deny release to Class Members for minor infractions of prison rules. Dkt. 68, Tate Dep. Dec. 9, 2020 at 83:7–85:17; Proctor-Brown Decl. at ¶ 22, Ex. 120 at 9:8–10:3 (Parole Commission recounting that one parole applicant lost work release and his chance at an imminent parole grant after being issued a minor misconduct ticket for accepting

203

pie from a "little old lady at his jobsite, a civilian, [who] brought in some homemade apple pie to work." This conduct merited a misconduct ticket because conduct "leads to a hug" which could "lead to a kiss. . . . And so on and so forth."); *id.* at ¶ 38, Ex. 136 (former Chairperson Gabler denying Named Plaintiff [redacted] release for four minor tickets because [redacted]; *id.* at ¶ 40, Ex. 138 (denying parole and increasing [redacted]' security level for smoking a cigarette, "[redacted]."); *id.* at ¶ 39, Ex. 137 ([redacted]); *id.* at ¶ 41, Ex. 139 at 2 ([redacted]).

171. Some behaviors classified as "major misconduct" in a prison setting, are a normal part of healthy human behavior. Dkt. 85, Gabler Dep. at 174:4 (testifying that the [redacted] cited in Class Member [redacted] parole denial was the result of [redacted], and that [redacted] are a normal part of existence); Proctor- Decl. at ¶ 6, Ex. 104, (noting that Class Member [redacted] last major misconduct report — which has delayed his release for decades—was for breaking up a fight).

172. Prison misconduct tickets are given when Class Members are themselves victims of assault. Declaration of Plaintiff [redacted] at ¶ 18–20 (Plaintiff [redacted] received conduct



QB\72763919.4

2041

reports for being attacked and, even after showing video that he did not throw a single punch while under attack, this conduct report has appeared again and again in parole considerations as a reason to deny [redacted] parole.). *See also* Proctor-Brown Decl. at ¶ 47, Ex. 145 (Commissioner [redacted] writing to [redacted] *after* the video proved Mr. [redacted] had been attacked: "[redacted]"); Cranberg Decl. at ¶ 100, Ex. 99 (denying [redacted] parole again three years later for the same conduct); Dkt. 85, Gabler Dep. 161: 3–15 (testifying that [redacted] being involved in a fight, whether he started it or not, indicated a propensity for violence).

### E. Class Members Are Denied Due Process of Law in Parole Decisions

#### 1. Defendants Fail to Give Plaintiffs Sufficient Advance Notice of Their Parole Hearing

173. The Parole Commission is required by law to provide Class Members with 15-days' notice of a Parole Commission hearing. WIS. ADMIN. CODE § PAC 1.06(4); Cranberg Decl. at ¶ 6, Ex. 5.

174. Fifteen days' notice is not enough time for parole-eligible individuals to prepare their own materials or respond to information that may be presented at their hearing. Dkt. 87, Expert Report at 16. In at least one instance, a Class Member received no notice of the parole hearing. Declaration of Class Member Terrance Prude at ¶ 14 ([redacted] was told he had an attorney phone call one week before his 2022 parole hearing. When he responded to the call, he discovered it was not an attorney phone call, but rather a video call with the Parole Board. "I had no time to prepare or gather support letters, and the program certificates I submitted were not received by the Commissioner in time for the hearing.").

175. If a Class Member does not receive the Notice of Parole Commission Consideration within the 15-day time frame, the Commissioner will give the Class Member two

205

choices: waiving the 15-day notice period or accepting a delay in the parole hearing Proctor-Brown Decl. at ¶ 56, Ex. 154 at 9 (Commissioner may ask the Class Members to "waive the 15 day notice and sign the waiver form . . . or the [C]ommissioner may give the inmate a one month deferment noting the reason on the action sheet and requesting that proper notification occur.").

**2. Defendants Fail to Give Class Members Notice of the Factors and Information to Be Considered at their Parole Hearing**

176. The Notice of Parole Commission Consideration provided to Plaintiffs lists 42 generic and "non-exhaustive" factors that might be evaluated at the parole hearing. Cranberg Decl. at ¶ 6, Ex. 5.

177. Class Members are given no information about which of the 52 factors will be significant or how they will be evaluated. *Id.*

178. Given that the notice states these factors "may include, but are not limited to" the ones listed, notice is not given of all the factors to be considered. *Id.*

179. The Notice of Parole Commission Consideration does not advise Class Members, in any meaningful or individualized way, of specific reasons why Parole Commissioners may find that they would present an "unreasonable risk" if released. *Id.*

180. The Notice of Parole Commission Consideration does not alert Class Members that they must affirmatively notify the Parole Commission of new misconduct tickets, *id.*, yet the Commission has imposed this as a requirement, and denied parole for failing to make this disclosure. Proctor-Brown Decl. at ¶ 42, Ex. 140 at 2:11–19, 9:4–6 (former Commissioner [redacted] increasing Plaintiff [redacted]'s parole deferral from 24 months as decided in a parole hearing earlier that morning to 36 months after learning that [redacted] had not corrected [redacted] for failing to address some new conduct reports [redacted] had received).

