[1 of 20 Page]

## Milwaukee County Circuit Court

Plaintiff: State of Wisconsin,

- vs -

Defendant: Terrance D. Prude.

Case No. 1999-CF-5988

Brief In Support Of Terrance
D. Prude Motion Pursuant To
Wis. Stat. 974.06(4)

---

I am the defendant, Terrance D. Prude, and I moved this Court pursuant to Wis. Stat. 974.06(4) seeking to void my guilty plea's and proceed to trial based on:

• Trial attorney Russell Bohach providing misadvice about: how much time I'd have to serve prior to being eligible for parole release; newly enacted laws that increase time that must be served cannot apply to me; and the parole release criteria I'd have to satisfy to be released.

In support, I allege the following facts entitles me to an evidentiary -Machner- hearing because the facts are true and entitles me to relief. See Nelson v. State, 54 Wis. 2d 489, at 497 (Wis. S.Ct. 1972).

[2 of 20 Page]

## Statement Of Case

(1) I, Terrance D. Prude, was arrested on 11-20-1999 for six counts of armed robbery (Wis. Stat. 943.32(1)(b) & (2)), one count of endangering safety by use of dangerous weapon (Wis. Stat. 941.20(1)(a)), and one count of false imprisonment (Wis. Stat. 940.30). All counts Party To A Crime under Wis. Stat. 939.05.

(2) While housed at the Milwaukee County Jail (MCJ), between November of 1999 and April of 2000, there existed uncertainty as to how the new law called Truth-In-Sentencing would apply to persons who were arrested prior to 12-31-1999. Amongst inmates, it was believed that any person ▨ sentenced after 12-31-1999 for crimes committed before 12-31-1999 would be subject ▨ to the Truth-In-Sentencing (TIS) law. See Affidavit of Terrance D. Prude (Aff.) at paragraph (par) 1.

(3) I believed that I would be subject to the laws & practices of TIS because I knew I would ▨ be sentenced after 12-31-1999. I was also told that parole would not apply to me after serving 25% of whatever sentence imposed and that I'd have to serve

Ex. 11 :2

[3 of 20 Page]

50% - 80% of whatever sentence imposed before I'm eligible for parole release due to ▪ being sentenced after 12-31-1999. See Aff. at par 2 .

(4) I asked my trial lawyer Russell Bohach to advise me of whether what I've heard is true or false. Bohach told me: (1) because my offenses took place prior to 12-31-1999 I would not be subject to TIS; (2) a new law created after my crimes were committed which increase time I must serve in prison cannot apply to me; (3) I'll only have to serve 25% of whatever sentence imposed before I'm eligible for parole release under Wis. Stat. 304.06(1)(b); (4) To be suitable for parole release I only had to show that I have adequate plans for suitable employment or that I'm able to sustain myself under Wis. Stat. 304.06(2). See Aff. at par 3 .

(5) After being convinced of this advice, provided by my trial lawyer Bohach, I released my interest in proceeding to trial by, instead, electing to plead guilty waiving my trial rights. See Aff. at par 4 . Bohach's advice is what pushed me to even be open to entertaining a plea bargain & is the reason I pled guilty. Without this advice, I would have elected to proceed to trial with the defense I had against the charges. See Aff. at par 4 .

[4 of 20 Page]

(6) On May 1, 2000, I pled guilty. See <u>Jury Trial</u>
<u>Transcript</u> dated May 1, 2000.

(7) On February 13, 2001, I was sentenced to an 80
year prison sentence with a 20 year stayed sentence.
See <u>Sentence Transcript, Page 41 Line 21 through to Page</u>
<u>42 Line 23</u>.

Standard Of Review For
Ineffective Assistance
<u>Of Counsel Claim</u>

(8) There are two components to a claim of ineffective
assistance of counsel: a demonstration that counsel's performance
was deficient, and a demonstration that such deficient performance
prejudiced the defendant. <u>Strickland v. Washington, 466 U.S.</u>
<u>668, 687 (1984).</u>

Standard Of Review For Counsel
Providing Misadvice Regarding
<u>Parole Release Eligibility</u>

(9) "Erroneous advice regarding parole eligibility can form

[5 of 20 Page]

the basis for a finding of ineffective assistance of counsel thus permitting withdrawal of guilty pleas." State v. Bentley, 195 Wis. 2d 580, 589 (Wis. Ct. App. 1995)(reversed on other grounds). The "earliest potential parole eligibility date... [is] normally one of the most important factors to a criminal client. The basic minimum amount of time that a defendant will have to serve is an integral factor in plea negotiation; it is a direct, not a collateral, consequence of the sentence. While the state has no federal constitutional duty to inform a defendant about parole, counsel owes a duty to provide accurate information about his client's earliest possible release date, especially when the client asks for it." State v. Bentley, Id. at 590 (citing Hill v. Lockhart, 877 F. 2d 698, 703 (8th Cir. 1989)(internal quotation marks omitted). Also, persuasively see Webb v. State, 334 S.W. 3d 126, at 127-30 (S.Ct. of Missouri 2011).

### Newly Created Parole Policies & Practices Effectuates Russell Bohach's Misadvice As Deficient Performance

(10) **First**, Bohach advised me that TIS would not apply to me because my offenses happened prior to 12-31-1999. See Aff. at par 3 . However, the Wisconsin Parole Commission (WPC)

[6 of 20 Page]

has expressly adopted a practice which increase "time that must be served for punishment for Class Members [in order] to align Class Members' minimum periods of imprisonment with Truth-in-Sentencing ("T-I-S") punishments, even though T-I-S did not go into effect in Wisconsin until December 31, 1999." See Heredia et al. v. Blythe et al., Case #19-CV-338-jdp (Western Dist. of Wis.), at Proposed Findings Of Fact In Support Of Plaintiffs' Motion For Summary Judgment, (Dkt #139), at par 43. This document is attached herewith at the Appendix Section. It is note worthy to advise this Court that I, Terrance D. Prude, was a named plaintiff who represented the Class Members in that case. See Heredia v. Blythe, 638 F. Supp. 3d 984 (W.D. Wis. 2022)[1]. It's apparent that TIS is being applied to "old law" parole reviews in a way that increase time that must be served as the above testimony proves. Bohach advised me that this "would not" happen and left no room for the possibility that an ex post facto law could be applied and challenged as being unlawfully applied to me. See Aff. at par 3. Had Bohach told me it was "possible" for TIS to be applied to me, despite the laws governing ex post facto, I would not have

---

[1] As a representative of the Class, I represented those juveniles under age 18 who received at least 470 months for nonhomicide crimes. See Aff. at par 5-6. See case attached marked Exhibit #6, at Heredia v. Blythe, Id. at 987

[7 of 20 Page]

pled guilty and would have proceeded to trial with the defense I had, which is detailed later in this brief. Bohach's failure to "engage in the type of good-faith analysis of the relevant facts and applicable legal principles" is what caused him to provide me misadvice about <u>TIS</u> not applying ~~[redacted]~~ to me through ex post facto means. <u>Moore v. Bryant,</u> 348 F.3d 238, 242 (7th Cir. 2003). This is deficient performance.

(11) <u>Second</u>, Bohach advised me that a new law created after my crimes were committed which increase time I must serve in prison cannot apply to me. See <u>Aff. at par 3</u>. However, the <u>WPC's</u> de facto practice is to apply the "...presumption that you're not going to release on your PE [parole eligibility] date.". See <u>Exhibit #1 attached Dkt #139, at par 35-37</u>. Also, the <u>WPC's</u> other practice is to only release prisoners on parole who have "transition through all DOC custody levels (maximum custody, medium custody, minimum security custody, and minimum community custody)". See <u>Dkt #139, par 110-111</u>. In fact, <u>Parole Commissioners</u> have stated that they **especially** "require [Prude] to proceed through custody reductions because [he] entered prison as [a] child[]". See <u>Dkt #139, par 122-124</u>. Here's the problem with the <u>WPC</u> having such a practice: For starters, the <u>Department Of Corrections (DOC)</u>, not the <u>WPC</u>, has sole control over whether a prisoner transitions

[8 of 20 Page]

through reduced custody levels. See Dkt.#139, par 21-23, 125, 138. Furthermore, and more damaging, the DOC has a separate policy that determines how much time a prisoner must do before being housed at custody levels where prisoners are granted parole releases from.

(12) The DOC has created a written policy on July 25, 2022 called 'DAI Instrument for Custody Classification (IFCC) Mandatory Restrictors'. See Exhibit #3 attached. This policy prohibits me from being housed at parole-release-institutions (i.e., minimum & minimum community ("MMC" hereafter)) because I have "...more than five years to [my] adjusted release date." See IFCC policy, Page 3 at par 6. My adjusted release date is scheduled for year 2054 as my mandatory release (MR) date. See PAROLE COMMISSION ACTION, Page 1 of 3 attached marked Exhibit #2. This means I cannot be housed at a parole-release-institution until year 2049 when I'm no longer "with more than five years" to my adjusted release date. See IFCC policy, Page 3, at par 6. I have to serve 25 more years before I meet the criteria to be housed at a parole-release-institution. I only pled guilty because my attorney told me a new law cannot retroactively apply to me where such law increase how much time I must serve before I'm suitable for parole release. See Aff. at par 3-4, 8-9. Under these new laws, I'm now required to serve

[9 of 20 Page]

more than the 25% established in Wis. Stat. 304.06(1)(b). Had I known that it was even **possible**, despite being unlikely, that a new law could retroactively increase how much time in prison I serve I would took my chances with proceeding to trial with my defenses. See Aff. at par 10-13. Being told this "cannot apply" to me left no room to be possible to happen to me. Again, being informed of such "possibility" would have allowed me to properly make a informed decision of whether to go to trial or plead guilty. I would have went to trial had I known it to be "possible" for a new law to retroactively apply to me increasing the time I must serve. Had Bohach conducted research about how Wisconsin has a history of creating laws that retroactively increase a prisoners incarceration he would have armed himself with the wisdom from cases State ex rel. Mueller v. Powers, 64 Wis. 2d 643, 645-47 (Wis. S. Ct. 1974); State ex rel. Richards v. Leik, 175 Wis. 2d 446, 450-451 (Wis. Ct. App. 1993). In fact, Wisconsin has not stopped creating new laws that retroactively increase the amount of time a prisoner must serve before being suitable for release. See State ex rel. Singh v. Kemper, 371 Wis. 2d 127, 149-153 (Wis. S. Ct. 2016). Bohach's failure to notify me that Wisconsin does have a history of such behavior and that it was "possible" to happen to me exhibited deficient performance. See Moore v. Bryant, 348 F. 3d at 242 (7th Cir. 2003).

[10 of 20 Page]

(13) <u>Third</u>, Bohach advised me that I had to show I had adequate plans for suitable employment or that I'm able to sustain myself in order to be suitable for release. See <u>Aff. at par 3</u>. Although <u>Wis. Stat. 304.06(2)</u>[a] is where counsel Bohach's advice is accurately rooted from, the retroactive application of the other laws explained above at <u>par 10-12</u> renders <u>Wis. Stat. 304.06(2)</u>(& Bohach's advice related to <u>Wis. Stat. 304.06(2)</u>) null and void. The criteria of <u>Wis. Stat. 304.06(2)</u> is meaningless while I'm housed in a maximum custody prison because the <u>WPC's</u> practice prohibit release from maximum custody prison. See <u>Dkt.#139, par 110-111, 122-124</u>. The <u>WPC</u> has created a substantial amount of new policies & practices that apply to me beyond s.304.06(2). See <u>Dkt#139, par 38-60, 63-75, 78-97, 110-112</u>. Thus, Bohach's advice related to <u>304.06(2)</u> is ⬛ deficient performace due to the new policies/practices being applied to me retroactively making 304.06(2) lose its force, which Bohach advised cannot happen. See <u>Aff. at par 3</u>. I'm now subject to more parole-release-criteria than what I understood when I pled guilty. Bohach's performance was deficient.[3]

---

[2] See also <u>Dkt.#139, par 141</u>.
[3] <u>Moore v. Bryant</u>, Id. at 242; <u>State v. Bentley</u>, 195 Wis. 2d 580, at 587-88 (Wis. Ct. App. 1995) (reversed on other grounds); & <u>Webb v. State</u>, 334 S.W. 3d 126, at 129 (Missouri, 2011).

[11 of 20 Page]

## Russell Bohach's Deficient
## Performance Prejudiced Prude

(14) Trial lawyer Bohach's misadvice prejudiced me because such misadvice caused me to plead guilty. Had I Known that it was "possible" for a new law to increase the time I serve in prison that aligns with (or even smells like) the TIS law I would have elected to go to trial forcing the State to prove me guilty beyond a reasonable doubt with my defense.

(15) I was sentenced to an 80 year prison term. Without the new policies/practices being applied to me I'd only have to serve 25% of 80 years (which totals 20 years) under s. 304.06(1)(b), & the narrow release criteria of s.304.06 (2) would be my only hurdle. However, applying the new policies/ practices (discussed at Dkt. #139) to me, I'm now required to serve 50 years of my 80 year prison term. See par 12 above. There's a big difference between serving 20 years and serving 50 years. I would have went to trial.

(16) Furthermore, I had a viable defense heading into trial. On Counts 1-5 of the criminal complaint, I would have testified at trial that the gun possessed was secured in a home-made-chest-holster visible for the victims to see but, the weapon was never used or threatened to be used as

3A The WPC's new policies/practices were born 2010 & applied to me 2020.

[12 of 20 Page]

required by s.943.32(2). See Aff. at par 10. I would have testified ~~that~~ at trial that I did:(1) use force against the victims with intent to overcome their physical resistance or physical power of resistance in carrying away the property; & (2) threatened the imminent use of force against the victims with intent to compel the victims to acquiesce in the carrying away the property. See s.943.32(1)(a)-(b). Merely being armed with a weapon (where that weapon is not used or threatened to be used) is **not** sufficient to be found guilty of armed robbery under s.943.32(2). See State v. Moriarty, 107 Wis. 2d 622, 629-31, 321 N.W. 2d 324, 329-30 (Wis. Ct. App. 1982)("...it is no longer sufficient for the State to prove that a defendant was merely armed, the State must now prove the use or threat of use of the weapon during the commission of the robbery."). Threatening force, without use or threatening use of a dangerous weapon, is simple robbery. See State v. Grady, 93 Wis. 2d 1, 6, 286 N.W. 2d 607 (Ct. App. of Wis. 1979).

(17) On Counts 7-8 of criminal complaint, my viable defense would have been that I was not involved. My fingerprints being only found on the outside roof of car does not implicate me being involved during the robbery. My only contact with the car was when I leaned up against while talking to the driver. As far as the victim claiming to recognize my voice during

Ex. 11:12

[13 of 20 Page]

a line-up, my defense would have been two-fold: (i) I would have called a voice identification expert who would testify that being able to identify a unfamiliar voice on a second occasion weeks later cannot be reliable evidence. Voice Identification matches are not the same as DNA matches; & (ii) the voice identification expert would have testified that people of the same race and same age range sounding alike is common and these commonalities are what makes the victims voice identification unreliable[4]. I'm actually innocent of Counts 7-8. These two charges carry a maximum of 42 years but the crimes I did implicate myself in carry a maximum of 200 years and 9 months. If I would have played any type of role in Counts 7-8 I would have implicated myself on these counts. See Aff. at par 11____. In fact, even the State expressly told the Court that it "...don't think the State would be in a position to prove that count [seven] and count eight, which are companion counts, beyond a reasonable doubt." See Jury Trial Transcript, Page 3 Line 11-14.

(18) Also, my other viable trial defense would have been to have my incriminating statements at a Miranda-Goodchild Hearing suppressed because: (i) evidence exist that at the time I was interrogated by detectives I was heavily intoxicated off marajuana and alcohol and that I was

[4]See State v. Free, 493 So. 2d 781, 789, footnote 8 (Louisiana Ct. App. 1986)

[14 of 20 Page]

intoxicated everyday leading up to my arrest. See Sentencing Transcript, Page 19 Line 23-7; Page 24 Line 5-7; Page 39 Line 13-22; Page 40 Line 24-25; Page 44 Line 21-23. Also, See the Motion Hearing Transcript, dated 1-12-2001, Page 82 Line 21; and (ii) during interrogation the detectives told me prior to, and after, reading me my Miranda rights that if I "chose to remain silent you wouldn't be able to give your side of the story to the jury because by invoking your right to remain silent you deprive yourself from being able to testify against the evidence that support your guilt." See Aff. at par 12. I was told it was "now or never" and "invoking silence now will lock you in to remaining silent at trial and if you want to be able to give your side of the story at trial you must start giving your side of the story now". See Aff. at par 12. Believing my Miranda rights meant what the detective told me they mean I chose to give statements to mitigate my role I played in the crime so that I can present those defenses to a jury. However, these definitions of my Miranda rights were legally wrong which made my incriminating statements involuntary. See State v. Reiholec, 398 Wis. 2d 729, 751-58, 963 N.W. 2d 121, 132-35 (Wis. Ct. App. 2021). See Aff. at par 13.

(19) In fact, the record proves that as a viable trial defense I actually intended to seek suppression of these statements

[15 of 20 Page]

pursuant to a Miranda-Goodchild-Hearing. See Motion Hearing Transcript, Page 17 Line 18-23. Also, In Wisconsin a criminal defendants incriminating statements cannot be used at trial without the Court issuing a ruling that such statement can be used as admissible evidence. See Wis. Stat. 971.3(3)("The admissibility of any statement of the defendant shall be determined at trial by the court in an evidentiary hearing out of the presence of the jury...") The burden is on the State to prove the statements are/were voluntary in order to be admissible. See State ex rel. Goodchild v. Burke, 27 Wis. 2d 244, 264-65, 133 N.W. 2d 753, 763-64 (Wis. S.Ct. 1965)("The state shall have the burden of proving voluntariness beyond a reasonable doubt."). Therefore, I believe my Miranda-Goodchild motion would have resulted in my statements being suppressed. My statements are the only foundations that materially show I played a role in the crimes on Counts 1-6. Without these incriminating statements the State's case would have been in the same fatal position as Counts 7-8. See Jury Trial Transcript, Page 2 Line 25-16 of Page 3.

(20) As such, I feel I had a viable defense going to trial as explained above at par 16-19. However, even with this viable defense, I thought there was a possibility or probability that I could be convicted. Therefore, being advised that I

[16 of 20 Page]

would not be subject to TIS; and that a new law created after my crimes were committed which increase time served in prison cannot apply to me; and that I'll only have to serve 25% of sentence imposed before I'm eligible for parole release under 304.06(1)(b); and that I had to meet the criteria of 304.06(2) to be released from prison, all prompted me to plead guilty. Had I known the WPC would use its deferral authority to increase time I serve to align my sentence with TIS punishments (see Dkt #139, par 43); and had I known a new law was possible to apply to me which increase time I serve beyond 25% outlined in 304.06(1)(b); and had I known I'd be subject to release criteria beyond 304.06 (2)(see Dkt #139 generally), I would have taken a chance that my defenses described above at par 16-19 would have been successful by going to trial. The "correct prejudice inquiry is not whether [Prude] would have been better off going to trial, but whether [Prude] would have elected to go to trial in lieu of accepting a plea." Pidgeon v. Smith, 785 F.3d 1165, 1173 (7th Cir. 2015). I "had a constitutional right to a trial; if [Prude's] attorney's deficient performance led [Prude] to forego that right, that is prejudice itself." Id. at 1173. I have shown how Bohach's deficient performance has prejudiced me. "[A]ny amount of [additional] jail time has Sixth Amendment significance". See Glover v. U.S., 531 U.S. 198, at 203(2001).

[17 of 20 Page]

## Prude Has Sufficient Reason Under Wis. Stat. 974.06(4) To Bring This Claim

(21) Prior to 8-19-2020, I could not have filed this claim before that time because the new policies/practices of the WPC weren't applied to me until I went to my first parole hearing. My first parole hearing was 8-19-2020 where I was first exposed to the new policies/practices described at Dkt. #139. See PAROLE COMMISSION ACTION dated "08/19/2020" attached marked Exhibit #2. I received an 80 year prison term where I had to serve 25% of the 80 years before being subjected to any parole hearing policies/practices. See Wis. Stat. 304.06(1)(b); also see Dkt. #139, par. 28-34; and Heredia et al. v. Blythe et al., 638 F. Supp. 3d 984, 988 (W.D. Wis. 2022). My "sufficient reason" for not raising these claims earlier is the same reasoning provided in State v. Howard, 211 Wis. 2d 269, 564 N.W. 2d 753, 762 (Wis. S. Ct. 1997)("Howard could not have foreseen the affect [sic] of the Peete decision at the time of his appeal constitutes a sufficient reason for not raising the issue at an earlier date."). The Wisconsin Supreme Court went on to hold that "...Howard and his counsel in 1990 had no way to know how this court would construe Wis. Stat. 939.63 by the time it decided Peete in 1994." Id. at 763. In my case

[18 of 20 Page]

herein, the same reasoning applies: I, in 1999-2020, had no way to know that the <u>WPC</u> would create new parole policies/practices (that increase time a defendant must serve before release is possible) that undercut my trial lawyers advice. The factual and legal basis for the claims raised in this motion was born on <u>8-19-2020</u>, which is when I first was subjected to the parole policies/practices. I could not raised these claims earlier arguing "anticipatory violations". In fact, the Wisconsin Supreme Court has held that a prisoner, as it relate to parole proceedings, cannot raise a claim or seek relief on a claim that is based on a parole hearing that has not happened yet. See <u>State ex rel. Mueller v. Powers</u>, 64 Wis. 2d 643, at 648 (Wis. S.Ct. 1974). As such, I have satisfied the "sufficient reason" standard of <u>974.06(4)</u> as to why these claims were not raised prior to <u>8-19-2020</u>. See <u>State v. Howard</u>, Id. at 762-63.


## Prude Is Entitled To A Machner-Evidentiary-Hearing By Law


(22) To get an evidentiary hearing I must alleged "facts which, if true, would entitle [...me...] to relief, the trial court must hold an evidentiary hearing." <u>Nelson v. State</u>, 54 Wis. 2d 489, at 497 (1972). This motion does exactly that, if not more.

[19 of 20 Page]

(23) At the evidentiary, my former attorney Bohach will testify that: (1) he did advise me that I would not be subject to TIS; (2) he did advise me that a new law created after my crimes were committed which increase time I must serve in prison cannot apply to me; (3) he did advise me that I'd only have to serve 25% of whatever sentence imposed before I'm suitable for parole release; (4) he did advise me that in order to be released I'm required to satisfy the requirements of 304.06(2) by having adequate plans for suitable employment or that I'm able to sustain myself upon release. See par 4 above.

(24) I will testify consistent with this motion that: (1) I only pled guilty based on Bohach's advice above at par 23; (2) I would have elected to go to trial with my defense mentioned above at par 16-19 had I known at that time what I know now about the advice being erroneous as argued above at par 10-15; (3) I only pled guilty on the first day of trial because it took alot of convincing from my attorney that what prisoners were saying was not true as mentioned above at par 2-3; (4) I feared being subject to the TIS laws or anything that represented a defacto form of TIS laws including practices that, when applied, performed like TIS laws. As such, an evidentiary hearing is warranted based on the facts in this motion show I'm entitled to withdraw my guilty plea's & head to trial. Nelson v. State, Id. at 497.

[20 of 20 Page]

The Plea-Colloquy-Hearing Did
Nothing To Alert Me To The
"Possibility" That Bohach's Advice
About Parole Eligibility-Criteria
Was Wrong In-Whole Or In-Part

(25) A review of the <u>Jury Trial Transcript</u>, where the
guilty plea-colloquy took place, will not be relevant to issues
presented here because I was not aware of even the possibility
of Bohach's advice being in error. See <u>Moore v. Bryant, Id.</u> at
243 [Headnote 6]. Nothing in the colloquy addressed any of the
issues in this motion above <u>at par 2-5, 9-13.</u> Any reference to
or "reliance on the plea colloquy as a panacea for [Prude's]
attorney's deficient performance is without legal precedent where
the colloquy did not even address the basis for that deficient
performance, and thus is an unreasonable application of the
Strickland test." <u>Moore v. Bryant, Id.</u> at 243. The misadvice
Bohach gave me happened during a private attorney-client in-
person visit at the <u>MCJ</u>, not at the plea-colloquy-hearing. See
<u>Aff. at par 14</u>. As such, this court should not review the
Irrelevancy of the plea-colloquy-transcript for these errors.

(26) <u>Conclusion:</u> Based on all the above arguments, this court
should grant me an evidentiary hearing.[5] Thank you.
Print Name: Terrance D. Prude     Sign: PP     Date: 4/29/2024
[5] For convenience, I seek a evidentiary hearing by zoom-video conference.

# Appendix

# APPENDIX SECTION

- Affidavit of Terrance D. Prude...... Page 1-7
- Proposed Findings Of Fact In Support Of Plaintiff's Motion For Summary Judgment ("Dkt.#139")...... Page 1-90 (Exhibit #1)
- Parole Commission Action Dated 8/19/2020...... Page 1-3 (Exhibit #2)
- DAI Instrument for Custody Classification (IFCC) Mandatory Restrictors...... Page 1-7 (Exhibit #3)
- Parole Commission Action Dated 2/16/2023...... Page 1-3 (Exhibit #4)
- Plea Questionnaire/Waiver of Rights...... Page 1-2 (Exhibit #5)
- Heredia v. Blythe, 638 F. Supp. 3d 984 (W.D. Wis. 2022)...... Page 1-19 (Exhibit #6)

Affidavit Of Terrance D. Prude
(7-Pages)

(original)

[1 of 7 Page]

## Milwaukee County Circuit Court

Plaintiff: State of Wisconsin,

-vs-

Case No. 1999-CF-5988

Defendant: Terrance D. Prude.

## Affidavit of Terrance D. Prude

I, Terrance Prude, swear under oath that the paragraphed testimony listed below is true and based on my personal experience and knowledge and knowingly and voluntarily made:

(1) While housed at the Milwaukee County Jail (MCJ), between November of 1999 and April of 2000, there existed uncertainty as to how the new law called Truth-In-Sentencing would apply to persons who were arrested prior to 12-31-1999. Amongst inmates, it was believed that any person sentenced after 12-31-1999 for crimes committed before 12-31-1999 would be subject to the Truth-In-Sentencing (TIS) law in some form or fashion.

(2) I believed that I would be subject to the laws & practices of TIS because I knew I would be sentenced after 12-31-1999. I was also told by inmates & family that

[2 of 7 Page]

parole would not apply to me after serving 25% of whatever sentence imposed and that I'd have to serve 50%-80% of whatever sentence imposed before I'm eligible for parole release due to being sentenced after 12-31-1999.

(3) I asked Russell Bohach to advise me of whether what I've heard from inmates & family is true or false. Bohach told me: (1) because my offenses took place prior to 12-31-1999 I would not be subject to TIS; (2) a new law created after my crimes were committed, which increase time I must serve in prison cannot apply to me; (3) I'll only have to serve 25% of whatever sentence imposed before I'm eligible for parole release under Wis. Stat. 304.06(1)(b); and (4) to be suitable for parole release I only have to show that I have adequate plans for suitable employment or that I'm able to sustain myself under Wis. Stat. 304.06(2).

(4) After being convinced of this advice being true, which was on the 30th day of April (the date I signed the plea form, see Exhibit #5 attached), I waived my right to trial by electing to plead guilty. Bohach's advice is what pushed me to even be open to entertaining a plea bargain & is the reason I pled guilty. Without this advice, I would have went to trial on the defenses I had.

Ex. 11.25

[3 of 7 Page]

(5) I swear that the attached document titled "Proposed Findings Of Fact In Support Of Plaintiffs' Motion For Summary Judgment" (Dkt.#139) is a true and correct copy of the record from case Heredia et. al. v. Blythe, 638 F. Supp. 3d 984 (Western District Federal Court of Wisconsin, 2022). I am a named representative-plaintiff in this cited case who represented the "Class Action Members". The testimony and the evidence cited to in this document (Dkt.#139) is public record and entirely relevant to my claim that my trial lawyer Russell Bohach was ineffective in his assistance during the plea bargaining phase of this case. I've marked this document (Dkt.#139) as Exhibit #1.

(6) Attached in the Appendix Section is a true copy of case Heredia et. al. v. Blythe et. al., 638 F. Supp. 3d 984 (W.D. Wis. 2022) which show me in the heading or case caption as a named plaintiff affected by the new parole policies/practices at Dkt.#139.

(7) Attached in the Appendix Section is a true copy of my Parole Commission Action decisions from 08/19/2020 (marked Exhibit #2) and 02/16/2023 (marked Exhibit #4); and the DOC's new policy DAI Instrument for Custody Classification (IFCC) Mandatory Restrictors dated July 25, 2022 (marked

[4 of 7 Page]

Exhibit #3); and Plea Questionnaire/Waiver of Rights form dated 4-30-2000 (but stamped by clerk "May 1, 2000") (marked Exhibit #5).

(8) The Wisconsin Parole Commission (WPC) has a permanent practice which prohibit parole release from maximum prisons and require prisoners to transition through lower level security prisons in order to be suitable for parole release. See Parole Commission Action (PCA), Page 2, Exhibits #2 & #4 (directing me to "transition[] through lower levels of security"); compare with DKt.#139, par 110-121, 125-140 at Exhibit #1 attached.

(9) My research has disclosed that Wisconsin is the only state within the U.S.A. that does not allow a prisoner to be released on parole from a maximum prison setting even though the WPC has no power over whether the prisoner stay in maximum prison or transitions to lower levels. See DKt.#139, par 125. In fact, the WPC recommended/endorsed me to transition to a lower level prison to be suitable for parole release, but such endorsement was rejected by the prisons reclassification committee. See PCA, Page 2 of Exhibit #4. Such rejection was based on the DOC's new policy which require me to be blocked from being housed at a lower custody level because I have "...more than five years

[5 of 7 Page]

to [my] adjusted release date." See IFCC policy, Page 3 at par 6, of Exhibit #3 attached. My "adjusted release date" is 7/10/2054 (see Page 1 of PCA, Exhibit #2 & #4 attached), which means I'm not suitable for housing at a lower custody level until 7/10/2049, which is when the "Mandatory Restrictor" of the IFCC policy at Page 3 at par 6. will no longer block me from transitioning to a lower level prison setting. As it stands, I have to serve 25 more years which would be 50 years I've served from 1999-2049, I would be 67 years old at that time.

(10) My trial defense would have been to testify that the gun possessed was secured in a home-made-chest-holster visible for the victims to see but, the weapon was never used or threatened to be used, as it relate to Counts #1-5 of the criminal complaint. I did use force against the victims with the intent to overcome their physical resistance and I did threaten the imminent use of force with the intent to compel the victims to acquiesce in the carrying away of property. See Wis. Stat. 943.32(1)(a)-(b). However, I never used or threatened to use a weapon under 943.32(2).

(11) My defense on Counts 7-8 was that I'm innocent. My fingerprint being found on the outside roof of the car is because I leaned up against the car while talking to

[6 of 7 Page]

the driver. As far as the victim claiming to recognize my voice during a line-up, my defense would have been to have a voice identification expert who would testify that being able to identify a unfamiliar voice on a second occasion weeks later cannot be reliable evidence. Voice identifications, by ear, are not the same as DNA matches. The expert would have testified that people of the same race, same age range, and same urban upbringing where talking a "certain way" is a trend is common for those persons to sound the same and that these commonalities are what makes the victim's voice identification unreliable. If I played any role in Counts 7-8 I would have gave a incriminating statement of that role as a highly uneducated/intoxicated 17 year old teenager.

(12) My other trial defense was to have my statements suppressed at a Miranda-Goodchild hearing for the following reasons: (i) I was heavily intoxicated off marajuana and alcohol during interrogation; (ii) during interrogating me the detective told me prior to, and after, reading me my Miranda rights that if I "chose to remain silent you wouldn't be able to give your side of the story to the jury because by invoking your right to remain silent you deprive yourself from being able to testify against the evidence that support your guilt." I was told it was "now or never" and "invoking silence now will lock you in to remaining silent at trial

[7 of 7 Page]

and if you want to be able to give your side of the story at trial you must start giving your side of the story now."

(13) Believing my <u>Miranda</u> rights meant what the detective told me they mean I chose to give statements to mitigate my role I played in the crime so that I can present those defenses to a jury. However, these definitions of my <u>Miranda</u> rights were wrong, legally, which made my incriminating statements involuntary.

(14) The misadvice Russell Bohach gave me took place during a off-the-record private attorney-client in-person visit at the <u>Milwaukee County Jail (MCJ)</u>, not at the plea-colloquy-hearing on May 1, 2000.

Notary Name: Mackenzie Wike
Signature: Mackenzie Wike
Notary Commission Expires: 12/7/27
Date: 4/16/24

Terrance D. Prude
Signed: Terrance D. Prude
Date: 4-16-2024

Exhibit #1

(90-Pages)

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

VICTORIANO HEREDIA, et al,

        Plaintiffs,

vs.

JOHN TATE II, et al.,

        Defendants.

