① ①

## Eastern District Court

Petitioner: Terrance Prude,

-vs-

Case #24-CV-1039

Respondent: Gary Boughton.

### Petitioner Terrance Prude's Actual Innocence And Cause & Prejudice Excuses The Procedural Defaults

This case is back in front of this Court from the Wisconsin state court after this Court issued a "stay" on these federal proceedings "while petitioner exhausts his claims in state court." See DKt. #32, Page 3. The state of Wisconsin's actions did prohibit me from exhausting such remedies.

### Standard Of Review For Excusing Claims That Procedurally Defaulted

(1) Before a prisoner can file a 28 U.S.C. 2254 Habeas Corpus he must comply with the procedures that governs under 2254(b)(1), 2254(b)(1)(A), and 2254(d)(1). However, a person can be excused from following these rules.

(2) In order to have a procedural default excused, a petitioner must demonstrate either of two things: (1) Cause for the default, and actual prejudice as a result of the alleged violation of federal law; or (2) Demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice, i.e. the miscarriage of justice exception 'applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted. See Wilson v. Cromwell, 69 F. 4th 410, 421 (7th Cir. 2023). To meet the "actually innocent" standard, a petitioner must demonstrate, based on new reliable evidence, that in light of new evidence it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. See Blackman v. Williams, 823 F.3d 1088, 1099 (7th Cir. 2016). "New evidence", in this context, does not mean "newly discovered evidence"; it just means "evidence that was not presented at trial". See Jones v. Calloway, 842 F.3d 454, 461 (7th Cir. 2016). A petitioner satisfies the gateway standard if his new evidence raise "sufficient doubt about [his] guilt to undermine confidence in the result of the trial, without the assurance that the trial was

... "constitutional error." Id. at 461. In

③ ③

the context of a guilty plea, the petitioner "still has to prove his innocence of the charge to which he pleaded guilty — namely, the crime of conviction." See <u>Taylor v. Powell</u>, 7 F.4th 920, 933(10th Cir. 2021). In cases where the Government has foregone more serious charges in the course of plea bargaining, a petitioner's showing of actual innocence must also extend to those charges. <u>Id.</u> Also see <u>Cobbs v. United States</u>, 141 F.4th 872, 879-80(7th Cir. 2025)(same).

### Petitioner Prude Admits To Procedurally Defaulting On Habeas Corpus Claims

(3) To avoid procedural default, a habeas petitioner must "fairly present" a claim to "each level" of the "state courts." See <u>McDowell v. Lemke</u>, 737 F.3d 476, 482(7th Cir. 2013). I filed my motion to the Milwaukee County Circuit Court on <u>3-2-2026</u> and the motion was decided on <u>3-9-2026</u> (See <u>Exhibit # 2</u> attached). I did not file an appeal through the Wisconsin Court of Appeals or the Wisconsin Supreme Court due to an "external impediment" preventing me from exhausting the appellate process in a timely manner. See

Case 2:24-cv-01039-LA   Document 36   Filed 07/08/26   Page 3 of 35

④ ④

<u>Promotor v. Pollard, 628 F.3d 878, 887 (7th Cir. 2010)</u> ("external impediment" is "cause" to excuse "procedural default").

(3A) For instance, the Milwaukee County trial court denied my postconviction motion (that I filed pursuant to <u>Wis. Stat. 974.06</u>) on 3-9-2026. However, the clerk of court failed to mail me a copy of the order. To this day, I still do not have a copy of the court's 3-9-2026 decision. I only know that a decision was made due to a friend sending me a screenshot of the 3-9-2026 order from the Wisconsin Website CCAP. See Exhibit #2. Under <u>Wis. Stat. 808.04(1)</u>, I had 90 days from 3-9-2026 to file a notice of appeal with the Wisconsin Court of Appeals. Failure to comply is a jurisdictional defect. See <u>Wis. Stat. 809.10(1)(e)</u>; <u>Green v. City of Waukesha, 2025 WL 3229259, at 1-2 (Wis. Ct. App. Nov. 19, 2025)</u>. It would have been futile to file a notice of appeal any time after 6-8-2026 to challenge the trial courts decision dated 3-9-2026 in the face of this objective external impediment. Meaning, the Wisconsin Court of Appeals lack jurisdiction to

hear the merits of the appeal. See e.g. State v. Baskerville, 2019 WL 13186773, at *1 n. 1 (Wis. Ct. App. Aug. 8, 2019).

(3B) Wis. Stat. 808.04(1) and Wis. Stat. 809.10(1)(e) does not permit a party who files a untimely notice of appeal to be excused when the party did not receive notice of the decision within the jurisdictional time limits. Compare Wis. Stat. 808.04(1) and 809.10(1)(e) to Federal Rules of Appellate Procedure Rule 4(a)(6)(A).