206

### 3. Defendants Deny Class Members a Fair Opportunity to Present Evidence Relevant to Maturity and Rehabilitation

181. The Notice of Parole Commission Consideration does not inform Class Members that they have a right to submit information and evidence of demonstrated maturity and rehabilitation at their parole interview. Cranberg Decl. at ¶ 6, Ex. 5.

182. The Parole Commission's preprinted "Release Plan Information" form, the only form applicants are asked to complete, instructs applicants "DO NOT ATTACH ANY DOCUMENTS TO THIS FORM." *Id.* at Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions No. 17).

183. Class Members are prevented from providing additional information in person or after the parole hearing.

a. Declaration of Plaintiff Joseph Orosco at ¶ 14 (Plaintiff [redacted] brought proof of potential employment with him to his parole hearing to which Commissioner Kramer told him that he should have attached it to his Release Plan; the same plan that provides a single paragraph of space for additional information and says "DO NOT ATTACH ANY DOCUMENTS." Since he had not, it could not be considered. Former Commissioner [redacted]).

b. Plaintiff [redacted] submitted weekly letters to the parole commission, a total of about 150 letters, chronicling his rehabilitation. Declaration of Plaintiff Dujuan Nash at ¶ 36.

c. During [redacted] parole hearing, former Commissioner [redacted], stating "[redacted]

207

[redacted] Cranberg Decl. at ¶ 60, Ex. 59 at 50:6–9; Declaration of Plaintiff Dujuan Nash at ¶ 43. The majority of these letters went unacknowledged. Declaration of Plaintiff Dujuan Nash at ¶ 38.

d. Former Chair Gabler chided Mr. [redacted] for writing the Parole Commission a request to reconsider his [redacted] immediately after the hearing. Proctor-Brown Decl. at ¶ 38, Ex. 136 at 2. Gabler warned Mr. [redacted] "The time to present information to the Parole Commission for its consideration is at the parole hearing and not in a letter after the fact." *Id.*

**4. Defendants Deny Plaintiffs the Opportunity to See and Rebut Information Used Against Them at Parole Hearings**

184. Defendants review the contents of Class Members' "institution files," including their "Social Service File," when making parole decisions. Dkt. 84, Drankiewicz Dep. at 128:17–25; Dkt. 118, Pierce Dep. at 163:4–11.

185. The Social Service File section includes a "Confidential Envelope," which is removed from the Social Service File if anyone other than Department of Corrections staff reviews the Social Service File. Proctor-Brown Decl. at ¶ 44, Ex. 142.

186. Documents that "may" be included in a "confidential" file include the following: Pre-Sentence Investigations; rap sheets; non-excluded clinical documents; investigative materials from police or prosecutors; victim-witness letters; Special Handling of Offenders; Sex Offender Registration forms; Community Reintegration Offender Questionnaire; Birth Notification; Petitions for Med. Commitment and doctor's letters; review of Offender in Observation; other confidential materials as designated by the author; and any juvenile information. *Id.*; Dkt. 116,

2081

Kramer Dep. at 54:5–8 ("Typically what is contained in that is the victim impact statements, presentence investigation if that was completed, possibly some protected health information.").

187. Institutional staff have discretion to determine what is considered "confidential" or "restricted" in an institutional file. WIS. ADMIN. CODE § PAC 1.06(6) ("The inmate shall have access at the correctional institution where the inmate is confined to the documentary information which the [C]ommissioner considered, except information determined to be confidential may not be disclosed."); Proctor-Brown Decl. at ¶ 44, Ex. 142.

188. The Notice of Parole Commission Consideration informs Class Members that they will be provided all materials reviewed by Parole Commissioners except where "the file contains restricted material, such as a pre-sentence investigation or information obtained under an assurance of confidentiality." Cranberg Decl. at ¶ 6, Ex. 5.

189. Class Members are not notified when "restricted" material exists or is added to their file. *See id.* at ¶ 4, Ex. 3, Defs. Resp. to Pls. Interrogatory 23 (asserting that Class Members are notified of information being added to their file when they receive a copy of the document added), *but see* Dkt. 84, Drankiewicz Dep. at 176:1–179:10; Proctor-Brown Decl. at ¶ 43, Ex. 141; *id.* at ¶ 60, Ex. 59 at 24:16–22 (former Commissioner Landreman advising that "these letters go in your confidential file and the only way you see them is if I pull them out and read them to you; otherwise, you don't have access to them." This testimony shows that Class Members do not always receive copies of confidential documents, and, accordingly, do not receive notice when these documents are added to the Class Member's file).

190. Class Members are not provided full access to their "clinical files" which prevents them from rebutting information contained in those files. Proctor-Brown Decl. at ¶ 45, Ex. 143 at

209

2 (instructions on documents in clinical file to "remove from CSU file when [redacted]] reviews his file").