        Case No. 3:19-cv-0338-jdp

**PROPOSED FINDINGS OF FACT IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

$$\left[ \text{Exhibit \#1} \right]$$

4875-0670-1578.2
QB\72763919.4

## TABLE OF CONTENTS

I.    THE PARTIES ................................................................................................................ 1

A.    Named Plaintiffs and Members of the Class ................................................................ 1

B.    Defendants .................................................................................................................... 3

II.   JURISDICTION AND VENUE ...................................................................................... 5

III.  UNDISPUTED FACTS ................................................................................................... 6

A.    Plaintiffs Were Sentenced Under Wisconsin's Indeterminate Sentencing Scheme, with a Minimum and Maximum Term of Imprisonment Set by the Court From a Legal Range ............................................................................................................................ 6

B.    Defendants Routinely and Arbitrarily Increase Plaintiffs' Punishment Beyond the Minimum Set by the Legislature and Sentencing Judge, Contrary to the Spirit of Indeterminate Sentencing ............................................................................................ 7

   1. Defendants' De Facto Practice Is to Deny Parole for Class Members Until After Their Initial Parole Eligibility Date ("Initial PED") ................................................... 7

   2. Defendants Interpret Administrative Code § PAC 1 to Require Them to Decide Whether Plaintiffs Have Served "Sufficient Time So That Release Would Not Depreciate the Seriousness of the Offense" ............................................................... 8

   3. The Parole Commission Has No Guidelines for How Much Punishment is "Sufficient" ...................................................................................................... 11

   4. Defendants Routinely Increase Punishment for Class Members Based on the Subjective and Arbitrary Finding That They Have Not Served "Sufficient" Time for Punishment ........................................................................................................ 15

C.    The Parole Commission Increases Plaintiffs' Minimum Term of Punishment Based on Facts Not Found at Trial or Required for Plea .......................................................... 24

   1. Defendants Aggravate the Mandatory Minimum Sentence Based on Facts that Were Not Elements of the Crime of Conviction .................................................... 24

   2. Defendants Punish Class Members for Crimes for Which They Were Not Convicted.... 32

   3. Defendants Increase Punishment Based on Administrative Fact Finding Regarding Class Members' Juvenile History: Facts Not Found By A Jury or Beyond a Reasonable Doubt 34

D.    Defendants Deny Class Members a Meaningful Opportunity for Release Based on Demonstrated Maturity and Rehabilitation and Do Not Consider the Hallmark Features of Youth to Diminish Culpability ................................................................. 35

   1. Defendants Do Not Evaluate Class Members Using the Standard of Maturity and Rehabilitation ........................................................................................................ 35

   2. Defendants Do Not Consider that Child Offenders Are Less Culpable for Their Crimes than Adult Offenders and Do Not Know How to Apply the Features of Youth .............. 43

4875-0670-1578.2
QB\72763919.4

3. Defendants Require Certain Programming For Release, But Deny Class Members Access to Rehabilitative Programming Until Well After They Have Already Served Their Minimum Term of Imprisonment ................................................................................... 43

4. Defendants Require Extended Time in Reduced Security Classifications For Release, But Deny Plaintiffs Transfer to These Classifications Until Well After Their Parole Eligibility Date ........................................................................................................................... 48

5. Defendants Impose Ad Hoc Release Requirements On Juvenile Lifers Unrelated to Rehabilitation and Reform ................................................................................................ 62

E.      Class Members Are Denied Due Process of Law in Parole Decisions ...................... 72

1. Defendants Fail to Give Plaintiffs Sufficient Advance Notice of Their Parole Hearing .. 72

2. Defendants Fail to Give Class Members Notice of the Factors and Information to Be Considered at their Parole Hearing ................................................................................. 73

3. Defendants Deny Class Members a Fair Opportunity to Present Evidence Relevant to Maturity and Rehabilitation at Their Parole Hearing ....................................................... 74

4. Defendants Deny Plaintiffs the Opportunity to See and Rebut Information Used Against Them at Parole Hearings ................................................................................................. 75

5. Plaintiffs Are Denied the Opportunity to Be Heard by the Actual Decisionmaker .......... 82

6. Defendants Fail to Adequately Explain Their Reasons for Denying Parole to Class Members ......................................................................................................................... 83

7. Plaintiffs Cannot Vindicate Their Liberty Interest Without Access to Counsel and Expert Assistance ................................................................................................................85

QB\72763919.4

Pursuant to Federal Rule of Civil Procedure 56, and this Court's procedures on summary judgment, Plaintiffs Victoriano Heredia, et al., as representatives of a class of similarly situated individuals ("Plaintiffs" or "Class Members"), by their attorneys, respectfully submit these Proposed Findings of Fact in support of their Motion for Summary Judgment.

## I.  **THE PARTIES**

### A.  **Named Plaintiffs and Members of the Class**

1.      Named Plaintiffs Victoriano Heredia, Jumar Jones, Barney Guarnero, Dujuan Nash, Joseph Orosco, Brian Pheil, Deng Yang, and Dontae Doyle, and the Class Members they represent, are individuals who are or were incarcerated within the Wisconsin prison system for crimes they committed as juveniles. Dkt. 61, Amended Complaint ("Complaint") at ¶ 8; Dkt. 65, Defendants' Answer to Amended Complaint, ("Answer") at ¶ 8.

2.      Each Named Plaintiff received a life sentence or a de facto life sentence to a term of years that exceeds 470 months (*i.e.*, greater than their life expectancy) with the opportunity to seek parole after serving a statutorily calculated minimum prison term. Dkt. 61, Complaint at ¶¶ 12–19; Dkt. 65, Answer at ¶¶ 12–19.

3.      The Named Plaintiffs represent "[a]ll persons serving life sentences, or a term of at least 470 months, for crimes committed when they were children under the age of 18 in the custody of Wisconsin Department of Corrections ['DOC'] and who are now, or will be, eligible for release under parole supervision," and are divided into two subclasses, persons who were convicted of homicide offenses and individuals who were convicted of non-homicide offenses. Dkt. 53, Opinion and Order granting Plaintiffs' Motion for Class Certification at 11–12; Dkt. 113, Opinion and Order at 7–8.

1

4875-0670-1578.2
QB\72763919.4

4.      Victoriano Heredia, Jumar Jones, Joseph Orosco, Dujuan Nash, Brian Pheil,

Barney Guarnero, and Deng Yang represent the subclass of prisoners convicted of homicide

offenses. Dkt. 113, Opinion and Order at 7.

5.      Dontae Doyle represents the subclass of prisoners convicted of non-homicide

offenses. Dkt. 113, Opinion and Order at 7–8.[1]

6.      Class Members fall into two categories: those who are or were incarcerated for

crimes committed before December 31, 1999 classified as Class A felonies: (1) first-degree

intentional homicide and (2) operating a vehicle without consent and use of dangerous weapon

causing death[2] or those who are or were serving de facto life sentences for crimes committed

before December 31, 1999 that included non-homicide "serious felonies." WIS. STAT. §

302.11(1g)(a).[3] [4] Declaration of Ellen E. Cranberg, Esq. in support of Plaintiffs' Proposed

---

[1] Mr. Doyle was released to parole after the Court certified the non-homicide subclass. Notwithstanding, Mr. Doyle remains eligible to represent this subclass. *See Sosna v. Iowa*, 419 U.S. 393, 401 (1975) (mooting of a named plaintiff's claim does not eliminate federal jurisdiction over a class action where the class has been certified and the controversy remains alive as to class members); *Payton v. County of Kane*, 308 F.3d 673, 680-81 (7th Cir. 2002) ("The Supreme Court underscored in *Sosna* the independent legal status of class actions from the original plaintiff and held that, where a class has been properly certified, even the mootness of the named plaintiff's individual claim does not render the class action moot . . . ."); *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546 (7th Cir. 2003) ("[T]he mooting of the named plaintiff's claim in a class action . . . does not moot the action so long as the case has been certified as a class action[.]") (citing *Sosna v. Iowa* and *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991)). For avoidance of doubt, however, Plaintiffs intend to seek leave to add Terrance Prude as an additional representative of the non-homicide subclass. Mr. Prude is a member of and is also willing and able to represent this subclass.

[2] Before 1988, the only Class-A Felonies other than homicide were (1) taking hostages, (2) kidnapping causing permanent physical injury, (3) causing death by tampering with household products, and (4) treason; in 1993 (5) causing death by carjacking was added. WIS. STAT. § 943.23(1r) (effective December 25, 1993).

[3] All references to Wisconsin Statutes are to the (2019–2020) code unless noted otherwise, with the exception that Class Members were convicted under the laws in effect at the time of their crime.

[4] These class members have a maximum discharge date of 470 months or longer, which, according to the U.S. Sentencing Commission, is a life sentence if they are not granted parole. *See* U.S. SENTENCING COMMISSION, LIFE SENTENCES IN THE FEDERAL SYSTEM 10 (February 2015), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf (last accessed Mar. 7, 2022).

2

QB\72763919.4

Case 1999CF005988      Document 223      Scanned 05-13-2024

Findings of Fact ("Cranberg Decl.") at ¶ 3, Ex. 1; *id.* at ¶ 3, Ex. 2; *id.* at ¶ 67, Ex. 66; *id.* at ¶ 68, Ex. 67.

**B.      Defendants**

7.      Defendant John Tate II ("Defendant Tate") is the Chairperson of the Wisconsin Parole Commission ("Parole Commission"). Dkt. 61, Complaint at ¶ 21; Dkt. 65, Answer at ¶ 21.

8.      As Parole Chair, Defendant Tate is responsible for the Parole Commission's administrative functions and for supervising other Parole Commissioners. WIS. STAT. § 304.01(1); Dkt. 68, Deposition of Parole Chairperson John Tate II in his capacity as a F. R. CIV. P. 30(b)(6) witness on December 9, 2020 ("Tate Dep.") at 19:16–20 ("I am the final decider of parole outcomes, responsible for administering all activities of the Parole Commission, responsible for providing supervision to the [C]ommissioners and the office staff.").

9.      Wisconsin Administration Regulations require that Defendant Tate approve all release recommendations made by Parole Commissioners. WIS. ADMIN. CODE § PAC 1.07(3) – (4); Dkt. 68, Tate Dep. Dec. 9, 2020 at 19:16.

10.      If parole is denied, the Commission sets the time at which the applicant may be considered again for parole release; this is called the "deferral period" or, colloquially, the "defer." WIS. ADMIN. CODE § PAC 1.06(9); *Id.* § 1.07(1) ([C]ommissioner "may deny release and defer consideration for a specified period of time.").

11.      Wisconsin Administration Regulations require that Defendant Tate approve all deferral periods more than 12 months. WIS. ADMIN. CODE §§ PAC 1.06(9); PAC 1.07(1); Dkt. 68, Tate Dep. Dec. 9, 2020 at 133:2–5.

12.      Deferral periods less than 12 months do not require the approval of the Chairperson. WIS. ADMIN. CODE § PAC 1.06(9).

QB\72763919.4

Ex. 11-37

13.     As Parole Chair, Defendant Tate has authority to raise or lower the deferral period recommended by the Parole Commissioner who conducted the Parole Interview. *Id.* § PAC 1.07(4).

14.     Shannon Pierce ("Pierce") is a Wisconsin Parole Commissioner. Dkt. 118, Deposition of Parole Commissioner Shannon Pierce ("Pierce Dep") at 5:3.

15.     Defendant Jennifer Kramer ("Kramer") is a Wisconsin Parole Commissioner. Dkt. 61, Complaint at ¶ 22; Dkt. 65, Answer at ¶ 22.

16.     Defendant Douglas Drankiewicz ("Drankiewicz") is a Former Wisconsin Parole Commissioner. Dkt. 61, Complaint at ¶ 23; Dkt. 65, Answer at ¶ 23.

17.     Parole Commissioners conduct "release consideration interviews," make recommendations to the Chairperson to grant or deny parole and make a recommendation regarding the length of the deferral period before a Class Member will again be considered for parole release. WIS. ADMIN. CODE §§ PAC 1.06(1); PAC 1.07(1).

18.     Defendant Kevin Carr ("Carr") is the Secretary of the Wisconsin Department of Corrections. Dkt. 61, Complaint at ¶ 24; Dkt. 65, Answer at ¶ 24.

19.     As DOC Secretary, Carr is responsible for the DOC's obligation to "[a]dminister parole, extend supervision, and probation matters, except that the decision to grant or deny parole to inmates shall be made by the [P]arole [C]ommission . . . ." WIS. STAT. § 301.03(3); Dkt. 61, Complaint at ¶ 24; Dkt. 65, Answer at ¶ 24.

20.     Defendant Carr is responsible for the DOC's obligation to "provide . . . to the parole commission: (a) Records relating to inmates which . . . are necessary to the conduct of the commission's responsibilities. (b) Scheduling assistance for parole interviews . . . (c) Clerical

QB\72763919.4

support related to parole interviews. (d) Appropriate physical space . . . to conduct the parole interviews." WIS. STAT. § 304.01(2).

21.    In addition, Defendant Carr is responsible for and supervises the Bureau of Classification and Movement ("BOCM"), a unit within the DOC's Division of Adult Institution ("DAI") which determines Class Members' custody classification, housing status, and program access. Dkt. 61, Complaint at ¶ 24; Dkt. 65, Answer at ¶ 24; WIS. ADMIN. CODE §§ DOC 302.03(7); DOC 302.03(12).

22.    Defendant Angela Hansen ("Hansen") is the Director of BOCM. Dkt. 61, Complaint at ¶ 25; Dkt. 65, Answer at ¶ 25.

23.    BOCM, with input from institution-level reclassification or Review Committees ("RC"), controls Class Members' custody classifications, institutional placement, and programming eligibility. WIS. ADMIN. CODE § DOC 302.17.

24.    Defendants are sued in their official capacity. Dkt. 61, Complaint at ¶¶ 21–25; Dkt. 65, Answer at ¶¶ 21–25.

## II.    JURISDICTION AND VENUE

25.    The Court has personal jurisdiction over these Defendants. Dkt. 61, Complaint at ¶ 11; Dkt. 65, Answer at ¶ 11.

26.    Federal question jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This controversy arises under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Dkt. 61, Complaint at ¶ 10; Dkt. 65, Answer, at ¶ 10.

27.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2). Dkt. 61, Complaint at ¶ 11; Dkt. 65, Answer at ¶ 11.

QB\72763919.4

### III.    UNDISPUTED FACTS

#### A.    Plaintiffs Were Sentenced Under Wisconsin's Indeterminate Sentencing Scheme, with a Minimum and Maximum Term of Imprisonment Set by the Court From a Legal Range

28.    Class Members were sentenced under Wisconsin's indeterminate sentencing scheme, in effect prior to December 31, 1999 (hereafter "Indeterminate Sentencing").

29.    Under Indeterminate Sentencing, the Wisconsin Legislature established the lawful range of punishment, both the statutory mandatory minimum term[5] and the statutory maximum.[6] WIS. STAT. § 939.50(3). Felony crimes were classified into letter-based categories, A through I. *Id.* §§ 304.06(1)(b); 939.50(1)–(2); 973.013(1)(a).

30.    Under Indeterminate Sentencing, the mandatory minimum term of imprisonment for a Class A felony—*i.e.,* the minimum time by law before initial parole eligibility—was 20 years.[7] WIS. STAT. §§ 939.50(3)(a); 304.06(1)(b). For a Class A felony, the mandatory statutory maximum term of imprisonment was life. *Id.* at § 939.50(3)(a).

31.    Under Indeterminate Sentencing, the maximum term of imprisonment for felonies in Classes B–I was set by WIS. STAT. § 939.50(3)(b)–(i).[8] The range for the minimum term of imprisonment was set by law at 25 percent of the maximum term of imprisonment. *Id.* at § 304.06(1)(b) (1995–96).

---

[5] *Minimum term of imprisonment,* as used here, is the number of years of incarceration that must be served before the person may be lawfully released to parole supervision (i.e., Initial Parole Eligibility Date or "Initial PED").

[6] *Maximum term of imprisonment,* as used here, is the highest number of years of incarceration authorized if parole is denied.

[7] If persons earned full time deductions for good time, they were entitled to be considered for parole after 13 years and four months. WIS. STAT. § 57.06(1) (1985–86).

[8] The maximum term of imprisonment for non-Class A felonies ranged from 20 years (Class B felonies) to less than two years (Class E felonies). *Id* at §§ 939.50(3)(b)-(e) (1985–86).

6

32.     The Wisconsin Legislature's Indeterminate Sentencing scheme also authorized the sentencing judge to select a minimum term of imprisonment within the range authorized by statute. *See* WIS. STAT. §§ 973.0135(2)(b); 973.014(1)(b) (1995–96).

33.     When persons sentenced under Wisconsin's Indeterminate Sentencing scheme reach their first parole eligibility date ("Initial PED"), they have served the minimum term of imprisonment imposed by the sentencing judge from the range for the minimum term set by the legislature. WIS. ADMIN. CODE § PAC 1.06(16)(a).

34.     Wisconsin law currently authorizes the Parole Commission to release Class Members once they have reached their Initial PED or minimum term of imprisonment; that is, their minimum sentence as set by the sentencing court based on the statutory range. WIS. STAT. § 304.06(1)(b); WIS. ADMIN. CODE § PAC 1.05.

**B.      Defendants Routinely and Arbitrarily Increase Plaintiffs' Punishment Beyond the Minimum Set by the Legislature and Sentencing Judge, Contrary to the Spirit of Indeterminate Sentencing**

   **1.      Defendants' De Facto Practice Is to Deny Parole for Class Members Until After Their Initial Parole Eligibility Date ("Initial PED")**

35.     The Parole Commission applies a "presumption" that Plaintiffs will not be released at their initial parole interview, i.e., upon completion of the minimum term of imprisonment. Dkt. 68, Tate Dep. Dec. 9, 2020 at 73:21–23 (". . . there is a presumption that you're not going to release on your PE [parole eligibility] date.").

36.     No current or former Class Member of the Homicide Offender Class *has ever been released at their initial parole interview*, i.e., when their minimum term of imprisonment was completed. Cranberg Decl. at ¶ 3, Ex. 2; *id.* at ¶ 67, Ex. 66.

37.     No Class Member, or former Class Member, of the Non-Homicide Offender Class has ever been released at their initial parole interview, i.e., when their minimum term of

7

QB\72763919.4

imprisonment was completed. *Id.* at ¶ 3, Ex. 2; *id.* at ¶ 67, Ex. 66; *id.* at 4, Ex. 3; Dkt. 85, Deposition of former Parole Chairperson Daniel Gabler ("Gabler Dep.") at 53:13–17 ("Q: [D]id you ever release somebody on their parole eligibility date?" A: "No." Q: "Why is that? A: "Because it wasn't appropriate.").

> ### 2. Defendants Interpret Administrative Code § PAC 1 to Require Them to Decide Whether Plaintiffs Have Served "Sufficient Time So That Release Would Not Depreciate the Seriousness of the Offense"

38. State statute provides no standards against which Parole Commissioners must evaluate candidates when making release determinations upon completion of the minimum term of imprisonment. See generally WIS. STAT. CH 304.

39. However, in 2010, the Parole Commission promulgated administrative rules to narrow and define their administrative powers. Wis. ADMIN. CODE PAC § 1.06, eff. Dec. 12, 2010.

40. Under the Parole Commission's rules, "[a] recommendation for a parole grant or release to extended supervision order may be made after consideration of . . . criteria . . . ." ("Release Criteria"). WIS. ADMIN. CODE § PAC 1.06; Dkt. 86, Deposition of former Parole Commissioner Steven Landreman ("Landreman Dep.") at 60:3–9 (affirming that Parole Commissioners are given "various criteria" to consider when making parole decisions).

41. The Release Criteria in the Parole Commission's administrative code include whether: "(a) The inmate has become parole . . . eligible under § 304.06, Stats., and § PAC 1.05; (b) The inmate has served sufficient time so that release would not depreciate the seriousness of the offense; (c) The inmate has demonstrated satisfactory adjustment to the institution; (d) The inmate has not refused or neglected to perform required or assigned duties; (e) The inmate has participated in and has demonstrated sufficient efforts in required or recommended programs . . . . ; (f) The inmate has developed an adequate release plan; (g) The inmate is subject to a sentence

8

of confinement in another state or is in the United States illegally and may be deported; and (h) The inmate has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice." WIS. ADMIN. CODE § PAC 1.06(16).

     42.     Parole Commissioners interpret § PAC 1.06(16)(b) as a requirement that Parole Commissioners, rather than the sentencing judge, must decide how much imprisonment must be served such that it constitutes sufficient punishment for a given crime. Dkt. 86, Landreman Dep. at 155:3–5 (Parole Commissioners must make "an independent assessment from what the judge made at the time of sentencing."); *id.* at 122:11–122:23 (asserting that Parole Commissioners' job is to "understand what the court's reasoning was, what [the court's] position was when [the court] made [the PED] determination so that I can use that as sort of my starting point for determining how to proceed."); Dkt. 85, Gabler Dep. at 73:14–17; (Q: "[D]id the chair, meaning yourself, need to have found that the person had served sufficient time for punishment in order to be granted release?" A: "Correct. That's how I did my job."); Dkt. 117, Deposition of Parole Chairperson John Tate II in his personal capacity on February 25, 2022 ("Tate Dep.") at 152:11–17 (Q: "Can you find that sufficient time has been served [so as not] to depreciate the seriousness of the offense simply because you believe that the minimum term of incarceration that was imposed by the judge is just not enough punishment, not enough time incarcerated?" A: "That is the discretion of the Commission, yes."); *id.* at 36:15 ("[T]he [§ PAC 1.06] factors. . . are the only reasons we're able to go by for either approving or disapproving an action."); Tate Dep. Dec. 9, 2020 at 82:2–8 (Q: "[D]o you think it's [P]arole's job to decide how much punishment is enough for a crime?" A: "Parole is assigned the task of determining how much time a person should serve as to not depreciate the seriousness of their offense by code, by statute. So it's not a

QB\72763919.4

matter of opinion; it's a matter of law."); *Id.* at 103:19–104:1 (A: "So you can't really presume that the parole eligibility date, even if everything else was met . . . those factors [relating to seriousness of offense] would still matter."); Dkt. 118, Pierce Dep at 107:3–8 (Q: "Does it matter to you whether a judge has set a specific PED?" A: "No.").

43.     Former Chairperson Gabler testified that one reason for increasing the time that must be served for punishment for Class Members was to align Class Members' minimum periods of imprisonment with Truth-in-Sentencing ("T-I-S") punishments, even though T-I-S did not go into effect in Wisconsin until December 31, 1999. Dkt. 85, Gabler Dep. at 52:3–23.

44.     In implementing Wis. Admin. Code § PAC 1, the Parole Commission completes a Parole Commission Action form ("Action Sheet"), which is an interface on the Wisconsin Integrated Corrections System ("WICS") for every Commission decision. Dkt. 68, Tate Dep. Dec. 9, 2020 at 195:8–12 ("It's the system used to do all of our parole actions. Wisconsin Integrated Corrections System [WICS] . . . . That's where every pretty much every document, that's when it's generated for persons in custody.").

45.     The Action Sheet contains a drop-down menu with five pre-listed items that must be answered for each parole interview. Dkt. 68, Tate Dep. Dec. 9, 2020 at 58:14–21; Dkt. 86, Landreman Dep. at 108:23–25; Dkt. 85, Gabler Dep. at 71:16–21.

46.     The drop-down menu on the Action Sheet requires choosing a setting for each of the following: "you [have/have NOT] served sufficient time for punishment;" "your institutional conduct [has/has NOT] been satisfactory;" "your program participation [has/has NOT] been satisfactory;" "you have developed an adequate plan, but will need Agent's verification" [or] "you have NOT developed an adequate plan. It will need further development;" and "release at

this time would involve an unreasonable risk to the public." Dkt. 68, Tate Dep. Dec. 9, 2020 at 58–61; Dkt. 117, Tate Dep. Feb. 25, 2022 at 39:3–7; Cranberg Decl. at ¶ 7, Ex. 6.

47.     Defendant Parole Commissioners will not recommend release unless all five criteria on the Action Sheet's drop-down menu are met, including the "sufficient time for punishment" factor. Dkt. 86, Landreman Dep. at 110:5–8 (Q: "And all of those have to be jointly met, correct, for parole release?" A: "All criteria must be met to justify parole release, correct."); Dkt. 85, Gabler Dep. at 72:2–3; *id.* at 111:3–7 (Q: "When you were the acting chair, did you ever see any of your [C]ommissioners that you were supervising recommend release for anyone where some subset or singular of these were not met?" A: "No."); Dkt. 84, Deposition of former Parole Commissioner Douglas Drankiewicz ("Drankiewicz Dep.") at 93:24–94:2, 103:23–104:4 (Parole Commissioners' release decisions are "tied directly" to these five criteria); Dkt. 117, Tate Dep. Feb. 25, 2022 at 103:18–21 (Q: "Do you have the legal authority to grant parole to someone who hasn't met all five of these criteria?" A: "No.").

48.     Regarding sufficient time for punishment, the "Notice of Parole Commission Consideration" form provided to Class Members provides that the Parole Commission "will consider" "(a) the length of sentence; (b) mitigating and aggravating factors of the crime; (c) the Class Member's motivation for the crime; (d) role in the crime; (e) type of crime; (f) the Class Member's feelings about the crime and victim(s); and (g) the attitude of the judge and District Attorney . . .." Cranberg Decl. at ¶ 6, Ex. 5.

### 3.     The Parole Commission Has No Guidelines for How Much Punishment Is "Sufficient"

49.     Defendants admit that the standard for "sufficiency of punishment" is subjective, similar to "what kind of wine do you like to drink." Dkt. 85, Gabler Dep. at 183:20; *see also* Dkt. 68, Tate Dep. Dec. 9, 2020 at 103:6–18 ("some of these factors are more subjective than

11

objective . . . sufficient time is really less—less objective because it really takes into account the person's subjective view of their offense, their objective role in the offense, the subjective impact of their offense, the objective length of time that they've served versus length of time that they were ordered to potentially serve."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 133:1–6 (Q: "So what the [C]ommissioner has to find in order for No. 5 to be satisfied is that in their own subjective opinion this amount of time is or is not sufficient as to not depreciate the seriousness of the offense?" A: "Yes."); Dkt. 116, Deposition of Parole Commissioner Jennifer Kramer ("Kramer Dep.") at 119:4–14 (Q: "[H]ow do you go about assessing how much punishment is enough for any given crime?  . . . ." [A:] "It goes . . . to -- talking with the individual, and looking at the circumstances of the case and the offense and going on that . . ."); Dkt. 118, Pierce Dep. at 118:11–13 (Commissioner Pierce would "argue that a sufficient amount of time is more subjective than the other criteria").

      50.     In making parole decisions, Defendants have never found that the minimum term of imprisonment for the crime—the punishment imposed by the sentencing judge from within the range authorized by the legislature—was "sufficient" for Class Members. *See e.g.*, Cranberg Decl. at ¶ 8, Ex. 7; *id.* at ¶ 9, Ex. 8; *id.* at ¶ 10, Ex. 9 (former Commissioner Francis noting ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ *id.* at ¶ 11;

Ex. 10 ██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ ); *id.* at ¶ 12,

Ex. 11 ██████████████████████████████████████████

QB\72763919.4



*id.* at ¶ 13, Ex. 12 (

; *id.* at ¶ 14, Ex. 13

; *id.* at ¶ 15, Ex. 14

; *id.* at ¶ 16, Ex. 15.

; *id.* at ¶ 17, Ex. 16.

; *see also* Dkt. 86, Landreman Dep. at 126:24–127:2 (Q: "Do you ever remember seeing a homicide case where you determined that 13 years and four months was sufficient time for punishment?" A: "No.").

51.     The Parole Commission does not define what quantum of punishment on top of the minimum term of incarceration mandated by the legislature and imposed by sentencing judge constitutes "sufficient punishment" for this administrative agency. Dkt. 85, Gabler Dep. at 183:10–24 (sufficiency of punishment is "like pornography . . . you know it when you see it."); Dkt. 68, Tate Dep. Dec. 9, 2020 at 26:7–19 ("There is no kind of prescription anywhere that this

QB\72763919.4

is what's supposed to happen when. It's really up to the judgment of those who are in those

positions."). *See also* Cranberg Decl. at ¶ 18, Ex. 17 at 5:10–11 

; Dkt. 118, Pierce Dep. at

100:11–12 ("We have disagreed on how sufficient time is determined."); Dkt. 117, Tate Dep.

Feb. 25, 2022 at 144:11–13 ("If you're looking for like these factors combined with this

conviction equals this time that's not going to exist, let's make that clear."); *id.* at 205:13–17 (Q:

"So is it the case that each [C]ommissioner is free to decide by what means they expect the

person to satisfy the five criteria?" A: "To a degree. And it's really based on each individual case

too.").

    52.    Commissioners are able to find that the time served is "insufficient," yet are

unable to articulate what *would be* "sufficient" punishment. Dkt. 84, Drankiewicz Dep. at

189:90–91

; Dkt.

85, Gabler Dep. at 183:16–186:21

;

Dkt 117, Tate Dep. Feb. 25, 2022 at 158:20–24 (Q: "Do you know when you evaluate someone

14

QB\72763919.4

Ex. 41:48

Case 1999GF005988   Document 223   Scanned 05-13-2024   Page 18 of 68

how much time they must serve in order to not depreciate the seriousness of the offense?" A: "No. That would be like making a decision before you see a person.").

53.     Defendants consider whatever information they wish, from whatever source, without any knowledge of the veracity of that information, when they assess the "seriousness" of a Class Members' crime. Dkt. 86, Landreman Dep. at 132:8 –14 (asserting that as a Commissioner, he considered "any other factor" that he deemed relevant to assessing seriousness and had "complete discretion" to decide what weight to give it); Dkt. 84, Drankiewicz Dep. at 115: 3–5 ("Severity might have to do with the level of violence in a particular crime or the level of culpability."); *id.* at 170:1–7 (former Commissioner Drankiewicz testifying that he considered the "element" of "premeditation" as relevant to the seriousness of an applicant's crime even though that was not an element of the crime for which the applicant had been convicted); Cranberg Decl. at ¶ 6, Ex. 5 (noting that the Parole Commission is "not limited to" the considerations of a–g); Dkt. 116, Kramer Dep. at 40:9-14 ("When I do parole reviews, I do review with them the offense for which we're discussing parole criteria, overall behaviors. And during my conversations with individuals, one of the questions I typically ask is 'what were the motivating dynamics involved in their behaviors . . . .'").

54.     Defendants maintain that the finding of whether punishment has been sufficient for a given offense is a matter of unfettered discretion. Dkt. 68, Tate Dep. Dec. 9, 2020 at 29:16– 17 ("Parole decisions are absolutely discretionary. That's the nature of parole."

> **4.     Defendants Routinely Increase Punishment for Class Members Based on the Subjective and Arbitrary Finding That They Have Not Served "Sufficient" Time for Punishment**

55.     The Parole Commission sets no uniform standards for Parole Commissioners to apply when determining what constitutes punishment that is "sufficient" and does "not depreciate the seriousness of the offense." Dkt. 86, Landreman Dep. at 131:12–25 ("There [are]

15

no uniform standards given to [P]arole [C]ommissioners to instruct them on what seriousness is and how to assess it."); Dkt. 118, Pierce Dep. at 108 (new Parole Commissioners receive no training on how to assess sufficient time).

56. As Defendants admit, determining what punishment is "sufficient" varies from Commissioner to Commissioner. Dkt. 85, Gabler Dep. at 73:10–17 (Former Chairperson Gabler testified that, as Chair, it was his job to determine the appropriate duration of punishment and to override the determination of other Commissioners as to whether the amount of punishment that was "sufficient"); Dkt. 68, Tate Dep. Dec. 9, 2020 at 105:24–107:1 (Chairman Tate explaining that before his tenure, "a [C]ommissioner could assess sufficient time had been served and then if a different [C]ommissioner reviews the case, they might determine sufficient time had not been served because of the subjective nature of that factor"); Dkt. 118, Pierce Dep. at 118:11–13 (explaining that Commissioners "have never had like a formal discussion of like X amount of time is sufficient or is not sufficient. It seems to be based on each individual [C]ommissioner."); *id.* at 187:8–11 ("I just think the [parole] criteria lend themselves to being rather subjective and I guess that consistency would inherently be improved if those [parole] criteria were reevaluated.").

*Plaintiff* ▮▮▮▮▮▮▮

    a. Plaintiff ▮▮▮▮▮ has been parole-eligible since 2004. Cranberg Decl. at ¶ 67, Ex. 66.

    b. ▮▮▮▮▮▮▮▮▮▮▮▮▮ found that ▮▮▮ had ▮▮▮

        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

        ▮▮▮▮▮▮▮. *Id.* at ¶ 19, Ex. 18.

16

QB\72763919.4

c. ██████ Parole Commissioner ████████ decided that ████████ *had not* ████████

████████████████████████ despite Commissioner ████████ previous

finding. *Compare id.* at ¶ 20, Ex. 19.

*Plaintiff* ████████████

d. In ██████████, former Commissioner ████████████ found that ████████

████████████████████████████████████████████████████████████

████████████████████████████, but ████████████████ found that ████████

████████ *had* ████████████████████████████████████████████████

████████████ Declaration of Patrick Proctor-Brown, Esq. in support of

Plaintiffs' Proposed Findings of Fact ("Proctor-Brown Decl."), filed herewith,

at ¶ 50, Ex. 148 at 2.

e. Six months later, Commissioner ████████████ again found that ████████

████████ "had NOT ████████████████████████████." And –

notwithstanding the fact that ████████████████████████████████████████

████████████████████████████████████████████████████████

ordered ████████████████ before the next consideration. Proctor-Brown

Decl. at ¶ 51, Ex. 149 at 2.

57.   Former Commissioner ████████████ has determined whether punishment was

"sufficient" by comparing the number of free years the Class Member would get to live relative

to the years the victim lived. Cranberg Decl. at ¶ 21, Ex. 20 at 39:16–21 ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████,

17

QB\72763919.4

███████████████████████████████████████████████

████████

58.     A Parole Commissioner may assess sufficiency of punishment based on speculation of how the victim, the District Attorney ("DA"), and judges, other than the sentencing judge (who set the minimum), would feel about release. Dkt. 68, Tate Dep. Dec. 9, 2020 at 61:16–19 (If "the victim still holds the same level of intensity as far as how they feel they've been impacted as day one, then that does indicate how serious the offense was . . . ."); Dkt. 84, Drankiewicz Dep. at 177:11–16; 114:9–11 (testifying that he assesses the seriousness of the offense by, in part, "consider[ing] how other people maybe respond to it, DAs, judges, supporters, victims.").

59.     A Parole Commissioner might find that the amount of punishment will *never* be sufficient. Cranberg Decl. at ¶ 22, Ex. 21 at 62:6–15 (former Commissioner ████████ telling ████████████████ that ██████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████.

60.     Defendants deny release to Class Members on the grounds that they have "NOT served sufficient time for punishment" even when they acknowledge strong evidence of rehabilitation.



a.

---

[9] Class Member ████ was convicted of ████████████████████████. Cranberg Decl. at ¶ 36, Ex. 35.