(3C) Due to the trial state court's failure to provide me with notice of its 3-9-2026 decision to this very date, this external impediment provides cause to excuse the procedural default that I played no part in.

(3D) It's also important to note that I did mail the Milwaukee County Clerk of Court a letter dated March 18, 2026 requesting that when a decision is made that I be mailed a copy of the order. See Exhibit #3. I also mailed the clerk a second letter dated 5-16-2026.

See Exhibit #4. These two letters that I mailed to the Milwaukee County Clerk of Court was triggered by the fact that the Milwaukee County Clerk has a habit of failing to mail pro se litigant defendants a copy of a judge's decision. See DKt. #12-3, Page 2 of this case. Despite these two letters that I mailed to the Clerk's ▲ office in Milwaukee County, I did not receive a response. I automatically assumed that due to these two letters the clerk would mail me a copy of the order when a decision is made. This expectation that I had of what the Clerk's office would reasonably do did not materialize, and to this day it still hasn't.

(3E) If it wasn't for a friend sending me a screenshot of the trial courts CCAP website record (see Exhibit #2 attached which only summarizes that the ████ judge "signed and filed" on "03-09-2026" a "Decision and Order Denying Motion To Challenge Sentence and Motion to Take Judicial Notice") I would have never known that a decision was rendered over 90 days ago.

(3F) This "external impediment" wholly blocked me from complying with filing a timely "notice of appeal" under s.808.04(1) and s.809.10(1)(e). I was "prejudiced" by this "external impediment" because it entirely stops me from complying with 28 U.S.C. 2254(b)(1)(A) exhaustion requirement.

(3G) FRAP Rule 4(a)(6)(A) acknowledges that when a "party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed", that it impedes the parties ability file a timely appeal and warrants an excuse to "reopen the time to file an appeal". Rule 4(a)(6). Although this rule governs federal cases, and not state cases, it clearly recognizes that a party may show a external impediment by showing he "did not receive notice[..] of the entry of the judgment or order sought to be appealed". This external impediment is not "cause" under Wisconsin laws. See Willingham v. Beanen, 2018 WL 1046869, at 6 (E.D. Wis. Jan. 30, 2018). But,

⑧ ⑧

this external impediment must, for the purpose of <u>28 U.S.C. 2254(b)(1)(B)(ii)</u>, qualify as "cause" to excuse procedural default. Had the Milwaukee County Clerk mailed me a copy of the trial court's <u>3-9-2026</u> order the same day the decision was made (or even later in the same month), I would have filed a notice of appeal <u>within</u> 90-days from the <u>3-9-2026</u> decision. I was "prejudiced" by the clerk's failure to mail me a notice of ~~entry~~ the order. I played no role in the court's failure to provide me a copy of its <u>3-9-2026</u> decision in a timely manner. Thus, I've established a "reasonable probability of a different result". <u>Garcia v. Cromwell, 28 F. 4th 764, 775 (7th Cir. 2022)</u>.

(3.H) Not providing me the information (i.e., notice that the judge issued a ruling on <u>3-9-26</u>, a failure attributed to the county clerk) is the functional equivalent of the state withholding Brady evidence. See e.g. <u>Crivens v. Roth, 172 F.3d 991, 995 (7th Cir. 1999)</u>. Thus, this excuses any procedural default in this case.

## Prude Is Actually Innocent Of The Charges That Form The Basis Of His Convictions Within The Guilty Plea

(4) I pled guilty to five counts of armed robbery, Wis. Stat. 943.32(2); while another count of armed robbery and false imprisonment (Wis. Stat. 940.30) and endangering safety by use of dangerous weapon (Wis. Stat. 941.20(1)(a)) was dismissed.[1] I am actually innocent of the five (5) counts of armed robbery that I pled guilty to.

## The New Evidence That Was Not Presented To The Trial Court That Support Prude's Actual Innocence

(5) I have a "complete defense" against the armed robbery convictions pursuant to Wis. Stat. 939.46(1m), which states: "A victim of a violation

[1] The state dismissed these 2 counts because it did not "think the State would be in a position to prove that count and count eight...beyond a reasonable doubt." See Jury Trial Transcript, page 3 of 4.

of s. 940.302(2) or 948.051 has an affirmative defense for any offense committed as a direct result of the violation of s. 940.302(2) or 948.051 without regard to whether anyone was prosecuted or convicted for the violation of s. 940.302(2) or 948.051." Also, s. 939.46(1) states: "A threat by a person other than the actor's coconspirator, which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the act or another and which causes him or her so to act is a defense to a prosecution for any crime based on that act[.]"[a]

The Wisconsin Supreme Court has emphasized that s. 939.46(1m) is a complete defense to a charge. See State v. Kizer, 403 Wis. 2d 142, 161-164, 976 N.W. 2d 956 (Wis. S. Ct. 2022). Also, see State v. Stetzer, 417 Wis. 2d 373, 388 n.11, 22 N.W. 3d 893 (Wis. S. Ct. 2025) (acknowledging that a defense that is "complete" is what "absolves the defendant of all criminal liability").