191. Class Member [redacted] has been denied release to parole supervision in part based on information inserted into his clinical file by a police officer seeking to [redacted] Mr. Campbell has never been charged with, nor convicted of [redacted]. Mr. [redacted] did not commit [redacted].

a. When [redacted] was convicted of homicide, the sentencing judge was clear that Plaintiff [redacted] had no motive. *Id.* at ¶ 59, Ex. 157 at 7 ("[T]he one thing that has been lacking through the eight days of this trial is any good reason for what occurred.").

b. The investigation of Mr. [redacted]s offense included an exhaustive search for evidence of [redacted]. *Id.* at ¶ 60, Ex. 158. None was found. *Id.* Accordingly, Mr. [redacted] was not charged with nor convicted of [redacted]. *Id.* at ¶ 59, Ex. 157 at 2– 3 (sentencing transcript only declaring judgment of homicide offense).

c. In [redacted] years after Class Member [redacted] conviction, a police officer submitted a file to Department of Corrections containing the hypothesis that [redacted] was [redacted]." Proctor-Brown Decl. at ¶ 61, Ex. 159.

d. As a result of this police officer's hypothesis, Oshkosh Correction Institution required [redacted] to be treated as [redacted]. *Id.* at ¶ 62, Ex. 160 ("Given the additional information that is kept in a separate file labeled 'police report' with [redacted] clinical file, there is evidence to suggest [redacted]).



QB\72763919.4

210 e. Defendant's denied [redacted] release in 2010, 2014, and 2018 because of the statements contained in [redacted] file that hypothesize [redacted] to his crime. Cranberg Decl. at ¶ 93, Ex. 92 (denying Plaintiff [redacted] parole in 2010 because "There is an unmet [redacted] need"); *id.* at ¶ 92, Ex. 91 (denying parole in 2014 because "[redacted] ha[d] been referred for [redacted].' This program was recommended based on the [redacted] component of the homicide . . . ."); *id.* at ¶ 32, Ex. 31 (denying parole in 2018 because "there was evidence to suggest [redacted] (which you deny.)").

192. While state law provides that Pre-Sentence Investigation Reports "may be used" by "the person who is the subject of the pre-sentencing investigation report" (i.e., these Class Members) in any "evaluation" "hearing" or "postcommitment relief proceeding," WIS STAT. § 972.15(6); Parole Commissioners do not in fact give Class Members access to their Pre-Sentence Investigation Reports prior to their parole hearing. Proctor-Brown Decl. at ¶ 44, Ex. 142 (Pre-Sentence Investigation documents are removed from the Social Service file prior to review by anyone other than DOC staff); Dkt. 68, Tate Dep. Dec. 9, 2020 at 116:13–17; Cranberg Decl. at ¶ 6, Ex. 5 (Notice of Parole Consideration informing parole applicants that pre-sentencing investigation reports are considered "restricted").

193. Presentence Investigation Reports are reviewed by Commissioners as a "prime resource[.]" Dkt. 84, Drankiewicz Dep. at 177:10–25; Dkt. 117, Tate Dep. Feb. 25, 2022 at 199:3–11 ("the three prime resources that [C]ommissioners would evaluate . . . [are] the criminal complaint, the presentence investigation, and the sentencing transcript."); Dkt. 118, Pierce Dep. at 51:2–7 ("I'd look at presentence investigations . . . .").

211

194. Presentence Investigation Reports include information not proved beyond a reasonable doubt, such as a police officer's description of the original offense, the Class Member's description of the original offense, any statements from co-defenders, victim statements, previous record (juvenile and adult), family background, family attitudes, personal history (academic/vocational skills, employment history, financial management, marriage status, emotional and physical health, mental ability, chemical uses, sexual behaviors, military history, religion) and a probation/parole agent's sentencing recommendation. Proctor-Brown Decl. at ¶ 54, Ex. 152.

195. Even after the parole hearing concludes, the interviewing Commissioner, or the Parole Chair, may review and rely on materials not contained in the institutional file, without any notice to Class Members or opportunity to respond. *Id.* at ¶ 46, Ex. 144 (Chairperson [redacted] after the parole interview, and writing [redacted]"); Dkt. 85, Gabler Dep. at 61:14–17 (Chairperson Gabler would seek additional information beyond that available in the WICS system); Dkt. 117, Tate Dep. Feb. 25, 2022 at 194:19–25 (Q: "Are [C]ommissioners given any instruction as to what they can or cannot consider from these letters that come in, these letters of opposition?" A: "I mean, we consider everything. We look at everything that's in the file. But they're not instructed to the degree of effect that any correspondence may have.").

196. The Parole Commission may draw erroneous conclusions from sources unavailable to the Class Member that the Class Member—having received no notice—has no opportunity to rebut. Proctor-Brown Decl. at ¶ 46, Ex. 144 (Former Chairperson [redacted] denying release to Class Member [redacted] by concluding from a Dateline transcript

212

not in [redacted]s file that he had, [redacted]" when in fact the Dateline transcript did not support that conclusion).[15]

197. Parole Commissioners consider factual statements made by victims in their parole decisions. Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions Nos. 8, 19); Dkt. 118, Pierce Dep. at 169:21–171:19; Dkt. 84, Drankiewicz Dep. at 176:22–177:24.