████████                    ██



; *id.* at ¶ 37, Ex. 36 (███████████████); *id.* at ¶ 58, Ex. 57

(██████████████████████████████████

███████████████████████); *id.* at ¶ 51,

Ex. 50 ████ ██████). Class Member ██████████████

████████████████ Proctor-Brown Decl. at ¶ 7, Ex. 105, before

████████████████████. Cranberg Decl. at ¶ 3, Ex. 2.

b.  On █████████, former Commissioner ████████ commended Class

Member ███ for ████████████████████████████

█████████████████████████████████

█████████████████████████████

Cranberg Decl. at ¶ 5; Ex. 4, at 3:42–3:53; *id.* at 6:30–7:12 (Audio of ████

████████████ Parole Hearing).

c.  On █████████ former Commissioner ████████ denied parole release

to Class Member ████ because, he decided, ████████████████ for

19



██████████ ," and that Mr. ████ had, "██████████

██████████ for the crime. Cranberg Decl. at ¶ 24 Ex. 23 at 31:21–

32:1; *id.* at 34:20–21 (████ stating "██████████

██████████

██████████

██████████

██████████ ).

d.  On ██████████ denied Plaintiff ████ release to parole

supervision, stating: ██████████

██████████

██████████

██████████ ." Cranberg Decl. at ¶ 25, Ex. 24 (emphasis

added).

e.  Plaintiff ████ has received ██████████

██████████ . Yet, Commissioner ████ believed more time

must be served "██████████ that he caused. Cranberg

Decl. at ¶ 26, Ex. 25; *Id.* at ¶ 27 Ex. 26 (██████████

██████████

██████████

███ .

f.  Plaintiff ████ has served almost four *decades* in prison, despite ██

██████████

███ Mr. ███ served nearly 20 years beyond his initial PED date because

20

QB\72763919.4



of what Commissioners consider to be ███████████████ " Cranberg Decl. at ¶ 67, Ex. 66 (showing ████████████████████ ████████████████████████████ ); *id.* at ¶ 28, Ex. 27 (denying Class Member ████████ parole nearly two decades after his initial parole eligibility date, stating ████████████████████ ██████████████████ .")

g.  After praising Class Member ██████████ ' honesty, responsibility, programming achievements, community involvement, and overall progress, Commissioner ██████ denied ████████ release to parole supervision because "████████████████████████ ████████████████████████████ ████████ Cranberg Decl. at ¶ 29, Ex. 28 at 36:14–20.

h.  Class Member ████████ was sentenced to serve a minimum term of 22 years. Cranberg Decl. at ¶ 67, Ex. 66. In 2010, five years beyond this court-set minimum, former Commissioner ████████ told him, "████████ ██████████████ despite the fact that Class Member ████████ ████████████████████████████████ ████████████████████████████ ████████ Cranberg Decl. at ¶ 30, Ex. 29. In 2020, 15 years after Class Member ████████ had served his minimum sentence, Commissioner ████████ found he *still* ██████████████████████ . Cranberg Decl. at ¶ 31, Ex. 30.

21

QB\72763919.4

i.  Class Member ███████████ has been denied release for over ██████ beyond his minimum term despite ████████████████████████ ████████████████████████████████. Mr. ████████ is now a "spiritual man" who tries to "grow and do something constructive." *Id.* at ¶ 22, Ex. 21 at 47:16-17; *id.* at 57:25; *id.* at ¶ 3, Ex. 1 (showing Class Member Campbell's Initial PED date as July 25, 2010). Nonetheless, Commissioners believe ███████████████████." Cranberg Decl. at ¶ 32, Ex. 31.

j.  Plaintiff ██████████ has been denied release for years because Former Chairman ████████ believed that ████████████████████████ ████████████████████████████████████████████ ████████████. Cranberg Decl. at ¶ 33, Ex. 32 at 2. In ████████████, the same month ████████ earned ████████████████████████, Commissioner ████████ again determined that ████████████████." *Id.* at ¶ 34, Ex. 33; Declaration of Plaintiff ████████████ However, that assessment was overridden by the Chair who instead denied release on the grounds that ████████ had ████████████████████████ ████████████████████████ Cranberg Decl. at ¶ 34, Ex. 33.

k.  Plaintiff ██████████ sustained no major conduct reports for nearly a decade, had completed all required programing, and was commended for ████████████████████████████████. Proctor-Brown Decl. at ¶ 63, Ex. 162. In light of these facts, Commissioner ████████ denied Mr. ████ parole because ████████████████████████. *Id.*

22

QB\72763919.4

61.     Parole Commissioners are not trained on how to interpret the parole criteria in §§ PAC 1.04 or 1.06 such that they are applying a clear and consistent standard for parole release. Dkt. 68, Tate Dep. Dec. 9, 2020 at 22:7–8 (the Chairperson position gets no training); 24:21–25:11 (training revolves around how to use the computer system); 51:16–19; 52:25 ("It's out of the frying pan and into the fire for new [C]ommissioners" because there is "no template"); Dkt. 85, Gabler Dep. at 94:2–7 (Q: "You didn't receive any training on how to assess the [parole] criteria, right?" A: "No."); *id.* at 58:10–19; Dkt. 86, Landreman Dep. at 40:15–23; Dkt. 84, Drankiewicz Dep. at 241:15–17 (Q: "But the Parole Commission itself does not provide that training?" A: "No.").

62.     Although the Parole Commission bases its release determination in part upon an administrative inquiry into the "seriousness of the offense," Commissioners are not trained in psychology, neurobiology, or youth trauma, and thus are not trained to evaluate the or reduced culpability and enhanced potential for change applicable to Class Members who were all children at the time they committed their offense. Dkt. 85, Gabler Dep. at 210:5–9; *id.* at 211:11–212:25; Dkt. 116, Kramer Dep at 32:24–33:25 (Commissioner Kramer testifying that she does not know the behavioral consequences for the immaturity of an adolescent brain, she "does not know what parts of the brain are later to develop," and she cannot say for sure that there is a specific behavior in adolescents that can be purely attributed to the characteristics of an adolescent brain); *id.* at 33:24–34:7 (Commissioner Kramer "recognize[s] that [trauma] may impact [brain development]" but she could not answer whether trauma impacts brain development because of her belief that the impact is "on an individual basis"); Dkt. 118, Pierce Dep. at 41:17–42:10 (Commissioner Pierce testifying that the Parole Commission provides no training regarding childhood trauma or adolescent brain development).

QB\72763919.4

**C.   The Parole Commission Increases Plaintiffs' Minimum Term of Punishment Based on Facts Not Found at Trial or Required for Plea**

**1.   Defendants Aggravate the Mandatory Minimum Sentence Based on Facts that Were Not Elements of the Crime of Conviction**

63.     When determining whether Class Members have served sufficient time so as not to depreciate the seriousness of the offense, Defendants consider circumstances of the crime beyond the statutory elements of the crime of conviction. Dkt. 68, Tate Dep. Dec. 9, 2020 at 60:9–61:25; Dkt. 86, Landreman Dep. at 144:4–10 (Q: "You're not just referring to the legal definition of the offense . . . . You're referring to the relationship of the victim and the defendant, the things that happened before and after, a motive that they might have had, all those things?" A: "Yes ma'am, that's correct."); Dkt. 84, Drankiewicz Dep. 175:20–25 (testifying that he does not "feel it necessary to disregard [a] fact just because . . . it was potentially not presented to a jury at time of conviction."); Dkt. 85, Gabler Dep. at 85:11–15; *id.* at 120:2–5 (former Chairperson Gabler testifying that he does not "limit himself" to the elements of the crime of conviction but looks to "all the factors, everything, everything in the guy's record to make a decision."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 147:13–148:4 (Q: "Does the Commission treat all legally identical crimes at the same level of seriousness?" A: "No.").

64.     The Parole Commission looks to statements made in pre-sentence reports, social service files, juvenile records, sentencing transcripts, victim statements, and other materials to determine how "serious" the crime is and therefore how much punishment beyond the minimum term Class Members must serve. Dkt. 85, Gabler Dep. at 67:8–20, 129:1–6; Dkt. 84, Drankiewicz Dep. at 128:17–25, 129:1–12, 176:13–21; Dkt. 118, Pierce Dep. at 73:22–74:24 ("[I]t's important that I get the description of the offense accurate through like the criminal complaint or arrest reports or presentence investigation. Also, I find a description in the

24

classification actions and in the prior Parole Commission actions. So I'll look at kind of all of those things for the description of the offense . . . ." Q: "Where would you say that you gather the most details about the underlying crime?" A: "The criminal complaint and the presentence investigation, if they're available."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 147:18–21; *id.* at 148:4 (Q: "So one source of facts that distinguish legally identical crimes would maybe be found in the criminal complaint?" A: "Yes."); Dkt. 116, Kramer Dep. at 68:23–69:11 (testifying that she relies on the criminal complaint to ascertain facts of the crime).

65.    Commissioners are free to make factual findings to an evidentiary standard less than beyond a reasonable doubt. Dkt. 84, Drankiewicz Dep. at 175:3–25; Dkt. 117, Tate Dep. Feb. 25, 2022 at 145:12–19 (Q: "Have you ever instructed your [C]ommissioners that they have to find the aggravating circumstances to any degree of certainty?" A. "No."); *id.* at 157:10–158:11 (Chairperson Tate testifying that "[i]t seems odd to [him] to have to instruct somebody and say, like, only follow the record if your (sic) X percentage certain that it is reality, when really that's the thing that informs why this person is incarcerated.").

66.    Defendants have denied parole based on the "high profile nature of the case." Cranberg Decl. at ¶ 31, Ex. 30 (████████████ denying Class Member ████████ even when he had served 37 years and 10 months — nearly two decades past his minimum sentence date. Commissioner ████ strongly praising ████ rehabilitation, programming completion, and release plan, but nonetheless denied parole ███████████████████ ████████████████████████████████"); *id.* at ¶ 67, Ex. 66 (showing Class Member Roeling's initial release date as 2004).

67.    Defendants have denied parole because they found the individual had, in the prelude to the crime, elected to involve themselves in a "high risk situation." Cranberg Decl. at ¶

25

35, Ex, 183 at 12:7–19. (█████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████).

68.     Defendants have denied parole based on speculative harms that *could have been*

*caused* by the crime.



a.  In ████ Class Member ███████████ was convicted of attempted first-degree

homicide, and sentenced to a minimum term of approximately 12 years. Cranberg

Decl. at ¶ 36, Ex. 35.

b.  In ████ former Commissioner████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████."

Cranberg Decl. at ¶ 36, Ex. 35.

c.  In ████, at ████████████ next parole hearing, former Commissioner ██████ again

████████ and set ██████████████, writing: ███████████████

███████████████████████████████████████

█████████████████████ *Id.* at ¶ 37, Ex. 36.

69.     Defendant Commissioners have increased the minimum term of imprisonment for

Class Members based on findings of mental states that were not found by a jury or beyond a

reasonable doubt.

a.  Class Member █████████ was convicted of WIS. STAT. § 943.23(1G), the crime of

"operating vehicle without owner's consent with a deadly weapon causing death," a

26

QB\72763919.4

carjacking-specific felony murder statute that briefly was classified as an A felony that does not have as an element a mens rea of intent/purpose to cause death.



b. In ███, former Commissioner ███████ denied parole and recommended that ████████ not be considered for parole release again ██████████, in part because he personally believed that █████████████████████████ ████████████████ Cranberg Decl. at ¶ 85, Ex. 84. In ███ ████████████████████████████████████████ ████████████████ *Id.*

c. ████████, in ███, former Commissioner ███████ again ████████ to Class Member ██████ and recommended a ████████████ because he found that ██████████████████████," based on the Commission's fact finding that ████████████████████ ████████████████ *Id.* at ¶ 38, Ex. 37.

d. Defendant ████████ further testified that he imposed a less lengthy parole deferral on Named Plaintiff ██████ than on Class Member ██████ because he believed that ██████ crime was ████████████ whereas ████████ deserved ████████████ because ████████████████████████ ██████ Dkt. 86, Landreman Dep. at 136:12–139:16 (continuing further, ████████ ████████████████████████████████ ████████████████████████████████ ████████) *Id.*

e. Unlike Class Member ██████, Named Plaintiff ██████ was convicted of, WIS. STAT § 940.01(1), first-degree intentional homicide, not second-degree intentional

QB\72763919.4

homicide with "adequate provocation," WIS. STAT. § 940.01 (2)(a) (known in other

jurisdictions as voluntary manslaughter or the common law "heat of passion"

killing).

70.     Defendant Commissioners have denied parole, thus increasing the minimum term

of imprisonment, because of their view that certain motives require more punishment, even

where motive is not an element of the crime (motive is distinct from mental states, which are

elements of the Class Members' crimes). Dkt. 68, Tate Dep. Dec. 9, 2020 at 60:19–20 (citing

"justification or rationale behind committing the offense" as a "factor" in whether a parole

applicant had "served sufficient time so as to not depreciate the seriousness of the offense"); Dkt.

84, Drankiewicz Dep. at 112:1–25; Dkt. 86, Landreman Dep. at 147:12–17 (premeditation

"would be a factor, certainly" when evaluating sufficiency of punishment); *id.* at 142:5–20 (Q:

"The one thing you're looking for when you're looking to assess seriousness is how culpable

their mind is, their mental state when they do the act?" A: "Yes."); *id.* at 144:17–19 (Q: "So you

might ask the parole applicant what their motive was?" A: "Yes."); Cranberg Decl. at ¶ 39, Ex.

38 at 2:20–22; *id.* at ¶ 41, Ex. 40 at 3:10, 7:18; *id.* at ¶ 42, Ex. 41 at 5:2 (former Commissioner

Drankiewicz asking Class Member ██████████ about his motives at the time of his offense);

*id.* at ¶ 43, Ex. 42 at 5:21; *id.* at ¶ 44, Ex. 43 at 46:11; *id.* at ¶ 42 (Class Member ██████████

being denied parole in part because ████████████████████████████████████

██████; Dkt. 117, Tate Dep. Feb. 25, 2022 at 142:8–15 (Q: "Examples of aggravating

circumstances that might make [one of] two legally identical crimes . . . more serious  would be

something like motive, vulnerability of the victim, the extent of harm that was brought about; is

that right?" A: "Yes, those can be examples of aggravating circumstances.").

QB\72763919.4

71.    Defendant Commissioners have increased the minimum term of imprisonment for Class Members based on characteristics of the victim including the age, profession, family, or social status of the victim, even when those attendant circumstances were not elements of the offense. *See e.g.*, Cranberg Decl. at ¶ 45, Ex. 44; *id.* at ¶ 46, Ex. 45; *id.* at ¶ 47, Ex. 46 (increasing punishment of Class Member ███████████, who had served almost 30 years beyond his minimum sentence, because ████████████████████; *id.* at ¶ 48, Ex. 47 (increasing punishment of Named Plaintiff ██████████████, in part because the victim, ███████████ ███████████ was █████████████████"); *id.* at ¶ 49, Ex. 48 at 8:1–11:25 (former Commissioner ████████ denying release to Class Member ███████████ in part because of a letter from the county executive urging her to deny parole because ████████ had been involved in the █████████████████████████ *id.* at ¶ 50, Ex. 49 at 4:23–25 (denying parole for Class Member ███████████, in part, because ███████████████████").

    a.  Former Parole Chair ████████ testified that a Class Member should serve a longer minimum term of imprisonment if s/he killed a 70-year-old or a child than someone who killed a 20-year-old. Dkt. 85, Gabler Dep. at 93:3–6.

    b.  In 2015 former Commissioner ████████ denied parole to ███████████████, effectively increasing his punishment, in part, because ████████████████ ████████ Cranberg Decl. at ¶ 24, Ex. 23.

    c.  In 2017, Commissioner ███████████ denied parole to Class Member ████████ ███████████ because the victim was ████████████████████ Cranberg Decl. at ¶ 51; Ex. 50.

    d.  Defendant Commissioners have denied parole, thus extending prison time further, based on the victim's "innocent" nature, something that is also not an

QB\72763919.4

element of the crime, nor a fact that was found by the jury at trial. *See*
Cranberg Decl. at ¶ 52, Ex. 51; *id.* at ¶ 53, Ex. 52 (increasing punishment of
Class Member ████████, emphasizing the innocence of his victim); *see id.*
at ¶ 54, Ex. 53; *id.* at ¶ 55, Ex. 54; *id.* at ¶ 56, Ex. 55; *id.* at ¶ 19, Ex. 18; *id.* at
¶ 57, Ex. 56 (praising Class Member ██████ for his rehabilitation and
institutional conduct over his more than 30 years in prison, but █████████
because his victim was ██████████); *id.* at ¶ 58, Ex. 57 (congratulating
Class Member ██████ on successfully completing programing and good
conduct, but still ███████ in part because ████████████
██████████); *id.* at ¶ 22, Ex. 21 at 60:1–3 (█████ Class Member
██████████ parole due to ████████████████
███████████████"); Dkt. 84, Drankiewicz Dep. at
213:10–11; 214:15–18 (Q: "You said that if the victim is innocent, that is
relevant to the seriousness of the offense. Is that also relevant if they're not
innocent?" A: "Well, it's something that I would consider." Q: "Fair to say the
status of the victim matters to you in your parole determination?" A: "Yes.");
Dkt. 116, Kramer Dep. at 141:14– 17 (testifying that whether the victim was a
child could factor into the seriousness of a crime); *id.* at 140:15–18; 141:23–
142:4 ("Motive matters. Because I want to know if they have an
understanding of that motivation and have they evaluated that motivation
within themselves . . . . Was it planned, and how many series of decisions
occurred to continuing the offense? Was it reactionary or impulsive? Was it

30

preplanned? The involvement of the planning. You know, some of that could be in factors if you're asking me to provide examples.").

72.     Defendant Commissioners have denied parole, thus increasing the minimum term of imprisonment, because of their view that additional punishment is warranted due to the nature of the relationship between the Class Member and the victim, although the nature of that relationship is not an element of the crime or a fact found at trial. *See e.g.,* Cranberg Decl. at ¶ 59, Ex. 58 (denying parole to Plaintiff ███████████ in part because ████████████████); *id.* at ¶ 60, Ex. 59 at 4:6–13 (Commissioner Landreman inquiring of ██████ Plaintiff ██████ ████ whether or not the victim was ████████████ and stating that he needed clarification of the "elements" of "what happened").

73.     Defendants have denied parole, thus increasing the minimum term of imprisonment, based on attendant circumstances that were not elements of the offense. Cranberg Decl. at ¶ 61, Ex. 60 at 5:05; *id.* at ¶ 12, Ex. 11 (asking why Class Member ████████████ ████ ████████████████████████████████████████████); *id.* at ¶ 54, Ex. 53; *id.* at ¶ 55, Ex. 54; *id.* at ¶ 56, Ex. 55; *id.* at ¶ 19, Ex. 18; *id.* at ¶ 57, Ex. 56 (each ██████ Plaintiff ████████████ based on the location of ████████████, that ████████████ ██████████████). *See also id.* ¶ 5, Dkt. 116, Kramer Dep at 142:8–12 (testifying that she considers the following: ████████████ had a loaded weapon, so that would be a question to be addressed as to, you know, why did that person have that? Was that common for him – for that individual to have ████████████]?").

74.     Defendants have denied parole, thus increasing the minimum term of imprisonment, after deciding that Class Members should be punished more based on their view of what took place before or after the crime of conviction.

31



a. Former Commissioner LaCost increased Class Member ▮▮▮▮▮ punishment because he and his codefendant ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Cranberg Decl. at ¶ 62, Ex. 61 at 18:3–9.

b. Class Member ▮▮▮▮▮ was denied release in ▮▮▮, in part because of the "▮▮▮▮▮▮▮▮▮" although this is not an element of his crime and Mr. ▮▮▮▮ has already served an additional two decades beyond his initial parole eligibility date. *Id.* at ¶ 49, Ex. 48 at 11:3–18; *see also id.* at ¶ 63, Ex. 62 at 22:1 (increasing punishment because Class Member ▮▮▮▮▮▮▮▮▮").

c. Defendant ▮▮▮▮▮ noted the fact that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at ¶ 84, Ex. 83 (2018 PCA stating "▮▮▮▮▮▮▮▮▮▮."); Cranberg Decl. at ¶ 83, Ex. 82 (same in January, 2019); *id.* at ¶ 80, Ex. 79 (same in September, 2019). Former Commissioner Drankiewicz has been echoing this finding since 2017. Cranberg Dec. at ¶ 81, Ex. 80.[10]

d. Chair Tate testified that the fact that Plaintiff ▮▮▮▮ "▮▮▮▮▮▮▮▮▮" and ▮▮▮▮▮▮▮▮▮▮▮▮ were "factors" that affected the "seriousness of the offense." Dkt. 117, Tate Dep. Feb. 25, 2022 at 154:22–155:13.

### 2. Defendants Punish Class Members for Crimes for Which They Were Not Convicted

75.     Defendants have denied parole to Class Members after concluding they committed crimes for which they were never convicted or for which they were not found liable.

---

[10] During former Commissioner ▮▮▮▮▮ s deposition, he "couldn't say" whether ▮▮▮▮▮ was a fact presented to the jury, but regardless determined that it went to ▮▮▮▮ "state of mind," a fact that Mr. ▮▮▮▮▮ "review[s]." Dkt. 84, Drankiewicz Dep. at 192:8–22.

a. Commissioner ▮▮▮▮▮ denied parole to Class Member ▮▮▮▮▮▮▮▮▮ based on Commissioner ▮▮▮▮▮'s belief that there was a "▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮ was never charged with ▮▮▮▮▮, nor ever convicted of such an offense. *Id.* at ¶ 22, Ex. 21 at 48:22–25; 49:1–17 (denying parole to Campbell, finding that there was a ▮▮▮▮▮" to his crimes, even thou▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮).

b. Commissioner ▮▮▮▮▮ denied parole to Plaintiff ▮▮▮▮▮ based on his personal conclusion that ▮▮▮ was very fortunate to not have been charged with intentional homicide. Cranberg Decl. at ¶ 60, Ex. 59 at 61.

c. In 1991, at the age of ▮, Class Member ▮▮▮▮▮ murdered his abusive father while ▮▮▮▮▮▮▮▮. He was found not legally liable of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮. Cranberg Decl. at ¶ 70, Ex. 69 at 2.

d. In ▮▮, Commissioner ▮▮▮▮▮ and former Parole Chairman ▮▮▮ denied ▮▮▮ release to parole supervision, extending his incarceration by five years, because "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮." Cranberg Decl. at ¶ 70, Ex. 69 at 2 (emphasis added) (Chairman ▮▮▮ requiring Class Member ▮▮▮ to serve more time for crimes for which *he was found not responsible* by a jury, and adding a crime for Mr.

33

QB\72763919.4

████ was never charged – ████████████████████ ████ is

not an element of First Degree Intentional Homicide – the actual crime of

conviction); Dkt. 85, Gabler Dep. at 187:18–24.

### 3. Defendants Increase Punishment Based on Administrative Fact Finding Regarding Class Members' Juvenile History: Facts Not Found By A Jury or Beyond a Reasonable Doubt

76.     Defendants have increased the minimum term of imprisonment, beyond the initial

parole eligibility date, based on fact finding about juvenile conduct not found by a jury or

beyond a reasonable doubt. *See, e.g.*, Cranberg Decl. at ¶ 50, Ex. 49 at 14:16–18; *id.* at 3:15–22

(asserting that Class Member ████████ "████████████████████████

████████████████ " basing that analysis on "prior reports" summarizing "statements"

"that █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ .").

77.     Defendant Commissioners have increased the minimum term of imprisonment for

Class Members based on past juvenile records of criminal conduct, "both leading up to and

following [the] crime." *See, e.g.*, Cranberg Decl. at ¶ 40, Ex. 39, (████ stating that "additional

time should be served so as not to depreciate the seriousness of your crimes and criminal history

both leading up to and following this crime."); *id.* at ¶ 71, Ex. 70 (████ notes that ████

████ "had a significant criminal record beginning when [he was] a juvenile.").

34

### D. Defendants Deny Class Members a Meaningful Opportunity for Release Based on Demonstrated Maturity and Rehabilitation and Do Not Consider the Hallmark Features of Youth to Diminish Culpability

#### 1. Defendants Do Not Evaluate Class Members Using the Standard of Maturity and Rehabilitation

78.     Parole Commissioners do not apply the standard of demonstrated maturity and rehabilitation to evaluate juvenile lifers for parole release. Dkt. 86, Landreman Dep. at 205:8–14 (Q: ". . . did you understand in those 18 years that you worked [at the Parole Commission] that the law required you to apply the standard of rehabilitation and reform . . . ?" A: "I don't know what 'standard for rehabilitation and reform' means."); Dkt. 84, Drankiewicz Dep. at 246:1–14 (Q: "Have you ever heard that phrase ['demonstrated maturity and rehabilitation'] before?" A: "No, not as you read it . . . ." Q: "Chairman Tate hasn't said, 'Juveniles deserve a meaningful opportunity for release based on demonstrated maturity and rehabilitation?'" A: "I don't recall that . . . . " Q: "Have you ever received training on legal developments related to juvenile lifers?" A: "No."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 66:2–14; *id.* at 64 (Chairperson Tate testifying that he "didn't know" if Parole was familiar with hallmark features of youth "relevant to culpability or capacity for reform[,]" and explaining his belief that training on the topic was "not necessary at this point").

79.     The parole criteria listed in the DOC Administrative Code make no mention of "demonstrated maturity and rehabilitation" as a standard for release to parole supervision. Nor are they mentioned in the criteria listed in the Notice of Parole Commission Action. Cranberg Decl. at ¶ 6, Ex. 5.

80.     Parole Commissioners do not believe that they need to release Class Members, including members of the non-homicide subclass, if they have demonstrated maturity and rehabilitation. Cranberg at ¶ 5, Ex. 4 at 186:18– (Q: "Do you believe you have to release ██████

35

QB\72763919.4

.

if he has demonstrated maturity and rehabilitation?" A: "I would not make a release recommendation until he – until I felt he had completed all the factors satisfactorily [including sufficient time for punishment].").

81.     The State of Wisconsin does not train Parole Chairs or Parole Commissioners how to evaluate Class Members for maturation and rehabilitation. Dkt. 87, Plaintiff's Expert Report ("Expert Report") at 19; Dkt. 68, Tate Dep. Dec. 9, 2020 at 22:7–18; Dkt. 85, Gabler Dep. 58:9–19; Dkt. 84, Drankiewicz Dep. at 245:23–246:14.

82.     Parole Commissioners devote a significant portion of parole interviews focusing on facts surrounding the offense, rather than on evidence of rehabilitation and maturity. Dkt. 87, Expert Report at 20–22; Parole Commissioners often mention evidence indicative of Class Members' emotional and social maturity (e.g., program participation, growth in education or vocation, acceptance of responsibility for past crimes and infractions, good processing of feelings, and other "pro-social" skills), but rather than evaluating whether such evidence shows maturation or rehabilitation they continue to deny parole for lack of "sufficiency of punishment." Cranberg Decl. at ¶ 89, Ex. 90; *id.* at ¶ 12, Ex. 11.

83.     While Class Members are offered a theoretical "opportunity" at parole, nothing in the formal training, regulations, or standards of the Parole Commission provides a *meaningful* opportunity to be released upon a showing of rehabilitation and maturity. Dkt. 87, Expert Report at 9.

84.     Defendants believe that granting parole release to Class Members is a purely discretionary act of grace reserved for "exceptional individuals" and "model inmates" instead of the Constitutional right for minors for whom a life sentence has been deemed disproportionate punishment by a sentencing judge (for all homicide offender Class Members) or by the United

QB\72763919.4

States Supreme Court (for all non-homicide offender Class Members). Dkt. 84, Drankiewicz

Dep. at 108:4–19 (Q: "So, you would only recommend release for a model inmate; is that

accurate?" A: "Well, again, it gets down to how you want to define what this model looks like.

But I mean yes, I'm looking for those criteria to be that . . . And so I'm not looking for marginal

individuals for discretionary release. I'm looking for exceptional individuals."); Cranberg Decl.

at ¶ 65, Ex. 64 at 16:2–5 ("If you ever want to get out before your [Maximum Release] date . . .

it's got to be . . . perfection."); *id.* at ¶ 88, Ex. 87 at 6:24–7:3 ███████ telling Class Member

███████ "And, you know, I, I can't *reward* someone who's continued to make mistakes.")

(emphasis added).

### 2.   Defendants Do Not Consider that Child Offenders Are Less Culpable for Their Crimes than Adult Offenders and Do Not Know How to Apply the Features of Youth

85.    Defendants believe it is their job, not the job of the sentencing judge, to assess

proportionality of punishment. Dkt. 117, Tate Dep. Feb. 25, 2022 at 230:7–14 (Q: [Do you agree

that] "[s]omeone else already decided how much time is sufficient so as not to depreciate the

seriousness of the offense. And that's the legislature and the sentencing judge, the person that

was closest to the facts of the crime." A: "I would disagree." Q: "And the democratic elected

body sets that punishment?" A: "I would disagree."); *id.* at 133:1–6 (Q: "So, what the

[C]ommissioner has to find in order for No. 5 ['You have/ have NOT served sufficient time for

punishment'] to be satisfied is that in their own subjective opinion this amount of time is or is not

sufficient so as to not depreciate the seriousness of the offense?" A: "Yes.").

86.    Parole Commissioners are unaware that the hallmark features of youth place

substantive limits on what constitutes proportionate punishment as set forth in *Graham v.*

*Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v.*

*Louisiana*, 577 U.S. 190 (2016). Dkt. 84, Drankiewicz Dep. at 246:18–247:14.

37

QB\72763919.4

87.     Wisconsin made no changes in its parole policies and practices for juvenile
offenders in response to the Supreme Court decisions in *Miller, Graham,* and *Montgomery.*
Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. First Set of Requests for Admissions Nos. 1–
3).

88.     Defendants apply the same parole policies, procedures, and standards to parole
applicants life-sentenced for crimes committed as children that they apply to all parole
applicants. Cranberg Decl. at ¶ 87, Ex. 86 (Defs. Resp. to Pls. Interrogatory No. 10) ("The
practice for juvenile lifers is no different than the practice for non-juvenile lifers."); Dkt. 68, Tate
Dep. Dec. 9, 2020 at 108:2–3; 107:1–3 ("There is no distinction between juvenile lifers [in]
parole practice."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 49:22–50:8 (Q: "When you started as a
chair, at the start of your tenure, how did the Parole Commission assure that the [C]ommissioner
actually conducting the in-person interview of a person who was life sentenced for a crime
committed as a child considered the hallmark features of youth in making their parole decision?"
A: "There were no distinctions to how the parole [C]ommissioners operate as far as conducting
hearings or writing their documents between persons who were convicted prior to 18, persons
who were convicted after, or before the age of 18 or after."); Dkt. 116, Kramer Dep. at 152:19
("It's the same factor for everyone's review.").

89.     Commissioners are not required to consider youth at the time of the crime. Dkt.
116, Kramer Dep. at 151:3–14 (Q: "[D]o you have discretion when you do consider age at the
time of the offense to give that age any weight you think it deserves?" A: "I would just say that
it's an overall factor of what was going on with that individual at the time of the age that they
were when they committed the offense." Q: "Okay. And so it doesn't have more or less weight
than any other factor necessarily?" A: "No." . . . . Q: "Could it in fact sometimes have no

38

QB\72763919.4

weight?" A: "Potentially."); *id.* at 150:25–151:2 (Q: "Is there any law or regulation that requires

you to [consider age at the time of the offense]?" A: "Not that I'm aware of.").

90.     Commissioners are not told to take youth into account or are otherwise given

training or instruction on understanding the hallmark features of youth. Dkt. 117, Tate Dep. Feb.

25, 2022 at 61:24–62:6 (Chairman Tate testifying that he has not instructed the Parole

Commissioners to consider the hallmark features of youth. Q: "So . . . you have not and you do

not need to instruct your [P]arole [C]ommissioners that they are required to make their decision

in light of the hallmark features of youth diminished culpability and enhanced capacity for

reform?" . . . "  A: "No."); *id.* at 57:21–18: "I do not require my [C]ommissioners – I do not give

my commissioners an explicit list of individual factors that they must consider. . . . [I]t would be

asinine for us to say, 'For this case to look at these things, for this type of case look at these

things.' That's not realistic. That's not logical."); *id.* 58:23–59:5 (Q: "So for the 140-so persons

who fit our class definition, the answer is no, that [C]ommissioners are not required to make their

decisions in light of the hallmark features of youth, the diminished culpability, and enhanced

capacity for reform?" A: "Commissioners are not instructed to do anything differently [for

juvenile offenders] than what they would do for everybody else . . . ."); Dkt. 118, Pierce Dep. at

63:10–16 ("Did you receive training for making parole decisions specifically for juvenile

offenders?" A: "No." Q: "Do you in practice make those decisions any differently for juvenile

offenders versus adult offenders?" "No.").

91.     Defendants do not understand what the hallmarks of youth are, and do not

understand how they are relevant to their parole evaluations. Dkt. 116, Kramer Dep. at 39:13–

40:1 (Q: "Other than impulse control and lack of experience with complex problem solving and

lack of general world experience, are there any ways that you know of in which an adolescent

39

QB\72763919.4

brain differs from that of an adult?" A: "In a technical sense, no." Q: "How about in any sense?"

A: "But I feel like you're asking me the technical sense of brain development, which I stated I do

not have a technical understanding of brain development specifically. You're asking me for

technical information that I don't have specific knowledge to address specific brain

development."); Dkt. 118, Pierce Dep. at 42:1al 7 (Commissioner Pierce testifying that she has

no knowledge, experience, or training in child development).

    92.    Defendants, in fact, penalize Class Members for explaining their crime within the

context of juvenile brain development. *See, e.g.*, Cranberg Decl. at ¶ 72, Ex. 71 at 2 (former

Chair ████ asserting "records reflect your ████████████████████████



"); Proctor-Brown Decl. at ¶ 81, Ex. 80 (Chair ████ telling Named Plaintiff ████ "Your

principle claim to the Commission was that . . . some of the crimes you admit to . . . were the

result of ████████████████████████. In

explaining to the Commissioner during the hearing that the reason why you were ████████

you said 'because that was my environment . . . ████████████████████

and that's why I ████.' ████████████████████

████ ").

    93.    Parole Commissioners have increased punishment for Class Members where they

had a juvenile history even when that misconduct is explained by childhood trauma, youthful

inability to engage in constructive self-expression, or because "the frontal cortex isn't fully

developed until way late in the late 20s." Cranberg Decl. at ¶ 82, Ex. 81 ("you explained

suppressed anger from childhood trauma and an inability to effectively express yourself contributed to your situation . . . considering the severity of the offense and the senseless loss of life, more time is warranted."); *id.* at ¶ 12, Ex. 11.