---

[a] See, e.g., State v. Dunlap, 224 Wis. 2d 935, 592 N.W. 2d 318, 1999 WL 86725, at *3 (Wis. Ct. App. 1999) ("Coercion is an exonerating factor for lesser crimes, 939.46(1) STATS.")

(6) From ages 14-17, leading through the offenses of my guilty plea convictions, I was a victim of human trafficking under Wis. Stat. 940.302(2)(a) 1.a. 2.a.c.d.h.j.K.L., (b)-(c). I was coerced by adult men to commit armed robberies and I was trafficked for the purpose of committing the crimes I pled guilty to.

## The Wisconsin Supreme Court Requires A Defendant To Offer "Some Evidence" To Support Coercion Defense

(7) In order for a defendant to assert a coercion defense, under s. 939.46(1m), the Wisconsin Supreme Court requires a defendant to present "some evidence" that the defense applies[3]. See State v. Kizer, 403 Wis. 2d 142, 99, 976 N.W. 2d 956 (Wis. S. Ct. 2022). After the "some evidence" has been established, the State carries the burden of proving that the affirmative complete defense of coercion does not apply, beyond a reasonable doubt. State v. Kizer, Id. at 99.

---

[3] My trial testimony would have been consistent with (DKT #5, Exhibit #8) to support my defense.

## "Some Evidence"

(8) In 1997, I was 14 years of age when I was introduced to a group of older men name "Flint", "Kane", "Marco", "Murder-Man", and "Mack". These five men were at least 25-39 years of age. I was introduced by my uncle, Kevin Prude. See Affidavit of Terrance Prude. at DKt.#21-1 at Exhibit #8, paragraph ("par") 1.

(9) These men (along with my uncle Kevin) ran a "crew" of teenagers who aged from 13-17 years old. Each of the five men had 15 to 20 teenagers they controlled that would go out and make money by way of crime. These men would use threats to beat or kill us teenagers if we didn't "break even" every Friday. See DKt.#21-1, Exhibit #8 at par 2.

(10) "Break Even" was one of the laws we had to obey. Each teenager must turn in $5,000 every Friday in order to "break even". This was a weekly tax that we owed for being apart of the "crew" and when we didn't pay the "break even" tax we would be physically beatened by the adult men (including my uncle Kevin). See DKt.#21-1, Exhibit #8 at par 3.

(13)

(13)

(11) <u>The male teenagers</u>: The male teens were ordered to bring money in by: (1) selling drugs; or (2) armed robbery; or (3) stealing cars and selling the parts off the car to local mechanic shops; or (4) doing all of the above. I was delegated the "job" of par 2 and 3 herein. See <u>Dkt.#21-1, Exhibit #8 at par 4.</u>

(12) <u>The female teenagers</u>: The female teens were ordered to bring money in by: (1) selling drugs; or (2) armed robbery; or (3) stealing cars and selling the parts off the car to local mechanic shops; or (4) prostitution; or (5) working at strip clubs with fake I.D.'s; or (6) doing all of the above. See <u>Dkt.#21-1, Exhibit# 8 at par 5.</u>

(13) If any of us didn't "break even", whatever the owed balance was would carry over to the next week. For an example, if I only brought in $2,000 that Friday, I would have to bring in $8,000 that next Friday. <u>Dkt.#21-1, Exhibit#8 at par 6.</u>

(14) The back-fees-owed were called "L.C. fees" which "L.C." meant "Last Chance". We could be severely beaten or have a finger or toe chopped off. Thus, under the L.C. fees we would work hard

regular $5,000 fee remained outstanding. In effect, the inability to be on time in paying the "break even" and "last chance" is what made us forever in debt[4] to the "Crew". In this way, they "owned" us. See DKt.#21-1, Exhibit#8 at par 7.

(15) Because of this, I caught an auto theft (i.e. stolen car charge) conviction in 1997 and did 2 years in a juvenile prison called Ethan Allen School for Boys. I had just turned 15 years of age on April 29th. I caught these convictions in July of 1997. See DKt.#21-1, Exhibit#8 at par 8.

(16) While in juvenile prison, my uncle visited me and told me I owed the "Crew" about $25,000 and that I'd have to repay it when I'm released. See DKt.#21-1, Exhibit#8 at par 9.