198. Victim statements are considered confidential and withheld from Class Members. Proctor-Brown Decl. at ¶ 43, Ex. 141 ("Confidential Envelopes" include victim-witness letters); *id.* at ¶ 44, Ex. 142 (staff should "[r]emove all Confidential envelope(s) and Administrative Confinement packet(s) from the Social Service file prior to the inmate reviewing the file.").

199. Parole is denied due to victim opposition to the release of Class Members. Cranberg Decl. at ¶ 49, Ex. 48 at 11:12–13) (denying [redacted] parole in December of 2019 due to "victim statements and the community opposition"); *id.* at ¶ 48, Ex. 47 (denying Plaintiff [redacted] parole in 2014, after former Commissioner LaCost introduced a victim statement that Mr. [redacted] had never seen which "[redacted]); Cranberg Decl. at ¶ 60, Ex. 59 at 12–19 (Commissioner [redacted] extended Plaintiff [redacted] incarceration because of a victim statement). This happens because victim statements often contain highly emotional language about Class Members that Class Members, without access or advance notice, do not have sufficient opportunity to rebut. Proctor-Brown Decl. at ¶ 55, Ex. 153 at 2 [redacted]

---

[15] Larson, John, "A Victim's Voice," NBC NEWS, available at https://www.nbcnews.com/id/wbna14190842#.XJwqYFW6OUI (last visited March 26, 2022) ([redacted]).

213

[redacted]e writing, "[redacted]); Cranberg Decl. at ¶ 21, Ex. 20 at 9–10 (The victim's family explained that based on [redacted]); *id.* at ¶ 60, Ex. 59 at 25:16–20 (a victim participating in a [redacted] stated: "[redacted].").

200. Victim statements influence Commissioners' determinations of how much time is sufficient for punishment. Dkt. 68, Tate Dep. Dec. 9, 2020 at 61:14–62:1 ("Another factor that may be considered is also victim impact . . . to inform the seriousness of the offense, it's 35 years later, the victim still holds the same level of intensity as far as how they feel they've been impacted as day one, then that does indicate how serious the offense was.").

201. Class Members are not given the opportunity to review victim impact statements in advance of their parole interview even when the author indicates that s/he has no objection to it being shared. Cranberg Decl. at ¶ 48, Ex. 47; Dkt. 84, Drankiewicz Dep. at 177:3–24.

202. Parole Commissioners also deny release based on opposition from prosecuting attorneys not made available to Class Members. In 2019, former Commissioner [redacted] denied release to [redacted] in part because of a letter from the county executive of Kenosha County urging her to deny parole to [redacted] because [redacted]. Cranberg Decl. at ¶ 49, Ex. 48 at 8:2–15; *id.* at 11:3–4; *id.* at 11:11–18 (former Commissioner [redacted] concluding "[redacted].").

214

### 5. Plaintiffs Are Denied the Opportunity to Be Heard by the Actual Decisionmaker

203. The final decision about whether to grant or deny parole is made by the Chair of the Parole Commission. Dkt. 68, Tate Dep. Dec. 9, 2020 at 19:16; 37:14–25, 38:1–6; Dkt. 85, Gabler Dep. at 129:17.

204. When parole is denied, the Chair of the Parole Commission makes the final decision about the length of the Deferral Period (*i.e.*, the length time until the parole applicant can have their next hearing). Dkt. 68, Tate Dep. Dec. 9, 2020 at 19:16–20; 38:2–3; Dkt. 85, Gabler Dep. at 129:17.

205. In most cases the Parole Chair is not the same individual who conducted the parole interview of Class Members; more often, those interviews are conducted by another Commissioner. Dkt. 117, Tate Dep. Feb. 25, 2022 at 191:17–192:17 (Chairperson Tate stating that "what [parole applicants] have to say about their case matters," but he does not personally conduct the interviews or "typically" listen to recordings).

206. The Parole Chair can, and does, increase the Deferral Period for a Class Member beyond the time recommended by the Commissioner who conducted the in-person interview, despite not participating in the interview. Dkt. 85, Gabler Dep. at 103:7–105:1; *id.* at 216:19–217:2; Cranberg Decl. at ¶ 72, Ex. 71 at 2–3 (telling Class Member [redacted] that [redacted]'s "belief" that he was "only partially to blame" for the crime he committed was [redacted]); *id.* at ¶ 70, Ex. 69 at 2–3; Proctor-Brown Decl. at ¶ 47, Ex. 145 at 2–3.

207. Despite only one Commissioner meeting with the parole applicant, parole decisions are sometimes made by the entire Parole Commission. Dkt. 68, Tate Dep. Dec. 9, 2020

215

at 45:9–16; Dkt. 118, Pierce Dep. at 97:20–25 (testifying that a Commissioner can opt to take "no action" on a parole decision which places the decision before the entire Parole Commission).

### 6. Defendants Fail to Adequately Explain Their Reasons for Denying Parole to Class Members

208. Parole Commission regulations require only that the Commissioner state their general reasons for denying or granting parole. WIS. ADMIN. CODE § PAC 1.07.