94.     Commissioners do not acknowledge that susceptibility to peer pressure is a hallmark feature of youth and a mitigating circumstance for Class Members' crimes. Cranberg Decl. at ¶ 75, Ex. 74 at 2 ("███████████████████████████████████████████████████ ███████████████████████████████████████████████."); *id.* at ¶ 73, Ex. 72 ("███████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████."); *id.* at ¶ 71, Ex. 70 (Commissioner ██████ noting that ██████ self-reported that he was ██████████ ████████████ at the time of his offense but still deferring the case 10 months); ¶ 86, Ex. 85 (failing to mention Class Member ████████████ susceptibility to peer pressure when 17 years old and committing crime ██████████████████).

95.     Even where the hallmark features of youth are fully present, Parole Commissioners impose full moral culpability on Class Members if the Parole Commissioner believes that the Class Member "knew right from wrong." *Id.* at ¶ 74, Ex. 73 at 6:22–24 ("[J]ust because someone's frontal cortex is not developed doesn't mean they don't know the difference between right and wrong."); *id.* at ¶ 11, Ex. 10 (denying parole for Class Member ████████ in part because "despite ██████████████ ██████████████████████████████ ████████████████████"); Cranberg Decl. at ¶ 76, Ex. 75 (former Commissioner LaCost incarcerating Class Member ██████ for 7 more months in part because he "██████████████████

41

QB\72763919.4

."); *id.* at ¶ 62, Ex. 61 at 7:23–24 (former Commissioner ███ denying

parole in part because she thought Class Member ██████████ given that ███

██████████ *id.* at ¶ 40, Ex. 39 (former Commissioner LaCost denying parole and

deferring the next parole hearing by 18 months in part because ██████████████

████████████████████████████.").

96.     Defendants do not interpret juvenile behavior that occurred before the crime of

conviction in light of the hallmark features of youth and transient immaturity, and instead base

denials on such records in spite of current evidence of rehabilitation and reform. Cranberg Decl.

at ¶ 77, Ex. 76 at 7:16–25 (noting Class Member ██████████████████████

████ in denying him parole); *id.* at ¶ 78, Ex. 77 (denying parole for Class Member █

████ because of his "juvenile record" for ██████████████████"); *id.* at ¶ 46, Ex.

45 (denying parole for Class Member ████, in part, due to of his "██████████"); *id.*

at ¶ 79, Ex. 78 (denying parole for Plaintiff ████ because of his ██████████████

██████████████████████████████████████████████████

██████████████████████████ . . . ."); *id.* at ¶ 80, Ex. 79

(denying parole for Class Member ████ in part because of ". . . a lengthy juvenile record . . .

."); *id.* at ¶ 71, Ex 151 (denying parole to Class Member ████ citing "a significant criminal

record beginning when you were a juvenile.").

97.     Defendants sometimes even treat youth as an aggravating factor. Dkt. 116,

Kramer Dep. at 153:4–9 ("Mitigating or aggravating, [a juvenile offender's] age could be one

factor that's reviewed." Q: "And it could be a mitigating factor, but it could also be an

aggravating factor, is that right?" A: "It could be.").

3.  **Defendants Require Certain Programming For Release, But Deny Class Members Access to Rehabilitative Programming Until Well After They Have Already Served Their Minimum Term of Imprisonment**

98.     Wisconsin Parole Commissioners receive no training or guidance on why, how, or when to endorse Class Members for programming or a reduced security classification. Dkt. 68, Tate Dep. Dec. 9, 2020 at 146:14–148:13.

99.     While a Parole Commissioner can recommend a Class Member for specific programming, the decision about whether or when that programming is made available is made by BOCM. Dkt. 68, 12/9/2020 Tate Dep. Dec. 9, 2020 at 146:14–15 ("BOCM is the sole authority for when and how and what programming people get."); Dkt. 86, Landreman Dep. at 73:5–10; 87:21–25 (BOCM and the programming committee have the power to make their own, final decisions); Dkt. 117, Tate Dep. Feb. 25, 2022 at 94:16 ("Programming is probably the one [requirement] that's [Class Members] have the [least] direct control over because even DOC doesn't necessarily have the entire control over what programming can or can't be offered.").

100.    BOCM does not provide Class Members priority for programming until they are deemed to be approaching "imminent release." Dkt. 67, Deposition of BOCM Director Angela Hansen ("Hansen Dep.") at 119:21–120:2.

101.    "Imminent release" requires a Class Member to have received a deferral length of less than 12 months. Dkt. 67, Hansen Dep. at 114:15–18.

102.    Class Members do not receive a deferral less than 11 months until after well after they have served their minimum sentence. *See* Cranberg Decl. at ¶ 92, Ex. 91; *id.* at ¶ 93, Ex. 92; *id.* at ¶ 32, Ex. 31 (Class Member ███████ received ████████████████████ ███████ ); *id.* at ¶ 94, Ex. 93; ¶ 48, Ex. 47; (Named Plaintiff ████████ received ████████ ████████████████████████████ ); *id.* at ¶ 42, Ex. 41 at 14:20–21; *id.* at

43

QB\72763919.4

16:3–17:12; *id.* at 21:23–22:7 (former Commissioner ███████ explaining to non-homicide

Class Member ████, incarcerated since 1997 for a ████████, that he could not receive ███

████████████ programming until he had an 11 month deferral, despite his "excellent

conduct." "[I]f we are serious about getting you into that program, there's a number that they

want to see. Otherwise I'd probably not offer it. That's an 11 month deferral.").

103.    Class Members, all of whom have maximum terms of life (or de facto life), who

become parole eligible are not considered close to release by BOCM staff because "we don't

know at that time or have any indication of when their release will occur." Dkt 67, Hansen Dep.

at 129:19–130:19; *id.* at ¶ 48, Ex. 47.

104.    Class Members are frequently denied access to reduced security classifications,

rehabilitative programming, including essential required programming, and work experience

because priority is given to people who are approaching their mandatory or fixed release date

under Truth-in-Sentencing. Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Request for

Admission No. 21); Dkt 67, Hansen Dep. at 110:20–24; 121:6–10) (testifying that "BOCM looks

at who is releasing to the community and [tries] to address those individuals first . . . ,"

programming is assigned "primarily by release date," and waitlists for programing invariably put

"lifers . . . grouped at the bottom" because BOCM does not consider parole eligibility dates to be

release dates); *id.* at 90:1–10 ("If an individual is confined and has 15 years to serve, they may

not go directly to a facility with their program available, just based on resources and bed

management . . . . Because not every site has every primary need."); *id.* at 119:21–120:2; 122:2–

8 (". . . it's a catch-22 that that juvenile lifers who are trying to get programming that will allow

them to demonstrate maturity and rehabilitation are denied the programming need because they

aren't prioritized for the programming."); Declaration of Class Member ████████████

QB\72763919.4



*Compare* Cranberg Decl. at ¶ 45, Ex. 44 *with id.* at ¶ 35, Ex. 34 at 7:10– 12 (denying Class Member ▮▮▮▮ parole in 2016, in part because he was still "in need of ▮▮▮▮ treatment]" which he could not receive until he was classified as ▮▮▮▮ custody by BOCM, but when Commissioner ▮▮▮▮ asked ▮▮▮▮▮▮" two years later, Mr. ▮▮▮▮ replied "I ain't done none of it. I mean, since the program . . . ."); *see also* Cranberg Decl. at ¶ 95, Ex. 94 (Plaintiff ▮▮▮ was denied placement on a waitlist for ▮▮▮▮ because group enrollment was based on release date); Dkt. 84, Drankiewicz Dep. at 153:25–155:17; *id.* at 158:23–25 (Class Member ▮▮▮▮ was ▮▮▮▮▮▮▮▮▮▮, in part because he could not enroll in ▮▮▮▮ Program, despite being waitlisted since 1998); Cranberg Decl. at ¶ 96, Ex. 95 ▮▮▮▮▮▮ ▮▮▮▮▮▮ *id.* at ¶ 65, Ex. 64 (Class Member ▮▮▮▮ was denied parole despite being on the "waitlist for cognitive behavioral" for years); Dkt. 67, Hansen Dep. 89:19–90:10; Cranberg Decl. at ¶ 97, Ex. 96 (Plaintiff ▮▮▮▮ was denied access to ▮▮▮ ▮▮▮▮, which he had been assigned since entering the prison system, because he was not classified as ▮▮▮▮ custody); Declaration of Class Member ▮▮▮▮ at ¶ 16 ▮▮▮ has been denied ▮▮▮ programming even though, in 1999, the court ordered him to receive it, because he is not closer to release. ▮▮▮▮ inability to complete this program prevents him from getting closer to release).

105.    BOCM's internal, invalidated, risk assessment matrix bars Class Members from access to programming available only in minimum security settings because it considers all life-

45

sentenced individuals to be "higher risk" for misconduct per se. Dkt. 67, Hansen Dep. at 144:12–14, 145:1–3.

106.    The Parole Commission frequently requires Class Members to complete certain programs prior to release, even if those programs were not assigned during their initial classification. Dkt. 68, Tate Dep. Dec. 9, 2020 at 123:24–124:7 ( ". . . as far as parole is concerned, if we say, you need to complete this program before we release you, then you need to complete this program before we release you . . . no release will happen . . . unless you satisfy the discretionary criteria that we're laying out in terms of expectations."); Dkt. 86, Landreman Dep. at 198:7–17 (testifying that though a Commissioner could not physically mandate someone to be in a program, deeming a program "essential" meant he would not release them without completion); Dkt. 117, Tate Dep. Feb. 25, 2022 at 95:4–9 (Q: "[I]s it true that each [C]ommissioner, it's up to their subjective discretion to decide which programs must be completed prior to release and which programs could be completed in the community?" A: "Yes[.]"); Proctor-Brown Decl. at ¶ 65, Ex. 164 at 4:13; 5:11–12 (former Commissioner ███ acknowledging that she lost track of Class Member ████ s programming progress, in part because she "keep[s] adding things" as "things always change in the DOC").

107.    BOCM does not necessarily provide Class Members the programming opportunities that Defendant Parole Commissioners require, and parole is then denied based on Class Members' failure to complete programs they were never offered or allowed to take. Dkt. 117, Tate Dep. Feb. 25, 2022 at 93:14 ("Is it [sometimes] the case that someone is willing and hoping to take a program and that they're not able to access it for an extended period of time for reasons outside of their control?" A "Yeah. That's probably one of the biggest challenges we actually have."); Cranberg Decl. at ¶ 98, Ex. 97 (instructing Plaintiff ████ to complete a

46

second vocational program, given his "limited work skills" due to incarceration as a youth, but when ███████ requested the program, he was denied by BOCM because he had already completed a vocational program and could not be prioritized for another. Instead of lifting the requirement for parole, former Commissioner ███████ instructed ███████ to "keep trying to obtain a spot in the program."); *id.* at ¶ 99, Ex. 98 (noting that Class Member ███████ had no major conduct reports for 13 years and had "successfully completed" a range of programming but denying parole, in part, based on the finding that he had "unmet program needs of ███████ ██████████████████████████ and must successfully complete these programs at the institution level, *when they become available to you*.") (emphasis added); Dkt. 68, Tate Dep. Dec. 9, 2020 at 124:10–14 "individuals sometimes will say, well, I don't have to complete that program . . . you don't have to do anything but we also don't have to release you unless discretionally we determine that you've satisfied our criteria.").

108.    The Parole Commission, in some cases, has refused to endorse a Class Member for programs that he or she is required to complete prior to release. Dkt 86, Landreman Dep 201:11–203:5 (testifying that he did not recommend programs he said Named Plaintiff ███████ ███████ needed to take to have "satisfactory program completion" and could not get into, even though his recommendation would make it more likely ███████ would get the program); Cranberg Decl. at ¶ 48, Ex. 47 (Parole Commissioners did not endorse Named Plaintiff ███████ ███████ application for the vocational program they had instructed him to take); *id.* at ¶ 96, Ex. 95 ("███████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████ ").

47

109.    Class Members have also been denied release for failure to complete
programming they cannot get into because BOCM has prioritized "individuals that are high need
and moderate need for resources versus those that are low need." Dkt. 67, Hansen Dep. at 93:25–
94:4; *id.* at 95:25–96:4; Cranberg Decl. at ¶ 100, Ex. 99 (BOCM repeatedly denying Named
Plaintiff ███████ access to "████████████," a program his COMPAS assessment
identified as a ████████, because he was *too low-need*, he was not able to complete the
program until 2020, after the Parole Commission Chair "overrode" the denial).

**4. Defendants Require Extended Time in Reduced Security Classifications For
Release, But Deny Plaintiffs Transfer to These Classifications Until Well After Their
Parole Eligibility Date**

110.    The Wisconsin Parole Commission requires Class Members to meet various
"unofficial" or "discretionary" requirements for release. Proctor-Brown Decl. at ¶ 2, Ex. 100 at
14:5–19 (Defendant Tate telling Class Member ███ : "Okay. So you probably are aware of like
some of the, you know, unofficial or discretionary things that the commission puts into place
before, you know, granting release. Some of which are being in a reduced level of custody,
working towards a [drivers'] license, having substantial savings.").

111.    One of the "unofficial" or "discretionary" requirements required of Class
Members is transition through all DOC custody levels (maximum custody, medium custody,
minimum security custody, and minimum community custody). Dkt. 85, Gabler Dep. at 79:9–12
(testifying that Commissioners "generally want to see someone progress from maximum to
medium to minimum to community work release"); Proctor-Brown Decl. at ¶ 3, Ex. 101
(advising Class Member ████████ that it is "essential" that he transition through reduced
custody); Cranberg Decl. at ¶ 67, Ex. 66; *id.* at ¶ 3 Ex. 2 (showing five of 83 Class Members
earned parole at a classification above minimum in the past 12 years; seven other Class Members

QB\72763919.4

were released from incarceration at a classification above minimum due to death, court order, mandatory release date, or extended supervision, but were not paroled).

**a. Classification Reduction Is Not Commenced Until Well After Class Members Have Completed Their Minimum Terms**

112.    As life-sentenced juvenile offenders, Class Members, are classified as ████████ security custody upon intake. Dkt. 67, Hansen Dep. at 145:1–148:5.

113.    Administrative regulations prevent Class Members from being classified as ███████ custody until they have already passed their parole eligibility date. Wis. Admin. Code § DOC 302.12.)

114.    Once commenced, progression through custody classifications is slow. Proctor-Brown Decl. at ¶ 58, Ex. 156 (BOCM Program Assistant Catherine Knuteson writing Plaintiff ████, "Most individuals in our care progress slowly through each level one at a time.").

115.    Movement through custody classifications depends on factors outside of the control of both Class Members and the Parole Commission, including available resources. *Id.* (Ms. Knuetson continued: "[P]lease know the speed of movement to other locations mainly depends upon available DAI resources at the time of transfer. We take into account transportation scheduling, bed space, individual program needs, proximately to release, in addition to appropriate adjustment along with several other factors outlined in [Wis. Admin. Code § DOC] 302.").

116.    Regardless of the level of custody, BOCM's security classification tool uses offense history and sentence structure as criteria for custody classification. Wis. Admin. Code § DOC 302.11; Dkt. 67, Hansen Dep. at 65:6–20 (explaining that risk assessment tool takes into account the following: offense, offense history, sentence structure, institutional adjustment, escape history, emotional mental health, program participation, temporary factors).

49

QB\72763919.4

117.    If a Class Member's "offense history" is "high," BOCM's security classification tool designates the Class Member's overall risk as "high" also, absent an override. Dkt. 67, Hansen Dep. at 142:19–22.

118.    BOCM's security classification tool tracks older custody guidelines. Dkt. 67, Hansen Dep. at 144:17–25, which explicitly required that life-sentenced person spend significant time in maximum custody. Proctor-Brown Decl. at ¶ 5, Ex. 103.

119.    Once Class Members are eligible for parole, BOCM's policy is to require an endorsement to minimum from the Parole Commission before reclassifying them to minimum custody levels. Proctor-Brown Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions No. 4) ("Defendants admit that it is BOCM's current practice to deny Class Members' request for minimum or minimum community custody absent an endorsement from the Parole Commission or some other indication that the Class Member is progressing towards release."); Dkt. 67, Hansen Dep. at 119:21–120:2; *id.* at 162:1–6 ("Where I think [Parole's endorsement] comes into play, like we have mentioned, is that when [BOCM is] looking at transitioning [a person] through minimum or minimum community custody because that -- then Parole would give us some indication of when that individual could potentially be facing release.").

120.    Typically, the Parole Commission does not endorse a Class Member for minimum custody until the Class Member has "D11 or less" (*i.e.,* 11 months or less until parole will be reconsidered), which is when the Class Member would be considered low risk, according to BOCM's risk tool. Dkt 67, Hansen Dep. at 155:14–25.

121.    The effect of BOCM's policies and administrative rules is to deny Class Members access to reduced custody classifications until they are well past their initial parole eligibility dates. Dkt. 67, Hansen Dep 163:17–20 (explaining that BOCM will not reduce custody from

50

████████████ until after parole eligibility date); Dkt 68, Tate Dep. at 91:3–12 (testifying that conviction with a life sentence should correspond to a higher level of initial custody, and "how quickly and how effectively [people] reduce in those levels of custody is outside of the purview of the Parole Commission, though, prior to their eligibility date."); *id.* at 157:17–20; 157:23–158:23; 184:20–25 (Defendant Tate testifying "there's no prescriptive time" that Class Members are instructed they must remain at certain custody levels, and that "each [C]ommissioner may have their own interpretation" of "what is an extended period of time" based on the Class Member's "overall history," length of time at higher custody levels, or time to determine "whether they're going to make another mistake at this next level or make a poor choice[.]" All of this to mean that the process of a Class Member moving through reduced classification levels can be a "slow transition."). *See also* Cranberg Decl. at ¶ 64, Ex. 63 (former Commissioner ██████ instructing Plaintiff ██████ he would have a "slow transition" through ██████ custody and ████████████████████); *id.* at ¶ 25, Ex. 24 (asserting that Class Member ██████, who had been incarcerated for 23 years with good conduct, needed ████████████ before the Parole Commission would even consider a possible endorsement to a secure ████████ custody facility. ████████ █████████████ ████████████████████████████████████████; Declaration of Plaintiff ██████ at ¶ 12 (same); Proctor-Brown Decl. at ¶ 4, Ex. 102 at 14:24–15:6, 21:25–22:19 (telling Class Member ████████ that he should serve more time to prepare for transition back into the community); *id.* at ¶ 6, Ex. 104 at 11:19–25 (after being housed in ██████ custody for nearly a year, Class Member ██████ was told by former [C]ommissioner ██████ that he would need to

51

QB\72763919.4

serve at least another year in ███ custody before the Parole Commission would considered

moving him to ███ custody).

**b.  Defendants Impose Additional "Risk Reduction" Burdens on Class Members Because They Were Juveniles When Entered Prison**

122.  Parole Commissioners have stated that they *especially* require Class Members to

proceed through custody reductions because they entered prison as children. *See, e.g.*, Dkt. 86,

Landreman Dep. at 163:8 – 164:25.



a. In 2021, Commissioner ███ found that Named Plaintiff ███ had

satisfactory programming, institutional conduct, and release plan. Nonetheless, she

denied parole based on insufficient time for punishment and stated: "███

███

███

███ " Cranberg Decl. at ¶ 34, Ex. 33.

b. Chairperson ███ overrode ███ stating that ███ has served

"sufficient [time] as to not depreciate the seriousness of [his] offense," based on his

sustained positive conduct and overall maturation. However, Chairperson Tate

denied ███ parole notwithstanding his assessment of maturation stating:

███

███

███

███ " *Id.*

c. Chairperson ███ made this assessment notwithstanding the fact that ███ had

not been given the opportunity to "demonstrate proper adjustment in a reduced

52

QB\72763919.4

custody setting" until nine years after completion of his minimum term of
incarceration. *Id.*

123.    Each reduced custody level is considered a "test" of whether the person is safe to
release and is therefore not a risk to society. *See* Dkt. 85, Gabler Dep. at 79:25 (testifying that
time spent in lower custody is a test of judgment); Dkt. 68, Tate Dep. Dec. 9, 2020 at 82:9–15
(Parole evaluates institutional adjustment by looking at conduct at reduced custody levels);
Proctor-Brown Decl. at ¶ 7, Ex. 105 at 10:23–11:16 (former Commissioner ██████ informing
Class Member ████████ that lower custody ██████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████████"); *id.* at
¶ 8, Ex. 106 at 13–23);[11] *id.* at ¶ 9, Ex. 107 at 5:16–17 (former Commissioner Drankiewicz again
describing to Class Member ██████ that the move to reduced security is a "right" that must be
"earned" and later stating ███████████████████████████████████████████
██████████████████████████████ Cranberg Decl. at ¶ 61, Ex. 60 at (former
Commissioner ██████ telling Plaintiff ██████ she would be "watching" for how he handled
himself when "things get shaky" after his step-down to ██████ custody); *id.* at ¶ 65, Ex. 64 at
23:3–13 ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

---

[11] Former Commissioner ████████: "I mean, people can hang out in maximum security, and minimum, medium
security, and say they've changed - "
██████ " - but the constraints upon them are pretty significant. So you're, you're changed in this environment
. . . but what happens when you get extra freedoms and nobody's watching? Are you still the same person?"

QB\72763919.4

████████████████████████████████████████████████████

████████████████████

124. The Parole Commission expects Class Members to serve even more time than adult offenders in reduced custody because they were incarcerated as adolescents. Dkt. 68, Tate Dep. Dec. 9, 2020 at 180:2–10 (Defendant Tate testified that "minimum community custody is so valuable as it relates to really lengthy sentences, particularly for those who are convicted as juveniles, because they otherwise have no exposure to the community."); *id.* at 184:20–185:2 (Chairperson Tate testifying that someone being in maximum for 21 years before transitioning is an indication of "slow transition" going forward because they need to accomplish more than someone who has been in for a shorter period of time); Proctor-Brown Decl. at ¶ 10, Ex. 108 (Commissioner ██████ telling Class Member ████████, who had served 37 years, including 17 years past his parole eligibility date, and had not had a conduct report since 2001, that he would still █████████████████████████████████████ ████████████████████████████████████████████████ █████████████████ since [he] w[as] so young when [he] came into prison."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 83:21–84:11 ("We'd like there to be an opportunity for a person to be exposed to a setting that they probably have not been in for decades prior to throwing them all the way back into that, ideally . . . I think it is more beneficial to [child offenders] . . . because their entire life has been incarcerated."); *id.* at ¶ 24, Ex. 23 at 14:6–24 (former Commissioner ████████ telling ██████████ "████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

54

QB\72763919.4



Proctor Brown Decl. at ¶ 64, Ex. 163 at 66:13–69:5 (former Commissioner ████ telling Plaintiff ████ that "████████ ████" because Mr. ████'s "goal" was to "release ████ back into the community in the best situation possible.").

### c. Proving Risk Reduction Is Outside of the Control of Class Members and They Are Denied the Opportunity for Arbitrary Reasons

125.    Custody classification, also referred to as security classification, is determined by BOCM not the Parole Commission. WIS. ADMIN. CODE § DOC 302.08; Dkt. 68, Tate Dep. Dec. 9, 2020 at 171:4–8 (testifying that the Parole Commission has no authority to designate security classification).

126.    Transition through security levels is also prolonged because "[Class Members are] always battling BOCM or bed space." Dkt. 84, Drankiewicz Dep. at 228:5–6. Even when Class Members receive endorsement to lower custody levels, they may have to wait years to obtain a transfer and start the process of transitioning through reduced custody levels and gradually reduced deferral periods. Dkt. 68, Tate Dep. Dec. 9, 2020 at 121:19–25. *See also* Proctor-Brown Decl. at ¶ 12, Ex. 110 at 5:16–7:6 (Class Member ████, who had served 21 years and been parole eligible since 2010, was approved for ████ custody in 2019, learned from BOCM and Parole that he would have to wait yet another year before actually receiving a bed in a ████ custody facility. Former Commissioner ████ told Mr. ████, "[t]he bed space in minimums is so packed up right now. You just have to wait for a bed to open before you can go.").

QB\72763919.4

127.     Parole Commissioners' discretion to decide what constitutes suitable adjustment to each reduced security level is checked only by the Chairperson. The Chairperson's discretion, in turn, is entirely unchecked. Dkt. 117, Tate Dep. Feb. 25, 2022 at 89:11–15 (Q: "So is it fair to say that it's up to each commissioner's individual discretion to decide what counts as satisfactory adjustment to the institution?" A: "Yes. It's their judgment."); *id.* at 90:3–13 (Q: "[S]ome [C]ommissioners might say, 'I want to see ten years without any bad reports' and some [C]ommissioners might say one year?" A: " . . . [A Commissioner expecting ten years] would probably be corrected and given some direction by the chair and say that's not reasonable." Q: "By you as the chair, but a different chair could say actually 50 years is the right number?" A: "Potentially. Those are possibilities based on the structure of the law.").

128.     After waiting years to attain minimum security custody, Class Members must wait further to attain minimum community custody, and then wait further to participate in work-release programs. Former Commissioner LaCost equated this wait to "standing in line at Great America." Cranberg Decl. at ¶ 44, Ex. 43 at 8:1–14; Proctor-Brown Decl. at ¶ 7, Ex. 105 at 6:8–6:13 (same).

129.     Defendants' requirement that Class Members serve time in minimum community custody prior to release is not reasonably related to the need to reduce risk to public safety prior to release. WIS. ADMIN. CODE § DOC 302.07 (Factors in Assigning a Custody Classification); Dkt. 117, Tate Dep. Feb. 25, 2022 at 81:6–83:20 (Q: "You wouldn't use the communities – the rural communities in Wisconsin where these facilities are located as lab rats if you thought the person had a significant probability of causing harm, would you?" A: "No . . . obviously I wouldn't recommend anybody who's actively dangerous or having fights or something like that to a level of custody, but we also need to measure whether they're going to perform well on

QB\72763919.4

supervision because they're kind of menial . . . there's a bunch of smaller rules that exist that we'd much rather they be able to manage those well and not come back to prison under some technicalities."); *id.* at 191:5–11 (Chairperson Tate describing minimum custody as not essential but "preferred and beneficial.").

130. As part of the transition to lower custody levels Class Members have also been required to "work outside the fence." Cranberg Decl. at ¶ 98, Ex. 97; Proctor-Brown Decl. at ¶ 11, Ex. 109; Dkt. 67, Hansen Dep at 123:5–20.

131. Work outside the fence is only available to people with minimum community custody who are housed at minimum community institutions or centers with work release options. Dkt. 67, Hansen Dep. at 123:5–12.

132. Defendants require minimum community custody and work release for Class Members who were incarcerated as children "because they otherwise have no exposure to the community." Dkt. 68, Tate Dep. Dec. 9, 2020 at 180:2–7; Dkt. 85, Gabler Dep. at 199:5–7 (noting that "an objective for the Parole Commission [is] to get somebody to have some experiences outside the fence before they're finally released from prison.").

133. Work-release assignments, like programming, are dependent on capacity including "what's happening in the community relative to jobs as well . . . sometimes there's ample space and sometimes, you know, if we're in a recession there's not." Dkt. 67, Hansen Dep. at 123:5–20.

134. Class Members with life sentences are not prioritized for work release because they do not have an "outdate." Cranberg Decl. at ¶ 44, Ex. 43 at 8:1–9:14 (███ telling Class Member ███ that based on his sentence, "[t]here's no guarantee of a release date . . . . If the Warden put all 60 people serving a life sentence out at work release it would tie up every work

57

release job she has, and it would give no one the opportunity to get to work release who's actually got a release date.").

135.    In 2018, there were 800 individuals awaiting a work release job to be "tested," but there were only 60 work release jobs available, and "only eight to 12 of them" were reserved for people with life sentences. Cranberg Decl. at ¶ 44, Ex. 43 at 8:10–22 (informing Class Member ███████ he has to wait in a "very long line" because there are 800 guys [the Warden] is trying to prepare for transition to the community" and there are not "800 work-release jobs."). *See also* Proctor-Brown Decl. at ¶ 7, Ex. 105 at 4:3–19; *id.* at 6:8–13 (former Commissioner LaCost informing Class Member ██████████ that ████████████████████████ ████████████████████████").

136.    Commissioners deny parole release to Class Members who have not been given an opportunity to participate in a work release program through no fault of their own. Cranberg Decl. at ¶ 98, Ex. 97 (former Commissioner ██████ told Class Member ███████████ that he must ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████"); Proctor-Brown Decl. at ¶ 13, Ex. 111 (As early as 2012, Class Member ████████ was told by the Parole Commission that he needed to ████████████████████████████████ ████████████████████████████████████████████████ ██████); Dkt. 86, Landreman Dep. 171:1–173:11.

137.    When a reclassification committee cannot make a unanimous recommendation, the decision will be referred to the second step committee. The second step committee consists of the warden of the institution and a BOCM sector chief. Proctor-Brown Decl. at ¶ 14, Ex. 112.

58

QB\72763919.4

138.    The Parole Commission can make endorsements for reduced classifications, transfers, specific programs, and early reclassification hearings but BOCM is not required to follow these endorsements and regularly declines to do so.

  a. Named Plaintiff ███████████ was denied a classification reduction and transfer to a ███████████ institution despite multiple parole endorsements, making it impossible for him to meet the discretionary release criteria Defendants demand.

  b. In ███████ Mr. ██████'s fourth parole interview and nine years beyond his minimum sentence, Defendant ██ denied parole stating: "██████████ ████████████████████████████████████████████ ███████████████████████████████████ ███████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ██████████████████████████████" The Chair imposed an additional ████████████████ so that ██████████ could "benefit" from this "exposure." Proctor-Brown Decl. at ¶ 15, Ex. 113 at 2.

  c. Despite having been housed at a ███████ institution for over a year, on ██████ Mr. ██████ was denied a classification reduction after the second step committee found that "in the interest of safe transition, continued ██████ custody demonstrating a longer period of positive adjustment before custody reduction is appropriate." *Id.* at ¶ 16, Ex. 114.

59

d. In ███████ at Mr. ████████ parole hearing approaching ten years beyond

his minimum term, the Chairman █████████████████

████████████████████████████████

████████████████████████

███████████" The Commission ████████████

████████████████████████████████

██████████████████████████ The

Chair imposed ██████████████████

████████████████████████████████

████████████████████████████"

Proctor-Brown Decl. at ¶ 17, Ex. 115 at 2.

e. In spite of the Commission's multiple recommendations, Mr. ████████ was *twice*

denied an early reclassification hearing making it impossible for him to receive a

reduction in custody or a transfer by his next parole hearing. Offender Classification

Specialist denied ████████████ an early reclassification hearing stating ██

████████████████████████████████

████████████████████████████████

████████████████" Proctor-Brown Decl. at ¶ 18, Ex. 116 at 7. *See also id.* at

¶ 19, Ex. 117 (Letter from Angela Hansen, BOCM Director).

f. In ███████ at Mr. ████████ parole hearing during the ten years

beyond his minimum term, the Commission again denied parole based on a

"████████████████████████ Proctor-Brown Decl. at ¶

51, Ex. 149. Commissioner ████████ again found that Mr. Guarnero had not



60

QB\72763919.4

served sufficient time for punishment. *Id.* Nonetheless, the Chair imposed another

four months of incarceration and ordered a Pre-Release Investigation. *Id.*

    g. To date, ▨▨▨▨▨▨ has been held in ▨▨▨▨ custody for an additional year

beyond what the Parole Commission endorsed. Finally, on ▨▨▨▨▨▨▨, Mr.

▨▨▨▨ was approved for ▨▨▨▨ custody but has not been transferred to a

▨▨▨▨-security institution. *Id.* at ¶ 52, Ex. 150.

    139.    Denials of early reclassification requests are not appealable even if they are based

on incorrect information. WIS. ADMIN. CODE § DOC 302.19(2).

    140.    By deferring parole reconsideration for more than 11 months (i.e., exceeding the

level at which BOCM will consider a custody reduction), the Parole Commission holds Class

Members at higher custody levels thus withholding the opportunity or ability to demonstrate

what Defendants call "risk reduction." Proctor-Brown Decl. at ¶ 21, Ex. 119 (granting Plaintiff

▨▨▨▨ a lengthy deferral). In Mr. ▨▨▨▨'s classification hearing before his custody reduction,

it was noted "▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ *Id.* at ¶ 53, Ex. 151.

QB\72763919.4

**5. Defendants Impose Ad Hoc Release Requirements on Juvenile Lifers Unrelated to Rehabilitation and Reform**

        **a. Defendants Have Required Class Members to Save Thousands of Dollars Notwithstanding That Their Ability to Save Money is Highly Limited**

141.      To grant parole, "the [P]arole [C]ommission [must be] satisfied that the prisoner has adequate plans for suitable employment or to otherwise sustain himself or herself." WIS. STAT. § 304.06(2).

142.      Commissioners require much more than adequate plans for employment and sustenance; they want Class Members to have thousands of dollars in savings. Proctor-Brown Decl. at ¶ 22, Ex. 120 at 21:4–5 (Parole Commission telling ███ that "it's not unusual, for me to release guys with 15, 20 thousand dollars in their account"); *id.* at ¶ 23, Ex. 121 (asserting ███ dollars of institutional savings was inadequate even though Plaintiff was employed and had no debt); *id.* at ¶ 24, Ex. 122 (014130) (Plaintiff ███ s savings of ███ "won't go far in aiding [his] financial sustainability in the community."); *id.* at ¶ 25, Ex. 123 at 39:8 (Commissioner ███ telling Class Member ███ that ███ is "Not a lot of money, really" and denying parole based on this lack of savings); *id.* at ¶ 26, Ex. 124 (former Commissioner ███ denying release to Class Member ███ because he has not saved enough money, saying "[y]ou managed to save 9K to date however, given the cost of living that is a minimal amount and further money should be saved to increase the likelihood of success post release."); Dkt. 68, Tate Dep. Dec. 9, 2020 at 182:10–184:2 (Chairperson Tate explaining the "informal" reasons that factor into parole, including that it's to the parole applicant's benefit to have "a lot of money" but "it's not a prerequisite.").

143.      One reason that Commissioners require Class Members to spend time in minimum and community minimum facilities is so that they can be assigned prison labor for

62

QB\72763919.4

minimal wages. Dkt. 86, Landreman Dep. at 183:13–20 (stating that the "value" of Class

Members spending time in minimum security facilities is "obtaining additional resources" such

as "[m]oney, civilian employee, civilian work, supervisors.").