(17) In 1999, I was released during the month of February. I was visited (at the group home I was released to) by the "Crew"[5] and told that I

---

[4] This debt constitutes as "Debt bondage". See Wis. Stat. 940.302(2)(a)2.h..

[5] By the way: "C.R.E.W." means "Cash Rules Every World". See DKt.#21-1, Exhibit#8 at

needed to escape from the group home and come live at their "spot" to get to work on my "outstanding debt". I agreed to awol but I got revoked from probation and sent back to Ethan Allen prison for stealing a cell phone from a group home staff member. See DKt. #21-1, Exhibit #8 at par 10.

(18) From April 13, 1999 to August 5, 1999 I remained at Ethan Allen. I discharged from Ethan Allen on August 5, 1999 and I was actually picked up by my uncle, Murder-Man and Kane. From the day I was released I was threatened to reimburse these fees and told that I would be endangering [my life and] my family lives if I went back to prison without repaying the debt. I was introduced to other teen males whose "job" was solely armed robbery activity. The "Crew" would gather up 10 to 15 of us teens and designate to us certain vicinities in Milwaukee to rob. My designated area was from 60th & Keefe down to 40th & Keefe and from 40th & Keefe over to 40th & North Avenue and from 40th & North Avenue up to 60th & North Avenue and from 60th & North Avenue over to 60th & Keefe. Me and 10 to 15 other teens worked these area's[6] during the month of November

---

[6] The "Crew" called it the "60/40 zone"

(16)

(16)

of 1999. See DKt. #21-1, Exhibit #8 at par 11.

(19) Every month the "Crew" would pick us up and take us to different designated area's within Milwaukee Wisconsin in a big 3 row-seated van.[7] See DKt. #21-1, Exhibit #8 at par 12.

(20) I managed to get a reduced "break even" fee and a reduced "L.C." fee weekly to $2,000 a week and my uncle managed to get the "Crew" to stop the weekly tax from stacking up until I became caught up on the outstanding debt I owed. So weekly my debt would go down, not up. This left me only owing $60,000 approximately. I owed this amount when I was arrested 11-20-1999. See DKt. #21-1, Exhibit #8 at par 13.

(21) Each robbery I was allowed to keep $200.00[8] for myself with which I used to buy marajuana[9] and food. Each robbery team consisted of at least 2 "reporters" who would report the amount of every

---

[7] See. Wis. Stat. 940.302(2)(a)1.a.2.a.c.d.j.k.L., of the Human Trafficking statute.

[8] At times, I chose to use the $200.00 towards the debt I owed the "Crew".

[9]

(17)

robbery, and they were paid $1,000 a week by the "Crew" as an incentive to accurately report. Sometimes these "reporters" would lie and say some of the younger teens under-reported the proceeds from a robbery, because they would only be paid if they reported misconduct of under-reporting. This caused alot of conflicts amongst the robbery teams because false-reporting allowed the "reporters" to under-report what amounts they were bringing in by the same $1,000 that their false-reports sliced off. My friend Anthony Seaberry was killed in year 1998 due to a "reporters" false-report. See Dkt.#21-1, Exhibit#8 at par 14.

(22) I've witnessed teenagers (i.e. boys and girls) be beatened and shot in the hand or foot for failing to pay fees.[10] I was stabbed by another teen in my neck and back for not turning in any fees on the "pay day" (i.e. Friday). This took place in 1997 at the direction of the "Crew". I was hospitalized for 2-days for this and the wounds are still visible today. See Dkt.#21-1, Exhibit#8 at par 15.

---

[10] These beatings and gun shot injuries was done in front of me and the other teenagers as a "scheme, pattern, or other means to directly or indirectly coerce, threaten, or

(23) The "some evidence" standard is a very low bar. The Wisconsin Supreme Court has said that the "some evidence" standard is met "even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility." State v. Johnson, 397 Wis. 2d 633, ¶17, 961 N.W. 2d 18, 24 (Wis. S.Ct. 2021)[11] (internal quotation marks omitted). Furthermore, a court "must not weigh the evidence; rather, the evidence must be viewed in the light most favorable to the defendant. The instruction should be given based on this low modicum of evidence unless the evidence is rebutted by the prosecution to the extent that no rational jury could entertain a reasonable doubt." Id. (internal citations and quotation marks omitted). As a human trafficking victim-survivor,[12] the testimony-evidence I've presented herein is "some evidence".

## More Likely Than Not

(24) Based on the new evidence now presented, it is more likely than not that no reasonable jury

[11] 2021 WI 61.