209. This is interpreted to mean checking the five boxes contained on the PCA drop-down menu: "you [have/have NOT] served sufficient time for punishment;" "your institutional conduct [has/has NOT] been satisfactory;" "your program participation [has/has NOT] been satisfactory;" "you have developed an adequate plan, but will need Agent's verification" or "you have NOT developed an adequate plan. It will need further development;" and "release at this time would involve an unreasonable risk to the public." Dkt. 117, Tate Dep. Feb. 25, 2022 at 46:5–10 (Q: "Your reading of [WIS. ADMIN. CODE § PAC 1.07] is that there's nothing more required other than just yes, no on those five short questions at the top of the PAC form; correct?" A: "At its basis, yes, that's accurate."); Dkt. 118, Pierce Dep. at 15:21–23 (explaining that the WICS system is limited to a drop-down set of 5 reasons why parole was granted or denied); *id.* at 154:9–11 (testifying that a different drop-down option is the extent of notification the Parole Commission provides when a parole applicant does not meet one of the criteria).

210. Chairperson Tate believes that parole explanations require nothing more than selecting from the pre-set standardized drop-down menu. Dkt. 117, Tate Dep. Feb. 25, 2022 at 41:17– 22 (Q: "It would be fully within the law to state that they don't have to provide any explanation as to why the person was found to have or have not met the criteria?" A: "Yeah. Sure."); *id.* at 40:3–8 (Q: "So it's your understanding that . . . nothing more is required of you by law?" A: "That's correct.").

216

211. Commissioners use fill-in-the-blank templates for their decisions. Proctor-Brown Decl. at ¶ 48, Ex. 146 (former Commissioner Drankiewicz emailing former Commissioner LaCost a template for parole decisions so that she does not need to "reinvent the wheel").

212. Commissioner Kramer's decisions recount a number of facts but contain no analysis of those facts or how those facts relate to the ultimate conclusion that an individual has not served sufficient time for punishment. Dkt. 116, Kramer Dep. at 73:14–77:23; Dkt. 117, Tate Dep. Feb. 25, 2022 at 100:24–101:6 (Q: "Okay. But again, because [Commissioners are] not required at all on your interpretation to do anything more than the top five reasons . . . it's entirely possible that the factors or considerations that led the Commission to come to the decision that it did are not listed on the PAC Form?" A: "Yeah.").

213. Parole Action Sheets do not include "every single factor that played a role" in the parole decision. Dkt. 86, Landreman Dep. at 50:20–52:14. To the contrary, the actual "decision" is typically reduced to a three-sentence paragraph at the bottom of recitation of facts. *See, e.g.*, Cranberg Decl. at ¶¶ 52–59, Exs. 51–58. This includes not explaining what factored into whether a Class Member served sufficient time in prison so as not to depreciate the seriousness of the offense, or what constitutes an unreasonable risk to the public. Dkt. 68, Tate Dep. Dec. 9, 2020 at 72:13–18; Dkt. 117, Tate Dep. Feb. 25, 2022 at 100:13–16 (Q: "Do [C]ommissioners in practice list all of the factors or considerations that led the, to come to their conclusion?" A: "Exhaustively, no.").

217

### 7. Plaintiffs Cannot Vindicate Their Liberty Interest Without Access to Counsel and Expert Assistance

214. Class Members have difficulty acquiring child welfare records, medical records, or other records relevant to their parole proceedings while they are incarcerated. Dkt. 87, Expert Report at 23.

215. Class Members are not allowed to have counsel present during their parole hearings. Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions No. 15).

216. Lack of legal counsel hampers the ability of Class Members to present information regarding maturity and rehabilitation. Declaration of Plaintiff Dujuan Nash at ¶ 41; Declaration of Terrance Prude at ¶ 15 ("[redacted])

217. Since being assisted by counsel in their documentary submissions, several Class Members have been granted release after having been denied time and time again previously. Dkt. 87, Expert Report at 25.

218. The State of Wisconsin does not make psychologists or clinical social workers available to Class Members to assist in interpreting their crime in the context of the hallmark features of youth. Dkt. 87, Expert Report at 23.

219. Lack of expert assistance impairs Class Members' ability to explain their crime within the context of juvenile brain development. Declaration of Plaintiff Dujuan Nash at ¶ 41; Cranberg Decl. at ¶ 79, Ex. 78 ("[redacted]

218

[redacted]

220. Parole Commissioners receive no training related to youth trauma or juvenile brain development. Dkt. 118, Pierce Dep. at 41:17–20; *id.* at 43:21–24.

221. Class members experience [redacted] which negatively impacts them during parole interviews. [redacted].

222. Parole Commissioners fail to account for youth trauma related explanations for Class Members' crimes. Cranberg Decl. at ¶ 22, Ex. 21 at 61:20–22; *id.* at 62:6–9 (former Commissioner [redacted] asked [redacted] extensive questions about the details of his [redacted] in asking about [redacted]s motive for the crime. [redacted] explained to Commissioner [redacted] that there *was no* motive for the crime — [redacted] Former Commissioner Landreman increasing Class Member [redacted] punishment by four years, citing "the lack of explanation for the [crimes [redacted] committed]" as the most significant reason he "couldn't justify releasing you today . . . and I don't know that I could justify releasing you in the future.").