144.    Saving money doing prison labor is difficult because Plaintiffs are paid from

$0.12 to $0.42 per hour at most for institution jobs, and roughly $0.79 to $1.41 for Bureau of

Correctional Enterprises (formerly Badger State Industries) jobs. *See* Wisconsin DAI Policy

309.55.01 I(B)(3); Dkt. 86, Landreman Dep. at 184:1–13 (acknowledging that prison labor is

paid "pennies on the dollar," and that it takes a long time to save the amount Commissioners

demand because incarcerated persons are "also responsible for purchasing their own hygiene and

things," in addition to restitution, court assessments, fines and fees).

145.    Labor fees for off-site project crews, an assignment only gained at minimum

community custody, range from $1.00 to $2.00 per hour, and incarcerated people still only

receive $0.42 per hour. Wisconsin DAI Policy 325.00.09(IV)(C)–(F)). At this low-pay, it takes

Class Members years, even decades, working full-time, to accumulate ten thousand dollars in

savings.[12] *See, e.g.*, Proctor-Brown Decl. at ¶ 27, Ex. 125 at 2 (Mr. ███ had only been able to

save about $1,500 dollars after two years on work release).

146.    In addition, DOC deducts room, board and transportation charges from the money

earned by Class Members. Proctor-Brown Decl. at ¶ 28, Ex. 126 (DOC policy requires that

work-release pay "shall be placed in a segregated trust account and shall result in room, board,

and transportation charges as determined by the DOC.").

---

[12] Accumulating just $10,000 at even $1.41 per hour requires over 177, 40-hour weeks, or roughly 3.5 years of fulltime labor. At $0.42 per hour, reaching $10,000 would take over 595, 40-hour weeks or roughly 11.4 years of fulltime labor. At $0.12 per hour, reaching $10,000 would take 2,083, 40-hour weeks or roughly 40 years of fulltime labor. All calculations assume the workers save every penny they make.

QB\72763919.4

147.    DOC Policy provides that "up to 100%" of funds can be deducted from monies deposited into a Class Member's account for any of 29 financial obligations, which range from court fees and restitution to room and board, including a catch-all category of "remaining DCC obligations." *Id.*; Wɪs. Sᴛᴀᴛ. §§ 973.032(10)–(11); 301.32.

148.    Defendants repeatedly deny parole to Class Members for failure to satisfy restitution requirements or other "financial obligations." Proctor-Brown Decl. at ¶ 29, Ex. 127 (denying Plaintiff ███ parole in 2██ because he had outstanding obligations in the amount of ███████ instructing him that "the Parole Commission expects satisfaction of your financial obligations as it further speaks to your attitude toward the crime"); *id.* at ¶ 30, Ex. 128 (instructing ███████████ to pay his obligations of ███████ as a condition for parole release); Cranberg Decl. at ¶ 44, Ex. 43 at 13:9–15:22 (former Commissioner ██████ informing Plaintiff ███████ that payment of restitution and supervision fees prior to release is "part of the expectation for the Parole Comission." and "███████████████████████ ███████████████████████████

149.    Class Members who are unable to work cannot pay restitution or other financial obligations. Proctor-Brown Decl. at ¶ 57, Ex. 155 (Named Plaintiff ███████ explaining that inability to work rendered him unable to pay restitution).

150.    The financial requirement is unrelated to public safety. Dkt. 116, Kramer Dep. at 133:3–14 (Q: "Is the fact that you think people should have a certain amount of money in their accounts, is that related at all to risk? Is that founded at all on scientific studies of risk to public safety?" A: I would not know if that's a scientific study. What I discussed with you earlier was my experience as a probation and parole agent for 21 years of what I've seen of individuals

64

QB\72763919.4

transitioning from incarceration with limited funds and limited resources, that that could

contribute to significant challenges transitioning.").

> **b. Defendants Consider Class Members' ability to Get a Driver's License to be Released But Deny Them The Opportunity to Do So Until Well After They Have Already Served Their Minimum Term of Imprisonment**

151.    The Parole Commission expects Class Members to obtain a driver's license prior

to release. Proctor-Brown Decl. at ¶ 32, Ex. 130 at 12:14–15 (former Commissioner ███

telling Class Member ████, "I expect inmates to get their driver's license while they're

incarcerated."); *id.* at ¶ 31, Ex. 129 at 3–6 (former Commissioner ████ explaining to

Class Member ██████ why he should earn his driver's license); *id.* at ¶ 22, Ex. 120 at 21:

11–13 (former Commissioner ████ telling Class Member ██████ "And the other thing I

want you to focus on, once you get to community custody, is getting your driver's license.");

Dkt. 68, Tate Dep. Dec. 9, 2020 at 182:10–14 (testifying as to why a driver's license is important

to parole).

152.    Class Members have been directed to obtain drivers' licenses even when their

housing assignment make it impossible for them to do so. Cranberg Decl. at ¶ 54, Ex. 53;

Proctor-Brown Decl. at ¶ 31, Ex. 129 at 7:14–15 (former Commissioner ██████ advising

Class Member ██████ that earning a driver's license is "probably the best course of

action, but it really comes down to bed space and -- and COVID." ██████ acknowledged

he had no control over ██████ transition).[13]

---

[13] The Wisconsin Department of Corrections' Opportunities and Options Resource Guide states that only the Milwaukee Secure Detention Facility and Racine Youthful Offender Correctional Facility offer Driver's License Permit Instruction. "Opportunities and Options Resource Guide" WIS. DEP'T OF CORRECTIONS available at https://doc.wi.gov/Documents/AboutDOC/AdultInstitutions/OpportunitiesOptionsResourceGuideEnglish.pdf (July 2020) (last accessed Mar. 28, 2022).

QB\72763919.4

### c. Defendants Deny Class Members the Opportunity to Develop a Release Plan Until Well After They Have Already Served Their Minimum Term of Imprisonment

153. DOC requires a release plan but gives Class Members no guidance on how to prepare this plan. Declaration of Plaintiff Victoriano Heredia, filed herewith, ¶17.

154. Defendants will deny Class Members release if their release plan is "inadequate". Wis. Admin. Code § PAC 1.06; Dkt. 118, Pierce Dep. at 86:25–87:3 (Q: "Would you ever . . . recommend someone for release without an approved release plan?" A: "No.").

155. Release plans for Class Members are deemed "inadequate" until they have been verified by a parole agent. Dkt. 118, Pierce Dep. at 85:25–86:2; 87:8–9.

156. Parole agents do not devote time or resources to developing or verifying Plaintiffs' release plans until years after the minimum term of imprisonment has already been served. Dkt. 85, Gabler Dep. at 197:13–17 (". . . an agent wouldn't necessarily allocate the time or resources to verify the plan knowing that . . . chances are the guy getting out on his first date is pretty limited."); Dkt. 84, Drankiewicz Dep. at 199:18–23 ("When someone is approaching release and it's considered to be more or less imminent, then I will ask for a release plan for the agent to verify the plan. It doesn't do me any good to send an agent out to do work that isn't going to be acted upon."); Dkt 86, Landreman Dep. at 177:4–7 ("I'm not going to ask that his parole plan be reviewed prematurely . . . ."); Dkt. 117, Tate Dep. Feb. 25, 2022 at 178:18–21 ("[Agents] usually won't [conduct a pre-release plan] until the Parole Commission requests it.").

157. The Parole Commission has no "method or certain criteria" for determining the adequacy of a release plan. Dkt. 85, Gabler Dep. at 98:1–4 (Q: "[I]n determining whether [the release plan] was appropriate or inappropriate, did you have any method or certain criteria that you used to assess that?" A: "No." ); Proctor-Brown Decl. at ¶ 4, Ex. 102 at 27:20–28:6 ("[O]ne of the things we do want to know is like, how much have you dug into whether this is going to be

66

QB\72763919.4

a good environment for you . . . [l]ike, you know, [ask your] uncle, what do you do?  Do you and

-- you know, your aunt or auntie, or whatever -- I mean, do they go to church?  Do they go out to

. . . the movies? . . . Do they go to the bar?  Do they play softball? . . . .try and get an idea of what

their lifestyle is like.").[14]

158.    Commissioners do not review the adequacy of the release plan until the parole

interview date. Dkt. 85, Gabler Dep. at 99:16–25. Any objections Commissioners may have to

the release plans, therefore, cannot be addressed prior to the interview. Declaration of Plaintiff

Victoriano Heredia ¶ 17.

159.    Parole Commissioners require that Class Members—people who, by definition,

have spent their entire adult lives in prison—demonstrate "pro-social connections" with family

members and reject release plans without these connections. Dkt. 85, Gabler Dep. at 82:14–83:3;

*id.* at 83:20–24 (former Chairman Gabler testifying that he relied on a chart as Chairman that

emphasizes "family and/or marital" connection as a "Top Four" criminogenic need essential to

reducing recidivism); Cranberg Decl. at ¶ 35, Ex. 34 at 14:3–16:12, (former Commissioner

████ encouraging Plaintiff ████ to begin a relationship with a sister he did not know so he

could list her as housing on his release plan adding: ████████████████████████

████████████████████████████████████████████████████████");

Proctor-Brown Decl. at ¶ 4, Ex. 102 at 25:23–26:5 (warning Class Member ████████ to

have a "solid support network" so if "all [of] the sudden dude gives you his sister's address, and

you start talking to her and all the sudden now one year later you want to marry her and move in

with her, DOC doesn't support that kind of thing."); *id.* at ¶ 32, Ex. 130 at 60:3–4 (former

---

[14] Ellipses indicate breaks in the transcript where Class Member ████████ attempted to answer former
Commissioner ████ question affirmatively that yes his family does attend church, in the hopes that this answer
would permit her to approve his release plan.

QB\72763919.4

Commissioner ██████ denying parole in part because of ██████ lack of "healthy relationships being formed.").

160. Parole Commissioners reject release plans if they rely on relationships formed while the Class Member was behind bars. Dkt. 85, Gabler Dep. at 75:24–76:10 ("how significant can this possibly . . . be when you've been separated by barbed wire?"); Proctor-Brown Decl. at ¶ 33, Ex. 131 (denying ██████ release after ██ had served 21 years and four months, in part, because ████████████████████████████████████████████ ████████ ).

161. Where Class Members cannot return to families, and DOC deems their relationships to be inadequate, they are required to list a transitional living program ("TLP") as their housing plan. Christina Charmichael & Jere M. Bauer, "Wisconsin Prisoner Reentry Programs," WIS. LEG. FISCAL BUREAU, available at https://wisfamilyimpact.org/wp-content/uploads/2014/10/s_wifis26c03.pdf (last accessed Mar. 25, 2022). TLPs are DOC sponsored, but Commissioners reject release plans because they rely on TLP housing. Cranberg Decl. at ¶ 35, Ex. 34 at 14:8–15:20 (former Commissioner LaCost describing TLPS as "a free for all" where "guys living there . . . are doing drugs, [and] are bringing prostitutes," despite the fact that ████████ reached out to several TLPs and felt that living there would provide him with a good support system); Cranberg Decl. at ¶ 34; Ex. 132 at 10:38-11:37 (audio track) (finding Class Member ████████ 's plan to live in a TLP upon release inadequate and denying him release to parole supervision because ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ").

QB\72763919.4

### d. Defendants Deny Release for Reasons That Has No Bearing on Risk to Society or Maturation and Rehabilitation

162.    One of the main routes for Class Members to show maturity and rehabilitation is through institutional adjustment and conduct. Dkt. 68, Tate Dep. Dec. 9, 2020 at 82:12–21.

163.    Conduct for which Class Members may be disciplined is outlined in the Wisconsin Administrative Code DOC Chapter 303.

164.    Rule violations are classified as either major or minor. Dkt. 68, Tate Dep. Dec. 9, 2020 at 83:6.

165.    Any violation may be a major violation depending on the "specific violation, situation, and perceived threat to order and security." Proctor-Brown Decl. at ¶ 35, Ex. 133 at 13.

166.    For example, Class Members can receive a minor or major conduct report for feeding squirrels, Cranberg Decl. at ¶ 74, Ex. 65 at 31:24–25; improper storage, WIS. ADMIN. CODE § DOC 303.55; inadequate work or school performance, *id.* at § DOC 303.62; unauthorized use of the mail, *id.* at § DOC 303.49; disrespect, *id.* at § DOC 303.29; dirty assigned living area, *id.* at § DOC 303.56; or group resistance and petitions, *id.* at § DOC 303.24; Proctor-Brown Decl at ¶ 37, Ex. 135 at 4:4–9:9.

167.    Commissioners acknowledge that not every misconduct report indicates a risk to the public, much less a risk or an unreasonable risk to the public upon release. Dkt. 84, Drankiewicz Dep. at 167:23–168:9; Dkt. 85, Gabler Dep. 109: 13–111:7 (Chair Gabler admitting that he did not know how Named Plaintiff ███████ minor tickets related to propensity for violent conduct and he did not know what kind of rules of society he thought ███ would break). This is in part because Commissioners acknowledge the difficulty of following rules when Class Members, by definition, spend their entire adulthood in the "intense, chaotic environment" that is prison. Dkt. 86, Landreman Dep. at 193:2; *see also* Proctor-Brown Decl. at

69

QB\72763919.4

¶ 36, Ex. 134 at 43:7–9 (former Commissioner ████████ telling Class Member ████████ "let's face it, coming into an adult prison when you're 16, that ain't right, that ain't normal, that—I'm not surprised that you've had some bumps.").

168.     Likewise, Class Members can receive major misconduct reports for behaviors that would be "perfectly legal" once they are released to parole. Dkt. 84, Drankiewicz Dep. at 167:22; Dkt. 85, Gabler Dep. at 109:2–5 (acknowledging that comparing the restrictiveness of prison rules to society's rules is like comparing "apples to basketballs").

169.     Commissioners, however, have considered even minor conduct violations such as replacing a dirty food tray with a clean food tray, loitering, or using unauthorized forms of communication as evidence that a Class Member will not follow the "rules of society," and therefore that Class Members should not be released. Proctor-Brown Decl. at ¶ 38, Ex. 136 at 3; Dkt. 85, Gabler Dep. at 108:17–109:22; *see also* Proctor-Brown Decl. at ¶ 9, Ex. 123 at 4:1–13 (former Commissioner ████████ expressing frustration at the minor infraction Class Member ████████ received for throwing a handball over the wall because "little things add up" and "when they do, it kind of demonstrates that there is a certain mindset that the details don't matter" despite Mr. ████ having no major infractions for 15 years); *id.* at ¶ 37, Ex. 135 (Former Commisisoner ████ telling Class Member ████ he's "shooting [him]self in the foot with [his] misconduct," specifically referring to keeping decks of cards given to him by a guard, taking extra hamburger patties, and improper storage of muscle cream).

170.     Accordingly, Defendants deny release to Class Members for minor infractions of prison rules. Dkt. 68, Tate Dep. Dec. 9, 2020 at 83:7–85:17; Proctor-Brown Decl. at ¶ 22, Ex. 120 at 9:8–10:3 (Parole Commission recounting that one parole applicant lost work release and his chance at an imminent parole grant after being issued a minor misconduct ticket for accepting

70

QB\72763919.4

pie from a "little old lady at his jobsite, a civilian, [who] brought in some homemade apple pie to work." This conduct merited a misconduct ticket because conduct "leads to a hug" which could "lead to a kiss. . . . And so on and so forth."); *id.* at ¶ 38, Ex. 136 (former Chairperson Gabler denying Named Plaintiff ██████ release for four minor tickets because ████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████; *id.* at ¶ 40, Ex. 138 (denying parole and increasing ████████' security level for smoking a cigarette, "█████████████

████████████████████████████████████

████████."); *id.* at ¶ 39, Ex. 137 (████████████████████

████████); *id.* at ¶ 41, Ex. 139 at 2 (████████████████████

████████████████████████████████████

████).

171.    Some behaviors classified as "major misconduct" in a prison setting, are a normal part of healthy human behavior. Dkt. 85, Gabler Dep. at 174:4 (testifying that the ████████

████████ cited in Class Member ████████████ parole denial was the result of █

████████████████, and that ████████████████ are a normal part of existence); Proctor- Decl. at ¶ 6, Ex. 104, (noting that Class Member ████████ last major misconduct report — which has delayed his release for decades—was for breaking up a fight).

172.    Prison misconduct tickets are given when Class Members are themselves victims of assault. Declaration of Plaintiff ████████ l at ¶ 18–20 (Plaintiff ████ received conduct

71

QB\72763919.4

reports for being attacked and, even after showing video that he did not throw a single punch while under attack, this conduct report has appeared again and again in parole considerations as a reason to deny ▓▓▓ parole.). *See also* Proctor-Brown Decl. at ¶ 47, Ex. 145 (Commissioner ▓▓▓ writing to ▓▓▓ *after* the video proved Mr. ▓▓▓ had been attacked: "



"); Cranberg Decl. at ¶ 100, Ex. 99 (denying ▓▓▓ parole again three years later for the same conduct); Dkt. 85, Gabler Dep. 161: 3–15 (testifying that ▓▓▓ being involved in a fight, whether he started it or not, indicated a propensity for violence).

### E. Class Members Are Denied Due Process of Law in Parole Decisions

#### 1. Defendants Fail to Give Plaintiffs Sufficient Advance Notice of Their Parole Hearing

173. The Parole Commission is required by law to provide Class Members with 15-days' notice of a Parole Commission hearing. WIS. ADMIN. CODE § PAC 1.06(4); Cranberg Decl. at ¶ 6, Ex. 5.

174. Fifteen days' notice is not enough time for parole-eligible individuals to prepare their own materials or respond to information that may be presented at their hearing. Dkt. 87, Expert Report at 16. In at least one instance, a Class Member received no notice of the parole hearing. Declaration of Class Member Terrance Prude at ¶ 14 (▓▓▓ was told he had an attorney phone call one week before his 2022 parole hearing. When he responded to the call, he discovered it was not an attorney phone call, but rather a video call with the Parole Board. "I had no time to prepare or gather support letters, and the program certificates I submitted were not received by the Commissioner in time for the hearing.").

175. If a Class Member does not receive the Notice of Parole Commission Consideration within the 15-day time frame, the Commissioner will give the Class Member two

QB\72763919.4

choices: waiving the 15-day notice period or accepting a delay in the parole hearing Proctor-

Brown Decl. at ¶ 56, Ex. 154 at 9 (Commissioner may ask the Class Members to "waive the 15

day notice and sign the waiver form . . . or the [C]ommissioner may give the inmate a one month

deferment noting the reason on the action sheet and requesting that proper notification occur.").

### 2.  Defendants Fail to Give Class Members Notice of the Factors and Information to Be Considered at their Parole Hearing

176.    The Notice of Parole Commission Consideration provided to Plaintiffs lists 42

generic and "non-exhaustive" factors that might be evaluated at the parole hearing. Cranberg

Decl. at ¶ 6, Ex. 5.

177.    Class Members are given no information about which of the 52 factors will be

significant or how they will be evaluated. *Id.*

178.    Given that the notice states these factors "may include, but are not limited to" the

ones listed, notice is not given of all the factors to be considered. *Id.*

179.    The Notice of Parole Commission Consideration does not advise Class Members,

in any meaningful or individualized way, of specific reasons why Parole Commissioners may

find that they would present an "unreasonable risk" if released. *Id.*

180.    The Notice of Parole Commission Consideration does not alert Class Members

that they must affirmatively notify the Parole Commission of new misconduct tickets, *id.*, yet the

Commission has imposed this as a requirement, and denied parole for failing to make this

disclosure. Proctor-Brown Decl. at ¶ 42, Ex. 140 at 2:11–19, 9:4–6 (former Commissioner

██████████ increasing Plaintiff ███████'s parole deferral from 24 months as decided in a parole

hearing earlier that morning to 36 months after learning that ██████ had not corrected

██████████ for failing to address some new conduct reports ██████ had received).

QB\72763919.4

### 3. Defendants Deny Class Members a Fair Opportunity to Present Evidence Relevant to Maturity and Rehabilitation

181.    The Notice of Parole Commission Consideration does not inform Class Members that they have a right to submit information and evidence of demonstrated maturity and rehabilitation at their parole interview. Cranberg Decl. at ¶ 6, Ex. 5.

182.    The Parole Commission's preprinted "Release Plan Information" form, the only form applicants are asked to complete, instructs applicants "DO NOT ATTACH ANY DOCUMENTS TO THIS FORM." *Id.* at Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions No. 17).

183.    Class Members are prevented from providing additional information in person or after the parole hearing.

    a.   Declaration of Plaintiff Joseph Orosco at ¶ 14 (Plaintiff ██████ brought proof of potential employment with him to his parole hearing to which Commissioner Kramer told him that he should have attached it to his Release Plan; the same plan that provides a single paragraph of space for additional information and says "DO NOT ATTACH ANY DOCUMENTS." Since he had not, it could not be considered. Former Commissioner ████ ████████████████████████████████████████).

    b.   Plaintiff ████ submitted weekly letters to the parole commission, a total of about 150 letters, chronicling his rehabilitation. Declaration of Plaintiff Dujuan Nash at ¶ 36.

    c.   During ████████████ parole hearing, former Commissioner ████████ ████████████████████████, stating "██████████ ████████████████████████████

74

QB\72763919.4

████████████████████████████

████████████ Cranberg Decl. at ¶ 60, Ex. 59 at 50:6–9; Declaration of

Plaintiff Dujuan Nash at ¶ 43. The majority of these letters went

unacknowledged. Declaration of Plaintiff Dujuan Nash at ¶ 38.

d. Former Chair Gabler chided Mr. ████ for writing the Parole Commission a

request to reconsider his ████████ immediately after the hearing. Proctor-

Brown Decl. at ¶ 38, Ex. 136 at 2. Gabler warned Mr. ████ "The time to

present information to the Parole Commission for its consideration is at the

parole hearing and not in a letter after the fact." *Id.*

### 4. Defendants Deny Plaintiffs the Opportunity to See and Rebut Information Used Against Them at Parole Hearings

184.    Defendants review the contents of Class Members' "institution files," including

their "Social Service File," when making parole decisions. Dkt. 84, Drankiewicz Dep. at 128:17–

25; Dkt. 118, Pierce Dep. at 163:4–11.

185.    The Social Service File section includes a "Confidential Envelope," which is

removed from the Social Service File if anyone other than Department of Corrections staff

reviews the Social Service File. Proctor-Brown Decl. at ¶ 44, Ex. 142.

186.    Documents that "may" be included in a "confidential" file include the following:

Pre-Sentence Investigations; rap sheets; non-excluded clinical documents; investigative materials

from police or prosecutors; victim-witness letters; Special Handling of Offenders; Sex Offender

Registration forms; Community Reintegration Offender Questionnaire; Birth Notification;

Petitions for Med. Commitment and doctor's letters; review of Offender in Observation; other

confidential materials as designated by the author; and any juvenile information. *Id.*; Dkt. 116,

QB\72763919.4

Kramer Dep. at 54:5–8 ("Typically what is contained in that is the victim impact statements, presentence investigation if that was completed, possibly some protected health information.").

187.    Institutional staff have discretion to determine what is considered "confidential" or "restricted" in an institutional file. WIS. ADMIN. CODE § PAC 1.06(6) ("The inmate shall have access at the correctional institution where the inmate is confined to the documentary information which the [C]ommissioner considered, except information determined to be confidential may not be disclosed."); Proctor-Brown Decl. at ¶ 44, Ex. 142.

188.    The Notice of Parole Commission Consideration informs Class Members that they will be provided all materials reviewed by Parole Commissioners except where "the file contains restricted material, such as a pre-sentence investigation or information obtained under an assurance of confidentiality." Cranberg Decl. at ¶ 6, Ex. 5.

189.    Class Members are not notified when "restricted" material exists or is added to their file. *See id.* at ¶ 4, Ex. 3, Defs. Resp. to Pls. Interrogatory 23 (asserting that Class Members are notified of information being added to their file when they receive a copy of the document added), *but see* Dkt. 84, Drankiewicz Dep. at 176:1–179:10; Proctor-Brown Decl. at ¶ 43, Ex. 141; *id.* at ¶ 60, Ex. 59 at 24:16–22 (former Commissioner Landreman advising that "these letters go in your confidential file and the only way you see them is if I pull them out and read them to you; otherwise, you don't have access to them." This testimony shows that Class Members do not always receive copies of confidential documents, and, accordingly, do not receive notice when these documents are added to the Class Member's file).

190.    Class Members are not provided full access to their "clinical files" which prevents them from rebutting information contained in those files. Proctor-Brown Decl. at ¶ 45, Ex. 143 at

QB\72763919.4

2 (instructions on documents in clinical file to "remove from CSU file when ███████████ ]
reviews his file").

191.    Class Member ███████████ has been denied release to parole supervision in
part based on information inserted into his clinical file by a police officer seeking to ███████ ▌
███████ Mr. Campbell has never been charged with, nor convicted of ███████████. Mr.
███████ did not commit ███████████.

    a. When ███████████ was convicted of homicide, the sentencing judge was clear
       that Plaintiff ███████ had no motive. *Id.* at ¶ 59, Ex. 157 at 7 ("[T]he one thing
       that has been lacking through the eight days of this trial is any good reason for what
       occurred.").

    b. The investigation of Mr. ███████ s offense included an exhaustive search for
       evidence of ███████. *Id.* at ¶ 60, Ex. 158. None was found. *Id.* Accordingly, Mr.
       ███████ was not charged with nor convicted of ███████. *Id.* at ¶ 59, Ex. 157
       at 2– 3 (sentencing transcript only declaring judgment of homicide offense).

    c. In ███████ years after Class Member ███████████ conviction, a police
       officer submitted a file to Department of Corrections containing the hypothesis that
       ███████████ was ███████████." Proctor-Brown Decl. at ¶ 61, Ex. 159.

    d. As a result of this police officer's hypothesis, Oshkosh Correction Institution
       required ███████ to be treated as ███████. *Id.* at ¶ 62, Ex. 160 ("Given
       the additional information that is kept in a separate file labeled 'police report' with
       ███████ clinical file, there is evidence to suggest ███████████
       ███████ ).

QB\72763919.4

e. Defendant's denied  release in 2010, 2014, and 2018 because of the statements contained in ▮▮▮▮▮▮ file that hypothesize ▮▮▮▮▮▮ to his crime. Cranberg Decl. at ¶ 93, Ex. 92 (denying Plaintiff ▮▮▮ parole in 2010 because "There is an unmet ▮▮▮▮▮▮ need"); *id.* at ¶ 92, Ex. 91 (denying parole in 2014 because "▮▮▮▮▮ ha[d] been referred for ▮▮ ▮▮▮▮▮▮.' This program was recommended based on the ▮▮▮ component of the homicide . . . ."); *id.* at ¶ 32, Ex. 31 (denying parole in 2018 because "there was evidence to suggest ▮▮▮▮▮▮▮▮ (which you deny.)").

192.    While state law provides that Pre-Sentence Investigation Reports "may be used" by "the person who is the subject of the pre-sentencing investigation report" (i.e., these Class Members) in any "evaluation" "hearing" or "postcommitment relief proceeding," WIS STAT. § 972.15(6); Parole Commissioners do not in fact give Class Members access to their Pre-Sentence Investigation Reports prior to their parole hearing. Proctor-Brown Decl. at ¶ 44, Ex. 142 (Pre-Sentence Investigation documents are removed from the Social Service file prior to review by anyone other than DOC staff); Dkt. 68, Tate Dep. Dec. 9, 2020 at 116:13–17; Cranberg Decl. at ¶ 6, Ex. 5 (Notice of Parole Consideration informing parole applicants that pre-sentencing investigation reports are considered "restricted").

193.    Presentence Investigation Reports are reviewed by Commissioners as a "prime resource[.]" Dkt. 84, Drankiewicz Dep. at 177:10–25; Dkt. 117, Tate Dep. Feb. 25, 2022 at 199:3–11 ("the three prime resources that [C]ommissioners would evaluate . . . [are] the criminal complaint, the presentence investigation, and the sentencing transcript."); Dkt. 118, Pierce Dep. at 51:2–7 ("I'd look at presentence investigations . . . .").

QB\72763919.4

194.     Presentence Investigation Reports include information not proved beyond a
reasonable doubt, such as a police officer's description of the original offense, the Class
Member's description of the original offense, any statements from co-defenders, victim
statements, previous record (juvenile and adult), family background, family attitudes, personal
history (academic/vocational skills, employment history, financial management, marriage status,
emotional and physical health, mental ability, chemical uses, sexual behaviors, military history,
religion) and a probation/parole agent's sentencing recommendation. Proctor-Brown Decl. at ¶
54, Ex. 152.

195.     Even after the parole hearing concludes, the interviewing Commissioner, or the
Parole Chair, may review and rely on materials not contained in the institutional file, without any
notice to Class Members or opportunity to respond. *Id.* at ¶ 46, Ex. 144 (Chairperson ███
████████████████████████████████████ after the parole interview, and
writing ████████████████████████████████████████
███████") ; Dkt. 85, Gabler Dep. at 61:14–17 (Chairperson Gabler would seek additional
information beyond that available in the WICS system); Dkt. 117, Tate Dep. Feb. 25, 2022 at
194:19–25 (Q: "Are [C]ommissioners given any instruction as to what they can or cannot
consider from these letters that come in, these letters of opposition?" A: "I mean, we consider
everything. We look at everything that's in the file. But they're not instructed to the degree of
effect that any correspondence may have.").

196.     The Parole Commission may draw erroneous conclusions from sources
unavailable to the Class Member that the Class Member—having received no notice—has no
opportunity to rebut. Proctor-Brown Decl. at ¶ 46, Ex. 144 (Former Chairperson ████████
denying release to Class Member ████████████ by concluding from a Dateline transcript

79

not in ▮▮▮▮▮s file that he had, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮" when in fact the Dateline transcript did not support that conclusion).[15]

197.    Parole Commissioners consider factual statements made by victims in their parole

decisions. Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions Nos. 8,

19); Dkt. 118, Pierce Dep. at 169:21–171:19; Dkt. 84, Drankiewicz Dep. at 176:22–177:24.

198.    Victim statements are considered confidential and withheld from Class Members.

Proctor-Brown Decl. at ¶ 43, Ex. 141 ("Confidential Envelopes" include victim-witness letters);

*id.* at ¶ 44, Ex. 142 (staff should "[r]emove all Confidential envelope(s) and Administrative

Confinement packet(s) from the Social Service file prior to the inmate reviewing the file.").

199.    Parole is denied due to victim opposition to the release of Class Members.

Cranberg Decl. at ¶ 49, Ex. 48 at 11:12–13) (denying ▮▮▮▮▮▮▮▮▮▮ parole in December of 2019

due to "victim statements and the community opposition"); *id.* at ¶ 48, Ex. 47 (denying Plaintiff

▮▮▮▮▮▮ parole in 2014, after former Commissioner LaCost introduced a victim statement that

Mr. ▮▮▮▮▮ had never seen which "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮); Cranberg Decl. at ¶ 60, Ex. 59 at 12–19 (Commissioner

▮▮▮▮▮ extended Plaintiff ▮▮▮▮▮▮▮ incarceration because of a victim statement). This

happens because victim statements often contain highly emotional language about Class

Members that Class Members, without access or advance notice, do not have sufficient

opportunity to rebut. Proctor-Brown Decl. at ¶ 55, Ex. 153 at 2 ▮▮▮▮▮▮▮▮▮▮▮▮

---

[15] Larson, John, "A Victim's Voice," NBC NEWS, available at
https://www.nbcnews.com/id/wbna14190842#.XJwqYFW6OUl (last visited March 26, 2022) (▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ ).

80

QB\72763919.4

███████ e writing, "████████████████████████████████

████████████); Cranberg Decl. at ¶ 21, Ex. 20 at 9–10 (The victim's family explained

that based on ██████████████████████████████████

████████████); *id.* at ¶ 60, Ex. 59 at 25:16–20 (a victim participating in a ████

████████████ stated: "███████████████████████████

███████████████████████████████████.").

200.    Victim statements influence Commissioners' determinations of how much time is

sufficient for punishment. Dkt. 68, Tate Dep. Dec. 9, 2020 at 61:14–62:1 ("Another factor that

may be considered is also victim impact . . . to inform the seriousness of the offense, it's 35 years

later, the victim still holds the same level of intensity as far as how they feel they've been

impacted as day one, then that does indicate how serious the offense was.").

201.    Class Members are not given the opportunity to review victim impact statements

in advance of their parole interview even when the author indicates that s/he has no objection to

it being shared. Cranberg Decl. at ¶ 48, Ex. 47; Dkt. 84, Drankiewicz Dep. at 177:3–24.

202.    Parole Commissioners also deny release based on opposition from prosecuting

attorneys not made available to Class Members. In 2019, former Commissioner ██████ denied

release to ██████████ in part because of a letter from the county executive of Kenosha County

urging her to deny parole to ██████████ because ████████████████████

██████████████████. Cranberg Decl. at ¶ 49, Ex. 48 at 8:2–15; *id.* at 11:3–4;

*id.* at 11:11–18 (former Commissioner ██████ concluding "███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████.").

QB\72763919.4

**5.  Plaintiffs Are Denied the Opportunity to Be Heard by the Actual Decisionmaker**

203.    The final decision about whether to grant or deny parole is made by the Chair of the Parole Commission. Dkt. 68, Tate Dep. Dec. 9, 2020 at 19:16; 37:14–25, 38:1–6; Dkt. 85, Gabler Dep. at 129:17.

204.    When parole is denied, the Chair of the Parole Commission makes the final decision about the length of the Deferral Period (*i.e.,* the length time until the parole applicant can have their next hearing). Dkt. 68, Tate Dep. Dec. 9, 2020 at 19:16–20; 38:2–3; Dkt. 85, Gabler Dep. at 129:17.

205.    In most cases the Parole Chair is not the same individual who conducted the parole interview of Class Members; more often, those interviews are conducted by another Commissioner. Dkt. 117, Tate Dep. Feb. 25, 2022 at 191:17–192:17 (Chairperson Tate stating that "what [parole applicants] have to say about their case matters," but he does not personally conduct the interviews or "typically" listen to recordings).

206.    The Parole Chair can, and does, increase the Deferral Period for a Class Member beyond the time recommended by the Commissioner who conducted the in-person interview, despite not participating in the interview. Dkt. 85, Gabler Dep. at 103:7–105:1; *id.* at 216:19–217:2; Cranberg Decl. at ¶ 72, Ex. 71 at 2–3 (telling Class Member ███████████ that ████████'s "belief" that he was "only partially to blame" for the crime he committed was ███████ ██████████████████); *id.* at ¶ 70, Ex. 69 at 2–3; Proctor-Brown Decl. at ¶ 47, Ex. 145 at 2–3.