[12] See Wisconsin's Ideal Affirmative Defense Standard [...] 2025 WI L R 813, 869-78.

would find me guilty beyond a reasonable doubt, which is the standard for overcoming a procedural default by showing "actual innocence" as a gateway to a merits review. <u>Wilson v. Cromwell,</u> 69 F. 4th at <u>421 (7th Cir. 2023).</u>

## The Seventh Circuit Court Of Appeals Has Held That A Affirmative Defense Can Prove A Defendant To Be Actually Innocent Of The Criminal Conduct

(25) A petitioner, in order to excuse a procedural default, must "show that he was "actually" and not merely "legally" innocent of the criminal charges against him." See <u>Britz v. Cowan,</u> 192 F.3d 1101, 1103 (7th Cir. 1999). In <u>Britz,</u> the court rejected the states argument where the state took the position that in order to prove "actual innocence" "Britz must show that he didn't kill his victim, and it is conceded that he did." <u>Id.</u> at 1103. The court rejected the states argument as being "too narrow a view". <u>Id.</u> The court explained how and why an affirmative defense can make a

court ruled: "One can kill yet be innocent of murder. Suppose Britz were the public executioner, prosecuted for the "murder" of a capital defendant whom Britz had lawfully executed; he would be actually innocence even though he had, as it were, pulled the trigger. It is the same, we think, when the accused murderer has an affirmative defense of insanity. If acquitted on grounds of insanity, he is actually innocent." Id. 1103.[13] Also see Froust v. Schaub, 2015 WL 8161384, at *2 (E.D. Wis., December 7, 2015)(When a person is "acquitted on grounds of insanity, he is actually innocent.")[14]

(26) The same is true for the complete defense of "coercion" under s. 939.46(1m). When a person is "acquitted on grounds of [coercion], he is actually innocent." Britz v. Cowan, Id. at 1103. My uncle Kevin Prude, who is the main person who was trafficking me, also testifies that he coerced me as a teenager through threats and physical violence to compel me to commit armed robberies. See Kevin Prude's Declaration.[14A]

---

[13] Internal citations omitted.
[14] Citing Britz v. Cowan, 192 F.3d 1101, 1103 (7th Cir. 1999).
[14A]

## Armed Robbery Was "Committed As A Direct Result" Of Human Trafficking Violators Coercion

(27) In order for the complete defense of coercion to apply, I must show that I'm a "victim of a violation" of the human-trafficking statute 939.46(1m).[15] My "new evidence" provides "some evidence" that I was a victim of s. 940.302(2). See above at par 8-23.

(28) Additionally, I must show that armed robbery was "committed as a direct result of the violation of the trafficking statutes". State v. Kizer, Id. at ¶19. My "new evidence" provides "some evidence" that the armed robbery offenses was the "direct result" of the underlying human trafficking offense.[16] Id. See above at par 11, 17-19, 21-22. The human trafficking that I'm a victim of was solely for the purpose of transporting teenagers to certain locations within Milwaukee to committed armed robberies. See Dkt. #21-1, Exhibit #8,

[15] See State v. Kizer, 403 Wis. 2d 142, ¶19 (Wis. S.Ct. 2022).

[16] Also, see Declaration By Kevin Prude attached marked

(22)

(22)

at par 11, 18-22.

(29) Had I not been a victim of human trafficking, under s. 940.302(2), I would not have had the audacity to commit any of the armed robberies that I've been convicted of. Being coerced by threats of physical violence (see Dkt. #21-1, Exhibit #8 at par 2-3, 7, 11-12) and actually being stabbed[17] as a result of my choice to attempt to walk away from being trafficked is what put me with two options as a teenager, which were: (1) go out and commit armed robberies as I'm forced to do, or (2) refuse to be trafficked and be killed or suffer bodily harm. I chose to stay alive and avoid any further physical harm, i.e. I complied with the human traffickers[18] threats. Based on my complete defense that I was coerced into committing armed robbery offense, a jury more likely than not would have acquitted me of my current armed robbery convictions on grounds of coercion, making me actually innocence. This absolves me of all criminal liability.

---

[17] See Dkt. #21-1, Exhibit #8 at par 15.
[18] The Human Trafficking law of Wisconsin does not require anyone to be "prosecuted or convicted" in order

(23)