223. Because Parole Commissioners lack adequate training, they do not know how social anxiety and childhood trauma may impact a Class Member's ability to express themselves at a parole interview. Proctor-Brown Decl. at ¶ 49, Ex. 147 (former Commissioner [redacted] interviewed Class Member [redacted] in [redacted] concluding that he [redacted] but also concluded that he [redacted]

Respectfully submitted this 1st day of April, 2022.

219

*Electronically signed by*
*Gregory T. Everts*

QUARLES & BRADY LLP

Gregory T. Everts (SBN 1001636)
Martha J. Snyder (SBN 1070865)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
gregory.everts@quarles.com
martha.snyder@quarles.com

Patrick J. Proctor-Brown (SBN 1091326)
Ellen Cranberg (SBN 1122484)
400 East Wisconsin Avenue, Suite 2350
Milwaukee, WI 53202
Telephone: (414) 277-5000
patrick.proctor-brown@quarles.com
ellen.cranberg@quarles.com

Issa Kohler-Hausmann (NY BN 4694576)
Yale Law School*
127 Wall Street
New Haven, CT 06511
Telephone: (203) 432-4956
issa.kohler-hausmann@yale.edu

Avery P. Gilbert (NY BN 4524237)
15 Shatzell Avenue, Suite 232
Rhinecliff, NY 12574
Telephone: (845) 380-6265
avery@agilbertlaw.com

ACLU FOUNDATION OF WISCONSIN

Laurence J. Dupuis (SBN 2029261)
R. Timothy Muth (SBN 1010710)
Emma S. Shakeshaft (SBN 1092046)
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272-4032
ldupuis@aclu-wi.org
tmuth@aclu-wi.org
eshakeshaft@aclu-wi.org

FOLEY & LARDNER LLP

H. Holden Brooks (SBN 1071254)
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400
HBrooks@foley.com

Daniel Kaplan (SBN1018122)
Hillary N. Vedvig (SBN 1113183)
150 East Gilman Street, Suite 5000
Madison, WI 53703
Telephone: (608) 257-5035
DKaplan@foley.com
HVedvig@foley.com

***Attorneys for Plaintiffs***

* This document has been partially prepared by an individual affiliated with Yale Law School, but does not purport to present the school's institutional views, if any.

# Exhibit #12

- 4-Pages Attached
- Note: The markings that I put inside of brackets (i.e. "[ ]") were added to the document to mark as exhibit number & page number. The original document does not have these bracketed markings.

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-0643 (Rev. 8/2022)

221

[Exhibit #[redacted]12] [[redacted]] [1 of 4]

WISCONSIN

# INTERVIEW/INFORMATION REQUEST
## *SOLICITUD PARA INFORMACION / ENTREVISTA*

Instruction to Inmate: Do not use this form to contact health staff. Use a Health, Dental or Psychological Service Request.
*Instrucciones para Reclusos: No utilice este formulario para comunicarse con el personal de cuidados de salud. Utilice una solicitud de servicio de cuidados de salud, dentales o psicológicos.*

| OFFENDER NAME *NOMBRE DEL/LA OFENSOR(A)* | DOC NUMBER *NUMERO DEL/LA OFENSOR(A)* | LIVING UNIT *UNIDAD DE VIVIENDA* |
|---|---|---|
| Terrance Prude | 335878 | Foxtrot/223 |
| DATE *FECHA* 3/16/2025 | WORK ASSIGNMENT *ASIGNACION DE TRABAJO* | |

[X] Interview *Entrevista* [X] Information *Informacion*

STATE REASON FOR INTERVIEW OR SPECIFY INFORMATION REQUESTED
*INDIQUE LA RAZON PARA LA ENTREVISTA O ESPECIFIQUE LA INFORMACION QUE SOLICITA*

I'm writing to inquired into how to obtain a Discretionary Override against a Mandatory Restrictor? Specifically, the Mandatory Restrictor prohibits me from being housed at a minimum or minimum community prison until I'm within 5 years of my adjusted release date. How can I obtain a Discretionary Override to where I can be housed at a minimum/minimum community prior to being within 5 years of my adjusted release date? What is the criteria or the standard for obtaining a Discretionary Override? Please respond. Thank you.

(Do Not Write Below This Line) *(No Escriba Debajo Esta Linea)*

**DISPOSITION OF REQUEST *DISPOSICION DE LA SOLICITUD***

[ ] You Will Be Interviewed *Usted sera entrevistado*

Date: *Fecha:* 03/17/2025 Time: *Hora:* 10:12 am

[ ] Information to Follow *Informacion Sera Proveida*

[✓] Request Referred To: *Solicitud Refereida A:* Terrance Prude 335878 F223

Information/Comment: *Informacion/Comentario:* per the Instrument for Custody Classification (ICC) Manual "Discretionary overrides cannot void a Mandatory restrictor." I suggest reviewing the ICC manual in the unit law library for more information.