207.    Despite only one Commissioner meeting with the parole applicant, parole decisions are sometimes made by the entire Parole Commission. Dkt. 68, Tate Dep. Dec. 9, 2020

QB\72763919.4

at 45:9–16; Dkt. 118, Pierce Dep. at 97:20–25 (testifying that a Commissioner can opt to take

"no action" on a parole decision which places the decision before the entire Parole Commission).

### 6. Defendants Fail to Adequately Explain Their Reasons for Denying Parole to Class Members

208.    Parole Commission regulations require only that the Commissioner state their

general reasons for denying or granting parole. WIS. ADMIN. CODE § PAC 1.07.

209.    This is interpreted to mean checking the five boxes contained on the PCA drop-

down menu: "you [have/have NOT] served sufficient time for punishment;" "your institutional

conduct [has/has NOT] been satisfactory;" "your program participation [has/has NOT] been

satisfactory;" "you have developed an adequate plan, but will need Agent's verification" or "you

have NOT developed an adequate plan. It will need further development;" and "release at this

time would involve an unreasonable risk to the public." Dkt. 117, Tate Dep. Feb. 25, 2022 at

46:5–10 (Q: "Your reading of [WIS. ADMIN. CODE § PAC 1.07] is that there's nothing more

required other than just yes, no on those five short questions at the top of the PAC form;

correct?" A: "At its basis, yes, that's accurate."); Dkt. 118, Pierce Dep. at 15:21–23 (explaining

that the WICS system is limited to a drop-down set of 5 reasons why parole was granted or

denied); *id.* at 154:9–11 (testifying that a different drop-down option is the extent of notification

the Parole Commission provides when a parole applicant does not meet one of the criteria).

210.    Chairperson Tate believes that parole explanations require nothing more than

selecting from the pre-set standardized drop-down menu. Dkt. 117, Tate Dep. Feb. 25, 2022 at

41:17– 22 (Q: "It would be fully within the law to state that they don't have to provide any

explanation as to why the person was found to have or have not met the criteria?" A: "Yeah.

Sure."); *id.* at 40:3–8 (Q: "So it's your understanding that . . . nothing more is required of you by

law?" A: "That's correct.").

83

QB\72763919.4

211.    Commissioners use fill-in-the-blank templates for their decisions. Proctor-Brown Decl. at ¶ 48, Ex. 146 (former Commissioner Drankiewicz emailing former Commissioner LaCost a template for parole decisions so that she does not need to "reinvent the wheel").

212.    Commissioner Kramer's decisions recount a number of facts but contain no analysis of those facts or how those facts relate to the ultimate conclusion that an individual has not served sufficient time for punishment. Dkt. 116, Kramer Dep. at 73:14–77:23; Dkt. 117, Tate Dep. Feb. 25, 2022 at 100:24–101:6 (Q: "Okay. But again, because [Commissioners are] not required at all on your interpretation to do anything more than the top five reasons . . . it's entirely possible that the factors or considerations that led the Commission to come to the decision that it did are not listed on the PAC Form?" A: "Yeah.").

213.    Parole Action Sheets do not include "every single factor that played a role" in the parole decision. Dkt. 86, Landreman Dep. at 50:20–52:14. To the contrary, the actual "decision" is typically reduced to a three-sentence paragraph at the bottom of recitation of facts. *See, e.g.,* Cranberg Decl. at ¶¶ 52–59, Exs. 51–58. This includes not explaining what factored into whether a Class Member served sufficient time in prison so as not to depreciate the seriousness of the offense, or what constitutes an unreasonable risk to the public. Dkt. 68, Tate Dep. Dec. 9, 2020 at 72:13–18; Dkt. 117, Tate Dep. Feb. 25, 2022 at 100:13–16 (Q: "Do [C]ommissioners in practice list all of the factors or considerations that led the, to come to their conclusion?" A: "Exhaustively, no.").

84

QB\72763919.4

### 7.   Plaintiffs Cannot Vindicate Their Liberty Interest Without Access to Counsel and Expert Assistance

214.   Class Members have difficulty acquiring child welfare records, medical records, or other records relevant to their parole proceedings while they are incarcerated. Dkt. 87, Expert Report at 23.

215.   Class Members are not allowed to have counsel present during their parole hearings. Cranberg Decl. at ¶ 90, Ex. 89 (Defs. Resp. to Pls. Requests for Admissions No. 15).

216.   Lack of legal counsel hampers the ability of Class Members to present information regarding maturity and rehabilitation. Declaration of Plaintiff Dujuan Nash at ¶ 41; Declaration of Terrance Prude at ¶ 15 ("████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ )

217.   Since being assisted by counsel in their documentary submissions, several Class Members have been granted release after having been denied time and time again previously. Dkt. 87, Expert Report at 25.

218.   The State of Wisconsin does not make psychologists or clinical social workers available to Class Members to assist in interpreting their crime in the context of the hallmark features of youth. Dkt. 87, Expert Report at 23.

219.   Lack of expert assistance impairs Class Members' ability to explain their crime within the context of juvenile brain development. Declaration of Plaintiff Dujuan Nash at ¶ 41; Cranberg Decl. at ¶ 79, Ex. 78 ("████████████████████████████████████

85

QB\72763919.4

███████████████████████████████████████████████████
███████████████████████████████████████████████████

220.    Parole Commissioners receive no training related to youth trauma or juvenile brain development. Dkt. 118, Pierce Dep. at 41:17–20; *id.* at 43:21–24.

221.    Class members experience ███████████ which negatively impacts them during parole interviews. ███████████████████████ .

222.    Parole Commissioners fail to account for youth trauma related explanations for Class Members' crimes. Cranberg Decl. at ¶ 22, Ex. 21 at 61:20–22; *id.* at 62:6–9 (former Commissioner ██████ asked ██████████ extensive questions about the details of his ██████████████████ in asking about ████████ s motive for the crime. ████████ explained to Commissioner ████████ that there *was no* motive for the crime — ████████████ ███████████████████████████████████████████ ██████████████████ Former Commissioner Landreman increasing Class Member ████████ punishment by four years, citing "the lack of explanation for the [crimes ████████ committed]" as the most significant reason he "couldn't justify releasing you today . . . and I don't know that I could justify releasing you in the future.").

223.    Because Parole Commissioners lack adequate training, they do not know how social anxiety and childhood trauma may impact a Class Member's ability to express themselves at a parole interview. Proctor-Brown Decl. at ¶ 49, Ex. 147 (former Commissioner █████ interviewed Class Member ████████ in ████ concluding that he ██████████████ ██████████████████████████ but also concluded that he ████████████ .

Respectfully submitted this 1st day of April, 2022.

QB\72763919.4

*Electronically signed by*
*Gregory T. Everts* _____

QUARLES & BRADY LLP

Gregory T. Everts (SBN 1001636)
Martha J. Snyder (SBN 1070865)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
gregory.everts@quarles.com
martha.snyder@quarles.com

Patrick J. Proctor-Brown (SBN 1091326)
Ellen Cranberg (SBN 1122484)
400 East Wisconsin Avenue, Suite 2350
Milwaukee, WI 53202
Telephone: (414) 277-5000
patrick.proctor-brown@quarles.com
ellen.cranberg@quarles.com

Issa Kohler-Hausmann (NY BN 4694576)
Yale Law School*
127 Wall Street
New Haven, CT 06511
Telephone: (203) 432-4956
issa.kohler-hausmann@yale.edu

Avery P. Gilbert (NY BN 4524237)
15 Shatzell Avenue, Suite 232
Rhinecliff, NY 12574
Telephone: (845) 380-6265
avery@agilbertlaw.com

ACLU FOUNDATION OF WISCONSIN

Laurence J. Dupuis (SBN 2029261)
R. Timothy Muth (SBN 1010710)
Emma S. Shakeshaft (SBN 1092046)
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272-4032
ldupuis@aclu-wi.org
tmuth@aclu-wi.org
eshakeshaft@aclu-wi.org

FOLEY & LARDNER LLP

H. Holden Brooks (SBN 1071254)
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400
HBrooks@foley.com

Daniel Kaplan (SBN1018122)
Hillary N. Vedvig (SBN 1113183)
150 East Gilman Street, Suite 5000
Madison, WI 53703
Telephone: (608) 257-5035
DKaplan@foley.com
HVedvig@foley.com

*Attorneys for Plaintiffs*

\* This document has been partially prepared by an individual affiliated with Yale Law School, but does not purport to present the school's institutional views, if any.

QB\72763919.4

Exhibit #2
(3-Pages)

PC±T240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS



**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

## PAROLE COMMISSION ACTION

| OFFENDER NAME PRUDE, TERRANCE D. | DOC # 335878 | FACILITY NAME Green Bay Correctional Institution [GBCI] | AGENT # 33603 | TIS No | 980 No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION TAKEN  Defer (for 18 Months) | NEW PED 04/05/2022 | MR/ES 07/10/2054 [Adjusted Release Date] | RECOMMENDED ELIGIBILITY DATE | DATE ACTION TAKEN 08/19/2020 | HEARING TYPE Parole Review |

**If you are recommended for a parole grant/release, the time frame within which you shall be released, as established by the Chairperson of the Parole Commission, shall be reflected in the grant/order.**

### GENERAL REASONS FOR ACTION TAKEN

1. You have developed an adequate plan, but will need Agent's verification.
2. Your institutional conduct has NOT been satisfactory.
3. Your program participation has NOT been satisfactory.
4. Release at this time would involve an unreasonable risk to the public.
5. You have NOT served sufficient time for punishment.

### COMMISSION COMMENTS

You were seen today for parole consideration on case 99CF05988 for 4 Cts. of Armed Robbery with Threat of Force (PTAC). You received 20 years on each count, consecutive, for a total of a 60 year sentence. This case carries PMR status and this has been explained to you. You were also convicted on Count 5 of this case - Armed Robbery with Threat of Force (PTAC) and received an imposed and stayed sentence of 20 years with a term of 20 years probation. This was your initial review as you had previously waived consideration in September 2019, but re-applied for parole consideration in June 2020.

According to the record, in November 1999 you and co-actors robbed individuals of their property. In one incident you pointed a semi-automatic handgun at a man and then you and co-actors grabbed the man out of his car and drove away in the car. In another incident a woman was approached as she was walking to her car. A male ran up and pointed a semi-automatic gun at her and she was told to let her purse fall. She dropped her purse and another individual picked up her purse and then they ran to her parked car and stole her car. Then in another incident, a male and female were walking home from work when two males came upon them with handguns and ordered the male and female to get on the ground. Money was taken from them, as well as the purse being taken from the female. There was also another incident of a man and a woman being approached as they were entering their car. A gun was put in the man's face and you and co-actors demanded money and the keys to his vehicle. The man and woman were told to then get out of the car and you and your co-actors drove away in the car. You discussed your involvement in the above offense noting that you were 17 years old at the time. You described not having proper guidance and acting out of greed for wanting things that you could not afford. You indicated that you were criminal minded back then but stated you have since matured and feel you have a changed mentality. You discussed your regrets to the harm you caused the victims. You stated that your aunt was recently robbed and you have gained further insight on how that has affected your aunt thus giving you further understanding on the impact your negative actions had on the victims of your case.

At the age of 38, you are serving your 1st adult incarceration and you have served approximately 20 years and 8 months. You do have a prior record as a juvenile for 2 cases of Operating Vehicle w/o Owner's Consent, Disorderly Conduct, Petty Theft, and Fleeing, Duty Upon Striking an Occupied/Attended Vehicle & 2nd Degree Reckless Endangering Safety. You did spend time at Ethan Allen School as a juvenile. You discussed your placement at EAS and did not feel it was a rehabilitative environment. You stated that you discharged from your EAS placement on August 5, 1999 and became involved in your current offenses in November 1999. During this incarceration, you have demonstrated problematic behaviors which has resulted you remaining in Maximum custody. You have 17 minor conduct reports and 33 major conduct reports on your record. It is noted that at the time of this review you were seen in Restrictive Housing via video due to being in Disciplinary Separation status as a result of your most recent major conduct report received on 07/30/2020 for Unauthorized Use of the Mail and Group Resistance & Petitions, which involved you participating in STG activity. It was discussed that there is documented history of you being involved in STG activity. You discussed your conduct history and provided your perspective. You denied being involved in further criminal behavior and stated that you no longer belong to a gang.

With regard to programming, you completed CGIP (09/2010) and Anger Management (04/2015). You have been terminated from Academics due to placements in disciplinary status. You indicated you are interested in completing education to obtain GED/HSED. You discussed that you had previously been working on your educational goals when the educational system updated to having only computer testing. You were toward the end of working on achieving your educational goals, but did not quite finish before the update and were told you would have to start the testing process over. You indicated that you were frustrated with learning of this at that time, but indicated that you are interested in pursuing completion of your GED/HSED. You are on the wait list for SUD 3 and Vocational (optional) programming. You discussed what you have learned so far in programming is that you have better self- control in your responses to negative situations and have developed a more positive attitude. You discussed utilizing self-talk to not impulsively react to a situation and take more time to think about your actions. You stated that you are motivated for continued programming.

Your release plan is to reside with your aunt in Milwaukee, WI, with an alternate plan with a friend in Milwaukee, WI. This may be workable, but will require the approval of your agent.

Based on the nature and severity of your case, more time is warranted. Demonstrating positive adjustment, successfully completing all of your identified program needs, successfully transitioning through lower levels of security and having an eventual approved release plan will assist in reducing your risk to a more reasonable level. It is the decision of the Commission to defer your case for 18 months.

**\*Note: The length of this deferral requires the final approval of the Parole Chairperson.**

Date: 08/19/2020 — Time: 03:35:25 PM — User: J. Kramer



PCAT240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

Exhibit #2

## PAROLE COMMISSION ACTION

| OFFENDER NAME<br>PRUDE, TERRANCE D. | DOC #<br>335878 | FACILITY NAME<br>Green Bay Correctional Institution<br>[GBCI] | AGENT #<br>33603 | TIS<br>No | 980<br>No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION<br>TAKEN<br><br>Defer (for 18 Months) | NEW PED<br><br>04/05/2022 | MR/ES<br><br>07/10/2054 | RECOMMENDED<br>ELIGIBILITY<br>DATE | DATE ACTION<br>TAKEN<br><br>08/19/2020 | HEARING<br>TYPE<br><br>Parole<br>Review |

RECOMMENDED CONDITIONS OF SUPERVISION

REQUESTS FOR INFORMATION

| | |
|---|---|
| J. Kramer 4392 | 08/19/2020 |
| MEMBER SIGNATURE | DATE SIGNED |
| | |
| PAROLE COMMISSION CHAIRPERSON<br>*The recommended Action is approved for the stated reasons.* | DATE APPROVED |

☐ File Review        THERE IS NO ADMINISTRATIVE APPEAL OF THIS DECISION

**DISTRIBUTION:** Original - Social Service File; Copy - Parole Commission; Copy - RC; Copy - DCC Case File; Copy - INMATE
Copy - Field Supervisor when PPI is Requested

Exhibit # 3

(7-Pages)

# DAI Instrument for Custody Classification (IFCC)

## Mandatory Restrictors



[Exhibit # 3]

GBCI LAW LIBRARY

Original Effective Date: July 25, 2022

Division of Adult Institutions
DAI Administrator: Sarah Cooper
DAI Assistant Administrator: Stephanie Hove
DAI Assistant Administrator: Paul Kemper
BOCM Director: Angela Hansen

State of Wisconsin Department of Corrections

Exhibit #3

**Purpose:** Mandatory restrictors prevent an individual from placement in a specified custody level due to Division of Adult Institution (DAI) policy and/or correctional practices implemented to manage an individual while confined. Individuals who were classified prior to implementing mandatory restrictors will remain at their current custody.

The mandatory restrictors shall be applied during initial and reclassification processes in DAI.

| Minimum Community Custody Mandatory Restrictor: |
|---|

Individuals with the following mandatory restrictor are excluded from being classified <u>minimum community custody</u>:

GPS and/or Special Bulletin Notice (SBN)
Individuals who require a lifetime GPS and/or Special Bulletin Notice (SBN).

| Minimum and Minimum Community Custody Mandatory Restrictors: |
|---|

Individuals who have one or more of the following mandatory restrictors are excluded from being classified <u>minimum and minimum community custody</u>:

1. Immigration & Customs Enforcement (ICE) Detainer
   Individuals who have an active or pending Immigration & Customs Enforcement (ICE) detainer or have been referred to ICE for review. If ICE has provided written confirmation the individual is <u>not</u> facing deportation, the restrictor does not apply.

2. Unmet Assigned Sex Offender Treatment (SOT) Needs
   Individuals who have an assigned SOT2, SOT4 or Child Pornography Only (CPO) treatment need that is not completed. Individuals with a SOT1 are not subject to this mandatory restrictor.

3. Pending Felony Charges and/or Detainers
   Individuals with any pending felony charges and/or felony detainers from any state, Federal government, or another country. This includes felony charges under review/investigation by the district attorney or other law enforcement agency with no final decision regarding whether charges will be filed.

   This does not include detainers due to cost commitments.

4. Life Sentence
   <u>Old Law (Offenses committed on/before 6-1-84) and New Law Life Sentence (Offenses committed on/after 6-1-84 and before 12-31-99):</u>
   Individuals who have not reached their initial PED <u>and</u> do not have a parole endorsement to reduce custody and/or an indication of release consideration.

# GBCI LAW LIBRARY

2

Exhibit#3

<u>Truth in Sentencing (TIS) Life Sentence (Offense dates on/after 12/31/99 for felonies):</u>
Individuals who have not reached their Extended Supervision Eligibility Date (ESED) <u>and</u>
have not received an indication from the sentencing court of upcoming release.

5. Pending End of Confinement Review Board (ECRB) and/or Special Purpose Evaluation (SPE)
Individuals who have not cleared the ECRB or SPE.

6. Sentence Structure
*Male System:*
Individuals with more than <u>five</u> years to their adjusted release date.
*Female System:*
Individuals with more than <u>eight</u> years to their adjusted release date.

Application of this mandatory restrictor shall not be applied for those individuals with the
following circumstances:
1. Parole eligible individuals who have reached their initial Parole Eligibility Date (PED)
<u>and</u> have a parole endorsement to reduce custody and/or an indication of release
consideration.

2. Individuals serving a Risk Reduction Sentence who are approaching their Release
Eligibility Date, have completed the majority of their Risk Reduction Sentence Plan
(RRSP) and need to attain minimum or minimum community to complete their RRSP.

| Medium, Minimum and Minimum Community Custody Mandatory Restrictors: |
| --- |

Individuals who have one or more of the following mandatory restrictors are excluded from
being classified <u>medium, minimum and minimum community custody</u>:

1. Life Sentence or 30 years or More of Confinement to Serve at Admission
Individuals serving a life sentence or total confinement time of 30 years or more upon DAI
admission shall be classified maximum custody for a minimum of three years. Utilize the
totality of the confinement time the individual was sentenced to serve. Calculate the time
left to serve from the date of the initial classification hearing.

Application of this mandatory restrictor shall not be applied for those individuals who:
• Released on a life sentence and are returned on revocation.
• Served 30 years or more during their last period of confinement and are returned on
revocation.
• Released on a vacated sentence and returned as a result of re-sentencing.

2. Administrative Confinement (AC)
Individuals managed in AC or have not completed 12 months in general population from
date of release from AC.

**GBCI LAW LIBRARY**

3

Exhibit #3

---

### Escape or Attempted Escape Mandatory Restrictors:

Individuals who have a documented history of attempted or completed escape from confinement or custody are impacted by this mandatory restrictor.

**Definitions:**
An <u>unfenced facility</u> is a correctional center with no physical barrier preventing individuals from leaving the facility.

A <u>fenced facility</u> is a maximum, medium, or minimum site where there is a physical barrier preventing individuals from leaving the facility. Escapes under the following circumstances shall be considered escapes from a fenced facility:
- Court, hospital or transportation trip
- Law enforcement during arrest or court hearings
- Jail/Detention/Huber facility (e.g., MSDF DCC holds)
- Mental health facility

Escape is any documented behavior which includes:
- Leaving the custody of DOC or law enforcement personnel
- Attempted escape from the custody of the DOC or law enforcement personnel
- Aiding in an escape
- Conspiring/making plans to escape
- Unauthorized possession of items/materials likely to be used in an escape

Escape does not include:
- Absconding from community supervision
- Failing to report to an assigned Division of Community Corrections agent
- Failing to appear for court/bail jumping
- Cutting off a GPS or electronic monitoring bracelet
- Escaping from house arrest while in the community
- Leaving a community-based Alternative to Revocation (ATR) Facility
- Fleeing/eluding in a vehicle

Confirmation of escape behaviors may be found in the following documents:
- Conduct Report
- Incident Report
- County Jail Report
- Criminal Complaint
- Judgment of Conviction
- Revocation Summary
- Pre-Sentence Investigation

**Application of Escape Mandatory Restrictor:**
The level of mandatory restrictor applied is based on the security level of the facility from which the individual escaped. Escapes from an out-of-state facility shall utilize the security

4

[Exhibit #3]

level of the facility as designated by that state. If the security level is not available, assume it is from a fenced facility.

When calculating time frame for escape:
- Utilize the most recent disposition date of the conduct report or county jail report for the escape-related behavior.
- Utilize the date of the most recent conviction if the escape conduct report is unavailable.
- Utilize the date of the escape-related behavior when no disposition date or conviction date is known.
- If the individual has been in escape status for a period of time, utilize the date of their return to DAI or the date of the conduct report disposition whichever is most current.

| Escape Minimum and Minimum Community Custody Mandatory Restrictors: |
|---|

Individuals are excluded from being classified minimum and minimum community custody for the following time period and circumstances:

1. One year from the date of an escape or attempted escape from an unfenced facility and/or while on a project crew or work release.

2. Five years from the date of an escape or attempted escape from an unfenced facility and/or while on a project crew or work release if the escape behavior involves one or more of the following elevating factors:
   - Use of violence, threat of violence, taking of hostages and/or weapons during the escape.
   - Solicitation of staff or coercion of staff to facilitate the escape.
   - Plans which may include outside assistance or paraphernalia such as manufactured tools, rope, handcuffs, letters/calls to family, maps of escape routes, facility blueprints, mannequins, etc.
   - Commission of further criminal activity/new charges while in escape status.

3. Five years from the date of an escape or attempted escape from inside a minimum-security fenced facility.

| Escape Medium, Minimum and Minimum Community Custody Mandatory Restrictions |
|---|

Individuals are excluded from being classified medium, minimum and minimum community custody for 10 years from the time of an escape or attempted escape from a maximum or medium security facility.

# GBCI LAW LIBRARY

5



## REFERENCE:

Document mandatory restrictors in the following areas of the inmate classification report:
- o  Initial Classification - Staffing Comments
- o  Pre-Hearing - Staff Appraisal
- o  Reclassification - Committee Comments

Sample Mandatory Restrictor Statements for Pre-Hearing and Committee Comments:

- A mandatory restrictor applies due to an unmet SOT2 need; therefore, continued placement in medium custody is appropriate.

- A mandatory restrictor applies due to an escape from WCCS on 10/19/2021. The restrictor will no longer apply 10/19/2022.

- A mandatory restrictor applies due to Special Bulletin Notice requirements; therefore, a custody assignment lower than minimum is not appropriate.

- It is acknowledged a mandatory restrictor is applicable due to more than 5 years remaining to serve; however, current custody will be maintained unless additional factors dictate custody elevation.

- The person has two mandatory restrictors due to the time remaining to serve (over 5 years) and an unmet SOT2 need.

GBCI LAW LIBRARY

6

[Exhibit # 3]

## Quick Review Mandatory Restrictors (refer to manual for detail in application)

1. **Requires GPS and/or Special Bulletin Notice (SBN)**
   (excludes minimum community custody)

2. **Immigration & Customs Enforcement (ICE) Detainer active/pending**
   (excludes minimum and minimum community custody)

3. **Pending Felony Charges and/or Detainers**
   (excludes minimum and minimum community custody)

4. **Unmet Assigned Sex Offender Treatment (SOT) Needs**
   (excludes minimum and minimum community custody)

5. **Pending End of Confinement Review Board (ECRB) and/or Special Purpose Evaluation (SPE)**
   (excludes minimum and minimum community custody)

6. **Sentence Structure**
   (excludes minimum and minimum community custody)
   **Male:** More than <u>five</u> years to adjusted release date
   **Female:** More than <u>eight</u> years to adjusted release date

7. **Life Sentence**
   (excludes minimum and minimum community custody)
   **Old Law/New Law Life Sentence** – Not reached their initial PED <u>and</u> do not have a parole endorsement to reduce custody and/or an indication of release consideration.

   **TIS Life Sentence** – Not reached their Extended Supervision Eligibility Date (ESED) <u>and</u> have not received an indication from the sentencing court of upcoming release.

8. **Life Sentence or 30+ years of confinement at the time of DAI Admission requires maximum custody a minimum or three years**
   (excludes medium custody).

9. **Administrative Confinement (AC)** – In AC or general population less than 12 months
   (excludes medium custody)

10. **Escape or Attempted Escape**
    - From a minimum unfenced facility and/or project crew or work release
      (excludes minimum and minimum community custody for one year)
    - From a minimum unfenced with elevating factors
      (excludes minimum and minimum community custody for five years)
    - From inside a fenced minimum facility
      (excludes minimum and minimum community custody for five years)
    - From a medium or maximum facility
      (excludes medium custody for 10 years)

# GBCI LAW LIBRARY

Exhibit #4
(3-Pages)

PCAT240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS

**[Exhibit #4]**

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

_SO/ G 57_

# PAROLE COMMISSION ACTION

| OFFENDER NAME<br>PRUDE, TERRANCE D. | DOC #<br>335878 | FACILITY NAME<br>Green Bay Correctional<br>Institution [GBCI] | AGENT #<br>33603 | TIS<br>No | 980<br>No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION<br>TAKEN<br><br>Defer (for 12 Months) | NEW PED<br>04/05/2024 | MR/ES<br>07/10/2054<br>_Adjusted Release Date_ | RECOMMENDED<br>ELIGIBILITY<br>DATE | DATE ACTION<br>TAKEN<br>02/16/2023 | HEARING<br>TYPE<br><br>Parole Review |

**If you are recommended for a parole grant/release, the time frame within which you shall be released, as established by the Chairperson of the Parole Commission, shall be reflected in the grant/order.**

### GENERAL REASONS FOR ACTION TAKEN
1. You have NOT developed an adequate plan. It will need further development.
2. Your institution conduct has been marred by multiple minor reports of misconduct.
3. Your program participation has NOT been satisfactory.
4. Release at this time would involve an unreasonable risk to the public.
5. You have NOT served sufficient time for punishment.

### COMMISSION COMMENTS
You were seen for parole consideration on case 99CF05988 for 4 Cts. of Armed Robbery with Threat of Force (PTAC). You received 20 years on each count, consecutive, for a total of an 80 year sentence structure. This case carries PMR status and this was explained to you. You were also convicted on Count 5 of this case - Armed Robbery with Threat of Force (PTAC) and received an imposed and stayed sentence of 20 years with a probation term of 20 years. Your PED is 04/05/2022 and your MR is 07/10/2054. This is your 3rd review with the Parole Commission and your last defer was 12 months.

According to the record, in November 1999 you and co-actors robbed individuals of their property. In one incident you pointed a semi-automatic handgun at a man and then you and co-actors grabbed the man out of his car and drove away in the car. In another incident a woman was approached as she was walking to her car. A male ran up and pointed a semi-automatic gun at her and she was told to let her purse fall. She dropped her purse and another individual picked up her purse and then ran to her parked car and stole her car and you acted as the look-out. Then in another incident, a male and female were walking from work when two males came upon them with handguns and ordered the male and female to get on the ground. Money was taken from them, as well as the purse being taken from the female. You were the driver of a car while the co-actors robbed these individuals. There was also another incident of a man and a woman being approached as they were entering their car. A gun was put in the man's face and you and co-actors demanded money and the keys to his vehicle. The man and woman were told to then get out of the car and you and your co-actors drove away in the car. You discussed your involvement in the above offenses noting that you were 17 years old at the time. You described not having proper guidance and acting out of greed for wanting things that you could not afford. You indicated that you were criminal minded back then but stated you have since matured and feel you have a changed mentality. You have discussed your regrets to the harm you caused the victims. You had previously shared that your aunt was robbed and you have gained further insight on how that has affected your aunt thus giving you further understanding on the impact your negative actions had on the victims of your case.

At the age of 40, you are serving your 1st adult incarceration and you have served approximately 23 years and 3 months. You do have a prior record as a juvenile for 2 cases of Operating Vehicle w/o Owner's Consent, Disorderly Conduct, Petty Theft, and Fleeing, Duty Upon Striking an Occupied/Attended Vehicle & 2nd Degree Reckless Endangering Safety. You did spend time at Ethan Allen School as a juvenile. You discussed your placement at EAS and did not feel it was a rehabilitative environment. You stated that you discharged from your EAS placement on August 5, 1999 and became involved in your current offenses in November 1999.

During this incarceration, you have demonstrated problematic behaviors which have resulted you remaining in Maximum custody. You have 21 minor conduct reports and 33 major conduct reports on your record. This is an increase of 3 minor conduct reports since your last review in February 2022. You received your last major conduct report on 07/30/2020 for Unauthorized Use of the Mail and Group Resistance & Petitions, which describes you participating in STG activity. It was discussed that there is documented history of you being involved in STG activity and you stated that you have removed yourself from STG association. You have discussed your conduct

history and provided your perspective, as well as indicating that you are making efforts in a positive direction. You received your last minor conduct report in November 2022 for Possession of Contraband. It was discussed that you were in Administrative Confinement for approximately 4 ½ years, but have been back in General Population for almost two years and you were encouraged to continue in this positive direction. You discussed that a previous Parole Chairperson supported a reduction in custody if your conduct remained satisfactory by your next reclassification review (03/15/2022). You then met with the reclassification committee on 12/22/2022. The reclassification committee acknowledged the Parole Commission's support for reduced custody, but determined continued monitoring at the current level is necessary to ensure the safety of the public and the institution, noting your overall adjustment history.

With regard to programming, you are on the wait list for SUD3, the Employment Program, and Vocational (optional). You completed CGIP (09/2010) and Anger Management (04/2015). Through programming, you have discussed learning better self- control in your responses to negative situations and developing a more positive attitude. You discussed utilizing self-talk to not impulsively react to a situation and to take more time to think about your actions. You are listed as withdrawing from Academics (01/2022) and you indicated that you have been trying to get back in school. You discussed that you have a desire to be involved in Academics, but there appears to be confusion with you getting re-enrolled. The Parole Commission will continue to endorse enrollment in Academics.

There was not an updated release plan in your file or uploaded in the computer for this review. Your social worker also documented a COMPAS note on 02/07/2023 that a completed release plan had not been received from you. During this review, you indicated you completed it. You were then asked about your release plan and you stated that you had several people willing to hire you, but did not indicate any residence options.

Based on the nature and severity of your case, more time is warranted. Demonstrating positive adjustment, successfully completing all of your identified program needs, successfully transitioning through lower levels of security and having an eventual approved release plan will assist in reducing your risk to a more reasonable level. It is the decision of the Commission to defer your case for 12 months with continued endorsement for re-enrollment in Academics.

Date: 02/16/2023 --- Time: 04:55:10 PM --- User: J. Kramer

[Exhibit #4]

PCAT240
**DEPARTMENT OF CORRECTIONS**
Parole Commission
DOC-1208 (Rev.08/2012) WICS

[Exhibit #4]

**WISCONSIN**
Wisconsin Statutes, Chapter 304
Administrative Code, Chapter PAC1

## PAROLE COMMISSION ACTION

| OFFENDER NAME<br>PRUDE, TERRANCE D. | DOC #<br>335878 | FACILITY NAME<br>Green Bay Correctional<br>Institution [GBCI] | AGENT #<br>33603 | TIS<br>No | 980<br>No |
|---|---|---|---|---|---|
| RECOMMENDED ACTION<br>TAKEN<br><br>Defer (for 12 Months) | NEW PED<br><br>04/05/2024 | MR/ES<br><br>07/10/2054 | RECOMMENDED<br>ELIGIBILITY<br>DATE | DATE ACTION<br>TAKEN<br><br>02/16/2023 | HEARING<br>TYPE<br><br>Parole Review |

RECOMMENDED CONDITIONS OF SUPERVISION


REQUESTS FOR INFORMATION

| **TYPE** | **COMMENTS** | **DUE<br>DATE** | **STAFF** |
|---|---|---|---|
| Other | The Parole Commission continues to endorse enrollment in Academics.<br>Thank you. | 12/31/9999 | CLEARY, CONSTANCE<br>A |

|  | |
|---|---|
| J. Kramer 4392 | 02/16/2023 |
| MEMBER SIGNATURE | DATE SIGNED |
| | |
| PAROLE COMMISSION CHAIRPERSON<br>*The recommended Action is approved for the stated reasons.* | DATE APPROVED |

☐ File Review        THERE IS NO ADMINISTRATIVE APPEAL OF THIS DECISION


**DISTRIBUTION:**   Original - Social Service File; Copy - Parole Commission; Copy - RC; Copy - DCC Case File; Copy - INMATE
Copy - Field Supervisor when PPI is Requested

Exhibit #5
(2-Pages)

[Ex # 5]

STATE OF WISCONSIN, CIRCUIT COURT, Milwaukee COUNTY

For Official Use

State of Wisconsin, Plaintiff,
-vs-

Terrance Prude , Defendant
Name

**Plea Questionnaire/
Waiver of Rights**

Case No. 99CF005988

I am the defendant and intend to plea as follows:

| Charge/Statute | Plea | Charge/Statute | Plea |
|---|---|---|---|
| Armed Robbery | ☒ Guilty ☐ No Contest | Armed Robbery | ☒ Guilty ☐ No Contest |
| Armed Robbery | ☒ Guilty ☐ No Contest | Armed Robbery | ☒ Guilty ☐ No Contest |

☐ See attached sheet for additional charges.