## Kevin Prude's Testimony

(30) Most relevant to my complete defense under s.939.46(1m) is the fact my uncle Kevin Prude's declaration provides evidence in direct support of my complete defense when he testified to the following: (1) He was the leader of a human trafficking organization called "The C.R.E.W.". See Kevin Prude's Declaration ("Decl." hereafter) at par 1; (2) He trafficked young kids from ages 10-17 for the purpose of facilitating illegal activities. See Decl. at par 2; (3) He recruited me into the C.R.E.W. and that I was ordered to commit armed robberies and that refusing to follow orders could result in physical beatings or murder. See Decl. at par 3; (4) I was stabbed in year 1997 due to owing a large amount of money in the five figure range. See Decl. at par 4; (5) I tried to have my debt cancelled but he refused, telling me to "get out there with your designated robbery crew and bring in what you owe". Then, he stated that "next time the violation will be worse than being stabbed." See Decl. at par 5; (6) I became a slave to the C.R.E.W. due to my outstanding debt. See Decl. at par 6; (7) All the funds collected by all branches of the Young Boys Incorporated ("YBI")

(24)

to the supreme leader Milton (Butch) Jones[19] in Detroit Michigan. See Decl. at par 7; (8) In year 2000 he quit his position in the YBI because he was nearly killed after being beatened with bats by teenagers at the direction of another branch leader. He suffered brain injury that left him unable to walk and he suffer from seizures due to the brain injury. See Decl. at par 8; (9) I was forced into human trafficking[20] when I was age 14 in year 1997 because as a teen I was easy to groom and was more impressionable. See Decl. at par 9; (10) Each time I requested to be freed from the debt-bondage it was denied and he reinforced the threat of physical violence if I didn't turn in $5,000 weekly. See Decl. at par 10; and (11) He used "debt" as a form of "bondage" and any refusal to pay resulted in physical beatings and even death. See Decl. at par 11.

(31) The evidence to support my affirmative defense of being actually innocent is strong and a reasonable jury, more likely than not, would acquit me of all the

---

[19] See United States v. Jones, 2022 WL 1487740, at *1 - *2 (E.D. Michigan: May 11, 2022). Also, see Y.B.I. (Young Boys, Incorporated) The Autobiography of Butch Jones.

[20] See ... 2022 WL ... (... 2022)

armed robbery charges based on the affirmative defense of s.939.46(1m).[21]

(32) Based on my affidavit (Dkt.#21-1, Exhibit# 8) and Kevin Prude's[22] declaration the court should find "that the evidence, which was never presented to the trier of fact, is strong enough to establish [my] innocence for the purpose of overcoming the procedural default and reaching the merits of [my] constitutional claims." See Bivens v. Briley, 2004 WL 1718437, at *4 (N.D. Ill. July 29, 2004).

(33) Human trafficking victim's in Wisconsin are only victim's, not criminals. Wisconsin has "an affirmative defense that excuses any crime that directly resulted from being trafficked. Thus, under Wisconsin law, a victim is only a victim. An affirmative defense, once raised by evidence, becomes an element that a prosecutor must disprove beyond a reasonable doubt. Practically, an

---

[21] A "coercion [defense] is to be treated the same as the other statutory defenses." See Moes v. State, 91 Wis. 2d 756, 765, 284 N.W. 2d 66 (Wis. S. Ct. 1979).

[22] Teens are especially prone to the influences of human trafficking when the trafficker is a family member. See

affirmative defense prevents prosecutors from initiating cases against known trafficking victims because they are unable to prove the absence of the affirmative defense." See Reaching Safe Harbor: A Path For Sex-Trafficking Victims In Wisconsin, 2013 Wis. L. Rev. 1489, 1507-08 (2013).

(34) With the public understanding of how victims of human trafficking are enslaved, coerced and manipulated and are without power to refused being a human trafficking victim, reasonable minded juries (and jurists) would (more likely than not) acquit me of the armed robbery charges. Also, important to this case is the fact that under s. 948.01(1) I was a "child" victim but, due to trial attorney Russell Bohach telling me to not reveal those details of being human trafficked by my uncle, I never presented any of these details.[23] See Dkt.#21-1, Exhibit #8 at par 16-21. As a result, I was prosecuted as a 17 year old "adult" under s. 938.02(1)(10m). My uncle Kevin Prude's testimony, which buttresses my own testimony, has

---

Victims In Wisconsin, 2013 Wis. L. Rev. 1489, 1494 n.31 (2013).

[23] Because this was never introduced to any court prior to it being introduced to this court, it qualifies as

relevant evidence[24] that is drenched in probative force in support of my assertion of being actually innocent.