[signature] Mr. Johnson
Signed *Firmado*

Social Worker Foxtrot
Department *Departamento*

222

TO:
A: Terrance Prude

NUMBER:
NUMERO: 335579

UNIT:
UNIDAD de VIVIENDA: Foxtrot / 223

DATE:
FECHA: 3/16/2025

[Exhibit #12] [ of ] [2 of 4]

FOLD *DOBLE*

**DESCARGO DE RESPONSABILIDAD (Disclaimer)**

Esta es una traducción de un documento escrito en inglés, distribuido como una cortesía a las personas que no pueden leer inglés. Si resulta alguna diferencia o algún malentendido con esta traducción, el único documento reconocido sera la versión en inglés.

This document contains translations of the English-language on this document provided as a courtesy to those not fluent in English. If differences or any misunderstandings occur, the document of record shall be the related English-language on this document.

031625

FOLD *DOBLE*

**DEPARTMENT OF CORRECTIONS**
Division of Adult Institutions
DOC-0643 (Rev. 4/2015)

**WISCONSIN**

## INTERVIEW/INFORMATION REQUEST
## *SOLICITUD POR INFORMACION/ENTREVISTA*

TO:
*A:* Mr. Johnson (Social Worker / Case Worker)

DEPARTMENT:
*DEPARTAMENTO:* Foxtrot Unit

DATE:
*FECHA:* 3/16/2025

For Confidentiality Use Either Staple/Scotch Tape or an Envelope
*Por Confidencialidad Engrape o use Cinta Scotch o un Sobre*

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-0643 (Rev. 8/2022)

223

[Exhibit #12] [[illegible]] [3 of 4]

WISCONSIN

# INTERVIEW/INFORMATION REQUEST
## *SOLICITUD PARA INFORMACION / ENTREVISTA*

Instruction to Inmate: Do not use this form to contact health staff. Use a Health, Dental or Psychological Service Request.
*Instrucciones para Reclusos: No utilice este formulario para comunicarse con el personal de cuidados de salud. Utilice una solicitud de servicio de cuidados de salud, dentales o psicológicos.*

| OFFENDER NAME *NOMBRE DEL/LA OFENSOR(A)* | DOC NUMBER *NUMERO DEL/LA OFENSOR(A)* | LIVING UNIT *UNIDAD DE VIVIENDA* |
|---|---|---|
| Terrance Prude | 335878 | Foxtrot/223 |
| DATE *FECHA* 3/18/2025 | WORK ASSIGNMENT *ASIGNACION DE TRABAJO* | |

☐ Interview *Entrevista* ☒ Information *Informacion*

STATE REASON FOR INTERVIEW OR SPECIFY INFORMATION REQUESTED
*INDIQUE LA RAZON PARA LA ENTREVISTA O ESPECIFIQUE LA INFORMACION QUE SOLICITA*

I received your 3/17/2025 response to my request to obtain a "Discretionary Override". You referenced the IFCC policy where it says a "Discretionary Override cannot void a mandatory restrictor." I'm not seeking to "void" the mandatory restrictor. I have the IFCC policy you reference and it says "Discretionary Overrides shall be an exception and limited in use." I'm seeking to obtain "an exception" to the 5 year Mandatory Restrictor. Again, what is the criteria in determining whether I should or should not be granted discretionary override? What's the guideline that determines how that "discretion" is used to grant or deny a discretionary override?

(Do Not Write Below This Line) *(No Escriba Debajo Esta Linea)*

**DISPOSITION OF REQUEST *DISPOSICION DE LA SOLICITUD***

☐ You Will Be Interviewed *Usted sera entrevistado* Date: *Fecha:* 03/20/2025 Time: *Hora:* 8:20am

☐ Information to Follow *Informacion Sera Proveida*

☑ Request Referred To: *Solicitud Refereida A:* Terrance Prude 335878 F 223

Information/Comment: *Informacion/Comentario:* Unfortunately, however, to grant an exception to the 5 year out from release Mandatory Restrictor we would be voiding that Mandatory Restrictor. The key word is mandatory; therefore they are finite rules and cannot be overturned. At this time, there have not been made any allowences to override a mandatory restrictor. Please review pages 30-31 Section 5 Discretionary Overrides for more information on how they are to be used. Lastly, I suggest that you write to the WCRC offender Classification Specialist for further clarification.

Signed *Firmado* [signature] M.V. Johnson

Department *Departamento*

224

TO:
A: Terrance Prude

NUMBER:
NUMERO: 335878

UNIT:
UNIDAD de VIVIENDA: Foxtrot/223

DATE:
FECHA: 3/18/2025

[Exhibit #12] [[redacted]] [4 of 4]

FOLD *DOBLE*

**DESCARGO DE RESPONSABILIDAD (Disclaimer)**

Esta es una traducción de un documento escrito en inglés, distribuido como una cortesía a las personas que no pueden leer inglés. Si resulta alguna diferencia o algún malentendido con esta traducción, el único documento reconocido sera la versión en inglés.