I am  17  years old. I have completed  8  years of schooling.

| | | | |
|---|---|---|---|
| I | ☒ do | ☐ do not | have a high school diploma, GED, or HSED. |
| I | ☒ do | ☐ do not | understand the English language. |
| I | ☒ do | ☐ do not | understand the charge(s) to which I am pleading |
| I | ☒ am not | ☐ am | currently receiving treatment for a mental illness or disorder |
| I | ☒ have not | ☐ have | had any alcohol, medications, or drugs within the last 24 hours |

[Stamp: FILED CRIMINAL DIVISION MAY 1 2000 JOHN BARRETT Clerk of Circuit Court]

**Constitutional Rights**
I understand that by entering this plea, I give up the following constitutional rights:
☒ I give up my right to a trial.
☒ I give up my right to remain silent and I understand that my silence could not be used against me at trial.
☒ I give up my right to testify and present evidence at trial.
☒ I give up my right to use subpoenas to require witnesses to come to court and testify for me at trial.
☒ I give up my right to a jury trial, where all 12 jurors would have to agree that I am either guilty or not guilty.
☒ I give up my right to confront in court the people who testify against me and cross-examine them.
☒ I give up my right to make the State prove me guilty beyond a reasonable doubt.
I understand the rights that have been checked and give them up of my own free will.

**Understandings**
- I understand that the crime(s) to which I am pleading has/have elements that the State would have to prove beyond a reasonable doubt if I had a trial. These elements have been explained to me by my attorney or are as follows: ☒ See Attached sheet.
  See Jury Instructions

- I understand that the judge is not bound by any plea agreement or recommendations and may impose the maximum penalty. The maximum penalty I face upon conviction is: 40 years each count for a total of 200 years

- I understand that the judge must impose the mandatory minimum penalty, if any. The mandatory minimum penalty I face upon conviction is: N/A

- I understand that the presumptive minimum penalty, if any, I face upon conviction is: N/A

- The judge can impose a lesser sentence if the judge states appropriate reasons.

CR-227, 11/99 Plea Questionnaire/Waiver of Rights                    §971.08, Wis. Stats.
This form shall not be modified. It may be supplemented with additional material.
Page 1 of 2
(X)

R-Ap. 115

Ex.# 5

Plea Questionnaire/Waiver of Rights          Page 2 of 2          Case No. 99 CF 005988

**Understandings**
- I understand that if I am placed on probation and my probation is revoked:
  - if sentence is withheld, the judge could sentence me to the maximum penalty, or
  - if sentence is imposed and stayed, I will be required to serve that sentence.

- I understand that if I am not a citizen of the United States, my plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law.

- I understand that if I am convicted of any felony, it is unlawful for me to possess a firearm.

- I understand that if I am convicted of a serious child sex offense, I cannot engage in an occupation or participate in a volunteer position that requires me to work or interact primarily and directly with children under the age of 16.

- I understand that if any charges are read-in as part of a plea agreement they have the following effects:
  - Sentencing – although the judge may consider read-in charges when imposing sentence, the maximum penalty will not be increased.
  - Restitution – I may be required to pay restitution on any read-in charges.
  - Future prosecution – the State may not prosecute me for any read-in charges.

- I understand that if the judge accepts my plea, the judge will find me guilty of the crime(s) to which I am pleading based upon the facts in the criminal complaint and/or the preliminary examination and/or as stated in court.

**Voluntary Plea**
I have decided to enter this plea of my own free will. I have not been threatened or forced to enter this plea. No promises have been made to me other than those contained in the plea agreement. The plea agreement will be stated in court or is as follows:                                                                    ☐ See Attached.

Plead to counts 1-5 dismiss a read in counts 6-8 recommend very substantial incarceration.

**Defendant's Statement**
I have reviewed and understand this entire document and any attachments. I have reviewed it with my attorney (if represented). I have answered all questions truthfully and either I or my attorney have checked the boxes. I am asking the court to accept my plea and find me guilty.

_Terrance Prude_                                    4-30-00
Signature of Defendant                                    Date

**Attorney's Statement**
I am the attorney for the defendant. I have discussed this document and any attachments with the defendant. I believe the defendant understands it and the plea agreement. The defendant is making this plea freely, voluntarily, and intelligently. I saw the defendant sign and date this document.

_____                                    4-30-00
Signature of Attorney                                    Date

CR-227, 11/99 Plea Questionnaire/Waiver of Rights                                    §971.08, Wis. Stats.
This form shall not be modified. It may be supplemented with additional material.
Page 2 of 2

R-Ap. 116

Exhibit #6
(19-Pages)



[Exhibit #6]

638 F.Supp.3d 984
United States District Court, W.D. Wisconsin.

Victoriano HEREDIA, Dujuan Nash, Joseph Orosco, Barney Guarnero, Brian Pheil, Terrance Prude,
Jumar Jones, and Deng Yang, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Christopher BLYTHE, Chairperson and Commissioner of the Wisconsin Parole Commission; Jennifer
Kramer, Commissioner of the Wisconsin Parole Commission; Douglas Drankiewicz, Commissioner of the
Wisconsin Parole Commission; Kevin Carr, Secretary of the Wisconsin Department of Corrections; and Angela
Hansen, Director of the Bureau of Classification and Movement, in their official capacities, Defendants. [1]

19-cv-338-jdp
|
Signed November 2, 2022

## Synopsis

**Background:** Parole-eligible juvenile offenders sentenced under indeterminate sentencing system brought § 1983 action for injunctive relief, as class action, against members of Wisconsin Parole Commission and state correctional officials, challenging constitutionality of denial of parole, for juvenile homicide and nonhomicide offenders serving long prison sentences, for reasons other than failure to demonstrate maturity and rehabilitation, and also challenging lack of resources to make such demonstration and lack of procedural protections for parole hearings. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, James D. Peterson, J., held that:

[1] the Eighth Amendment does not prohibit a parole board from considering the seriousness of the criminal offense, when deciding whether to grant parole to a juvenile offender;

[2] plaintiffs presented no evidence that Commission categorically violated Eighth Amendment rights of juvenile offenders;

[3] denial of parole is not a deprivation of "liberty" within the meaning of the Due Process Clause; and

[4] Sixth Amendment right to jury trial does not apply to fact finding for denial of parole.

Summary judgment for defendants; claims of four class representatives dismissed as moot.
Motion for Summary Judgment

West Headnotes (9)

**[1]    Summary Judgment ⟡ Form and Requisites**

Issue of whether plaintiffs' claims could be brought under § 1983 rather than in habeas petition was forfeited by defendant state parole commission members and defendant state correctional officials, on cross-motions for summary judgment in plaintiff prisoners' § 1983 action challenging, on behalf of class of juvenile homicide and nonhomicide offenders, constitutionality of state's parole procedures and parole criteria for juvenile offenders serving long prison sentences, and challenging process leading up to parole decisions, where district court had made a preliminary determination, in its order screening plaintiffs' complaint, that claims could be brought under § 1983, and defendants did not challenge that determination when parties filed cross-motions for summary judgment. 42 U.S.C.A. § 1983.

**[2]    Federal Courts ⟡ Civil rights and discrimination in general**

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                1

Claims of four class representatives were moot, on cross-motions for summary judgment in § 1983 action brought by parole-eligible juvenile offenders, challenging, on behalf of class of juvenile homicide and nonhomicide offenders, constitutionality of state's parole procedures and parole criteria for juvenile offenders serving long prison sentences, and challenging process leading up to parole decisions, where the four class representatives had been granted parole. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[3]     **Sentencing and Punishment** — Proportionality

The Eighth Amendment's disproportionality principle is narrow and affects only extreme sentences. U.S. Const. Amend. 8.

[4]     **Pardon and Parole** — Discretionary nature

**Pardon and Parole** — Factors governing decision, in general

Parole is a discretionary determination that may be informed by numerous factors, and there is no prescribed or defined combination of facts which, if shown, would mandate release on parole; rather, the parole-release decision is subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by parole board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release.

[5]     **Sentencing and Punishment** — Juvenile offenders

The Eighth Amendment does not prohibit a parole board from considering the seriousness of the criminal offense, when deciding whether to grant parole to a juvenile homicide offender or a juvenile nonhomicide offender. U.S. Const. Amend. 8.

1 Cases that cite this headnote

[6]     **Infants** — Sentencing of Minors as Adults

**Pardon and Parole** — Offenses, punishments, and persons subject of parole

**Sentencing and Punishment** — Juvenile offenders

Wisconsin Parole Commission did not categorically violate the Eighth Amendment rights of juvenile homicide offenders and juvenile nonhomicide offenders when making parole decisions, in absence of any evidence of a uniform practice to give juvenile offenders de facto life sentences or of any policy or practice that would prevent juvenile offenders from asking the Commission to consider facts relevant to youth. U.S. Const. Amend. 8.

1 Cases that cite this headnote

[7]     **Constitutional Law** — Parole

Denial of parole is not a deprivation of "liberty" within the meaning of the Due Process Clause; the natural desire of an individual to be released is indistinguishable from the initial resistance to being confined, but the conviction, with all its procedural safeguards, has extinguished that liberty right. U.S. Const. Amend. 14.

[8]     **Constitutional Law** — Parole

Heredia v. Blythe, 638 F.Supp.3d 984 (2022)

A state can create a liberty interest in parole, which is protected by due process, by placing substantive limits on its own discretion when deciding whether to grant or deny parole. U.S. Const. Amend. 14.

[9]     **Jury**  ⚖  Sentencing Matters

Sixth Amendment right to jury trial does not apply to fact finding for denial of parole; a denial of parole does not increase a prisoner's sentence, and instead, it is a decision not to shorten the portion of the sentence that is served in prison. U.S. Const. Amend. 6.

**Attorneys and Law Firms**

**\*986**  Avery Gilbert, Rhinecliff, NY, Christine Ann Donahoe, Emma Smith Shakeshaft, Laurence J. Dupuis, R. Timothy Muth, ACLU of Wisconsin Foundation, Inc., Milwaukee, WI, Ellen Anderson, Patrick John Proctor-Brown, Quarles & Brady LLP, Milwaukee, WI, Andrew Martin Meerkins, Foley & Lardner LLP, Milwaukee, WI, Daniel A. Kaplan, Jasmine Jade Monee Reed, Foley & Lardner LLP, Madison, WI, Gregory T. Everts, Martha Jahn Snyder, Quarles & Brady, Madison, WI, Issa Kohler-Hausmann, Yale Law School, New Haven, CT, for Plaintiff Victoriano Heredia.

Avery Gilbert, Rhinecliff, NY, Christine Ann Donahoe, Laurence J. Dupuis, ACLU of Wisconsin Foundation, Inc., Milwaukee, WI, Ellen Anderson, Quarles & Brady, Milwaukee, WI, Andrew Martin Meerkins, Foley & Lardner LLP, Milwaukee, WI, Hillary Nicole Vedvig, Foley & Lardner, Madison, WI, Gregory T. Everts, Quarles & Brady, Madison, WI, for Plaintiffs Dujuan Nash, Joseph Orosco, Barney Guarnero, Brian Pheil, Dontae Doyle, Jumar Jones, Deng Yang.

Karla Z. Keckhaver, Beauregard William Patterson, Colin A. Hector, Wisconsin Department of Justice Office of the Attorney General, Madison, WI, for Defendants Steven Landreman, Danielle LaCost, Douglas Drankiewicz, Kevin Carr, Mark Heise.

Karla Z. Keckhaver, Beauregard William Patterson, Wisconsin Department of Justice, Madison, WI, for Defendants John Tate, Jennifer Kramer, Angela Hansen.

OPINION and ORDER

JAMES D. PETERSON, District Judge

Plaintiffs represent a class of Wisconsin prisoners serving long sentences for crimes committed when they were minors. The central question in the case is how the Constitution limits the authority of the Wisconsin Parole Commission to grant or deny parole to those who committed crimes as juveniles.

The traditional view is that the Constitution places few limits on a state parole board's discretion. Plaintiffs say that view is outdated in light of *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). *Graham* held that the Eighth Amendment prohibits life without parole sentences for juveniles who committed crimes other than homicide, because such a sentence would be grossly disproportionate to the offense. Building from this basic principle, plaintiffs contend that the commission may not deny them parole for any reason other than their failure to demonstrate maturity and rehabilitation, and that defendants must provide them the resources they need to meet that standard by their first parole eligibility date. Plaintiffs contend further that they are entitled to a range of procedural protections in connection with parole hearings, including **\*987** counsel, experts, in-person interviews with the commission chairperson, and advanced notice of any information that the commission may rely on to deny parole.

Heredia v. Blythe, 638 F.Supp.3d 984 (2022)

Plaintiffs assert claims under the Eighth Amendment, the Fourteenth Amendment, and the Sixth Amendment. Plaintiffs sue the parole commissioners, the secretary of the Wisconsin Department of Corrections, and the director of the Bureau of Classification and Movement, contending that the latter two defendants fail to meet their constitutional obligations to help plaintiffs demonstrate maturity and rehabilitation by their parole eligibility date. Both sides move for summary judgment. Dkt. 120 and Dkt. 126.

Plaintiffs make a good case that Wisconsin's parole system uses imprecise standards that are sometimes applied capriciously, and that offenders are not provided much help in achieving and demonstrating maturity and rehabilitation. Plaintiffs show that there are many ways that the parole system could be improved to make it fairer, more consistent, and grounded in a better understanding of youthful offenders.

But the Constitution does not require Wisconsin to have an ideal parole system. The Constitution establishes a minimum, beyond which lies unusual cruelty. The role of the court here is simply to determine whether Wisconsin's parole system meets the constitutional minimum as established by Supreme Court precedent. And the Supreme Court has made it clear that parole is fundamentally a discretionary determination within the purview of the executive and legislative branches of state government. Nothing in *Graham* or any other controlling case undermines that basic understanding. *Graham* prohibits life sentences for juvenile offenders under some circumstances, but it doesn't empower the courts to scrutinize every decision that affects a juvenile offender's chances of parole, nor does it impose exacting procedural requirements on parole officials. And—a point critical to plaintiffs' central theme—nothing in *Graham* prohibits the commission from considering the seriousness of the offense and the consequences to the victims in making parole decisions.

Those convicted of serious crimes as juveniles commonly serve long sentences in Wisconsin, and parole is not guaranteed. But plaintiffs have not shown that, as a class, they face de facto life sentences without a legitimate opportunity for parole at some point. They have not shown that defendants refuse to allow plaintiffs to progress toward parole, or that they fail to consider plaintiffs' youth when making parole decisions. Under these circumstances, plaintiffs are not entitled to class relief under any of their constitutional theories. The court will grant defendants' motion for summary judgment and deny plaintiffs' motion.

## BACKGROUND

### A. Overview of the parole process

Plaintiffs are a class of Wisconsin prisoners who committed crimes when they were under the age of 18, received a sentence of at least 470 months, and are eligible for release under parole supervision or will be eligible at some point. Wisconsin abolished parole in 2000 for crimes committed after December 31, 1999, and in its place enacted a determinate sentencing scheme that includes a fixed term of imprisonment and a fixed term of supervised release. *See* Wis. Stat. § 973.01 and § 973.014; *State v. Yakich*, 2022 WI 8, ¶ 33, 400 Wis. 2d 549, 970 N.W.2d 12. The class includes only prisoners sentenced under the indeterminate system, so all class members committed their crimes before 2000.

**\*988** Under the indeterminate system, prisoners become eligible for parole after serving 25 percent of their sentence, or six months, whichever is greater. *See* Wis. Stat. § 304.06(1)(b) (1997–98). If prisoners received a life sentence with the possibility of parole, the default rule is that they are eligible for parole after 20 years, which may be reduced to approximately 13 years and four months with good time credits; but the sentencing court may also set a later initial eligibility date. *See State v. Borrell*, 167 Wis. 2d 749, 765 & n.6, 482 N.W.2d 883 (1992) (citing Wis. Stat. § 973.014, § 302.11, and § 304.06).

State statutes impose few substantive requirements on parole decisions. The commission must consider statements offered by the victim, the district attorney's office, and the sentencing court, *see* Wis. Stat. § 304.06(1)(e), and the commission may not grant parole unless the prisoner "has adequate plans for suitable employment or to otherwise sustain himself or herself," *id.* § 304.06(2). The primary guidance for the commission comes from Wis. Admin. Code § PAC 1.06(16), which sets for the following criteria for making a parole decision:

Heredia v. Blythe, 638 F.Supp.3d 984 (2022)

(a) The inmate has become parole or release to extended supervision eligible under s. 304.06, Stats., and s. PAC 1.05.

(b) The inmate has served sufficient time so that release would not depreciate the seriousness of the offense.

(c) The inmate has demonstrated satisfactory adjustment to the institution.

(d) The inmate has not refused or neglected to perform required or assigned duties.

(e) The inmate has participated in and has demonstrated sufficient efforts in required or recommended programs which have been made available by demonstrating one of the following:

1. The inmate has gained maximum benefit from programs.

2. The inmate can complete programming in the community without presenting an undue risk.

3. The inmate has not been able to gain entry into programming and release would not present an undue risk.

(f) The inmate has developed an adequate release plan.

(g) The inmate is subject to a sentence of confinement in another state or is in the United States illegally and may be deported.

(h) The inmate has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice.

The commission construes § PAC 1.06(16) as requiring the prisoner to satisfy all the criteria before being released.

Section PAC 1.06 applies to both adult and juvenile offenders. The commission has no special policies or procedures for parole applicants who were juveniles at the time of their offense.

Prisoners receive their first parole interview during the month before their parole eligibility date. At least 15 days before the interview, prisoners receive a notice that elaborates on the criteria that the commission may consider, including the prisoner's age, both at the time of the parole decision and at the time of the offense. Dkt. 124-1. The notice lists numerous other factors, including the offender's reason for committing the crime, the offender's part in the crime, and any other mitigating or aggravating facts related to the crime.

The notice states that the commission may consider documents in the prisoners' institutional files and that the prisoners will have the opportunity during the interview to "provide information that is relevant, material, and not unduly repetitious, including the opportunity to comment on *989 perceived errors of material fact in the record." Prisoners are asked to submit a release plan, but that form instructs prisoners not to attach any documents.

The interview is conducted by one commissioner. After the interview, the commissioner may either deny release or recommend granting release. If release is recommended, the chairperson must approve that recommendation. If release is denied, the commissioner gives the prisoner a document called a "parole commission action" that provides the reasons for denial along with a date for the next opportunity to be considered for release. The document lists general reasons for the decision based on the criteria in § PAC 1.06(16), and it also includes detailed "committee comments" that elaborate on those reasons. The chairperson reviews decisions that defer reconsideration for more than 12 months.

**B. Named plaintiffs**

Plaintiff Victoriano Heredia was convicted of first-degree intentional homicide as party to a crime committed in 1997 when he was 17 years old. He was sentenced to life in prison, with eligibility to seek parole in 2010. He was granted parole and released in February 2022.

Heredia v. Blythe, 638 F.Supp.3d 984 (2022)

Plaintiff Dujuan Nash pleaded guilty to reckless homicide and mutilating a corpse for crimes he committed in 1999 when he was 17 years old. He was sentenced to 50 years in prison, with eligibility to seek parole in 2012. After Nash's last parole hearing, the committee deferred consideration for nine months, reasoning that Nash needed to spend more time in a reduced custody setting to help the committee evaluate Nash's risk for release. Dkt. 129-34.

Plaintiff Joseph Orosco pleaded guilty to first-degree intentional homicide for a murder he committed in 1996 when he was 16 years old. He was sentenced to life in prison, with eligibility to seek parole in 2018. The committee has denied Orosco parole multiple times, but the parties did not submit the committee's written decisions for Orosco, and Orosco doesn't identify in his declaration why he was denied parole.

Plaintiff Barney Guarnero pleaded guilty to first-degree reckless homicide and first-degree reckless injury with a dangerous weapon for crimes he committed in 1997 when he was 17 years old. He was sentenced to 60 years in prison, with eligibility to seek parole in 2011. He was granted parole and released in 2022.

Plaintiff Brian Pheil was convicted of first-degree intentional homicide, armed robbery, burglary, and theft as a party to crimes committed in 1987 when he was 17 years old. He was sentenced to life in prison, plus 35 years to be served concurrently, with eligibility to seek parole in 2005. He was granted parole and released in December 2021.

Terrance Prude was convicted of five counts of armed robbery with threat of force for crimes he committed in 1999. He was sentenced to 20 years on four of these counts, consecutive, for a total of 80 years. On the fifth count, he received an imposed and stayed sentence of 20 years, with a term of 20 years' probation. He became eligible for parole in 2019.

After Prude's last parole hearing, the committee deferred consideration for 18 months. The decision notes that Prude was 17 years old at the time he committed his crime, that he didn't have "proper guidance," and that he believes he has matured. The committee gave multiple reasons for the deferral, including: (1) he has received numerous conduct reports; (2) he has a documented history of involvement with security threat groups; (3) he hasn't completed needed programming; and (4) more time is warranted "based on the  **990**  nature and severity" of his crimes. Dkt. 129-86.

Plaintiff Jumar Jones pleaded guilty to three counts of armed robbery as party to a crime and one count of felony murder for crimes he committed in 1995 and 1996 when he was 17 years old. He was sentenced to 105 years in prison, with eligibility to seek parole in 2022. The parties don't say whether Jones received a parole hearing in 2022, or, if he did, what the outcome of the hearing was.

Plaintiff Deng Yang pleaded guilty to first-degree intentional homicide for a crime he committed in 1997 when he was 15 years old. He was sentenced to life in prison, with eligibility to seek parole in 2011. He was granted parole and released in September 2021.

Since 2010, the commission has released 88 out of 176 prisoners who met the class definition at the time of release. But no class member was released at his first parole eligibility date.

The court will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

[1]  The court will begin by clarifying the scope of the claims and the relief that plaintiffs are seeking. Plaintiffs are not seeking immediate release, and they are not challenging the statutes governing the timing of their eligibility for parole or the policies and practices related to the frequency of their parole hearings.[2] Rather, plaintiffs challenge the procedures and criteria used by the parole commission when making decisions whether to grant parole, as well as the process leading up to parole decisions, and they contend that they are entitled to new hearings without the alleged defects.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    6

Plaintiffs assert three claims. First, plaintiffs contend that defendants are violating the Eighth Amendment by denying them parole for reasons unrelated to maturity and rehabilitation and imposing barriers to satisfying the prerequisites for release. Defendants contend that the Eighth Amendment imposes no requirements on parole decisions relating to plaintiffs. Alternatively, defendants say that the only requirement is to give plaintiffs an opportunity to show maturity and rehabilitation, something Wisconsin's parole process already does.

Second, plaintiffs contend that defendants are violating their right to due process by denying them parole without providing additional protections such as a lawyer, an expert on child psychology, and advance notice of any documents or facts the commission may rely on to deny parole. Defendants contend that a denial of parole doesn't implicate the Due Process Clause. Alternatively, defendants say that due process requires only that plaintiffs receive an opportunity to be heard and a statement of reasons, which Wisconsin prisoners already receive.

Third, plaintiffs contend that defendants are violating their Sixth Amendment right to a jury trial by relying on information about the seriousness of their offense to deny parole. Defendants deny that the Sixth Amendment has any bearing on parole decisions.

**\*991** Because this is a class action, the question before the court isn't whether every parole hearing of every class member is valid. Plaintiffs made this point clear in the context of seeking class certification, as the court observed in the order certifying the class: "[P]laintiffs aren't challenging the decision to deny them parole; they are challenging the validity of the standard used to make parole decisions." Dkt. 53, at 7. The court also observed that plaintiffs will have to demonstrate "the existence of a uniform practice" to obtain class relief. *Id.* at 8. So the court will not consider whether individual parole decisions of class members were unconstitutional, only whether defendants are generally applying an unlawful standard.

## A. Released class representatives

**[2]** Before discussing the merits of plaintiffs' claims, the court briefly addresses an important procedural issue, which is that the claims of four named plaintiffs are now moot because they have been granted parole. *See Koger v. Bryan*, 523 F.3d 789, 804 (7th Cir. 2008) (prisoner's claim for injunctive relief about treatment in prison is moot once prisoner is released). The released plaintiffs are Victor Heredia, Barney Guarnero, Brian Pheil, and Deng Yang. Defendants ask the court to dismiss those plaintiffs on mootness grounds, Dkt. 121, at 33, and plaintiffs don't contend that there is a live controversy between defendants and those four class representatives. Accordingly, the court will dismiss the claims of Heredia, Guarnero, Pheil, and Deng as moot.

## B. Cruel and unusual punishment

The Eighth Amendment prohibits the government from "inflict[ing]" "cruel and unusual punishments." The first question presented by plaintiffs' claim is whether the Eighth Amendment places any limits on parole decisions regarding juvenile offenders. If it does, the next question is what those limits are.

Plaintiffs' Eighth Amendment claim rests largely on *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), in which the Supreme Court held that "the Eighth Amendment forbids the sentence of life without parole" for "a juvenile offender who did not commit homicide." *Id.* at 74, 130 S.Ct. 2011. In reaching that conclusion, the Court relied on previous cases applying a proportionality principle under the Eighth Amendment, especially *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), in which the Court held that the Eighth Amendment prohibits the death penalty for a juvenile offender under any circumstance.

Since *Graham*, the Court has provided little guidance about other possible Eighth Amendment limitations on punishing juvenile offenders who committed nonhomicide crimes. The only other case addressing that issue was *Virginia v. LeBlanc*, 582 U.S. 91, 137 S. Ct. 1726, 198 L.Ed.2d 186 (2017), which involved the habeas petition of a juvenile offender convicted of rape and sentenced to life in prison. Virginia had abolished parole, but in its place, the state had established a "geriatric release" program that allowed older inmates to receive conditional release under some circumstances. Applying the deferential standard required by 28 U.S.C. § 2254(d), the Court held that it wasn't unreasonable for the state court to conclude that the geriatric

release program was consistent with *Graham* because the program "employed normal parole factors," even though it required the offender to wait more than 40 years before applying. *LeBlanc*, 137 S. Ct. at 1728–29.

The Court also addressed how the Eighth Amendment applies to the sentences of juvenile offenders who committed homicide in **\*992** *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016). Lower courts have disagreed about the scope of *Miller* and *Montgomery*, but this court need not wade into that debate because the Supreme Court itself resolved it recently in *Jones v. Mississippi*, ⸺ U.S. ⸺, 141 S. Ct. 1307, 209 L.Ed.2d 390 (2021). Specifically, *Jones* construed those cases as holding only that "an individual who commits a homicide when he or she is under 18 may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment." *Id.* at 1311. The Court rejected contentions that the Eighth Amendment requires sentencing courts "to make extra factual findings before sentencing an offender under 18 to life without parole" or "to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth." *Id.* at 1323.

In light of the Supreme Court's different treatment of juvenile offenders who commit homicide and nonhomicide crimes, this court created subclasses for the two types of offenders. Dkt. 117, at 7. The court will consider the subclasses' Eighth Amendment claims separately.

**1. Juvenile offenders convicted of nonhomicide crimes**

*Graham*'s holding is limited to a prohibition on *sentencing* a juvenile offender to life *without* parole. *Graham* says nothing about Eighth Amendment limitations on *parole decisions* relating to juvenile offenders who were sentenced to life *with* the possibility of parole or who were sentenced to a lengthy term of years with the possibility of parole. In other cases, the Supreme Court has described parole as a discretionary decision that isn't protected by the Constitution in the absence of substantive limits imposed by state law. *See, e.g., Swarthout v. Cooke*, 562 U.S. 216, 220, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). For this reason, defendants contend that *Graham* has no application outside the sentencing context and, even at sentencing, it applies only to sentences of life without parole.

In arguing to the contrary, plaintiffs rely on a statement in *Graham* that "the State must ... give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75, 130 S.Ct. 2011. Plaintiffs construe this statement to mean that the Eighth Amendment applies to every parole decision juvenile offenders receive after reaching their parole eligibility date and imposes the following limitations and requirements on defendants when making those decisions:

(1) defendants may not deny parole to juvenile offenders for any reason other than a failure to demonstrate maturity and rehabilitation—including any reason related to the seriousness of the offense;

(2) the state's parole procedures must cabin the discretion of the decisionmakers and expressly require them to consider the factors identified in *Miller* as relevant to sentencing juvenile offers, including "immaturity, impetuosity, and failure to appreciate risks and consequences ... the family and home environment that surrounds [them] ... the extent of [their] participation in the conduct and the way familial and peer pressures may have affected [them]." *Miller*, 567 U.S. at 477–78, 132 S.Ct. 2455;

(3) in anticipation of juvenile offenders' parole eligibility date, defendants must ensure that offenders can satisfy any prerequisites to a grant of parole that are related to showing maturity and rehabilitation, including programming, reduced security **\*993** classification, work experience, savings, community relationships, and an adequate release plan.

Plaintiffs also appear to be challenging defendants' judgment regarding what qualifies as sufficient rehabilitation. Plaintiffs criticize several parole denials that relied in part on what plaintiffs view as minor misconduct. *See* Dkt. 127, at 24–25 and Dkt. 166, ¶¶ 166–72.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    8

Plaintiffs' strongest argument is that *Graham*'s prohibition on sentencing juvenile offenders to life without parole would have little meaning if the Eighth Amendment has *no* application to parole. If defendants are correct, a court could sentence a juvenile offender to life with the possibility of parole, but then parole officials could give the offender the functional equivalent of a life sentence without parole by categorically refusing to grant him parole regardless of the circumstances and require him to remain in prison until his death, no matter how long he lived or how strongly he demonstrated that he was reformed. Several courts have made this point, and defendants don't respond to it, even though plaintiffs cited those cases in their briefs. *See Maryland Restorative Just. Initiative v. Hogan*, No. CV ELH-16-1021, 2017 WL 467731, at \*21 (D. Md. Feb. 3, 2017); *Wershe v. Combs*, No. 12-CV-1375, 2016 WL 1253036, at \*3 (W.D. Mich. Mar. 31, 2016); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015); *Greiman v. Hodges*, 79 F. Supp. 3d 933, 944 (S.D. Iowa 2015); *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 772–73 (Iowa 2019).

The Court of Appeals for the Seventh Circuit hasn't directly addressed the question whether *Graham* has any bearing on parole. *Sanders v. Eckstein*, 981 F.3d 637 (7th Cir. 2020), is the closest the court has come. The case involved a Wisconsin juvenile offender who filed a habeas petition to challenge a set of consecutive sentences that added up to 140 years. The court began its analysis by stating that "the Eighth Amendment prohibits not only de jure life sentences [for juvenile offenders], but also de facto life sentences—a term of years so long as to equate for all practical purposes to a life sentence." Applying the deferential standard required by 28 U.S.C. § 2254(d), the court denied the petition because the petitioner is eligible for parole in 2030—when he will be 51 years old—and it wasn't unreasonable for the Wisconsin Court of Appeals to conclude in that situation that the petitioner had a meaningful opportunity for release. *Sanders*, 981 F.3d at 643.

The court of appeals noted the petitioner's belief that "the deck is stacked against his receiving parole in 2030." *Id.* at 644. The court declined to consider that issue, reasoning that "[n]ow is not the time for Sanders to advance this argument." *Id.* But the court pointed to a statement during oral argument by the lawyer for the state that the petitioner "will have a future opportunity to challenge that outcome in state court, including by raising claims grounded in *Graham, Miller*, or another Supreme Court precedent that may enter the U.S. Reports in the intervening years." *Id.*

*Sanders* supports plaintiffs' claim in two respects. First, the court concluded that *Graham* applies not just to de jure life sentences, but also to de facto life sentences, which suggests that courts should focus on the likely effect of a sentence and not just its label. Second, the court kept the door for open for Eighth Amendment challenges to individual parole decisions, which undermines defendants' categorical view that *Graham* has no bearing on parole.

This only gets plaintiffs so far. It is one thing to say that the Eighth Amendment can apply to a parole decision. It is quite another to contend, as plaintiffs do, that **\*994** the Eighth Amendment imposes numerous requirements and restrictions in the parole context, not just on every decision whether to grant parole to a juvenile offender, but also on any decision that could possibly affect the offender's chances of being granted parole.

There are several reasons to question plaintiffs' expansive reading of *Graham.*

**Lack of support in *Graham*'s text.** The statement in *Graham* that plaintiffs rely on—that juvenile offenders must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"—is not central to the holding. Plaintiffs point to no suggestion in *Graham* or any other Supreme Court case that the Court was announcing a new standard for parole of juvenile offenders or using the phrases "meaningful opportunity" and "demonstrated maturity and rehabilitation" as terms of art for states and courts to apply under that new standard. Plaintiffs have extracted from a few words an elaborate new regime of parole for juvenile offenders. If the Court had meant to create that regime, it is reasonable to expect that the Court would have expressed its intent more clearly.

Other passages from *Graham* support the view that the Supreme Court wasn't creating a new parole standard. In the sentence that follows the one plaintiffs rely on, the Court wrote that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance" of giving juvenile offenders a meaningful opportunity for release. *Graham*, 560 U.S. at 75, 130 S.Ct. 2011. This suggests that states retain substantial discretion to determine when and under what circumstances an offender

may be released on parole. *See Wershe*, 2016 WL 1253036, at \*4 (relying on this statement in *Graham* to conclude that "*Graham* does not allow courts to undertake a full review of the State's parole procedures and substitute its own judgment for the State's"). In another passage, the Court wrote that "[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity." *Graham*, 560 U.S. at 73, 130 S.Ct. 2011. That sentence suggests the Court is saying only that a parole system is what gives an offender a meaningful "chance to demonstrate growth and maturity," not that the Court intended to create a new standard for considering a parole application by referring to a "meaningful opportunity" and "demonstrated maturity and rehabilitation." Finally, the Court stated a juvenile offender sentenced to life must have "some realistic opportunity to obtain release *before the end of that term*," *id.* at 82, 130 S.Ct. 2011 (emphasis added), which suggests that the Eighth Amendment prohibits a de facto life sentence, not that every parole hearing a juvenile hearing receives is subject to Eighth Amendment review by federal courts.

***Graham*'s reasoning.** Plaintiffs' Eighth Amendment argument is divorced from much of the reasoning of *Graham*. Plaintiffs rely heavily on the portions of *Graham* that discuss the characteristics of juvenile offenders that make a life sentence without the possibility of parole less appropriate. These characteristics include a "lack of maturity and an underdeveloped sense of responsibility," a greater susceptibility "to negative influences and outside pressures, including peer pressure," and a greater "capacity for change." *Graham*, 560 U.S. at 68, 72–74, 130 S.Ct. 2011. The Court also observed that "[l]ife without parole is an especially harsh punishment for a juvenile" because "a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." *Id.* at 70–71, 130 S.Ct. 2011.