(35) Had I been a 17 year old sex-trafficking-victim I would not have been charged with prostitution (s. 944.30(1m)(a)-(e)) and would have, instead, been viewed as a 17 year old "child" and a victim of sex trafficking. See State v. Conley, 2021 WI App. 36, at ¶21-23, 960 N.W. 2d 628, 2021 WL 1375909, at 5 (Ct. App. Wis., April 3, 2021). I would not have been charged for armed robbery (or the dismissed charges) due to my affirmative defense. See, e.g., Anthony v. Louisiana, 143 S. Ct. 29, 30-31 (2022) ("Asked again why Lee or C.W. were not charged after they had been arrested, ADA Block testified, again over objection, to the legal conclusion that "[Lee] has an affirmative defense to the charges of prostitution... insofar as she was a victim of human trafficking as a result of his actions, [Kevin Prude's] actions..")(internal quote-

---

[24] Kevin Prude, unfortunately, passed away in year 2024. But, his declaration is still admissible under Schlup v. Delo, 513 U.S. 298, 328 (1995)(ruling that when a habeas corpus court reviews an actual innocence claim it

"..." & "... exculpatory evidence.)

marks in original). My affirmative defense[25] pursuant to s.939.46(1m) would have more likely than not resulted in one of two outcomes: (1) I would not have been charged; or (2) If I would have been charged I more likely than not would have been acquitted of all charges.

(36) As such, Kevin Prude's testimony supports my actual innocence. Therefore, this court should declare that I've met the criteria to overcome whatever procedural default the respondent invokes. Remember, the affirmative defense of s.939.46(1m) applies "without regard to whether anyone was prosecuted or convicted for the violation of s.940.302(2) or 948.051." See s.939.46(1m). Thus, Kevin Prude's admissions of guilt is not required in order for the affirmative defense of s.939.46(1m) to apply. My own testimony (Dkt.#21-1, Exhibit#8); independently, would have satisfied the

---

[25] Although the record is silent as to my "coercion defense" (pursuant to s.939.46(1m)), my attorney Russell Bohach did ramble off one of my affirmative defenses: Intoxication pursuant s.939.42. See Motion Hearing Transcript, Page 17 Line 1-17. See Prude v. Pollard, Case #11-CV-1005 (E.D. Wis.) at Dkt#

"some evidence"[26] criteria. See Footnote 33 at Page 30.

(37) There exist no evidence in the record that would question, or be inconsistent with, my affirmative defense. I entirely inculpated myself on counts #1-#6 of the criminal complaint, and I sought to assert the affirmative defense of s. 939.46(1m) but, my trial counsel counseled against revealing such details. See DKt. #21-1, Exhibit #8 at par 16.

(38) A jury hearing Kevin Prude's confessions of how he trafficked me from age 14-17 through methods of coercion, i.e. physical beatings, serious bodily injury, threats of killing me, and threats to stab me again after I was previously stabbed for refusing to engage in armed robbery crimes (See DKt. #21-1, Exhibit #8 at par 15; Kevin Prude's Decl. at par 4-5) a jury more likely than not would acquit me of all charges especially seeing I'm presumed innocent under a affirmative defense as well. See s. 939.70; also see Moes v. State, 91 Wis. 2d 756, 763-65. Also, a jury hearing Kevin Prude testify about being a

---

[26] The "some evidence" standard is so low even an ant (i.e. insect) can jump over it. See above at par 23. My testimony is objectively reasonable to show

leader of a human trafficking gang called "C.R.E.W." that only trafficked children under the age of 18 and that the gang used "debt bondage"[27] (Kevin Prude's Decl. at par 11) as one of its methods of coercion, no reasonable jury would convict me and would instead acquit me, more likely than not. Kevin Prude, had he been prosecuted, would have been found guilty of human trafficking pursuant to s. 940.302(2)(a)1.a. 2.a.c.d.h.j.k.,(b) pursuant to my testimony against Kevin Prude and his own admissions in his declaration. No one disputes that a jury would more likely than not convict Kevin Prude of human traffic based on my testimony (Dkt.#21-1, Exhibit #8) and his own admissions. As such, Kevin Prude's conviction[28] would, independently of anything else, support why and how it is more likely than not that a jury would have acquitted me of all charges with my s. 939.46(1m) defense. These facts support my assertion of actual innocence in order to overcome any procedural defaults that exist. See Anthony v. Louisiana, 143

---

[27] See s. 940.302(2)(a)2.h..

[28] See Wisconsin Jury Instruction-Criminal 1276 which outlines the burden of the state proving a human trafficking charge. State v. Mannery, 2023 WI App 32, 993 N.W. 2d 167, 146, 2023 WL 3478448 (Wi. Ct. App. May 11 2023).

S.Ct. 29, 31 (2022) (when the prosecutor was asked why the victim's were not charged with prostitution he stated that "[Lee] has an affirmative defense to the charges of prostitution... insofar as she was a victim of human trafficking as a result of his actions, Willard Anthony's actions."); also see Bivens v. Briley, 2004 WL 1718437, at 4 (N.D. Ill., July 29, 2004)("...the evidence, which was never presented to the trier of fact, is strong enough to establish [actual] innocence for the purpose of overcoming the procedural default and reaching the merits of [my] constitution claim.").