This document contains translations of the English-language on this document provided as a courtesy to those not fluent in English. If differences or any misunderstandings occur, the document of record shall be the related English-language on this document.

WSPF FOXTROT

031825

FOLD *DOBLE*

**DEPARTMENT OF CORRECTIONS**
Division of Adult Institutions
DOC-0643 (Rev. 4/2015)

**WISCONSIN**

## INTERVIEW/INFORMATION REQUEST
## *SOLICITUD POR INFORMACION/ENTREVISTA*

TO:
A: Social Worker Mr. Johnson

DEPARTMENT:
DEPARTAMENTO: Foxtrot Unit

DATE:
FECHA: 3/18/2025

For Confidentiality Use Either Staple/Scotch Tape or an Envelope
*Por Confidencialidad Engranpe o use Cinta Scotch o un Sobre*

2251

# Exhibit #13

- 2-Pages

**DEPARTMENT OF CORRECTIONS**
Division of Adult Institutions
DOC-0643 (Rev. 8/2022)

226

[Exhibit#13: Page 1 of 2]

**WISCONSIN**

# INTERVIEW/INFORMATION REQUEST
## *SOLICITUD PARA INFORMACION / ENTREVISTA*

Instruction to Inmate: Do not use this form to contact health staff. Use a Health, Dental or Psychological Service Request.
*Instrucciones para Reclusos: No utilice este formulario para comunicarse con el personal de cuidados de salud. Utilice una solicitud de servicio de cuidados de salud, dentales o psicológicos.*

| OFFENDER NAME / *NOMBRE DEL/LA OFENSOR(A)* | DOC NUMBER / *NUMERO DEL/LA OFENSOR(A)* | LIVING UNIT / *UNIDAD DE VIVIENDA* |
|---|---|---|
| Terrance Prude | 335475 | Foxtrot/223 |
| DATE / *FECHA* 3/23/2025 Sunday | WORK ASSIGNMENT / *ASIGNACION DE TRABAJO* | |

[X] Interview *Entrevista* [X] Information *Informacion*

STATE REASON FOR INTERVIEW OR SPECIFY INFORMATION REQUESTED
*INDIQUE LA RAZON PARA LA ENTREVISTA O ESPECIFIQUE LA INFORMACION QUE SOLICITA*

I was informed by social worker Mr. Johnson on Foxtrot Unit to contact the WSPF Offender Classification Specialist about my questions about the mandatory restrictor. The IFCC policy indicates that a prisoner cannot be housed at a minimum or minimum community prison if the inmate has more than 5 years to their adjusted release date. I'm seeking to obtain a discretionary override of the 5 year mandatory restrictor. What's the criteria in determining whether I should or should not be granted a discretionary override? What's the guideline that determines how that "discretion" is used to grant or deny a discretionary override?

(Do Not Write Below This Line) *(No Escriba Debajo Esta Linea)*
**DISPOSITION OF REQUEST** ***DISPOSICION DE LA SOLICITUD***

[ ] You Will Be Interviewed *Usted sera entrevistado*
[ ] Information to Follow *Informacion Sera Proveida*
[ ] Request Referred To: *Solicitud Refereida A:*

Date: *Fecha:* 03-24-25
Time: *Hora:*

Information/Comment: *Informacion/Comentario:* We do not have the ability to override mandatory restrictors. The discretionary override is used when the PRC Committee recommendation doesn't match the "IFCC overall Recommendation", but mandatory restrictors are MANDATORY.

Signed *Firmado* [signature]
Department *Departamento* BOCM

[Exhibit#13: Page 2 of 2] TO: / A: Terrance Prude
NUMBER: / NUMERO: 335476
UNIT: / UNIDAD de VIVIENDA: Foxtrot/223
227 DATE: / FECHA: 3/23/2025 Sunday

FOLD *DOBLE*

**DESCARGO DE RESPONSABILIDAD (Disclaimer)**

Esta es una traducción de un documento escrito en inglés, distribuido como una cortesía a las personas que no pueden leer inglés. Si resulta alguna diferencia o algún malentendido con esta traducción, el único documento reconocido sera la versión en inglés.

This document contains translations of the English-language on this document provided as a courtesy to those not fluent in English. If differences or any misunderstandings occur, the document of record shall be the related English-language on this document.

988880

FOLD *DOBLE*

**DEPARTMENT OF CORRECTIONS** **WISCONSIN**
Division of Adult Institutions
DOC-0643 (Rev. 4/2015)

## INTERVIEW/INFORMATION REQUEST
## *SOLICITUD POR INFORMACION/ENTREVISTA*

TO: / *A:* WSPF Offender Classification Specialist
DEPARTMENT: / *DEPARTAMENTO:* Inmate Classification Department
DATE: / *FECHA:* 3/23/2025 Sunday

For Confidentiality Use Either Staple/Scotch Tape or an Envelope
*Por Confidencialidad Engrape o use Cinta Scotch o un Sobre*