**\*995** But *Graham* rested on much more than a conclusion by the Court that children are different and require more lenient treatment than adults. The ultimate question in *Graham* was whether a life sentence without parole is a disproportionate punishment under the Eighth Amendment for a juvenile offender who commits a crime other than homicide. The Court acknowledged its holdings from previous cases that the proportionality principle is "narrow" and "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 59–60, 130 S.Ct. 2011 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). The Court then applied the standard from those cases, which requires consideration of not just the characteristics of the offender but also of "objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue." *Id.* at 48, 130 S.Ct. 2011. In concluding that there was a national consensus against sentencing juvenile offenders to life without parole, the Court cited evidence that nationwide there were only 109 juvenile offenders serving sentences of life without parole for nonhomicide offenses. *Id.* at 62, 130 S.Ct. 2011.

Plaintiffs' Eighth Amendment argument fails to grapple with two key aspects of *Graham*. The first problem is that plaintiffs haven't even attempted to show that there is a "national consensus" that supports the type of parole regime they are advocating for. In fact, plaintiffs don't identify a single state that imposes all of their proposed limitations and requirements on parole decisions and only a smaller number of states that have adopted *any* of those limitations or requirements. *See Jones*, 141 S. Ct. at 1315 (rejecting requirement that sentencing courts make a finding of "permanent incorrigibility" before imposing life sentence on juvenile offender for homicide in part because no one had identified "a single State that, as of that time, made permanent incorrigibility an eligibility criterion for life-without-parole sentences imposed on murderers under 18").

[3]  The second problem is that plaintiffs' proposals don't reflect the actual holding of *Graham*, which is that a *life sentence* is a disproportionate punishment for juvenile offenders if it doesn't allow for the possibility of parole. Plaintiffs don't explain why that narrow holding translates into a rule that gives juvenile offenders a limited right to release at their very first parole hearing, regardless of how little time they have served at that point. In Wisconsin, even a prisoner with a life sentence may be eligible for parole in as little as 13 years and 4 months. *See Borrell*, 167 Wis. 2d at 765 & n.6, 482 N.W.2d 883. Plaintiffs' proposal converts a limitation on life sentences to a constitutional requirement that juvenile offenders be released once they demonstrate maturity and rehabilitation, regardless of the length of the sentence. That view is inconsistent with the supreme Court's repeated observation that the Eighth Amendment's disproportionality principle is narrow and affects only extreme sentences. *See, e.g.*, *Ewing v. California*, 538 U.S. 11, 23, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003). In *Montgomery*, 577 U.S. at 212–13, 136 S.Ct. 718, the Court suggested that states must give juvenile offenders "hope for some years of life outside prison walls," not that juvenile offenders have a qualified right to release on their initial parole eligibility date. *See also Miller*, 567 U.S. 460 at 477–

78, 132 S.Ct. 2455 (*Graham* "teach[es] that in imposing *a State's harshest penalties*, a sentencer misses too much if he treats every child as an adult" (emphasis added)).

**\*996** Plaintiffs cite no cases in which a court has held that *Graham* applies to sentences of 20 or 30 years that don't allow the possibility of parole, and the court has uncovered none in its own research. *See Jedlicka v. State*, 481 Md. 178, 281 A.3d 820, 830 (2022) (50 years is "the threshold accepted by many states as the point at which a term of years crosses the line into a de facto life-without-parole sentence"). Plaintiffs don't explain why the Eighth Amendment would allow a 30-year sentence that doesn't allow for parole but at the same time require executive officials like defendants to grant parole after 13 years and 4 months. Parole officials generally have *greater* discretion, not less, than a sentencing court, as the court will discuss in the next section.

**[4]**  **Parole is discretionary.** The Supreme Court has emphasized in other cases that parole is a discretionary determination that may be informed by numerous factors. For example, in *Greenholtz*, 442 U.S. at 8, 99 S.Ct. 2100, the Court stated that "there is no prescribed or defined combination of facts which, if shown, would mandate release on parole." Rather, "[t]he parole-release decision ... is ... subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release." *Id.* at 9, 99 S.Ct. 2100. The Court went further, stating that a parole decision "turns on a discretionary assessment of a multiplicity of imponderables." *Id.* at 10, 99 S.Ct. 2100 (internal quotation marks omitted).

**[5]**  This summary of the parole decision-making process is directly inconsistent with plaintiffs' view that the Eighth Amendment tightly circumscribes the criteria defendants may consider and prohibits them from considering the seriousness of the criminal offense. In fact, the Court expressly noted that part of a parole board's job is to "assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense." *Id.* at 8, 99 S.Ct. 2100. *See also Swarthout*, 562 U.S. at 216–17, 131 S.Ct. 859 (upholding parole denial that was based on the "especially cruel and callous manner" of the offense); *California Dept. of Corr. v. Morales*, 514 U.S. 499, 502–03, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (upholding parole denial that was based on "the heinous, atrocious, and cruel nature of [the] offense"). *Graham* didn't express any disagreement with the Court's long-expressed understanding of the parole process; the Court didn't even cite *Greenholtz*. It would be unreasonable to infer such a significant departure from settled law without clearer guidance from the Court.

*Greenholtz* involved an interpretation of the Due Process Clause, but the Court has made similar observations in Eighth Amendment cases. For example, in *Ewing*, the Court declined to invalidate a sentence of 25 years to life for a repeat offender convicted of theft. The Court wrote that "the Constitution does not mandate adoption of any one penological theory," that "[a] sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation," and that "[s]electing the sentencing rationales is generally a policy choice to be made by state legislatures, not federal courts." *Id.* at 25, 99 S.Ct. 2100. This court can discern no reason why the same observations wouldn't apply to parole decisions.

Plaintiffs say that cases like *Greenholtz* and *Ewing* aren't instructive because they are about adult offenders, not juveniles. And plaintiffs cite statements from the Supreme Court that "children are constitutionally different" and "cannot be viewed simply as miniature adults," *see, e.g.,* **\*997** *Miller*, 567 U.S. at 471, 480, 132 S.Ct. 2455, so it is appropriate to apply a different standard to juvenile offenders. But the Court has never suggested that juvenile offenders are different from adult offenders in the context of a parole decision. One reason for this may be that juvenile offenders are no longer juveniles at the time they become eligible for parole.

When a court is sentencing a juvenile offender, the court is evaluating the offender's conduct at the time of the crime, so it makes sense to focus on the offender's characteristics at that time, including his youth. But as plaintiffs repeatedly emphasize in their briefs, a parole board's job is different. Its evaluation is more forward-looking: it is an attempt to determine whether the offender is ready for reintegration into the community, so it is less focused on culpability. Thus, the factors defendants consider when deciding a parole application may not vary significantly depending on the age of the offender at the time of the crime.

This is not to say that a juvenile offender's age is irrelevant to a parole determination. An offender's age and social history can provide context for the offender's current situation. And if the parole board does consider the offender's culpability, youth is relevant to that issue. But the important point is that a juvenile offender's circumstances are not so different from an adult offender

at the time of a parole decision to support an inference without clearer evidence that the Court in *Graham* was communicating to lower courts that the Court's basic understandings of how parole operates don't apply to juvenile offenders.

**Other proportionality cases.** The Supreme Court's other cases applying the Eighth Amendment proportionality principle counsel against a conclusion that the Court's intent in *Graham* was to significantly change parole standards for juveniles. In concluding that a life sentence without parole was disproportionate for juvenile offenders, *Graham* compared the reasoning and outcomes of *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), and *Solem v. Helm*, 463 U.S. 277, 299–300, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), both of which involved harsh sentences for nonviolent offenders. In *Rummel*, the Court upheld a sentence of life with the possibility of parole, and in *Solem*, the Court invalidated a sentence of life without parole. The availability of parole was the key difference between the two cases, as *Graham* acknowledged. 560 U.S. at 70, 130 S.Ct. 2011.

In upholding the sentence in *Rummel*, the Court didn't impose any special requirements on the state's parole system, despite a vigorous dissent contending that it should have. Justice Powell objected that the Court shouldn't rely on the possibility of parole to uphold the sentence because "parole is simply an act of executive grace" and the governor had "refused to grant parole to 79% of the state prisoners whom the parole board recommended for release." *Rummel*, 445 U.S. at 293–94, 100 S.Ct. 1133 (Powell, J., dissenting). The Court acknowledged that the defendant could not "enforce any 'right' to parole," but it was enough that parole is "an established variation on imprisonment of convicted criminals," and parole gave him the "possibility that he will not actually be imprisoned for the rest of his life." *Id.* at 280–81, 100 S.Ct. 1133.

*Rummel* suggests that the Eighth Amendment doesn't create new standards for parole, even when the existence of parole is a necessary condition of upholding a sentence as constitutional. It is true that *Rummel* didn't involve a juvenile offender. But the case provides further evidence that courts should exercise restraint before interpreting ambiguous language in **\*998** *Graham* as expansively as plaintiffs suggest.

**Limitations on *Graham* in subsequent cases.** Language in *Montgomery* and *Jones* provides strong support for a view that *Graham* did not impose numerous new limitations and restrictions on state parole officials. In the context of discussing the scope of *Graham* and *Miller*, the Court emphasized in *Montgomery* that "[e]xtending parole eligibility to juvenile offenders does not impose an onerous burden on the States" and that when "a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." 577 U.S. at 212, 136 S.Ct. 718. In *Jones*, the Court reiterated this view and relied on it to reject a requirement on sentencing courts to make findings of fact about how they considered a juvenile offender's youth before sentencing him to life in prison without parole. 141 S. Ct. at 1321.

Plaintiffs' proposed parole standard for juvenile offenders would contradict or at least be in tension with the Court's observation in *Montgomery* and its holding in *Jones* because that standard would create significant new burdens on states. And those burdens would go far beyond the fact-finding requirement that the Court in rejected in *Jones*. It would constitutionalize any decision that could affect a juvenile offender's parole prospects, which, in turn, would lead to more litigation about those decisions.

Adopting plaintiffs' standard would invalidate not just Wisconsin's parole system, but the many other state parole systems that allow the parole board to consider seriousness of the offense. *See* Dkt. 121, at 29–30 (identifying a dozen states that allow consideration of this factor). Moreover, any time a juvenile offender was denied parole, there would be room to challenge the reasons relied on by the commission. Courts would have to distinguish between reasons based on lack of maturity and rehabilitation and reasons based on the seriousness of the offense, even though there can be significant overlap between the two types of reasons. For example, if the offender's crime was very serious, parole officials may demand a stronger showing of maturity and rehabilitation before taking the risk of releasing the offender into the community. Courts would have to untangle these reasons to determine whether officials violated the Eighth Amendment.

Even more significant, a juvenile offender could raise an Eighth Amendment challenge to any denial of a request for programming, a reduced classification, a job, or any other resource that may be relevant to a parole decision. It is simply untenable to suggest that such an overhauling of the parole process as it relates to juvenile offenders is consistent with a view

Heredia v. Blythe, 638 F.Supp.3d 984 (2022)

that requires courts to "avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." *See Wershe*, 2016 WL 1253036, at *4 ("That *Graham* was not intended to upend parole systems is confirmed by the Court's later decision in *Montgomery*, which noted that making juvenile lifers eligible for parole would not 'impose an onerous burden' on states.").

**Consequences of plaintiffs' position.** The reasons discussed above provide ample support for rejecting plaintiffs' proposed Eighth Amendment standard for making parole decisions related to juvenile offenders. But there is more. Another problem is that plaintiffs don't grapple with the consequences of their position, which would lead to either logical inconsistencies in Eighth Amendment jurisprudence **\*999** or even more expansive changes in the parole process than what plaintiffs are currently proposing.

A key question that plaintiffs don't answer is why a juvenile offender's initial parole eligibility date is what triggers the Eighth Amendment's protections. If the court were to accept that view, it would mean that Wisconsin juvenile offenders who received a life sentence under the indeterminate system would have Eighth Amendment rights starting as early as 13 years and 4 months after they were first imprisoned, but juvenile offenders sentenced to a 25-year determinate sentence would not be protected by the Eighth Amendment at all. It would also mean that the Eighth Amendment would apply differently in different states, depending on whether or when that state made parole available for a particular sentence. Plaintiffs point to no other situation in which Eighth Amendment rights vary from state to state. So it makes little sense to make a parole eligibility date the trigger for Eighth Amendment protections.

Plaintiffs' response to this criticism might be to say that the parole eligibility date isn't the critical event. Plaintiffs suggest an even broader standard in their reply brief: "the state may not continue to imprison a juvenile offender once he or she has matured and rehabilitated." Dkt. 165, at 20–21. If that's correct, then there would no principled basis for distinguishing longer sentences from shorter sentences for the purpose of determining a juvenile offender's right to parole. If the analysis turns on maturity and rehabilitation, then any denial of parole to any juvenile offender convicted of a nonhomicide crime would violate the Eighth Amendment, regardless of whether the sentence was for 1 or 100 years, if parole officials relied on any reason other than a failure to demonstrate maturity and rehabilitation.

The bottom line is that plaintiffs' proposed Eighth Amendment standard is inconsistent with multiple lines of Supreme Court precedent and isn't supported even by the cases that they rely on. The court declines to adopt it.

But this still leaves the question of what limitations, if any, the Eighth Amendment places on parole decisions related to juvenile offenders. The court concludes that the role of courts in policing those decisions is modest, but not meaningless. *Graham* says that the Eighth Amendment prohibits the state from sentencing juvenile offenders convicted of crimes other than homicide to life without parole. The court can discern no reason why executive officials should be immune from complying with that rule. Parole officials may not force a reformed juvenile offender to die in prison for no reason other than that they believe he should have been sentenced to life without parole. The parole process cannot be a sham. *See Graham*, 560 U.S. at 70, 82, 130 S.Ct. 2011 (juvenile offender sentenced to life must have "some realistic opportunity to obtain release before the end of that term"; "remote" possibility not enough).

A broader rule simply isn't supported by *Graham* or any other Supreme Court precedent. *Graham* is about life sentences, so it cannot be reasonably construed to give juvenile offender a wide array of new rights simply because the offender has reached his parole eligibility date. Rather, *Graham* and its progeny don't limit parole officials unless there is substantial evidence that there is "too great a risk" that they are attempting to convert an offender's sentence to one of life without parole. *See Miller*, 567 U.S. at 480, 132 S.Ct. 2455. Offenders could meet that standard with evidence that parole officials have communicated by word or deed that they will never be paroled or will be refused parole **\*1000** for so long that they won't have an opportunity to "truly reenter society and have a meaningful life outside of prison." *See Kitchen v. Whitmer*, No. 18-11430, 2022 WL 2898633, at *12 (E.D. Mich. July 21, 2022) (internal quotation marks omitted).

As for the factors defendants may consider, *Graham* suggests that there is a point when the Eighth Amendment prohibits parole officials from refusing to grant parole solely based on the seriousness of the offense. Repeated denials for that reason alone

even after the offender has served a lengthy term of imprisonment may be evidence that continued incarceration violates the Eighth Amendment because it is "totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), and "results in the gratuitous infliction of suffering," *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). But that would be a rare circumstance. Parole boards traditionally have had the discretion to rely on many factors when making a decision, including the seriousness of the offense, and *Graham* doesn't purport to cabin that discretion except in extreme cases when doing so will give the offender a de facto life sentence.

As for the type of process the Eighth Amendment requires, the most that could be plausibly argued is that a juvenile offender should have an opportunity to ask parole officials to consider information relevant to youth. *See Jones*, 141 S. Ct. at 1319–20 (stating in sentencing context that there may be an Eighth Amendment violation in sentencing context if the court "expressly refuses as a matter of law to consider the defendant's youth"). *Jones* rejected a view that states must have policies outlining how youth is to be considered or requiring findings of fact, even in the sentencing context. *Id.* at 1323. The court isn't persuaded that the requirements on parole officials are more onerous than the requirements on sentencing courts.

[6]    These general principles are enough to decide plaintiffs' Eighth Amendment claim. Plaintiffs have not adduced evidence of a uniform practice by defendants to give juvenile offenders de facto life sentences or of any policy or practice that would prevent offenders from asking the commission to consider facts relevant to youth. For example, plaintiffs don't allege that defendants consistently refuse to allow juvenile offenders to make progress toward release or deny parole because of the seriousness of the offense even when those offenders approach what could be reasonably considered a life sentence. And plaintiffs point to no examples in which defendants refused to consider mitigating circumstances related to the youth of an offender convicted of a nonhomicide crime.

In fact, plaintiffs say little of anything in their briefs or proposed findings of fact about class members who were convicted of nonhomicide crimes. The only class member convicted of a nonhomicide crime that plaintiffs discuss in their brief in chief is Marvin Ingram. But he was released on parole after serving 24 years of a 62-year sentence for robbery and sexual assault with the use of a dangerous weapon. Dkt. 124-12; Dkt. 129-15; Dkt. 165, at 20. Plaintiffs also refer to Sandy Farrior and Terrance Prude in their proposed findings of fact. At the time of Farrior's last parole hearing, he had served 15 years of a 46-year sentence for first-degree sexual assault. Dkt. 129-71. The commission deferred consideration for ten months, in part because he was still completing programming. *Id.* At the time of Prude's last parole hearing, he had served 20 years of an 80-year sentence for four armed robberies. Dkt. 129-86. The commission deferred consideration for 18 months, in part **\*1001** because of his numerous conduct reports that continued to the present, including for being involved with a security threat group. *Id.*

None of these decisions suggest that defendants are violating the requirements of *Graham*. The evidence submitted by defendants suggests the opposite. Contrary to plaintiffs' contention, Wisconsin's parole system cannot be compared to clemency, which gives offenders only a remote chance of release. *See* Dkt. 165, at 8. Since 2010, the commission has released 88 out of 176 prisoners who met the class definition at the time of release. *Cf. Hayden*, 134 F. Supp. 3d at 1010 (finding Eighth Amendment violation in part because juvenile offenders were "rarely paroled" and no juvenile offender had obtained release in last four out of five years). This is strong evidence that there is no uniform policy or practice that is preventing juvenile offenders from being granted parole. Although there is a substantial number of class members who haven't been released, plaintiffs don't point to a policy or practice that is preventing those offenders from making progress toward that goal.

Plaintiffs' arguments related to juvenile offenders who committed nonhomicide crimes rest on the view that the Eighth Amendment constrains every parole decision for juvenile offenders and that defendants may not consider the seriousness of an offender's crime, regardless of how much time the offender has served at that point. The court has rejected both of these contentions, so the court will deny plaintiffs' motion for summary judgment and grant defendants' summary judgment motion on plaintiffs' Eighth Amendment claims related to juvenile offenders convicted of crimes other than homicide.

**2. Juvenile offenders convicted of homicide**

The court's conclusion regarding the juvenile offenders convicted of nonhomicide crimes dooms plaintiffs' Eighth Amendment claims related to class members convicted of homicide. *Graham* was limited to sentences for nonhomicide crimes. And *Jones*

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    14

held that juvenile offenders *can* be sentenced to life without parole for homicide, so long as the sentencing court has discretion to consider the offender's youth. 141 S. Ct. at 1311. That is the case in Wisconsin because Wisconsin law doesn't require a court to sentence juvenile offenders to life without parole under any circumstance, and none of the class members are serving sentences of life without parole. If it is permissible under the Eighth Amendment for a sentencing court to preclude the possibility of parole at the outset for a juvenile offender convicted of homicide, then it follows that the Eighth Amendment places few, if any, limitations on a parole board's decision whether to grant or deny parole to the same offender later. Plaintiffs' argument rests on the view that *Graham* should be extended to homicide crimes, but plaintiffs fail to reconcile that argument with *Jones*. Two circuits have expressly rejected plaintiffs' view, *See Brown v. Precythe*, 46 F.4th 879, 886 (8th Cir. 2022), and *Bowling v. Director, Virginia Department of Corrections*, 920 F.3d 192, 197 (4th Cir. 2019), and none have accepted it.

But even if *Graham* does apply to juvenile homicide offenders, plaintiffs still would not be entitled to relief in this case. Again, plaintiffs haven't adduced evidence of a uniform practice by defendants to impose life sentences on juvenile offenders, even those who have committed homicide. Defendants are routinely releasing such offenders, as shown by the experiences of the named plaintiffs themselves, several of **\*1002** whom have been released while this lawsuit has been pending. *See* Dkt. 57. Many of the prisoners convicted of homicide whom plaintiffs discuss in their briefs and proposed findings of fact have also been released. *See* Dkt. 166, ¶ 56a–c (referring to Joseph Roeling, who was released in June 2021, *see* Dkt. 124-15); Dkt. 166, ¶ 56d–e (referring to Barney Guarnero, who was granted parole in May 2022, *see* Dkt. 167-2); Dkt. 166, ¶ 60 (referring to Stuart Gwiazada, Carlos King, Thaddeus Karow, Craig Sussek, Deng Yang, and Roy Rodgers, who have all been released).

Defendants also point to numerous instances in which the commission has considered an offender's youth when making parole decisions, and plaintiffs cite no examples in which the commission refused to do so. *See, e.g.*, Dkt. 130-9 (noting the offender's "young age at which [he] committed the offense" and that he grew up in a "chaotic" and "abusive" environment). *See also* Dkt. 154, at 41–42 (citing other examples). Plaintiffs say that the commission treats youth as "an aggravating factor," Dkt. 166, ¶ 97, but the examples they cite they don't show that the commission failed to consider youth appropriately. *See id.*, ¶ 124. Rather, those examples show concerns about the offender's ability to transition to independent living after release. *See id.* (quoting chairperson's statement that "minimum community custody is so valuable ..., particularly for those who are convicted as juveniles, because they otherwise have no exposure to the community"); *id.* (quoting commissioner's statement that the offender needed "to see a lengthier period" of "working in a community setting" because the offender was "so young when [he] came into prison"). Nothing in *Graham* or *Jones* suggests that a parole board is required by the Eighth Amendment to ignore challenges that a juvenile offender may face outside prison. That isn't treating youth as an "aggravating" factor; it is considering whether the offender has the necessary life skills to succeed after release.

The court need not decide whether every parole decision related to a class member complied with the Eighth Amendment. As already discussed, this is a class action for injunctive relief, so plaintiffs' task was to show that defendants are violating the Eighth Amendment rights of the entire class or subclass. Plaintiffs haven't done that, so the court will grant summary judgment to defendants on all of plaintiffs' Eighth Amendment claims. The court does not now decide whether there may be individual offenders who can bring an as-applied challenge to a particular parole decision.

## C. Due process

Under the Fourteenth Amendment, no state may "deprive any person of life, liberty, or property, without due process of law." Plaintiffs contend that defendants are depriving them of a liberty interest by refusing to grant them parole and then failing to provide them due process of law. Specifically, plaintiffs say that they are entitled to the following procedural protections in the context of parole decisions:

- an attorney provided by the state;

- a notice that is provided more than 15 days before the hearing and includes any facts the commission may rely on to deny parole;

- an in-person interview with the chairperson of the commission;

• a request from the commission to the prisoner to provide information related to maturity and rehabilitation;

• any document that the commission may rely on to deny parole;

• a more detailed explanation of the reasons for denying parole; and

• the right to call experts.

**\*1003** **[7]** **[8]** The Supreme Court has rejected the view that the denial of parole is a deprivation of liberty within the meaning of the Due Process Clause. This is because "[t]he natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right." *Greenholtz*, 442 U.S. at 7, 99 S.Ct. 2100. The Court stated the rule even more emphatically in a more recent case: "There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners." *Swarthout v. Cooke*, 562 U.S. 216, 220, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011). A state can create a liberty interest in parole by placing substantive limits on its own discretion when deciding whether to grant or deny parole. *See Board of Pardons v. Allen*, 482 U.S. 369, 378, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But Wisconsin hasn't done that. *See Grennier v. Frank*, 453 F.3d 442, 444 (7th Cir. 2006).

Plaintiffs acknowledge the general rule, but they contend that *Graham* created an exception for juvenile offenders. Specifically, they say that *Graham* requires a parole board to release juvenile offenders once they demonstrate maturity and rehabilitation, so that gives juvenile offenders a liberty interest in parole. And that liberty interest, plaintiffs say, entitles them to a panoply of procedural protections in the parole context, including the right to counsel and the right to present an expert opinion.

Plaintiffs' due process claim fails for three reasons. First, the claim relies on an interpretation of *Graham* that this court rejected when considering plaintiffs' Eighth Amendment claims. *Graham* is a prohibition on life sentences under certain circumstances; it doesn't require the immediate release of a juvenile offender upon a showing of maturity and rehabilitation.

Second, even if plaintiffs' interpretation of *Graham* were correct, the Court said nothing about the Due Process Clause or liberty interests in *Graham*, and it didn't purport to overrule any cases, so this court remains bound by *Greenholtz* and *Swarthout*, even if they are in tension with *Graham*. *See U.S. v. Blagojevich*, 612 F.3d 558, 562 (7th Cir. 2010) ("[T]he Supreme Court often reminds other judges that they must follow all of its decisions, even those that seem incompatible with more recent ones, until the Justices themselves deliver the coup de grâce."). Plaintiffs say that *Greenholtz* and *Swarthout* don't supply the relevant rule because they didn't involve juvenile offenders, but the rule articulated in those cases didn't create an exception for juveniles. And this court doesn't have the authority to create one.

Third, even if *Graham* did create a liberty interest for juvenile offenders, it wouldn't follow that plaintiffs would be entitled to the long list of procedural protections that they have identified. In cases in which the Court has concluded that a prisoner has a liberty interest in parole based on state law, due process required "an opportunity to be heard and ... a statement of the reasons why parole was denied." *Swarthout*, 562 U.S. at 220, 131 S.Ct. 859. Wisconsin already provides that, and plaintiffs don't contend otherwise. Plaintiffs' only basis for distinguishing those cases is again that they didn't involve juvenile offenders. But even under plaintiffs' theory of the case, plaintiffs' status as juvenile offenders is what gives them a liberty interest. It is not a basis for turning parole hearings into trials. Plaintiffs don't persuasively explain why their liberty interest in parole would be or should be more expansive than other **\*1004** group of prisoners who have a liberty interest in parole.

For all of these reasons, defendants are entitled to summary judgment on plaintiffs' due process claim.

**D. Right to jury trial**

Plaintiffs' last claim is their most novel as well their farthest reaching because it would apply to all parole decisions and not just parole decisions related to juvenile offenders. The claim arises under the Sixth Amendment, which states that "[i]n all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury."

Understanding plaintiffs' theory under the Sixth Amendment requires some unpacking. The theory rests on a line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The defendant in that case was convicted of a gun crime that carried a maximum prison sentence of 10 years. But the trial court gave him a longer sentence under a statute that applied a sentencing enhancement if the court found that the defendant committed the crime with racial bias. The Supreme Court held that the enhancement violated the Sixth Amendment right to a jury trial, under which "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" or admitted by the defendant. *Id.* at 490, 120 S.Ct. 2348.

*Apprendi* was about statutory maximums, but the Court has also applied it to increases in a statutory minimum. *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), involved a federal statute that imposed a five-year minimum sentence for using a firearm when committing a crime of violence and a seven-year minimum if the defendant brandished the firearm. The jury found that the defendant used a firearm, but the verdict form didn't ask about brandishing. *Id.* at 104, 133 S.Ct. 2151. Instead, the district court found that the defendant had brandished the weapon and relied on that fact to sentence the defendant to seven years. *Id.* That violated the Sixth Amendment, the Court held, because *Apprendi* applies to any "increase [in] the prescribed range of penalties," so it "applies with equal force to facts increasing the mandatory minimum." *Alleyne*, 570 U.S. at 111–12, 133 S.Ct. 2151.

Plaintiffs contend that *Alleyne* applies to parole decisions and that defendants are violating plaintiffs' Sixth Amendment by denying parole based on the seriousness of their offense. Plaintiffs rely on the following premises: (1) plaintiffs' parole eligibility date is their mandatory minimum sentence; (2) the commission is denying parole based on facts about the seriousness of a class member's offense that weren't found by a jury; (3) by denying parole for this reason, the commission is increasing the class member's mandatory minimum.

Plaintiffs' argument fails at their first premise. Plaintiffs cite no authority for the view that a parole eligibility date qualifies as a mandatory minimum sentence under *Alleyne* or that a parole decision has any bearing on an offender's Sixth Amendment right to a jury. The mandatory minimum at issue in *Alleyne* was the term of imprisonment established by statute *before* sentencing. By contrast, plaintiffs' parole eligibility date is determined as a *consequence* of sentencing. Plaintiffs are comparing apples and oranges. When the commission makes a parole decision, it isn't changing the punishment prescribed by statute, it is only determining how much of the sentence prescribed by the sentencing court the prisoner must serve in prison. At the point a prisoner is being considered for parole, a "mandatory minimum," **\*1005** as that term was used in *Alleyne*, has no meaning.

This view is confirmed by *United States v. Haymond*, ─── U.S. ───, 139 S. Ct. 2369, 2373, 204 L.Ed.2d 897 (2019), which summarized the *Apprendi* line of cases as standing for the proposition that "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty." In plaintiffs' case, a jury already took their liberty (or they pleaded guilty); the commission's task is to decide whether to *return* liberty to plaintiffs before the end of their sentence.

Plaintiffs rely on *Haymond* for the proposition that *Apprendi* principles apply even after an offender is sentenced because *Haymond* applied those principles to invalidate a parole revocation. But *Haymond* provides no support to plaintiffs. The district court in *Haymond* did not simply revoke the offender's parole and return him to prison to complete his sentence. Rather, the statute at issue required the court to issue a *new* sentence of no less than five years based on *new* conduct, so the situation was virtually indistinguishable from a new conviction. *Id.* at 2379–80. Both the plurality opinion and Justice Breyer's concurrence emphasized this fact, reasoning that the Sixth Amendment wouldn't apply to an ordinary revocation because "the prison sentence a judge or parole board could impose for a parole or probation violation normally could not exceed the remaining balance of the term of imprisonment already authorized by the jury's verdict." *Id.* at 2377 (plurality); *See also id.* at 2386 (Breyer, J., concurring in the judgment) ("[T]he consequences for violation of conditions of supervised release under § 3583(e), which governs most revocations, are limited by the severity of the original crime of conviction, not the conduct that results in revocation.").

**[9]** The lesson from *Haymond* is that the Sixth Amendment doesn't apply to fact finding that doesn't increase a prisoner's original sentence. A denial of parole doesn't increase a sentence; it's a decision not to shorten the portion of the sentence that

Heredia v. Blythe, 638 F.Supp.3d 984 (2022)

is served in prison. The *Haymond* plurality implicitly acknowledged this distinction when it repeated the Court's observation from previous cases that parole is an "act of grace." *Id.* at 2377.

Plaintiff also say that *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), is "indistinguishable" from this case. Dkt. 165, at 12. But *Blakely* is no more similar to this case than *Apprendi*, *Alleyne*, or *Haymond*. The defendant had pleaded guilty to second-degree kidnapping with a firearm, and state-law imposed a 53-month maximum sentence on that crime. But state law allowed the trial court to increase the sentence if it found that the defendant had acted with "deliberate cruelty," among other things. *Blakely*, 542 U.S. at 299–300, 124 S.Ct. 2531. The court made that finding and sentenced the defendant to 90 months. *Id.* at 300, 124 S.Ct. 2531. The Supreme Court invalidated the sentence, concluding that it violated thew Sixth Amendment because it exceeded the 53-month maximum. *Id.* at 303–04, 124 S.Ct. 2531.

Plaintiffs say that *Blakely* is controlling because the sentencing court's finding of "deliberate cruelty" is related to the seriousness of the offense, which is what plaintiffs are challenging in this case. But this misses the point. *Blakely* wasn't about the *type* of facts found by the court. All that mattered was that the court had increased the defendant's maximum sentence authorized by the conviction: "Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*) ... or any aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence." *1006 *Blakely*, 542 U.S. at 305, 124 S.Ct. 2531. Nothing defendants did in this case exceeded what was authorized by the jury verdict (or plea agreement), so the Sixth Amendment doesn't apply.

The court will grant defendants' motion for summary judgment on plaintiffs' Sixth Amendment claim.

CONCLUSION

The basic proposition underlying plaintiffs' claims is difficult to argue with: prisoners should be released on parole once they become rehabilitated, and corrections officials should try to help prisoners reach that goal however they can. But there is often significant daylight between what qualifies as good policy and what the Constitution requires. In this case, plaintiffs' proposals for reform can't be squared with any understanding of the Constitution adopted by the Supreme Court, past or present. If plaintiffs are to obtain relief, it will have to come from the political branches of government, which can make improvements based on policy considerations. But this court does not have the authority to displace Wisconsin's system of parole in the manner that plaintiffs suggest, regardless of the merits of the system they envision. Under current law, defendants are entitled to summary judgment on all of plaintiffs' claims.

ORDER

IT IS ORDERED that:

1. The claims of Victor Heredia, Barney Guarnero, Brian Pheil, and Deng Yang are DISMISSED as moot.

2. Plaintiffs' motion for summary judgment, Dkt. 126, is DENIED, and defendants' motion for summary judgment, Dkt. 120, is GRANTED.

3. The clerk of court is directed to enter judgment in defendants' favor and close this case.

**All Citations**

638 F.Supp.3d 984

Footnotes

1    The court has substituted the current chairperson of the commission in accordance with Federal Rule of Civil Procedure 25.

2    The court made a preliminary determination in the order screening plaintiffs' complaint that plaintiffs may bring their claims under
     42 U.S.C. § 1983 rather than in a habeas petition because plaintiffs are seeking a change in parole procedures rather a release from

Ex. 45-158

prison. Dkt. 3, at 2 (citing *Wilkinson v. Dotson*, 544 U.S. 74, 76, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005)). Defendants don't challenge that determination now, so they have forfeited that issue. *See Polzin v. Gage*, 636 F.3d 834, 838 (7th Cir. 2011) (question whether action was properly filed under § 1983 rather than as a habeas petition can be waived).

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Date: April 30, 2024

From: Terrance Prude #335878          Signature: [signature]
Wisconsin Secure Program Facility
P.O. Box 1000
Boscobel, WI 53805

To: Milwaukee County Courthouse
Clerk of Court:
c/o Appellate Section of Criminal Division
821 West State Street, Room 117, Safety Building
Milwaukee, WI 53233

Re: State of Wisconsin v. Terrance D. Prude,
Case# 1999-CF-5988

Dear Clerk,

Enclosed please my pro se postconviction motion pursuant to
Wis. Stat. 974.06(4) to be filed upon the court. The motion
complies with the Local Rule 4.17 at B. 20 page limit. Also, I
complied with the Local Rule 4.17 at C. by serving a copy
of the attached motion upon the State by using certified
mail services (mailing receipts attached as proof). Thank you.