(39) Thus, I respectfully ask this court to excuse my procedural defaults because I am actually innocent[29] of all the charges I've been convicted of.

---

[29] Additionally, I request that this court review these same fact in determining a independent freestanding "actual innocence" claim seeing s. 939.46(1m) absolves me of all criminal liability due to the factual circumstances (i.e. see my Declaration at Dkt #21-1, Exhibit #8; also see Kevin Prude's Affidavit) which fueled and accelerated my armed robbery convictions. E.g. see López-Correa v. United States,

## Expert Testimony On Human Trafficking Will Show A Jury How Traffickers Systematically And Intentionally Coerce Victims By Inflicting Fear And Psychological Control

(40) Including a expert into the equation to support my complete defense of coercion, under s. 939.46(1m), would firmly show that I am in fact actually innocent of my armed robbery convictions. For example, in United States v. Dingwall, 6 F.4th 744 (7th Cir. 2021), the Seventh Circuit Court of Appeal emphasized the importance of an expert testifying on matters surrounding a different complete defense, i.e.: Duress. Specifically, however, the court adopted its legal reasoning from experts who testified about how human trafficking victims act under "coercion" due to how traffickers systematically and intentionally inflict fear, physical violence and psychological control. Dingwall, Id. 751-54. The court cited United States v. Jackson, 535 F. Supp. 3d 809 (N.D. Ind. Apr. 22, 2021) for a "good illustration" for how an expert can help a jury understand the "cycle of force, fear, and coercion that distinguishes trafficking from prostitution"

by explaining how the "trafficker may use physical abuse and psychological tactics to continue exploitation, in essence by overcoming the victim's free will." <u>Dingwall, Id.</u> 753.

(41) Similarly, Wisconsin recognizes the special importance of having an expert testify about the general "methods employed by people engaged in human trafficking or trafficking a child." See <u>State v. Hogan, 397 Wis. 2d 171, ¶2, 959 N.W. 2d 658, 660</u> (Wis. Ct. App. 2021). The court ruled that "[s]uch testimony has become prevalent in human trafficking prosecutions". <u>Id.</u> Such generality testimony applies to all victims of human trafficking because it "is helpful[...] because it enables the jury to assess the alleged victim's credibility, to understand the concepts and dynamics of exploitation and trafficking invariably foreign to the jury's experience, to decide whether the alleged victim acted voluntarily or under coercion, and to evaluate whether the alleged victim's experience was typical or implausible." See <u>Dingwall, Id.</u> at 754.[30] An expert testifying to the coercive effects of human trafficking would substantially boost the jury to

---

[30] Citing <u>United States v. Jackson, 535 F. Supp. 3d 809, 817 (N.D.I.A. 2021)</u>

understand how my coercion defense, pursuant to s.939.46(1m), absolves me of all criminal liability. It is more likely than not that a jury would find me not guilty of my criminal convictions beyond a reasonable doubt hearing my testimony in combination with hearing expert testimony of human traffickers coercive tactics.[31] This type of expert testimony (related to human trafficking and its "general features" surrounding coercion, physical abuse and threats is widely a tool traffickers use to continue their trafficking operations) is widely accepted. See, e.g., United States v. Jackson, 535 F.Supp. 3d 809, 817 (N.D. Ind. Apr. 22, 2021); also see State v. Hogan, 397 Wis. 2d 171, ¶12-16, ¶27-34. It's important to treat human trafficking victims as victims, not criminals. See Reaching Safe Harbor: A Path For Sex-Trafficking[32] Victims In Wisconsin, 2013 Wis. L. Rev.

---

[31] These coercive tactics overcame my free will.

[32] There exist no difference between a victim who has been trafficked for purposes of "sex" crimes and a victim who has been trafficked for purposes of "non-sex" crimes. The traffickers coercion tactics (i.e. cycles of violence-against the victims-and threats) does not change to any meaningful degree. E.g. see s.940.302(2)(a)1.a. L.

1489, Part II. B. 1. at 1507 (2013).

## Conclusion

(42) Respectfully, I request that this Court rule in my favor by holding that I've shown my actual innocence[33] and cause & prejudice to excuse the procedural defaults. Thank you.

Terrance Prude
*Terrance Prude*[34]
Date: 6/28/2026

---

[33] My **own testimony**, to support my actual innocence claim, is permissible even though I was aware of my testimony's substance prior to convictions. See Gomez v. Jaimet, 350 F.3d 673, 679-80 (7th Cir. 2003) (holding that Petitioner Gomez's "own testimony" meets the Schlup "new evidence" standard).

[34] This signature verifies and swears under penalty of perjury that the personal experience in this brief are true and correct and based on my own personal experience as explained at par 3-3H, 18-23, 29.